No. 19-60133

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

JOSEPH THOMAS; VERNON AYERS; MELVIN LAWSON,

Plaintiffs – Appellees

v.

PHIL BRYANT, Governor of the State of Mississippi, all in the official capacities of their own offices and in their official capacities as members of the State Board of Election Commissioners; DELBERT HOSEMANN, Secretary of State of the State of Mississippi, all in the official capacities of their own offices and in their official capacities as members of the State Board of Election Commissioners,

Defendants – Appellants

_____

On Appeal from the United States District Court for the Southern District of Mississippi;
USDC No. 3:18-cv-00441-CWR-FKB

**EMERGENCY MOTION FOR STAY OF JUDGMENT**

Michael B. Wallace (MSB #6904)
Charles E. Cowan (MSB #104478)
T. Russell Nobile (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651
mbw@wisecarter.com
cec@wisecarter.com

Tommie S. Cardin (MSB #5863)
B. Parker Berry (MSB #104251)
BUTLER SNOW LLP
1020 Highland Colony Park, Suite 1400
Ridgeland, Mississippi 39157
tommie.cardin@butlersnow.com
parker.berry@butlersnow.com

trn@wisecarter.com

*Counsel for Appellants*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an

interest in the outcome of this case.  These representations are made in order that the

Judges of this Court may evaluate possible disqualifications or recusal.

a. **Appellants and Defendants**

    i. Phil Bryant, Governor of the State of Mississippi
    ii. Delbert Hosemann, Secretary of State of the State of Mississippi

*The following attorneys have appeared on behalf of Appellants either before this Court or in the District Court:*

**Michael B. Wallace** (MSB #6904)
**Charles E. Cowan** (MSB #104478)
**T. Russell Nobile** (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651

**Tommie S. Cardin** (MSB #5863)
**B. Parker Berry** (MSB #104251)
BUTLER SNOW LLP
Suite 1400
1020 Highland Colony Park
Ridgeland, Mississippi 39157

b. **Defendant**

    iii. Jim Hood, Attorney General of the State of Mississippi

*The following attorneys have appeared on behalf of Defendant Hood either before this Court or in the District Court:*

i

**Douglas T. Miracle**
MISSISSIPPI ATTORNEY GENERAL'S OFFICE
550 High Street, Suite 1200
P.O. Box 220 (39205)
Jackson, Mississippi  39201

c. **Appellees and Plaintiffs**

    i.  Joseph Thomas
   ii.  Vernon Ayers
  iii.  Melvin Lawson

*The following attorneys have appeared on behalf of Appellees either before this Court or in the District Court:*

**Robert B. McDuff** (MSB #2532)
767 North Congress Street
Jackson, Mississippi 39202

**Beth L. Orlansky** (MSB #3938)
MISSISSIPPI CENTER FOR JUSTICE
P.O. Box 1023
Jackson, Mississippi  39205-1023

**Kristen Clarke**
**Jon Greenbaum**
**Ezra D. Rosenberg**
**Arusha Gordon**
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1401 New York Ave., NW, Suite 400
Washington, D.C. 20005

**Ellis Turnage** (MSB #8131)
TURNAGE LAW OFFICE
108 N. Pearman Ave.
Cleveland, Mississippi 38732

**Peter Kraus**
**Charles Siegel**

**Caitlyn Silhan**
WATERS KRAUS
3141 Hood Street, Suite 700
Dallas, Texas 75219

_s/Michael B. Wallace_
Attorney of Record for Appellants
DATE:       March 8, 2019

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

TABLE OF AUTHORITIES ......................................................................vi

TABLE OF EXHIBITS ...........................................................................ix

STATEMENT OF JURISDICTION..................................................................2

STATEMENT OF THE CASE.....................................................................2

   i.   Relevant procedural history................................................................2

   ii.   Statement of facts ........................................................................5

STANDARD OF REVIEW ........................................................................7

ARGUMENT .....................................................................................7

   I.   THERE IS A STRONG LIKELIHOOD DEFENDANTS
      WILL SUCCEED ON THE MERITS..........................................................7

      A.   The District Court failed to give the Legislature a reasonable
          opportunity to adopt a new districting plan. ...........................................8

      B.   The District Court's remedy is predominantly based on race. ................9

      C.   The Court erred as a matter of law by finding that the
          border of District 22 violates the results test of § 2..............................11

      D.   Relief is barred by laches. ....................................................17

      E.   The Court erred as a matter of law by failing to convene
          a three-Judge Court under § 2284(a) ....................................................18

   II.   IRREPARABLE HARM TO THE STATE OUTWEIGHS
      ANY POSSIBLE INJURY TO THE PLAINTIFFS. ...................................20

   III. A STAY PROTECTS THE INTERESTS OF THE PUBLIC.....................20

CONCLUSION ....................................................................................21

CERTIFICATE OF SERVICE ..............................................................23

CERTIFICATE OF COMPLIANCE......................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. State Bd. of Elections*, 393 U.S. 544 (1969) ..........................................19, 20

*Arizona Minority Coalition for Fair Redistricting v. Arizona Ind.
   Redistricting Comm'n*, 366 F. Supp. 2d 887 (D. Ariz. 2005) ...........................17

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ...........................................................*passim*

*Boddie v. City of Cleveland*, 297 F. Supp. 2d 901 (N.D. Miss. 2004) ....................16

*Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006) .........................................10

*Campaign for Southern Equality v. Bryant*, 773 F.3d 55 (5th Cir.
   2014) ......................................................................................................................8

*Chestnut v. Merrill*, 2019 WL 338909 (N.D. Ala. Jan. 28, 2019)...........................19

*City of Pleasant Grove v. United States*, 479 U.S. 462 (1987) ...............................10

*Duncan v. Walker*, 533 U.S. 167 (2001) .................................................................18

*Elvis Presley Enters., Inc. v. Capece*, 141 F. 3d 188 (5th Cir. 1998)................17, 18

*Fairley v. City of Hattiesburg*, 122 F. Supp. 3d 553 (S.D. Miss. 2015),
   *aff'd*, 662 Fed. Appx. 291 (5th Cir. 2016)....................................................15, 16

*Fouts v. Harris*, 88 F. Supp. 2d 1352 (S.D. Fla.1999) ...........................................17

*Growe v. Emison*, 507 U.S. 25 (1993) .....................................................................13

*Hall v. Louisiana*, 108 F. Supp. 3d 419 (M.D. La. 2015).......................................17

*Jeffers v. Beebe*, 895 F. Supp. 2d 920 (E.D. Ark. 2012) ........................................11

*Johnson v. DeGrandy*, 512 U.S. 997 (1994)................................................11, 12, 13

*Jordan v. Winter*, 604 F.Supp. 807 (N.D. Miss. 1984)...........................................10

*Kelly Investment, Inc. v. Continental Common Corp.*, 315 F.3d 494
    (5th Cir. 2002)...........................................................................7

*League of United Latin American Citizens v. Clements*, 999 F.2d 831
    (5th Cir. 1993) ....................................................................6, 14

*League of United Latin American Citizens v. Perry*, 548 U.S. 399
    (2006) ...............................................................................1, 13

*League of United Latin American Citizens v. Texas*, 113 F.3d 53
    (5th Cir. 1997)...........................................................................2

*Maxwell v. Foster*, 1999 WL 33507675 (W.D. La. Nov. 24, 1999).......................17

*McGhee v. Granville Cty.*, 860 F.2d 110 (4th Cir. 1988) ........................................10

*Miller v. Johnson*, 515 U.S. 900 (1995)............................................................1, 9, 10

*Monroe v. City of Woodville*, 881 F.2d 1327 (5th Cir. 1989) ...............................13

*N.A.A.C.P. v. Fordice*, 252 F.3d 361 (5th Cir. 2001) ........................................14, 15

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
    734 F.3d 406 (5th Cir. 2013) ...............................................7, 20

*Rangel v. Morales*, 8 F.3d 242 (5th Cir. 1993)...............................................17, 20

*Rodriguez v. Bexar County*, 385 F.3d 853 (5th Cir. 2004) ............................1, 8, 16

*Shaw v. Reno*, 501 U.S. 630 (1993) ........................................................................10

*Shelby County v. Holder*, 570 U.S. 529 (2013) ......................................................15

*Thornburg v. Gingles*, 478 U.S. 30 (1986)........................................................*passim*

*United States v. Kay*, 359 F.3d 738 (5th Cir. 2004) ..............................................19

*Upham v. Seamon*, 456 U.S. 37 (1982) ................................................................8, 9

*Veasey v. Perry*, 769 F.3d 890 (5th Cir. 2014) ......................................................20

*Watkins v. Mabus*, 771 F. Supp. 789 (S.D. Miss. 1991)........................................21

*Whitcomb v. Chavis*, <u>403 U.S. 124</u> (1971)....................................................................9

*White v. Daniel*, <u>909 F.2d 99</u> (4th Cir. 1990) .........................................................17

*Whole Woman's Health v. Lakey*, <u>769 F.3d 285</u> (5th Cir. 2014)...............................7

*Wildmon v. Berwick Universal Pictures*, <u>983 F.2d 21</u> (5th Cir. 1992).....................7

*York v. City of St. Gabriel*, <u>89 F. Supp. 3d 843</u> (M.D. La. 2015)............................17

## Statutes and Rules

<u>28 U.S.C. § 1292</u> ........................................................................................2

<u>28 U.S.C. § 1331</u> ........................................................................................2

<u>28 U.S.C. § 1343</u> ........................................................................................2

<u>28 U.S.C. § 2284</u> ...................................................................................2, 18

<u>42 U.S.C. § 1973</u> ......................................................................................19

<u>52 U.S.C. § 10301</u> ...............................................................................*passim*

<u>52 U.S.C. § 10304</u> ....................................................................................10

<u>Fed.R.App.P. 8</u> ...........................................................................................2

Miss. Code. Ann. § 23-15-299.................................................................21

## Other Authorities

S. Rep. 94-204, 94th Cong. 2d Sess. 1976, 1976 U.S.C.C.A.N. 1988 ...................19

S. Rep. 97-417, 97th Cong. 2d Sess. 1982, 1982 U.S.C.C.A.N. 177 .....................20

# TABLE OF EXHIBITS

## TRIAL COURT EXHIBITS

### <u>Plaintiffs' Exhibits</u>

1.    P-1    Plaintiffs' Expert Report of Dr. Maxwell Palmer

2.    P-3    Plaintiffs' Explanation of Precinct Boundaries

3.    P-4    Revised Expert Report of William S. Cooper (without exhibits)

4.    P-6    Map of Illustrative Plan 1 of Senate District 22

### <u>Defendants' Exhibits</u>

5.    D-10  United States Dept. of Justice Preclearance Approval Letter

6.    D-11  2012 Long Report (TRP1 Plan)

7.    D-14  Defendants' Supplemental Expert Report of Dr. Peter A. Morrison

8.    D-16  August 20, 2012, Letter from Joseph Thomas

## <u>TRIAL COURT PAPERS</u>

9.    Plaintiffs' First Amended Complaint, filed July 25, 2018 [Dkt. #9]

10.   Order Denying Motion to Convene Three-Judge Court or Dismiss, filed Feb. 5, 2019 [Dkt. #51]

11.   Order of Feb. 13, 2019 [Dkt. #60]

12.   Memorandum Opinion and Order, Feb. 16, 2019 [Dkt. #61]

13.   Defendants' Motion to Stay Order Pending Appeal, filed Feb. 19, 2019 [Dkt. #63]

14.   Plaintiffs' Motion to Extend Qualifying Deadline in Two Senate Districts, filed Feb. 25, 2019 [Dkt. #66]

15.    Order of Feb. 25, 2019 [Dkt. #68]

16.    Memorandum of Governor Phil Bryant and Secretary of State Delbert Hosemann in Opposition to Motion to Extend Qualifying Deadline in Two Senate Districts, filed Feb. 26, 2019 [Dkt. #72]

17.    Order Granting Injunctive Relief, Feb. 26, 2019 [Dkt. #74]

18.    Order Denying Stay, Feb. 26, 2019 [Dkt. #75]

19.    Final Judgment, Feb. 26, 2019 [Dkt. #76]

20.    Motion for Stay, Feb. 28, 2019 [Dkt. #80]

21.    Order of Feb. 28, 2019 [Dkt. #85]

22.    Plaintiffs' Response in Opposition to Motion to Stay, filed March 1, 2019 [Dkt. #87]

23.    Appellants' Supplemental Memorandum in Support of Motion to Stay, filed March 1, 2019 [Dkt #88]

24.    Plaintiffs' Supplemental Response in Opposition to Motion to Stay, filed March 3, 2019 [Dkt. #89]

25.    Plaintiffs' Second Supplemental Response in Opposition to Motion to Stay, filed March 4, 2019 [Dkt. #90]

26.    Order denying stay, March 6, 2019 [Dkt. #93]

27.    Excerpts from Trial Court Transcript

The District Court for the Southern District of Mississippi, the Honorable Carlton Reeves presiding, after erroneously finding a violation of § 2 of the Voting Rights Act, 52 U.S.C. § 10301, failed to give the Mississippi Senate the reasonable opportunity it had requested to adopt a new districting plan.  Without affording defendants their requested opportunity to be heard, it imposed a remedy, proposed by plaintiffs, that moved from Senate District 22 into District 23 the resident precincts of both individuals qualified to run as Republicans, leaving plaintiff Joseph Thomas, a Democrat, without Republican opposition.  Because the improper and unconstitutional plan will irreparably injure the voters and candidates in Districts 22 and 23, appellants Phil Bryant, Governor of Mississippi, and Delbert Hosemann, Secretary of State, move to stay the final judgment, Ex.19, pursuant to Fed.R.App.P. 8(a)(2).

Not only did the Court deny reasonable opportunity to enact new districts, contravening *Rodriguez v. Bexar County*, 385 F.3d 853, 870 (5th Cir. 2004), it imposed a plan, Ex.4, about which nothing was known but the race of the residents, violating *Miller v. Johnson*, 515 U.S. 900 (1995).  The Court erred in finding that District 22, with a black voting age population ("BVAP") majority of 50.77%, violated the results test of §2, contravening *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009), and *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 430 (2006).

1

Appellants' stay motion in their earlier appeal, docketed as No. 19-60109, sought relief before the qualifying deadline. This Court's order of February 28 dismissing that appeal renders such relief impossible. Because uncertainty increases each day, appellants seek a stay at the earliest possible date. Counsel certifies that the facts are true and complete, and plaintiffs oppose the requested relief.

## STATEMENT OF JURISDICTION

Plaintiffs allege jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). Ex.13, ¶9. The Court erred by exercising jurisdiction over this legislative redistricting case without convening the three-Judge Court required by 28 U.S.C. § 2284(a). Under 28 U.S.C. § 1292(a)(1), this Court may review an erroneous exercise of jurisdiction. *League of United Latin American Citizens v. Texas*, 113 F.3d 53 (5th Cir. 1997).

## STATEMENT OF THE CASE

**i.    Relevant procedural history**

Although plaintiffs complain about a 2015 election, they did not file suit until July 9, 2018. The Court set trial for February 6, 2019, five weeks after candidate qualification opened on January 2, 2019. Defendants received plaintiffs' expert reports on December 10, 2018, Ex.1, but not until January 31, 2019, did plaintiffs disclose that their expert had excluded two substantially white precincts in Cleveland, Mississippi, whose voters would have constituted 10% of the District 22 total. Ex.2.

The Court stated that the expert had "identifie[d] the pattern of behavior running through a series of elections over time." Ex.12, 26.  Only the 2015 election was held in District 22 under the current boundaries.  The turnout estimates for 2003, 2007, and 2011 involved elections held with different boundaries.  The Court nevertheless used that "series" to conclude that "white bloc voting . . . defeats the African-American community's candidate of choice."  Ex.12, 26-27.  The Court found liability, Ex.12, 30, and rejected defendants' affirmative defense of laches. Ex.12, 19-23.

Three days before that opinion, the Court announced that District 22 was illegal, stating that the Legislature would have "the first opportunity to redraw District 22."  Ex.11, 1.  Neither that order nor the subsequent opinion described the violation which the Legislature should remedy.  On February 26, appellants disclaimed any redistricting authority, but reported that "the Senate desires the opportunity to enact a new redistricting plan," and asserted their own "right to be heard on any remedy this Court may order."  Ex.16, 2-3.

Less than three hours later, the Court ordered into effect a plan that plaintiffs had introduced, Ex.4, and extended to March 15 the qualifying deadline for the two districts affected.  Ex.21.  Minutes later, the Court entered its final judgment.  Ex.19.

In denying appellants' motion for stay, the Court declared that appellants "have not made a strong showing that they are likely to succeed."  Ex.18, 5.  The

Court described as "speculation" whether the self-reporting of blacks differs from that of whites, Ex.18, 3, in the Census Bureau report that black turnout exceeds white turnout in Mississippi, Ex.7, 3. The record contains neither evidence nor speculation that the Census Bureau report is wrong, and the District Court identified no record evidence to support its own speculation concerning "known issues with self-reported voting surveys." Ex.12, 28.

"The final three factors are collectively in equipoise." Ex.18, 5. The Court acknowledged that enjoining the statute irreparably injures the State. Ex.18, 6. However, "a stay would substantially injure" plaintiffs because they "were unable to vote their candidate of choice into office . . . because of the structure of the District." Plaintiffs did not prove that the old District 22 violated § 2 or anything else when the 2003, 2007, and 2011 elections were conducted.

"Finally, the public interest factor is inconclusive." Ex.18, 5. The Court concluded that this is "a run-of-the-mill case," Ex.18, 7, notwithstanding the Court's inability to cite any precedent for ordering an increase in black population in a BVAP majority district.

On February 28, appellants moved to stay the final judgment and all injunctive relief. Ex.20. The Chairman of the Mississippi Republican Party affirmed that two persons, residents of the Valley Precinct in Yazoo County and the Mount Hope Missionary Baptist Church Precinct in Madison County, had qualified to run in

District 22. The injunctive order moves both of those precincts into District 23, Ex.3, ¶¶ 6, 13, where incumbent Senator Hopson of Warren County has already qualified.[1] Plaintiff Joseph Thomas reported that two other persons had qualified to run in District 22 as Democrats, Ex.14, 2, but he did not identify them or their locations.

On March 6, the District Court denied a stay. Ex.26.

### ii.    Statement of facts

District 22, according to the 2010 census, includes a BVAP of 50.77%. Ex.6. In the only election ever held in District 22, the white Republican incumbent, Eugene Clarke, Chairman of the Senate Appropriations Committee, defeated former Senator Joseph Thomas, a black Democrat, 8,149 votes to 6,985 votes. Ex.12, 16. Those returns are wrong because of errors in Bolivar County, where 654 voters who lived in other Senate districts cast votes in District 22, and 1,508 voters resident in District 22 were diverted to other districts. Ex.2, 4.

Instead of challenging the 2015 election, Senator Thomas waited almost three years to file this action. Before a court may examine "the totality of circumstances," as § 2(b) requires, plaintiffs must establish three prerequisite facts:

> (1) the group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.

---

[1] The Court cited no record evidence to support its observation that "the District 23 incumbent is favored to win under any redrawn map and may even run unopposed." Ex.18, 4.

*League of United Latin American Citizens v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993), citing *Thornburg v. Gingles*, 478 U.S. 301, 50-51 (1986).

This is not a case "[w]here an election district could be drawn in which minority voters form a majority but such a district is not drawn." *Bartlett*, 556 U.S. at 18 (opinion of Kennedy, J.). District 22 includes a BVAP majority. To meet the first requirement, plaintiffs submitted into evidence three maps, each with larger BVAP majorities, Exs.12, 8-10, even though a BVAP majority district already exists.

Plaintiffs attempted to satisfy the second and third without a single election for Senator having ever been properly conducted in District 22. Instead, they analyzed certain statewide elections in 2015 in District 22, as well as other elections in other districts in earlier years. Ex.1. Plaintiffs must demonstrate that white bloc voting "enable[s] it *usually* to defeat the minority's preferred candidate," *LULAC v. Clements*, 999 F.2d at 849 (emphasis added), without proving that whites have *ever* actually defeated "the minority's preferred candidate" for Senator for District 22.

Only if plaintiffs establish these three prerequisites does the Court examine factors specified in *Gingles*, 478 U.S. at 44-45. Plaintiffs principally claimed that the effects of past discrimination hinder the ability of black voters to participate effectively in the political process. Although plaintiffs introduced proof that blacks in District 22 trail whites in socioeconomic categories, Ex.1, they neither connected

that fact to discrimination nor proved that those circumstances hinder their ability to participate.

## STANDARD OF REVIEW

Denial of a stay is reviewed for abuse of discretion. "In so doing this court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 23 (5th Cir. 1992) (citation omitted). "However, to the extent that such a decision rests on an interpretation of law, the review is *de novo*." *Kelly Investment, Inc. v. Continental Common Corp.*, 315 F.3d 494, 497 (5th Cir. 2002). "Factual findings by the District Court are typically reviewed for clear error." *Whole Woman's Health v. Lakey*, 769 F.3d 285, 292 (5th Cir. 2014) (citation omitted).

This Court considers four factors in resolving a stay application:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and (4) where the public interest lies.

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013) (citation omitted).

## ARGUMENT

## I. THERE IS A STRONG LIKELIHOOD DEFENDANTS WILL SUCCEED ON THE MERITS.

This Court should have "little difficulty concluding the legal questions presented by this case are serious, both to the litigants involved and the public at large, and that a substantial question is presented for this court to resolve." *Campaign for Southern Equality v. Bryant*, 773 F.3d 55, 57 (5th Cir. 2014).

### A.  The District Court failed to give the Legislature a reasonable opportunity to adopt a new districting plan.

In redistricting, "a district court should not pre-empt the legislative task nor intrude upon state policy any more than necessary." *Upham v. Seamon*, 456 U.S. 37, 41-42 (1982).  Instead, "[t]he primary responsibility for correcting Voting Rights Act deficiencies rests with the relevant legislative body." *Rodriguez*, 385 F.3d at 870.  This Court has "admonished district courts to afford local governments a reasonable opportunity to propose a constitutionally permissible plan and not haphazardly to order injunctive relief."  *Id.*

Here, defendants asked to be heard, Ex.16, 2, and notified the Court that the Senate desired an opportunity to act should the stay motions be denied, while pointing out that the Court failed to reveal what criteria a remedy should satisfy. Ex.16, 3.  Instead, the Court, ten days after its opinion, denied the Legislature's right to perform its constitutional duty and without explanation imposed its own plan. Ex.17.  *Rodriguez* held that imposing a remedy in such circumstances "does not comport with the Supreme Court's and this court's clear requirements."  *Id.*, at 870 n.26.

A court may not "broadly brush[] aside state apportionment policy" when designing a remedy. *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971). *See Upham*, 456 U.S. at 40-42.   Here, state policies include traditional redistricting principles, such as compactness, preservation of communities of interest, contiguity, and preservation of political subdivisions.  Ex.27, 282-83. The plan affects communities and subdivisions by splitting Vicksburg, which was entirely in District 23 under the law.  In adopting plaintiffs' plan as its own, the Court offered no explanation for its choice.

### B.     The District Court's remedy is predominantly based on race.

The Court's plan, Ex.4, was drawn by plaintiffs' expert, who explained:

> The attorneys for the Plaintiffs asked me to determine whether it is possible to create an alternative configuration from Mississippi State Senate District 22 that increases the current Black voting age population ("BVAP"), which is 50.77% according to the 2010 Census, with minimal disruption to surrounding districts.

Ex.3, ¶2.  The expert admitted his purpose of "separat[ing] . . . citizens into different voting districts on the basis of race," *Miller*, 515 U.S. at 911, and the Court offered no other reason for adopting the plan.

The expert's claimed effort to reduce the impact on neighboring districts does not detract from his confessed purpose.  "Although a legislature's compliance with 'traditional districting principles such as compactness, contiguity, and respect for political subdivisions' may well suffice to refute a claim of racial gerrymandering,

*Shaw* [*v. Reno*], 501 U.S. [630,] 647 [(1993)], appellants cannot make such a refutation where, as here, those factors were subordinated to racial objectives." *Miller*, 515 U.S. at 919.

Because the Court failed to identify the precise violation, it could not narrowly tailor the remedy. "[P]laintiffs did not ask Dr. Palmer to determine whether a BVAP lower than 62% would be sufficient to elect the African-American community's candidate of choice." Ex.12, 8. The Court made no such finding, and it certainly made no finding on the actual § 2 standard, the right of equal opportunity. Instead of narrowly tailoring a remedy, the Court simply adopted plaintiffs' plan. *See Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022–23 (8th Cir. 2006) (plans "should be narrowly tailored" and not create new Voting Rights Act violations).[2] A District Court "must exercise its discretion in fashioning a 'near optimal' plan." *McGhee v. Granville Cty.*, 860 F.2d 110, 115 (4th Cir. 1988).

It is apparent that the remedy is based on race, because the record reveals nothing more about the individuals moved into redrawn District 22. To base a

---

[2] Defendants' expert testified that the court-ordered plan would have been considered evidence of intentional discrimination under the Act. Ex.27, 238. It reduces minority voting strength in District 23 by more than 10%, without regard to the future of District 23. Carving out minority voters, before an ability to elect emerges, to pack them into another district is evidence of discriminatory purpose. *City of Pleasant Grove v. United States*, 479 U.S. 462, 471 (1987) ("[A]n impermissible purpose under § 5 [of the Act, 52 U.S.C. § 10304,] may relate to anticipated as well as present circumstances."). Similarly, 35 years ago, the District Court refused to increase the black majority in one district because it would reduce a substantial black presence in another district. *Jordan v. Winter*, 604 F.Supp. 807, 814-15 (N.D. Miss. 1984).

remedy on race alone violates constitutional prohibitions against discrimination.

### C.    The Court erred as a matter of law by finding that the border of District 22 violates the results test of § 2.

The Court misapplied race in its remedy because it misapplied race in finding liability. Plaintiffs claim that the border grants blacks "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," in the words of § 2(b), even though blacks make up a majority of the voting age population. Plaintiffs cite no case holding that a majority-minority district violates § 2.[3] They speculate that a different border for District 22 will improve their opportunity.

*Bartlett* refused to permit courts to speculate in enforcing § 2. Plaintiffs here argue that a majority is not enough to guarantee equal opportunity; plaintiffs in *Bartlett* argued that less than a majority might be enough. They contended that § 2 should be construed to require creation of crossover districts in which the minority population could unite with others "to support the minority's preferred candidate." 556 U.S. at 13 (opinion of Kennedy, J.). The Court refused:

> Nothing in § 2 grants special protection to a minority group's right to form political coalitions. "[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground." [*Johnson v.*] *DeGrandy*, 512 U.S. [997], 1010 [(1994)].

*Bartlett*, 556 U.S. at 15 (opinion of Kennedy J.). The Court declined to require

---

[3] That claim was rejected in *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 932 (E.D. Ark. 2012).

courts and legislatures "to scrutinize every factor that enters into districting to gauge its effect on crossover voting." *Id*., at 22.

Instead, explaining the holding of *Gingles*, the Court set a simple numerical standard:

> Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area? . . . Where an election district could be drawn in which minority voters form a majority but such a district is not drawn, . . . then -- assuming the other *Gingles* factors are also satisfied -- denial of the opportunity to elect candidate of choice is a present and discernable wrong that is not subject to the high degree of speculation and prediction attendant upon the analysis of crossover claims.

*Id*., at 18-19 (citation omitted).

Here, the premise of *Gingles* is not satisfied, and the danger of speculation is as apparent as in *Bartlett*. This is not a case in which "such a district is not drawn." *Id*., at 18. The 2012 Legislature drew "an election district . . . in which minority voters form a majority." *Id*. Plaintiffs' effort to blame electoral defeat on the border instead of other factors relies on the sort of speculation that *Bartlett* rejected in favor of "an objective, numerical test." *Id*.

Of course, the Court has recognized the right of minorities to seek more majority-minority districts:

> [I]n the context of a challenge to the drawing of district lines, "the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *DeGrandy*, *supra*, at 1008.

*LULAC v. Perry*, 548 U.S. at 430.  Because plaintiffs did not show that more majority-minority districts are possible, no relief is available.  They cannot complain that a majority-minority district should have a different border.  "If the inclusion of the plaintiffs would necessitate the exclusion of others, then the State cannot be faulted for its choice."  *Id.*, at 429-30.  Because § 2 does not immunize a black minority "from the obligation to pull, haul, and trade to find common political ground," *DeGrandy*, 512 U.S. at 1020, it certainly should not immunize a black majority from the need to do such work within its own ranks.

The Court relied, Ex.12, 30-31, upon a single Fifth Circuit decision, acknowledging that cases before the 1982 amendment to § 2 held that at-large forms of government could be attacked even where blacks held a voting age majority. *Monroe v. City of Woodville*, 881 F.2d 1327, 1333 (5th Cir. 1989).  *Monroe* has never been extended to single-member districts[4] because the Supreme Court acknowledged that *Gingles* must be applied with the understanding that at-large plans "generally pose greater threats to minority-voter participation in the political process than do single-member districts."  *Growe v. Emison*, 507 U.S. 25 (1993).  In examining single-member districts, "factfinders cannot rest uncritically on assumptions about the force of the *Gingles* factors in pointing to dilution."

---

[4] Indeed, *Monroe* acknowledged that its application in the future might be limited "[a]s *de jure* restrictions on the right to vote mercifully recede further into the historical past."  *Id.*, at 1333.

*DeGrandy*, 512 U.S. at 1013. That is why § 2 requires plaintiffs to show that additional majority-minority districts can be created. *Id*., at 1008.

The question under § 2(b) is whether black citizens "have less opportunity than other members of the electorate to participate." Plaintiffs "bore the burden to demonstrate that the African-American citizens of Mississippi 'do not in fact participate to the same extent as other citizens.'" *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 368 (5th Cir. 2001) (citation omitted).

The evidence shows that black Mississippians participate to a greater extent than white Mississippians. Although Census Bureau statistics show that black turnout has exceeded white turnout in even-numbered election years since at least 2004, Ex.7, 3, [5] the Court declared that black voters "are less likely to have transportation options that facilitate voter turnout in odd-year elections," Ex.12, 28, but cited no evidence differentiating odd-numbered-years from even-numbered-years.[6] This Court has long acknowledged that "in recent years Mississippi's African-American and white citizens have maintained virtual parity in voter turnout." *Fordice*, 252 F.3d at 368 (footnote omitted).

---

[5] Without citing evidence, the Court disparaged "known issues with self-reported voting surveys." Ex.12, 28. Absent evidence that blacks are more likely to over-report their participation than whites, the conclusion that black participation is greater than white participation remains sound.

[6] This Court has previously acknowledged evidence that black turnout was relatively higher in odd-numbered-years compared to even-numbered-years. *Fordice*, 252 F.3d at 368 n.1.

14

Plaintiffs, however, claim that black voters in District 22 have a lower turnout rate, which is the indispensable foundation of their contention "that minority voters *in this case* failed to participate equally in the political process." *LULAC v. Clements*, 999 F.2d at 867 (emphasis in original). There are legal and factual problems with that argument.

Every decade, the Legislature must perform multiple statewide redistrictings. *Fordice* required proof of the participation levels of "the African-American citizens of *Mississippi*." 252 F.3d at 368 (emphasis added). There, it might have been possible to obtain reliable evidence of participation levels in the three Supreme Court districts. That kind of knowledge is impossible to obtain at a legislative district level. To deny the Legislature the right to rely on Census Bureau statistics means that any one of 174 districts can be challenged at any time on the basis of statistical estimates.[7] The law should not impose any such burden.

Plaintiffs' statistical estimates are unreliable because no properly conducted election has ever been held in District 22. Plaintiffs' expert estimated that 29.6% of the black voting age population participated in the 2015 election, compared to 36.9% of whites. Ex.1, 7. He never denied that the exclusion of the Cleveland precincts

---

[7] Plaintiffs cite no case in which legislators have been held unable to rely on Census Bureau figures on any subject. *See Shelby County v. Holder*, 570 U.S. 529, 535 (2013) (citing Census Bureau data that "African–American voter turnout has come to exceed white voter turnout in five of the six States originally covered").

affected his turnout analysis.  Ex.27, 85-86.  Because plaintiffs disclosed their expert

data less than a week before trial, defendants could not examine that data, but they

sought judicial notice that Cleveland is the location of predominantly white Delta

State University.  Ex.27, 188-89.  University students "are unlikely to vote." *Fairley*

*v. City of Hattiesburg*, 122 F. Supp. 3d 553, 570 n.6 (S.D. Miss. 2015), *aff'd*, 662

Fed. Appx. 291 (5th Cir. 2016).  *Accord*, *Boddie v. City of Cleveland*, 297 F. Supp.

2d 901 (N.D. Miss. 2004).

The fact that census data for District 22 includes students among the voting

age population is fatal for the turnout analysis of plaintiffs' expert, who admitted:

> Without the number of registered voters in each precinct, I cannot
> estimate voter turnout as a share of registered voters by race.  Instead,
> I estimated the share of the voting age population that casts a vote for
> the office at issue in this case.

Ex.1, 7.  Because of low student participation, white turnout for Cleveland precincts

as a percentage of the voting age population would be extremely low.  Had the low

white turnout in Cleveland been included with the calculation of white turnout in the

rest of District 22, it would necessarily have reduced the overall calculation of white

turnout.  That requires no expert, but only the simple addition and division taught in

grade school.

Plaintiffs' expert analyzed turnout in 2003, 2007, and 2011, but those

elections took place under a District 22 with different boundaries.  He did not adjust

those results using reconstituted election analysis, as described in *Rodriguez*, 385

F.3d at 861.  His defective analysis of a single election in District 22 cannot possibly be enough to carry plaintiffs' burden of demonstrating depressed black participation.

A single election was found insufficient to prove depressed participation in *Rangel v. Morales*, 8 F.3d 242 (5th Cir. 1993).  District Courts in this Circuit have applied *Rangel* to reject § 2 claims.  *Hall v. Louisiana*, 108 F. Supp. 3d 419, 422 (M.D. La. 2015); *York v. City of St. Gabriel*, 89 F. Supp. 3d 843, 857-58 (M.D. La. 2015).  The reliance here upon a single defective election to establish the third *Gingles* factor contravenes *Rangel*.

**D.    Relief is barred by laches.**

Laches may apply to a proceeding under the Voting Rights Act.  The Fourth Circuit squarely so held in *White v. Daniel*, 909 F.2d 99 (4th Cir. 1990).  In reliance on *White*, at least three different District Courts have upheld a laches defense. *Arizona Minority Coalition for Fair Redistricting v. Arizona Ind. Redistricting Comm'n*, 366 F. Supp. 2d 887 (D. Ariz. 2005); *Maxwell v. Foster*, 1999 WL 33507675 (W.D. La. Nov. 24, 1999); *Fouts v. Harris*, 88 F.Supp.2d 1352 (S.D. Fla.1999).  The last two cases arose just before a new census and applied the principle announced in *White* that old census data "might not provide fair and accurate representation."  909 F.2d at 103.  This is especially true regarding the Delta, which has been losing population.  Ex.27, 290.

The Court acknowledged but misapplied the legal standard for determining whether laches bars the claim of the remaining plaintiffs. Laches "does not depend on the subjective awareness of the legal basis on which a claim can be made." Ex.12, 22. Rather, the test is whether plaintiffs knew or should have known of defendants' injurious conduct. *Elvis Presley Enters., Inc. v. Capece,* 141 F. 3d 188, 205 (5th Cir. 1998). Plaintiff Joseph Thomas unsuccessfully asked the Department of Justice to deny preclearance in 2012, Exs.5, 8, and no plaintiff has offered any reason for delaying six years to assert a claim.

The public and these defendants have been prejudiced by the delay. Defendants had less than a week to counter the disclosure that plaintiffs had excluded the Cleveland precincts from their calculations, Ex.2, but plaintiffs had been preparing their evidence for over a year. Ex.27, 160. Election officials have been delayed in the massive amount of work they must do to prepare ballots on time. Ex.13. Two persons who have been preparing their campaigns have suddenly been moved from District 22 to District 23. Ex.20. The delay of plaintiff Joseph Thomas in filing suit has cleared his path back to the Senate. Equity should deny him and his equally dilatory plaintiffs relief.

### E.    The Court erred as a matter of law by failing to convene a three-Judge Court under § 2284(a).

As drafted, the gerund "challenging" may be read as having two direct objects: "constitutionality" and the second use of "apportionment." So read, a three-Judge

18

Court is required when any action challenges "the apportionment of any statewide legislative body." By contrast, a single Judge may preside unless "the constitutionality of the apportionment of congressional districts" is challenged. Statutory construction begins with statutory language, *Duncan v. Walker*, <u>533 U.S. 167, 172</u> (2001), but cannot end there where, as here, the language is ambiguous.

The Court observed, Ex.10, 2-3, that a § 2 challenge to congressional apportionment is being tried to a single Judge in *Chestnut v. Merrill*, <u>2019 WL 338909</u> (N.D. Ala. Jan. 28, 2019), but there is no grammatical way to separate the word "constitutionality" from the prepositional phrase "of the apportionment of congressional districts." Regarding congressional redistricting, then, there is no ambiguity to resolve.

Ambiguity permits resort to legislative history. *United States v. Kay*, <u>359 F.3d 738, 743</u> (5th Cir. 2004). That history is clear: "[T]he Committee explained that 'three-judge courts would be retained . . . in any case involving congressional apportionment or the reapportionment of any statewide legislative body." S. Rep. 94-204, 94th Cong. 2d Sess. 1976 at 1, 1976 U.S.C.C.A.N. 1988. Congress believed that every statutory method of challenging any apportionment likewise required three-Judge Courts.[8] The statute can be so read, and it should be so enforced.

---

[8] The report listed "42 U.S.C. section . . . 1973(a)," S. Rep. 94-204 at 9, 1976 U.S.C.C.A.N. at 1996, which is now § 2(a). When Congress amended § 2 in 1982, the Senate Report "reiterate[d] the existence of the private right of action under Section 2," citing *Allen v. State Bd. of Elections*,

## II.  IRREPARABLE HARM TO THE STATE OUTWEIGHS ANY POSSIBLE INJURY TO THE PLAINTIFFS.

The Court properly acknowledged that the State suffers irreparable injury when the enforcement of its laws is enjoined, Ex.18, 6, citing *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014).  The Court found plaintiffs injured because they "were unable to vote their candidate of choice into office in the 2003, 2007, 2011, and 2015 election cycles," Ex.18, 6, but the Court did not find that the earlier elections were in any way illegal, and its finding of illegality based on the 2015 election alone violates *Rangel* and *Bartlett*.  Because appellants have demonstrated their likelihood of success, nothing in the District Court's balancing of interests precludes a stay.

## III.  A STAY PROTECTS THE INTERESTS OF THE PUBLIC.

"[T]he State has a significant interest in ensuring the proper and consistent running of its election machinery."  *Veasey v. Perry*, 769 F.3d at 895-96.  Where "the State is the appealing party, its interest and harm merges with that of the public." *Planned Parenthood*, 734 F.3d at 419 (citation omitted).  The Secretary of State's office explained the extensive efforts they must undertake to permit the timely preparation of ballots in all counties.  Ex.13.  All must be completed in time to send absentee ballots to the troops overseas no later than June 22, 2019, as required by law.

---

393 U.S. 544 (1969).  S. Rep. 97-417, 97th Cong. 2d Sess. 1982 at 30, 1982 U.S.C.C.A.N. 177, 208.  *Allen*, of course, requires a three-Judge Court.

The Court implied that appellants had waived any consideration of the diversion of qualified candidates from District 22 to 23, Ex.26, but that issue was raised to support the public interest in a stay motion, not to attack the validity of the judgment. Ex.23, 4 n.3.[9] The record lacks evidence that anyone other than Senator Thomas has qualified to run in redrawn District 22 or that anyone can organize and finance a campaign between now and March 15. Absent a stay, all voters, not just minorities, may lose the opportunity to elect a candidate of their choice.

Allowing elections to go forward even under an unvalidated plan recognizes the significant public interest in the election process. In *Watkins v. Mabus*, 771 F. Supp. 789, 802 (S.D. Miss. 1991), the Court allowed previously scheduled elections to go forward under an invalidated plan due to the "imminent elections and lack of advisable options."

## CONCLUSION

The final judgment should be stayed.

---

[9] The Republicans are not appellants' "preferred candidates," Ex.26, but the only ones identifiable at the time, because the Democrats kept theirs secret until the qualifying deadline. Nor did appellants earlier know their addresses, because the parties do not report to the Secretary until the deadline. Miss. Code. Ann. § 23-15-299(4)(b). Appellants could not have reported anything, because the Court disregarded their request to be heard before imposing its remedy.

Respectfully submitted,

*s/ Michael B. Wallace*
MICHAEL B. WALLACE (MSB #6904)
CHARLES E. COWAN (MSB #104478)
T. RUSSELL NOBILE (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, MS  39205-0651
(601) 968-5534
mbw@wisecarter.com

ATTORNEYS FOR DEFENDANTS PHIL
BRYANT, GOVERNOR OF THE STATE
OF MISSISSIPPI, AND DELBERT
HOSEMANN, SECRETARY OF STATE
OF THE STATE OF MISSISSIPPI

TOMMIE S. CARDIN (MSB #5863)
B. PARKER BERRY (MSB #104251)
BUTLER SNOW LLP
Suite 1400 1020
Highland Colony Park
Ridgeland, MS 39157
Post Office Box 6010
Ridgeland, MS 39158-6010
Tel: (601) 985-4570
Fax: (601) 985-4500
E-mail: tommie.cardin@butlersnow.com
E-mail: parker.berry@butlersnow.com

ATTORNEYS FOR ALL DEFENDANTS

## **CERTIFICATE OF SERVICE**

I, Michael B. Wallace, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and that I have served the District Court by email as follows:

District Judge Carlton Reeves
501 East Court Street, Suite 5.500
Jackson, MS  39201
reeves_chambers@mssd.uscourts.gov

I have also served all counsel of record by email:

Arusha Gordon - PHV agordon@lawyerscommittee.org
Benjamin McRae Watson ben.watson@butlersnow.com
Beth L. Orlansky borlansky@mscenterforjustice.org
Brian Parker Berry parker.berry@butlersnow.com
Caitlyn E. Silhan - PHV csilhan@waterskraus.com
Charles E. Cowan cec@wisecarter.com
Charles E. Griffin charles.griffin@butlersnow.com
Charles S. Siegel - PHV siegel@waterskraus.com
Douglas T. Miracle dmira@ago.state.ms.us
Ellis Turnage eturnage@etlawms.com
Ezra Rosenberg - PHV erosenberg@lawyerscommittee.org
Jon Greenbaum - PHV jgreenbaum@lawyerscommittee.org
Peter A. Kraus - PHV kraus@waterskraus.com
Pooja Chaudhuri - PHV pchaudhuri@lawyerscommittee.org;
pchaudhuri7@gmail.com
Robert B. McDuff RBM@McDuffLaw.com
Tommie S. Cardin tommie.cardin@butlersnow.com

This the 8th day of March, 2019.

*s/ Michael B. Wallace*
Michael B. Wallace

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2, this document contains 5,194 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word, Version 2013, in 14-point Times New Roman font, except for footnotes which are in 12-point Times New Roman font.

This, the 8th day of March, 2019.

s/*Michael B. Wallace*
Attorney for Appellants

# EXHIBIT 1

Expert Report for
*Thomas v. Bryant*

Maxwell Palmer

December 6, 2018
Revised December 10, 2018

_____
Maxwell Palmer, Ph.D.
December 10, 2018

# I  Statement of Inquiry

1. I have been asked to evaluate racially polarized voting in Mississippi State Senate District 22 under the redistricting plan enacted by the Mississippi State Legislature in 2012.

# II  Summary of Analysis and Findings

2. Using ecological inference I find that African American and white voters are highly polarized in elections between African American and white candidates. Large, cohesive majorities of African Americans support African American candidates, and whites vote sufficiently as a bloc to nearly always defeat the candidate of choice of African American voters.

# III  Qualifications

3. I am currently an Assistant Professor of Political Science at Boston University. I joined the faculty at Boston University in 2014, after completing my Ph.D. in Political Science at Harvard University. In 2014 I was also appointed as a Junior Faculty Fellow at the Hariri Institute for Computing at Boston University. I teach and conduct research on American politics and political methodology.

4. I have published academic work in leading peer-reviewed academic journals, including *The American Political Science Review*, *The Journal of Politics*, and *Perspectives on Politics*. I have published work on compactness in redistricting in *The Ohio State University Law Review* and on traditional redistricting principles in *The Journal of Politics*. My curriculum vitae is attached to this report. My published research uses a variety of analytical approaches, including statistics, geographic analysis, and simulations.

5. I testified before the U.S. District Court for the Eastern District of Virginia as an expert in "redistricting and data analysis as it pertains to redistricting" in *Bethune Hill v. Virginia* (3:14-cv-00852-REP-AWA-BMK). I worked as a data analyst assisting testifying experts in multiple cases concerning congressional and state legislative districting, including: *Perez v. Perry*, in the U.S. District Court for the Western

2

District of Texas (No. 5:11-cv-00360); *LULAC v. Edwards Aquifer Authority* in the U.S. District Court for the Western District of Texas, San Antonio Division (No. 5:12cv620-OLG,); *Harris v. McCrory* in the U. S. District Court for the Middle District of North Carolina (No. 1:2013cv00949); *Guy v. Miller* in the U.S. District Court for Nevada (No. 11-OC-00042-1B); *In re Senate Joint Resolution of Legislative Apportionment* in the Florida Supreme Court (Nos. 2012-CA-412, 2012-CA-490); and *Romo v. Detzner* in the Circuit Court of the Second Judicial Circuit in Florida (No. 2012 CA 412).

6. I am being compensated at a rate of $300/hour for my work in this case.


# IV    Data

7. I relied on the following primary data sources for this report. All data was provided by counsel.

1. Precinct-level election results compiled from county reports, available from the website of the Mississippi Secretary of State.[1]

2. Census data on population and voting age population (VAP) by race, from the 2010 United States Census and from the Mississippi Standing Joint Legislative Committee on Reapportionment and Redistricting, including reports on precinct-level voting age population of each precinct under the 2002 and 2012 state senate redistricting plans.[2]

8. Analyzing racial voting patterns requires data on population by race and data on election results, at the same level of aggregation. The lowest level of election result reporting is the precinct, which are generally drawn by county officials along census block lines.

9. To construct the data for analysis, we began with three reports prepared by the Mississippi Standing Joint Legislative Committee on Reapportionment and Redistricting. The first identified the precincts assigned to each district in the 2002 plan with census data from 2000[3], the second identified precincts assigned to each district in the 2002 plan with census data from 2010[4], and the third identified precincts

---

[1] http://www.sos.ms.gov/Elections-Voting/Pages/Election-Results-By-Year.aspx
[2] http://www.msjrc.state.ms.us/
[3] http://www.msjrc.state.ms.us/pdf/senate_detail.pdf
[4] http://www.msjrc.state.ms.us/pdf/senate_bench.pdf

assigned to each district in the 2012 plan with census data from 2010.[5] Using these precincts as a starting point, we then updated each precinct based on information we uncovered regarding changes to precinct boundaries, splits, and reorganizations, and merged the population data with the precinct-level election results in each year.

10. As reported by the Joint Committee when the 2002 plan was adopted, 42.1% of the VAP in Senate District 22 was African American under the 2000 census. In 2011, the Committee released a report stating that 49.8% of the VAP was African American according to the 2010 census. Under the plan adopted in 2012, 50.8% of the VAP was African American under the 2010 census.

11. The State Senate elections in 2003, 2007, and 2011 were conducted using the 2002 plan. The 2015 election was conducted using the 2012 plan. For purposes of analyzing the 2003 elections, I utilized precinct VAP, as reflected in 2000 census data, for the precincts in the 2002 plan. For the 2007 and 2011 elections, I utilized precinct VAP, as reflected in 2010 census data, for the precincts in the 2002 plan. For the 2015 election, I utilized precinct VAP, as reflected in the 2010 census data, for the 2012 plan.

# V    Racially Polarized Voting

12. I use ecological inference (EI) to analyze racially polarized voting in Senate District 22. Ecological Inference is a statistical procedure that estimates group-level candidate preferences based on aggregate data. I use the MCMC implementation of the multinomial-Dirichlet eiRxC method using the R package eiPack. The outputs of this analysis are estimates of the percentage of each group (African Americans, and non-African Americans) voting for each of the two major-party candidates in each election or abstaining from voting. The outputs include both a mean estimate (the most likely vote share), and a 95% confidence interval (the range in which 95%

---

[5]https://www.maris.state.ms.us/pdf/MS2010SenateDist/TRP_FINAL_REPORT.pdf

of the simulated estimates fall).[6]

13. In all of the analyses below, I analyze racially polarized voting using two groups, blacks and non-blacks. The non-black minority "other" population in District 22 is sufficiently small that combining it with white voters does not materially affect the results.

14. This report focuses on elections between minority candidates and white candidates. As demonstrated by my analysis, African American voters often support African American candidates, and these candidates of choice are routinely defeated in Senate District 22 in elections characterized by racially polarized voting. Therefore I conclude that African American voters have a difficult time electing candidates of choice in Senate District 22.

15. Here, I have analyzed 10 elections for state officeholders involving African American candidates running against white candidates in the general election: elections for Senate District 22 in 2003, 2007, and 2015; for Governor in 2011 and 2015, for Lieutenant Governor in 2003, for Treasurer in 2003, for Commissioner of Insurance in 2007, for Commissioner of Agriculture in 2015, and for Secretary of State in 2015. In all ten elections, the Democratic candidate was African American and the Republican candidate was white. In 2003, there was also an African American candidate for State Senate in District 22 who ran as an independent. I combine the vote totals for both African American candidates for this election, such that the results show the percentage of each racial group voting for *either* African American candidate.

16. In all ten elections with African American and white candidates, the white candidate won the majority of the vote within Senate District 22. Table A1 lists the results for each election. The highest vote share for an African American candidate for Senate District 22 was 46% in 2015.

17. Using EI, I find strong evidence of racially polarized voting in all ten elections between African American and white candidates for state offices. Figure 1 presents the results of this analysis. The circles represent the average estimated vote share for

---

[6]The specific model used here estimates the share of African Americans and non-African Americans (1) voting for the Democratic candidate, (2) voting for the Republican candidate, or (3) not voting. Votes for third party candidates are excluded, with the exception of the independent candidate for State Senate in 2003 (see ¶15). Split precincts are included for Senate District 22 contests and excluded for statewide contests. Estimates and confidence intervals are calculated using 100,000 simulations for each election. Vote choice estimates are scaled as percentages of the 2-party vote. I also estimated separate models for vote choice and turnout; the results from using two separate models were consistent with the results from the joint vote choice and turnout model presented here.



Figure 1: **Ecological Inference Estimates of Contests with African American and White Candidates**

each group in each election, and the vertical lines are 95% confidence intervals. The same pattern persists across all ten elections: large majorities of African American voters supported the African American candidates, and large majorities of white voters supported the white candidates. The average level of support for African American candidates by African American voters ranged from 82% to 93% and the average level of support of African American candidates by white voters ranged from 8% to 19%. The differences between African American and white support for African American candidates in all contests are statistically significant; a large majority of African American voters choose African American candidates, and a large majority of white voters consistently voted as a bloc to defeat the African American candidate of choice.[7]

18. I also analyzed the general election for Senate District 22 in 2011. Both major party candidates were white. Table A1 includes the overall result this election and Table A3 provides the racially polarized voting results for this contest. 83% of African American voters supported the Democratic candidate while 84% of the white voters supported the Republican candidate. The African American candidate of choice was

---

[7]Table A2 presents the results used in Figure 1.

defeated.

19. I estimate voter participation by race using the 2003, 2007, 2011, and 2015 elections for Senate District 22 (regardless of the race of the candidates). Without the number of registered voters in each precinct, I cannot estimate voter turnout as a share of registered voters by race. Instead I estimated the share of the voting age population that casts a vote for the office at issue in this case.

20. Figure 2 presents the results of the voter participation analysis. In all four elections, I find that on average African Americans voted at lower rates than whites. The average participation gap was 10.2 percentage points in 2003 (34.7% African American participation and 45.0% white participation), 14.6 percentage points in 2007 (24.7% African American participation and 39.3% white participation), 8.0 percentage points in 2011 (31.3% African American participation and 39.3% white participation), and 7.3 percentage points in 2015 (29.6% African American participation and 36.9% white participation). The difference in voting between the two groups is statistically significant in 2003, 2007, and 2015, and weakly significant in 2011.[8]

21. I understand that Plaintiffs expert demographer has created an alternative plan for Senate District 22 that would have an African-American voting age population of 62%. Based upon the vote choice and turnout estimates from the ecological inference analysis of the 2015 SD 22 election, and assuming that any African American and white populations added to or removed from the district vote in the same ways as the current groups, it is my opinion that this alternative district would provide African American voters with a realistic opportunity to elect candidates of their choice.

# VI    Conclusions

22. There is a high level of racial polarization between African Americans and whites in Senate District 22. In every elections I analyzed, African American voters cohesively support African American candidates, and white voters vote sufficiently as a bloc to defeat the candidates of choice of African American voters.

---

[8]Statistical significance is assessed using one-sided tests based on the simulated EI results. $p = .040$ in 2003, $p = .004$ in 2007, $p = .018$ in 2015, and $p = .084$ in 2011. Table A4 presents the results used in Figure 2.



Figure 2: Ecological Inference Estimates for Voter Participation

# A   Appendix

Table A1: **Election Results in Senate District 22**

| Year | Election | Black Candidate % | White Candidate % |
|------|----------|-------------------|-------------------|
| 2003 | Sen. Dist. 22 | 44.3 | 55.7 |
|      | Lt. Gov. | 43.9 | 56.1 |
|      | Treasurer | 49.1 | 50.9 |
| 2007 | Sen. Dist. 22 | 41.3 | 58.7 |
|      | Comm. Ins. | 49.0 | 51.0 |
| 2011 | Governor | 47.8 | 52.2 |
| 2015 | Sen. Dist. 22 | 46.1 | 53.9 |
|      | Governor | 36.7 | 63.3 |
|      | Comm. Agr. | 41.8 | 58.2 |
|      | Sec. State | 42.1 | 57.9 |

| Year | Election | Dem. Candidate % | Rep. Candidate % |
|------|----------|------------------|------------------|
| 2011 | Sen. Dist. 22 | 46.1 | 53.9 |

Note: For Senate District 22 elections, when a precinct is split, only the part of the precinct in the district is included. However, for purposes of reporting the results in statewide elections, the total vote in the full precinct is included because separate results for each part of split precincts are not available. 2003 Senate District 22 results includes the total votes received by the two African American candidates. Third-party or independent candidates in the 2003 elections for Lieutenant Governor and Treasurer and the 2015 elections for Governor, Commissioner of Agriculture, and Secretary of State are omitted.

9

Table A2: EI Estimates for Reported Contests with African American and White Candidates

| Year | Election | % Voting for Black Candidate | |
|------|----------|-------|-----------|
| | | Blacks | Non-Blacks |
| 2003 | Sen. Dist. 22 | 0.877 (0.740, 0.960) | 0.144 (0.073, 0.226) |
| | Lt. Gov. | 0.877 (0.745, 0.960) | 0.104 (0.037, 0.199) |
| | Treasurer | 0.918 (0.790, 0.981) | 0.190 (0.085, 0.312) |
| 2007 | Sen. Dist. 22 | 0.861 (0.724, 0.949) | 0.080 (0.028, 0.154) |
| | Comm. Ins. | 0.860 (0.712, 0.958) | 0.126 (0.050, 0.229) |
| 2011 | Governor | 0.856 (0.720, 0.952) | 0.093 (0.031, 0.185) |
| 2015 | Sen. Dist. 22 | 0.928 (0.850, 0.974) | 0.114 (0.049, 0.199) |
| | Governor | 0.824 (0.726, 0.908) | 0.077 (0.034, 0.139) |
| | Comm. Agr. | 0.883 (0.784, 0.951) | 0.091 (0.037, 0.169) |
| | Sec. State | 0.905 (0.816, 0.960) | 0.087 (0.035, 0.163) |

Table A3: EI Estimates for Reported Contests with Two White Candidates

| Year | Election | % Voting for Democratic Candidate | |
|------|----------|-------|-----------|
| | | Blacks | Non-Blacks |
| 2011 | Sen. Dist. 22 | 0.825 (0.699, 0.934) | 0.162 (0.073, 0.262) |

Table A4: EI Estimates for Voter Participation in SD 22 Elections

| Year | % Voting | |
|------|-------|-----------|
| | Blacks | Non-Blacks |
| 2003 | 0.347 (0.278, 0.419) | 0.450 (0.401, 0.498) |
| 2007 | 0.247 (0.204, 0.299) | 0.393 (0.346, 0.437) |
| 2011 | 0.313 (0.256, 0.374) | 0.393 (0.333, 0.448) |
| 2015 | 0.296 (0.257, 0.332) | 0.369 (0.331, 0.411) |

10

# Maxwell Palmer

CONTACT          Department of Political Science          *E-mail:* mbpalmer@bu.edu
                 Boston University                        *Website:* www.maxwellpalmer.com
                 232 Bay State Road                       *Phone:* (617) 358-2654
                 Boston, MA 02215

APPOINTMENTS     **Boston University, Boston, Massachusetts**

                 Assistant Professor, Department of Political Science, 2014–Present

                 Junior Faculty Fellow, Hariri Institute for Computing, 2017–Present

EDUCATION        **Harvard University, Cambridge, Massachusetts**

                 Ph.D., Political Science, May 2014.

                 A.M., Political Science, May 2012.

                 **Bowdoin College, Brunswick, Maine**

                 A.B., Mathematics & Government and Legal Studies, May 2008.

REFEREED         Einstein, Katherine Levine, Maxwell Palmer, and David M. Glick. Forthcoming.
PUBLICATIONS     "Who Participates in Local Government?  Evidence from Meeting Minutes."
                 *Perspectives on Politics.*

                 Palmer, Maxwell and Benjamin Schneer. Forthcoming. "Post-Political Careers:
                 How Politicians Capitalize on Public Office." *Journal of Politics.*

                 Einstein, Katherine Levine, David M. Glick, and Maxwell Palmer. Forthcoming.
                 "City Learning: Evidence of Policy Information Diffusion From a Survey of U.S.
                 Mayors." *Political Research Quarterly.*

                 Einstein, Katherine Levine, David M. Glick, Maxwell Palmer, and Robert Pres-
                 sel. Forthcoming. "Do Mayors Run for Higher Office? New Evidence on Pro-
                 gressive Ambition." *American Politics Research.*

                 Ansolabehere, Stephen, Maxwell Palmer and Benjamin Schneer. 2018. "Divided
                 Government and Significant Legislation, A History of Congress from 1789-2010."
                 *Social Science History* 42(1): 81–108.

                 Edwards, Barry, Michael Crespin, Ryan D. Williamson, and Maxwell Palmer.
                 2017. "Institutional Control of Redistricting and the Geography of Representa-
                 tion." *Journal of Politics* 79(2): 722–726.

                 Palmer, Maxwell. 2016. "Does the Chief Justice Make Partisan Appointments
                 to Special Courts and Panels?" *Journal of Empirical Legal Studies* 13(1): 153–
                 177.

Palmer, Maxwell and Benjamin Schneer. 2016. "Capitol Gains: The Returns to Elected Office from Corporate Board Directorships." *Journal of Politics* 78(1): 181–196.

Gerring, John, Maxwell Palmer, Jan Teorell, and Dominic Zarecki. 2015. "Demography and Democracy: A Global, District-level Analysis of Electoral Contestation." *American Political Science Review* 109(3): 574–591.

OTHER PUBLICATIONS
Ansolabehere, Stephen and Maxwell Palmer. 2016. "A Two Hundred-Year Statistical History of the Gerrymander." *Ohio State Law Journal* 77(4): 741–762.

Ansolabehere, Stephen, Maxwell Palmer, and Benjamin Schneer. 2016. "What Has Congress Done?" in *Governing in a Polarized Age: Elections, Parties, and Political Representation in America*, eds. Alan Gerber and Eric Schickler. New York, NY: Cambridge University Press.

POLICY REPORTS
Einstein, Katherine Levine, David Glick, and Maxwell Palmer. 2018. "2017 Menino Survey of Mayors." Research Report. Boston University Initiative on Cities.

BOOK MANUSCRIPT
*Neighborhood Defenders: Participatory Politics and America's Housing Crisis* (with Katherine Levine Einstein and David M. Glick). *Under Review*

WORKING PAPERS
"Rainmakers: Former Politicians as Lobbyists" (with Pamela Ban and Benjamin Schneer). Invited to Revise and Resubmit, *Legislative Studies Quarterly*.

"Racial Disparities in Housing Politics: Evidence from Administrative Data" (with Katherine Levine Einstein and David M. Glick). *Under Review*.

"The Gender Pay Gap in Congressional Offices" (with Joshua McCrain).

"Descended from Immigrants and Revolutionists: How Immigrant Experience Shapes Congressional Decision-making on Immigration Votes" (with James Feigenbaum and Benjamin Schneer).

"Reexamining the Gender Gap in Support of War" (with Katherine Krimmel and Douglas Kriner).

"Corporate Political Activity as a Bundle of Goods" (with Daniel Moskowitz and Benjamin Schneer).

GRANTS AND AWARDS
The Rockefeller Foundation, "Menino Survey of Mayors" (Co-principal investigator). 2017. $325,000.

Hariri Institute for Computing, Boston University. Junior Faculty Fellow. 2017. $10,000.

The Rockefeller Foundation, "2017 Menino Survey of Mayors" (Co-principal investigator). 2017. $100,000.

The Center for Finance, Law, and Policy, Boston University, Research Grant for "From the Capitol to the Boardroom: The Returns to Office from Corporate Board Directorships," 2015.

Senator Charles Sumner Prize, Dept. of Government, Harvard University. 2014.
*Awarded to the best dissertation "from the legal, political, historical, economic, social or ethnic approach, dealing with means or measures tending toward the prevention of war and the establishment of universal peace."*

The Center for American Political Studies, Dissertation Research Fellowship on the Study of the American Republic, 2013–2014.

The Tobin Project, Democracy and Markets Graduate Student Fellowship, 2013–2014.

The Dirksen Congressional Center, Congressional Research Award, 2013.

The Institute for Quantitative Social Science, Conference Travel Grant, 2014.

The Center for American Political Studies, Graduate Seed Grant for "Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," 2014.

The Institute for Quantitative Social Science, Research Grant, 2013.

Bowdoin College: High Honors in Government and Legal Studies; Philo Sherman Bennett Prize for Best Honors Thesis in the Department of Government, 2008.

SELECTED
PRESENTATIONS

"Descended from Immigrants and Revolutionists: How Immigrant Experience Shapes Immigration Votes in Congress," Congress and History Conference, Princeton University, 2018.

"Identifying Gerrymanders at the Micro- and Macro-Level." Hariri Institute for Computing, Boston University, 2018.

"Descended from Immigrants and Revolutionists: How Immigrant Experience Shapes Immigration Votes in Congress," Annual Meeting of the Southern Political Science Association, New Orleans, LA, 2018.

"How Institutions Enable NIMBYism and Obstruct Development," Boston Area Research Initiative Spring Conference, Northeastern University, 2017.

"Corporate Political Activity as a Bundle of Goods," Annual Meeting of the

American Political Science Association, Philadelphia, PA, 2016.

"Congressional Gridlock," American Studies Summer Institute, John F. Kennedy Presidential Library and Museum, 2016.

"Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," Microeconomics Seminar, Department of Economics, Boston University, 2015.

"The Corporate Boardroom's Revolving Door," Annual Meeting of the American Political Science Association, San Francisco, CA, 2015.

"The Corporate Boardroom's Revolving Door," Annual Meeting of the European Political Science Association, Vienna, Austria, 2015.

"A Two Hundred-Year Statistical History of the Gerrymander," Congress and History Conference, Vanderbilt University, 2015.

"A New (Old) Standard for Geographic Gerrymandering," Harvard Ash Center Workshop: How Data is Helping Us Understand Voting Rights After Shelby County, 2015.

"Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," Boston University Center for Finance, Law, and Policy, 2015.

"Does the Chief Justice Make Partisan Appointments to Special Courts and Panels?" Annual Meeting of the American Political Science Association, Washington, DC, 2014.

"Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," Annual Meeting of the Midwest Political Science Association, Chicago, IL, 2014.

"Capitol Gains: The Returns to Elected Office from Corporate Board Directorships," Bowdoin College, 2014.

"Corporate Boards as Legislatures," Annual Meeting of the Southern Political Science Association, New Orleans, LA, 2014.

"Presidential Legacies and Partisan Balance on the Federal Courts," Annual Meeting of the Southern Political Science Association, New Orleans, LA, 2014.

"Time and Political Power: Setting the Calendar in a Busy Legislature," Annual Meeting of the Midwest Political Science Association, Chicago, IL, 2013.

"Using Multiple Elections to Evaluate Districting Maps," Annual Meeting of the Midwest Political Science Association, Chicago, IL, 2012.

| | |
|---|---|
| TEACHING | Boston Univeristy |

- *Introduction to American Politics* (Fall 2014, Fall 2015, Fall 2016, Fall 2017)
- *Congress and Its Critics* (Fall 2014, Spring 2015, Spring 2017)
- *Formal Political Theory* (Spring 2015, Spring 2017)
- *Prohibition, Regulation, and Bureaucracy* (Fall 2015)
- *Political Analysis* (Fall 2016, Fall 2017)

Harvard University
- *American Government* (Head Teaching Fellow, Fall 2012 and Fall 2013)
- *The Politics of Congress* (Head Teaching Fellow, Spring 2013).
- *Introduction to Congress* (Teaching Fellow, Spring 2012).

SERVICE — Boston University
- College of Arts and Sciences

  - General Education Curriculum Committee, 2017–2018.

- Department of Political Science

  - Co-organizer, Research in American Politics Workshop, 2016–2018.
  - American Politics Search Committee, 2017.
  - American Politics Search Committee, 2016.
  - Graduate Program Committee, 2014–2015.

Co-organizer, *Boston University Local Political Economy Conference*, August 29, 2018.

Reviewer: *American Journal of Political Science*; *American Political Science Review*; *Journal of Politics*; *Quarterly Journal of Political Science*; *Political Analysis*; *Public Choice*; *Political Science Research and Methods*; *Journal of Law, Economics and Organization*; *Election Law Journal*; *Applied Geography*; Cambridge University Press; Oxford University Press.

Coordinator, Harvard Election Data Archive, 2011–2014.

OTHER EXPERIENCE

**Charles River Associates, Boston, Massachusetts**          2008–2010

*Associate, Energy & Environment Practice*
Economic consulting in the energy sector for electric and gas utilities, private equity, and electric generation owners. Specialized in Financial Modeling, Resource Planning, Regulatory Support, Price Forecasting, and Policy Analysis.

# EXHIBIT 2

## Precinct Boundaries Used In Plaintiffs' RPV Analysis

*Thomas v. Bryant*

Except where noted otherwise, for 2003 elections, we used precinct VAP from Census 2000 as reflected in the legislature's redistricting plan of 2002[1]; for 2007 and 2011 elections, we used precinct VAP from Census 2010 as reflected in the legislature's listing of the 2002 plan with 2010 census data[2]; and for the 2015 election, we used VAP from Census 2010 as reflected in the legislature's redistricting plan of 2012[3].

# 1) 2003

We used the official MARIS 2001 precinct shapefile[4] as our source for boundary data, except where noted below.

a) Bolivar County: PACE precinct registered five votes for Senate District 22 (SD22) candidates (in addition to 146 votes for the unopposed SD12 candidate). According to the State of Mississippi Senate Plan As Adopted on 3-21-02, PACE is entirely in SD12. We excluded the precinct and its five votes from our analysis.
We verified this in GIS using MARIS 2001 precincts as published and the SD22 boundary as defined by the published Block Equivalency File[5]. The boundary between PACE and WEST CLEVELAND was at some time between 2001 and 2012 moved eastward (reflected in MARIS 2012 published shapefile[6]) adding hundreds of VAP to a portion of PACE falling in District 22, so this clearly happened *after* the 2003 election.

b) Humphreys County:
   i) There were very minor changes to Humphreys County precincts between 2001 and 2012. Differences are not enough to determine whether the 2001 precincts were still in place in 2003, or if some changes had already occurred by the time of the 2003 election. The changes shifted 23 total VAP from NORTH BELZONI to FOUR MILE (both precincts outside SD22) and 5 total VAP from LAKE CITY to SILVER CITY (both precincts inside SD22).[7] We used both LAKE CITY and SILVER CITY in the analysis due to the very small population uncertainty.
   ii) The 2003 Election Recap Report for Humphreys County shows two precincts, 3 BELZONI SOUTH and 5 BELZONI SOUTH voting in the SD22 race, when these precincts are clearly in SD13. This is verified in GIS using the SD22 boundary and either of the 2001 or 2012 MARIS precinct shapefiles, as these two Belzoni precincts are unchanged. Both precincts are listed

---

[1] "Detailed Report" available at *http://www.msjrc.state.ms.us/ms_senate.html*
[2] "Benchmark Plan: 2002 Geography With 2010 Population" at
*http://www.msjrc.state.ms.us/historical_archive.html*
[3] "Redistricting Plan: TRP1" at *https://www.maris.state.ms.us/HTM/DownloadData/MS2010Redistricting.html*
[4] "2001 Voting Precincts" at *https://www.maris.state.ms.us/HTM/DownloadData/Statewide.html*
[5] "Senate TRP1 Block Equivalency File" at
*https://www.maris.state.ms.us/HTM/DownloadData/MS2010Redistricting.html*
[6] "2012 Voting Precincts" at *https://www.maris.state.ms.us/HTM/DownloadData/Statewide.html*
[7] VAP figures from Census 2010.

      as whole precincts part of SD13 in the 2002 Senate Plan. We excluded both of these precincts from our analysis.

      iii) The county has the SD21 candidates listed on its election recap report, though no part of the county is in District 21 and no votes were cast for them. This may indicate some potential error in election administration.

c) Sharkey County: Though there were numerous minor adjustments made to the county's precinct boundaries between 2001 and 2012, the entire county is in District 22 and there is not enough information to determine which vintage to use. We used 2001 boundaries.

d) Washington County: We used the MARIS 2012 precinct shapefile. With one exception, the names and number of precincts in Washington County's 2003 Election Recap match the MARIS 2012 precinct shapefile, and *do not* match the MARIS 2001 shapefile. This indicates that the changes recorded in the 2012 shapefile were implemented between 2001 and 2003. (The exception is the precinct named AMERICAN LEGION 304 in the MARIS 2012 precinct shapefile, and 3-4 MIXON GARRETT POST in the 2003 Washington County election recap report. By deduction and similarity, the two names clearly refer to the same precinct.)

e) Yazoo County: MARIS 2001 PRECINCTS, except:

      i) LAKE CITY PRECINCT: We use the MARIS 2012 boundary. The CARTER precinct was consolidated into LAKE CITY precinct by 2012. CARTER does not appear on the county's 2003 election recap report, indicating that the consolidation occurred between 2001 and 2003.

      ii) BENTON PRECINCT: By MARIS 2001 boundaries, a small piece of BENTON precinct lies within SD22, but Census 2000 and 2010 show no population within that piece of BENTON. The 1990 precinct boundaries[8] have the same boundary for BENTON, so it appears not to have changed. By 2012, ZION Precinct had absorbed the split piece of BENTON, so the problem disappears. The 48 total votes cast for SD22 candidates remain a mystery. The precinct is coded SPLIT in the data, but we exclude it from EI since there is no associated population.

      iii) HOLLY BLUFF and LAKE CITY PRECINCTS: The boundary between the two moved from 2001 to 2012, with neither year's boundary accurately reflecting the boundary of District 22. We adjusted the boundaries of both, but the changes do not affect any of the numbers as the adjustments are in an unpopulated area west of Yazoo City.

      iv) We noted that a precinct named ENOLA/FAIRVIEW is shown on the 2003 Yazoo County election recap report, while two separate precincts, ENOLA and FAIRVIEW appear in the MARIS 2001 precinct shapefile. This combined precinct is outside SD22 in 2003, but becomes part of SD22 in 2012 redistricting and is relevant in the 2015 election.

## 2) 2007

We used the official MARIS 2001 precinct shapefile[9] as our source for boundary data, except where noted below.

a) Bolivar, Humphreys, and Sharkey Counties: unchanged from 2003.

b) Washington County: All precinct names are unchanged from 2003 with three minor exceptions:

---

[8] "1990 Voting Precincts" at *https://www.maris.state.ms.us/HTM/DownloadData/Statewide.html*
[9] "2001 Voting Precincts" at *https://www.maris.state.ms.us/HTM/DownloadData/Statewide.html*

    i)  3-4 VFW MIXON-GARRETT POST reverts to the name OLD AMERICAN LEGION. This precinct reports 213 votes for SD22 candidates and 402 votes for SD12 candidates, although the precinct is entirely in SD12. It was entirely in SD12 in 2003 and 2011 and reported votes accordingly. (Precinct was consolidated into METCALF MUNICIPAL BUILDING in 2015.) Because it is entirely outside SD22, we excluded it from our analysis.

    ii)  CHRIST WESLEYAN METHODIST renamed COVENANT PRESBYTERIAN. The church is located at 1865 S Main St in Greenville[10] which is inside the precinct formerly known as Christ Wesleyan Methodist. This is clearly a change in polling place location, as Washington County names its precincts after the polling place location.

    iii)  GLEN ALLAN LIBRARY renamed GLEN ALLAN HEALTH CLINIC. Glen Allan is a remote, rural community in the southern part of Washington County. The two names appear to refer to the same precinct. Once again, clearly a simple change in polling place location in the unincorporated town of Glen Allan.

    iv)  GREENVILLE INDUSTRIAL COLLEGE reports 14 votes for SD22 candidates and 393 for SD12, although the precinct is entirely in SD12. It was entirely in SD12 in 2003, 2011, and 2015 and reported votes accordingly. (In 2015 its name was changed to JAKE'S CHAPEL MB CHURCH.) Because it is entirely outside SD22, we excluded it from our analysis.

c)  Yazoo County:

    i)  BENTON PRECINCT: The issue noted in 2003 still existed in 2007.

    ii)  WARD 5 PRECINCT: This precinct was entirely in SD21 in 2003, according to both the MARIS 2001 precinct shapefile and the county's election recap report. In 2007, the recap report indicates a split has occurred, showing votes in both SD21 and SD22. The MARIS 2012 precinct shapefile does show a split of WARD 5, so for this election we used the MARIS 2012 boundary and indicate the precinct as split in our data.

## 3) 2011

We used the official MARIS 2001 precinct shapefile[11] as our source for boundary data, except where noted below.

a)  Bolivar, Humphreys, Sharkey, and Washington Counties: unchanged from 2007.

b)  Yazoo County: BENTON precinct now has all of its State Senate votes in SD21, and none in SD22.

## 4) 2015

We used the official MARIS 2012 precinct shapefile as our source for boundary data, except where noted.

a)  Humphreys and Sharkey Counties: Unchanged from 2011.

---

[10] http://www.covenantgreenville.org/

[11] "2001 Voting Precincts" at https://www.maris.state.ms.us/HTM/DownloadData/Statewide.html

b) Bolivar County:
   i) Four precincts were affected by an election administration error involving incorrect ballots for Senate District 22[12] and we excluded them from analysis:
      (1) NORTHWEST CLEVELAND voters were given ballots for the SD12, as reflected on the election recap report, which shows votes only for SD12 candidates. The precinct is in SD22.
      (2) *Some* WEST CLEVELAND voters received ballots for SD12, which is reflected in the election recap report, where votes are recorded for both SD12 and SD22 candidates. The precinct is entirely within SD22.
      (3) Voters in WEST CENTRAL CLEVELAND were given ballots for SD22 as reflected in the election recap report, which shows votes for candidates in SD12, SD13, and SD22. The precinct is entirely in SD13.
      (4) STRINGTOWN voters were given ballots for SD22, as reflected in the election recap report, which shows votes only for SD22 candidates. The precinct is entirely in D12.
c) Madison County: We used the Madison County GIS Shapefile vintage February 2014 provided to us by Madison County.
d) Washington County:
   i) ARCOLA CITY HALL is renamed ARCOLA TECHNOLOGY CENTER.
   ii) SWIFTWATER BAPTIST CHURCH recorded 21 votes for candidates in SD22, though the precinct is entirely in SD12. (237 votes were recorded for the unopposed SD12 candidate.) Because the precinct is entirely outside SD22, we excluded it from our analysis.
e) Yazoo County:
   i) Yazoo County's GIS viewer shows a consolidation of HOLLY BLUFF and FAIRVIEW precincts.[13] While FAIRVIEW still exists in the MARIS 2012 shapefile, it is not shown on the Yazoo County 2015 election recap, indicating that the consolidation occurred between 2012 and 2015. We concluded that FAIRVIEW was consolidated into HOLLY BLUFF for the 2015 election.
   ii) WARD 4 and VALLEY are both split; the recap shows votes in Districts 22 & 23 for each. The MARIS 2012 shapefile shows both precincts entirely within District 22, but each is adjacent to a precinct in SD23 that does not appear in the 2015 election recap report:
      (1) WARD 4 is adjacent to a precinct in the MARIS 2012 shapefile named DISTRICT 4 WARD 2, assigned to SD 23, which is not shown in the election recap. Because all other

---

[12] In a newspaper article, election officials acknowledged these errors. *Bolivar Commercial*, November 20 2015, "Senate lines obscure election" by Anne Preus. The article references the following information from a statement made by the Secretary of State's office:

> According to the statement [from the Secretary of State's office], the following eligible voters may have voted in the wrong senate districts:
> * West Central Cleveland Precinct — 607 voters are voting in Senate District 22 and should be voting in Senate District 13;
> * Stringtown precinct — 47 voters are voting in Senate District 22 and should be voting in Senate District 12.
> [...]
> * Northwest Cleveland precinct — 1,087 voters are voting in Senate District 12 and should be voting in Senate District 22;
> * West Cleveland precinct — 421 voters are voting in Senate District 12 and should be voting in Senate District 22.

[13] http://gis.cmpdd.org/yazoo/

precincts in the election recap match precincts in the MARIS 2012 shapefile, with the exception of (2) below, we concluded that DISTRICT 4 WARD 2 was consolidated into WARD 4. We included this precinct in our analysis and indicate it as split.

(2) VALLEY is adjacent to a precinct named TINSLEY, assigned to SD 23, which is likewise not shown on the election recap. As with (1) above, we concluded that TINSLEY was consolidated into VALLEY, and we included this precinct in our analysis, indicated as split.

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSPPI
## NORTHERN DIVISION

JOSEPH THOMAS, et al.,

      Plaintiffs,

v.                       Civil Case  No. 3:18cv441-CWR-FKB

PHIL BRYANT, et al.,

      Defendants.

## **REVISED EXPERT REPORTOF WILLIAM S. COOPER**

## I. INTRODUCTION

1.      My name is William S. Cooper.  I serve as a demographic and
redistricting expert for the Plaintiffs.  I filed a declaration in this case on September,
18, 2018.  **Exhibit A** attached to this Second Declaration describes my redistricting
experience and voting cases where I have testified at trial or by declaration.
**Exhibit B** describes the sources and methodology I employed in the preparation of
this declaration.[1]

2.      The attorneys for the Plaintiffs asked me to determine whether it is
possible to create an alternative configuration for Mississippi State Senate District

---

[1] This is the second revision to this report.  The first report was submitted on December 6,
2018.  The first revised version was submitted on December 10, 2018.  It added paragraphs 25
and 26 and renumbered the subsequent paragraphs.  This second revised version, which is being
submitted January 18, 2019, corrects a typographical error in paragraph 20 and an editing error
in paragraph 22.

22 that increases the current Black voting age population ("BVAP"), which is 50.77% according to the 2010 Census, with minimal disruption to surrounding districts.

3.    The BVAP can be increased in SD 22 by exchanging certain areas with the adjacent district known as SD 23.  Under the 2012 Plan, as shown in **Figure 1**, the eight counties within the combined area of SD 22 and SD 23 are all of Issaquena, Sharkey, and Warren counties, and parts of Washington, Yazoo, Bolivar, Humphreys, and Madison counties.

**Figure 1    Eight-County Area – SD 22 and SD 23 – 2012 Plan**



4.    **Figure 2** reports summary population statistics for District 22 and District 23 under the 2012 Plan.

**Figure 2**

### SD 22 and SD 23 – 2012 Plan – 2010 Census

| District | Population | % Dev | % Black | 18+ Pop | % 18+ Black |
|----------|-----------|-------|---------|---------|-------------|
| 22 | 58838 | 3.11% | 54.02% | 43883 | 50.77% |
| 23 | 56594 | -0.82% | 45.20% | 41965 | 42.00% |

5.    SD 22 is one of largest districts in the state: it stretches over 100 miles from northwest to southeast, from Cleveland in Bolivar County to the northern suburbs of Jackson in Madison County. Only one other Senate district is longer (SD 38). And with an area of 2,166 square miles, SD 22 is second only to SD 14.

## II. PLAINTIFF'S ILLUSTRATIVE PLAN – SD 22 and SD 23

### (a) Illustrative Plan Description

6.    The Plaintiff's Illustrative Plan ("Illustrative Plan") would reassign all of the Madison County voters presently in SD 22 to SD 23 and all voters in Issaquena from SD 23 to SD 22. Election officials in those counties would simply be switching the Senate district number to which those votes are allocated. Eight precincts in Yazoo would be reassigned from SD 22 to SD 23. Eight precincts in Warren would be reassigned from SD 23 to SD 22. Election officials in those counties would switch the Senate district number for those particular precincts.

3

7.    The map in **Figure 3** depicts District 22 and District 23 under the

Illustrative Plan, with an overlay showing the 2012 Plan (blue lines). The map in

**Exhibit C** is a more detailed version of the **Figure 3** map, showing towns and cities.

**Figure 3**

**Eight-County Area– SD 22 and SD 23 –Illustrative Plan – 2012 Plan Overlay**



8.    **Figure 4** (on the next page) reports summary population statistics for

District 22 and District 23 under the Illustrative Plan. The 61.98% BVAP in District

22 represents about an 11 percentage point increase over the 50.77% BVAP in the

2012 Plan.

**Figure 4**

**SD 22 and SD 23 – Illustrative Plan – 2010 Census**

| District | Population | % Dev | % Black | 18+ Pop | % 18+ Black |
|---|---|---|---|---|---|
| 22 | 57463 | 0.70% | 65.85% | 42937 | 61.98% |
| 23 | 57969 | 1.59% | 33.67% | 42911 | 30.98% |

9.    Under the Illustrative Plan, Warren County residents would continue to comprise the majority of the population in District 23 (55.9%) – dropping from 86.2% under the 2012 Plan. The remainder of District 23 would encompass the area in Madison County that is in SD 22 under the 2012 Plan, as well as the realigned area in Yazoo County.

10.    The map in **Exhibit D-1** shows the area in Yazoo County where the eight precincts are moved from SD 22 to District 23 under the Illustrative Plan. **Exhibit D-2** is a similar map that shows the area in Warren County where the eight precincts are moved from SD 23 to SD 22 under the Illustrative Plan  In both maps, red lines identify precincts that are reassigned. Blue lines demarcate the 2012 Plan and black lines show county boundaries.

11.    The address searchable Google map available at the link below provides additional street-level detail of SD 22 and SD 23 under the Illustrative Plan, with a 2012 precinct overlay.

http://www.fairdata2000.com/Fusion/Illustrative_Plan_SD_22_23/index.html

5

12.    On the Google map, red lines show precincts that are shifted between

SD 22 and SD 23 under the Illustrative Plan. Blue lines demarcate the 2012 Plan

and black lines show county boundaries. Click anywhere on the map for the county

name, 2012 Plan Senate district number, Illustrative Plan district number, precinct

name, precinct population, and precinct BVAP percentage.

13.    **Figure 5** identifies the precinct reassignments in Warren and Yazoo.

**Figure 5**

### Illustrative Plan – Precinct Reassignments

| County | Precinct | Population | 18+ Pop | 18+ Black | % 18+ Black | From 2012 Plan | To Illustrative Plan |
|--------|----------|-----------|---------|-----------|-------------|----------------|----------------------|
| Warren | American Legion Hall | 2957 | 2226 | 1669 | 75.0% | 23 | 22 |
| Warren | Auditorium | 2599 | 1906 | 1621 | 85.0% | 23 | 22 |
| Warren | Brunswick | 489 | 410 | 40 | 9.8% | 23 | 22 |
| Warren | Cedar Grove | 1953 | 1348 | 983 | 72.9% | 23 | 22 |
| Warren | Kings | 2380 | 1734 | 905 | 52.2% | 23 | 22 |
| Warren | No.7 Fire Station | 1489 | 1123 | 637 | 56.7% | 23 | 22 |
| Warren | St. Aloysius | 673 | 491 | 456 | 92.9% | 23 | 22 |
| Warren | Vicksburg Jr. High | 3847 | 2737 | 1818 | 66.4% | 23 | 22 |
| Yazoo | 3-4 South | 1029 | 712 | 303 | 42.6% | 22 | 23 |
| Yazoo | Benton | 965 | 731 | 171 | 23.4% | 22 | 23 |
| Yazoo | Eden | 559 | 419 | 88 | 21.0% | 22 | 23 |
| Yazoo | Fairview | 69 | 59 | 21 | 35.6% | 22 | 23 |
| Yazoo | Free Run | 289 | 235 | 44 | 18.7% | 22 | 23 |
| Yazoo | Fugates | 721 | 572 | 279 | 48.8% | 22 | 23 |
| Yazoo | Valley | 152 | 115 | 13 | 11.3% | 22 | 23 |
| Yazoo | Zion | 702 | 515 | 133 | 25.8% | 22 | 23 |

14.    As previously noted, in addition to the Warren and Yazoo precinct

reassignments, all precincts in SD 22 in Madison County are shifted into Illustrative

Plan District 23. All of Issaquena County is shifted from SD 23 to Illustrative Plan

District 22.

15.     Under the Illustrative Plan, 69.76% of the population of the current SD

22 remains in SD 22 and 67.42% of the population in SD 23 remains in SD 23.

16.     The 2012 precinct boundaries do not change under the Illustrative Plan.

This means that even if post-2012 precinct boundaries have changed in some

counties, the boundaries delineating the split precinct areas in the Illustrative Plan

are exactly the same as the 2012 Plan lines.

17.     In sum, the Illustrative Plan demonstrates that an alternative majority-

Black Senate District 22 can be drawn with a BVAP that is 11 percentage points

higher than the 50.77% BVAP district under the 2012 Plan.

18.     Moreover, under the SD 22 and SD 23 reconfiguration in the

Illustrative Plan, there is no ripple-effect into any of the other 50 Senate districts in

the state.  Those can remain in place as presently drawn.

**(b) Traditional Redistricting Principles**

19.     As shown in the **Figure 4** table *supra*, Illustrative Plan District 22 has a

population deviation of 0.70% and District 23 has a deviation of 1.59%.  Thus, both

districts are comfortably within the +/- 5% deviation established by the Mississippi

Senate for 2012 legislative redistricting.

20.    The Illustrative Plan districts are compact and reasonably shaped.

Under the Reock [2] compactness measure, Illustrative Plan District 22 scores .26 and

District 23 scores .25.  In comparison, 2012 Plan SD 22 scores .25 and SD 23

scores .34.

21.    The two incumbent Senators remain in their respective districts.

22.    District 22 and District 23 as reconfigured under the Illustrative Plan

comply with the one-person one-vote rule, are contiguous, reasonably compact, and

do not dilute minority voting strength.

## III. SOCIO-ECONOMIC PROFILE OF SD 22

23.    Whites in SD 22 outpace African Americans by a wide margin across a

broad range of socioeconomic measures, as reported in the five-year 2012-2016

ACS.[3] This disparity is summarized below and depicted with further detail in charts

and tables found in **Exhibit E.** A similar set of charts and tables for **SD 23** is in

**Exhibit F.**

---

[2] "The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district.  The measure is always between 0 and 1, with 1 being the most compact. The Reock test computes one number for each district and the minimum, maximum, mean and standard deviation for the plan." *Maptitude For Redistricting* software documentation (authored by the Caliper Corporation).

[3] In this section, "White" refers to non-Hispanic White. "African American" and "Black" refer to single-race Black, including Hispanic Blacks.  The 2012-2016 ACS survey is the second time that the Census Bureau has released socioeconomic statistics by state senate district. (The 2011-2016 ACS contained the first state legislative district ACS report.)

*(a) Income*

- Two in five (41.2%) of African Americans in SD 22 live in poverty, which is nearly five times the 8.8% White poverty rate. **(Exhibit E, pp. 28-29.)**

- Black median household income is $23,741 – just barely more than one-third (35.6%) of the $66,736 median income of White households. **(Exhibit E, pp. 32-33.)**

- Black family households (defined by the Census Bureau as households with related persons) experience an even sharper median income disparity *vis-à-vis* White family households – $27,673 for Black median family household income compared to $81,654 for White family households. **(Exhibit E, pp. 36-37.)**

- Black per capita income is $14,683, which represents 45.1% of White per capita income ($32,524). **(Exhibit E, pp. 40-41.)**

- Reflecting the high Black poverty rate, 40.3% of Black households in SD 22 participate in the Supplemental Nutrition Assistance Program (SNAP), compared to 4.3% of White households. **(Exhibit E, pp. 49-50.)**

*(c) Education*

- Of persons 25 years of age and over, over one-fourth (28.7% ) of African Americans are without a high school diploma – three times higher than the 9.8% drop-out rate for their White counterparts.**(Exhibit E, pp. 21-22.)**

- At the other end of the educational scale, for ages 25 and over, about one in seven African Americans (14.0%) have a bachelor's degree or higher, compared to 38.6% of their White counterparts. **(Exhibit E, pp. 21-22.)**

*(d) Employment*

- The $20,256 median earnings level of African Americans working full-time in SD 22 is half of the $40,485 annual median earnings garnered by

Whites.  (**Exhibit E, pp. 42-43.**)

- The Black unemployment rate (for the working-age population ages 16-64, expressed as a percent of the civilian labor force) is five times the rate for Whites.  On average, over the course of the 5-year survey, 21.2% of working-age African Americans were unemployed, compared to a 4.3% White unemployment rate.  (**Exhibit E, p. 54 and pp. 51-54.**)

- Just 22.0% of African Americans in SD 22 are employed in management or professional occupations compared to 48.2% of Whites. (**Exhibit E, pp. 55-56.**)

*(e) Housing*

- Half of Black households (50.2%) rent their residences, compared to 19.7% of White households.  (**Exhibit E, pp. 57-58.**)

*(f) Health*

- Nearly one in five (18.5%) of African Americans ages 18-64 have a disability, compared to 8.3% of Whites in the same age group. (**Exhibit E, pp. 61-62.**)

- Nearly one-third (29.1%) of African Americans ages 18-64 lack health insurance, compared to 11.5% of Whites in the same age group. **Exhibit E, pp. 63-64.**)

24.    In sum, the Black/White disparity in socioeconomic status in SD 22 is severe. A significant portion of the Black population in SD 22 lives under extremely disadvantaged circumstances, which likely affects Black voter turnout.

25.    The socioeconomic disparities in SD 22 were increased by the addition of a portion of Madison County to the district in 2012.  Previously SD 22 did not include any of Madison County.  In 2012, a significant white-majority portion of Madison was added to the southern end of the district.  Specifically, 14,682 people

were added from Madison County, 34.4% of whom were Black. The people from

Madison County constitute 25% of the population in SD 22 in the 2012 Plan.

26.    The Madison County population is much wealthier than the rest of SD

22. The chart in **Figure 6** compares the median household income of Madison

County with the other counties that are part of the existing SD 22 under the 2012

Plan.[4]

**Figure 6**

**Median Household Income in SD 22 Counties – 2013-2017 ACS**

| County | Median Household Income[5] |
|---|---|
| **Madison** | **$68,600** |
| Bolivar | $28,468 |
| Humphreys | $26,188 |
| Madison | $68,600 |
| Sharkey | $30,033 |
| Washington | $29,387 |
| Yazoo | $28,330 |

---

[4] The Madison County portion of SD 22 is demographically similar to Madison County as a whole. The SD 22 portion is 34.4% Black while Madison County as a whole is 38.2% Black under the 2010 Census.

[5] Source: Five-Year 2013-2017 ACS via

https://factfinder.census.gov/bkmk/table/1.0/en/ACS/17_5YR/B19013/0500000US28011|050000
0US28053|0500000US28089|0500000US28125|0500000US28151|0500000US28163

The 2013 -2017 ACS was released by the Census Bureau on December 6, 2018.

## IV. CONCLUSION

27.   I conclude that the African American    population encompassing SD 22 and SD 23 under the 2012 Plan is sufficiently numerous and geographically compact to allow for a majority-Black Senate district with a BVAP in excess of 60% – i.e., a BVAP that is at least 10 percentage points higher than SD 22 under the 2012 Plan.

28.   I also conclude that a 62% BVAP-majority Senate district can be drawn by exchanging whole precincts between SD 22 and SD 23 as drawn under the 2012 Plan. The resulting districts are reasonably compact, particularly in comparison to the existing districts.  The other 50 Senate districts in the state do not need to be modified.

29.   In addition, I conclude that African Americans in the area encompassed by SD 22 lag far behind Whites across all key indicators of socioeconomic well-being.

Executed on: January **18**, 2019

*William S. Cooper*

WILLIAM S. COOPER

# EXHIBIT 4



# EXHIBIT 5



**U.S. Department of Justice**

Civil Rights Division

_____

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

SEP 1 4 2012

The Honorable Chris McDaniel
Chairperson, Mississippi Senate Elections Committee
P.O. Box 1018
Jackson, Mississippi 39215-1018

The Honorable William C. Denny, Jr.
Chairperson, Mississippi House of Representatives
   Apportionment and Elections Committee
P.O. Box 12185
Jackson, Mississippi 39236-2185

Dear Senator McDaniel and Representative Denny:

    This refers to Joint Resolution No. 201 (2012), which provides the 2012 redistricting plan for the Senate, and Joint Resolution No. 1 (2012), which provides the 2012 redistricting plan for the House of Representatives, for the State of Mississippi, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c. We received your submission on July 16, 2012; additional information was received through September 11, 2012.

    The Attorney General does not interpose any objection to the specified changes. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes. *Procedures for the Administration of Section 5 of the Voting Rights Act of 1965*, 28 C.F.R. 51.41.

                    Sincerely,

                    Thomas E. Perez
                    Assistant Attorney General

# EXHIBIT 6

# Mississippi Senate

# Redistricting Plan: "TRP1"

Precleared by USDOJ - 09/14/2012

PROPOSED SENATE SUMMARY

POPULATION OF DISTRICTS - PLAN TRP_1

Plan Geography: Statewide

Precinct Year: 2008

Total Plan Population:
2,967,297

Number of Districts:
52

Ideal District Size:
57,603

**Summary Statistics**

| | DISTRICT | TOTAL | DEVN | % DEVN. |
|---|---|---|---|---|
| Highest Deviation: | 51 | 59,854 | 2,791 | 4.89% |
| Highest Deviation: | 34 | 59,697 | 2,634 | 4.62% |
| Highest Deviation: | 38 | 59,472 | 2,409 | 4.22% |
| Lowest Deviation: | 12 | 54,310 | -2,753 | -4.82% |
| Lowest Deviation: | 14 | 54,288 | -2,775 | -4.86% |
| Lowest Deviation: | 19 | 54,279 | -2,784 | -4.88% |

**DISTRICTS WITH 50 PERCENT OR MORE BLACK POPULATION**

| DISTRICT | TOTAL | DEVN | % DEVN | Black | %Black | [18+ Pop] | [18+ Blk] | %18+Blk |
|---|---|---|---|---|---|---|---|---|
| 11 | 58,529 | 1,466 | 2.57% | 42,652 | 72.87% | 41,431 | 28,533 | 68.87% |
| 12 | 54,310 | -2,753 | -4.82% | 38,887 | 71.60% | 39,275 | 26,661 | 67.88% |
| 13 | 57,916 | 853 | 1.49% | 42,053 | 72.61% | 43,645 | 30,233 | 69.27% |
| 16 | 55,307 | -1,756 | -3.08% | 35,888 | 64.89% | 41,131 | 25,289 | 61.48% |
| 21 | 54,562 | -2,501 | -4.38% | 37,809 | 69.30% | 39,192 | 25,876 | 66.02% |
| 22 | 58,838 | 1,775 | 3.11% | 31,782 | 54.02% | 43,883 | 22,280 | 50.77% |
| 24 | 57,205 | 142 | 0.25% | 43,998 | 76.91% | 41,308 | 30,591 | 74.06% |
| 26 | 56,204 | -859 | -1.51% | 38,772 | 68.98% | 41,885 | 27,902 | 66.62% |
| 27 | 54,449 | -2,614 | -4.58% | 40,476 | 74.34% | 40,191 | 29,091 | 72.38% |
| 28 | 57,480 | 417 | 0.73% | 50,009 | 87.00% | 39,794 | 33,511 | 84.21% |
| 29 | 58,509 | 1,446 | 2.53% | 33,900 | 57.94% | 43,669 | 23,320 | 53.40% |
| 32 | 59,380 | 2,317 | 4.06% | 39,137 | 65.91% | 43,603 | 27,098 | 62.15% |
| 34 | 59,697 | 2,634 | 4.62% | 34,941 | 58.53% | 43,714 | 24,075 | 55.07% |
| 36 | 56,599 | -464 | -0.81% | 36,373 | 64.26% | 43,133 | 26,750 | 62.02% |
| 38 | 59,472 | 2,409 | 4.22% | 38,904 | 65.42% | 43,919 | 27,468 | 62.54% |

**TOTAL POPULATION BY DISTRICT**

| DISTRICT | TOTAL | DEVN | % DEVN | Black | %Black | [18+ Pop] | [18+ Blk] | %18+Blk |
|---|---|---|---|---|---|---|---|---|
| 1 | 58,854 | 1,791 | 3.14% | 10,262 | 17.44% | 42,781 | 7,050 | 16.48% |
| 2 | 58,820 | 1,757 | 3.08% | 15,873 | 26.99% | 41,837 | 9,894 | 23.65% |
| 3 | 57,746 | 683 | 1.20% | 10,676 | 18.49% | 42,731 | 7,539 | 17.64% |
| 4 | 59,289 | 2,226 | 3.90% | 7,765 | 13.10% | 44,625 | 5,418 | 12.14% |
| 5 | 59,452 | 2,389 | 4.19% | 4,687 | 7.88% | 45,845 | 3,545 | 7.73% |
| 6 | 59,315 | 2,252 | 3.95% | 8,286 | 13.97% | 44,226 | 5,681 | 12.85% |
| 7 | 56,245 | -818 | -1.43% | 22,464 | 39.94% | 41,431 | 15,369 | 37.10% |
| 8 | 54,953 | -2,110 | -3.70% | 18,536 | 33.73% | 40,545 | 12,969 | 31.99% |
| 9 | 58,543 | 1,480 | 2.59% | 14,327 | 24.47% | 47,008 | 10,434 | 22.20% |
| 10 | 55,329 | -1,734 | -3.04% | 22,847 | 41.29% | 41,671 | 16,733 | 40.16% |
| 11 | 58,529 | 1,466 | 2.57% | 42,652 | 72.87% | 41,431 | 28,533 | 68.87% |
| 12 | 54,310 | -2,753 | -4.82% | 38,887 | 71.60% | 39,275 | 26,661 | 67.88% |
| 13 | 57,916 | 853 | 1.49% | 42,053 | 72.61% | 43,645 | 30,233 | 69.27% |
| 14 | 54,288 | -2,775 | -4.86% | 15,931 | 29.35% | 41,654 | 11,512 | 27.64% |
| 15 | 54,994 | -2,069 | -3.63% | 16,145 | 29.36% | 44,003 | 11,889 | 27.02% |
| 16 | 55,307 | -1,756 | -3.08% | 35,888 | 64.89% | 41,131 | 25,289 | 61.48% |
| 17 | 54,327 | -2,736 | -4.79% | 16,344 | 30.08% | 41,126 | 11,487 | 27.93% |
| 18 | 55,419 | -1,644 | -2.88% | 14,446 | 26.07% | 39,446 | 9,334 | 23.66% |

| DISTRICT | TOTAL | DEVN | % DEVN. | Black | %Black | 18+ Pop | 18+ Blk | %18+Blk |
|---|---|---|---|---|---|---|---|---|
| 19 | 54,279 | -2,784 | -4.88% | 12,478 | 22.99% | 39,206 | 8,428 | 21.50% |
| 20 | 57,094 | 31 | 0.05% | 8,180 | 14.33% | 42,982 | 5,721 | 13.31% |
| 21 | 54,562 | -2,501 | -4.38% | 37,809 | 69.30% | 39,192 | 25,876 | 66.02% |
| 22 | 58,838 | 1,775 | 3.11% | 31,782 | 54.02% | 43,883 | 22,280 | 50.77% |
| 23 | 56,594 | -469 | -0.82% | 25,580 | 45.20% | 41,965 | 17,626 | 42.00% |
| 24 | 57,205 | 142 | 0.25% | 43,998 | 76.91% | 41,308 | 30,591 | 74.06% |
| 25 | 59,203 | 2,140 | 3.75% | 10,867 | 18.36% | 43,875 | 7,481 | 17.05% |
| 26 | 56,204 | -859 | -1.51% | 38,772 | 68.98% | 41,885 | 27,902 | 66.62% |
| 27 | 54,449 | -2,614 | -4.58% | 40,476 | 74.34% | 40,191 | 29,091 | 72.38% |
| 28 | 57,480 | 417 | 0.73% | 50,009 | 87.00% | 39,794 | 33,511 | 84.21% |
| 29 | 58,509 | 1,446 | 2.53% | 33,900 | 57.94% | 43,669 | 23,320 | 53.40% |
| 30 | 55,905 | -1,158 | -2.03% | 13,170 | 23.56% | 42,173 | 9,672 | 22.93% |
| 31 | 56,647 | -416 | -0.73% | 17,721 | 31.28% | 41,565 | 12,345 | 29.70% |
| 32 | 59,380 | 2,317 | 4.06% | 39,137 | 65.91% | 43,603 | 27,098 | 62.15% |
| 33 | 55,637 | -1,426 | -2.50% | 15,209 | 27.34% | 42,892 | 10,945 | 25.52% |
| 34 | 59,697 | 2,634 | 4.62% | 34,941 | 58.53% | 43,714 | 24,075 | 55.07% |
| 35 | 58,571 | 1,508 | 2.64% | 15,592 | 26.62% | 43,147 | 10,780 | 24.98% |
| 36 | 56,599 | -464 | -0.81% | 36,373 | 64.26% | 43,133 | 26,750 | 62.02% |
| 37 | 55,264 | -1,799 | -3.15% | 19,933 | 36.07% | 42,495 | 14,192 | 33.40% |
| 38 | 59,472 | 2,409 | 4.22% | 38,904 | 65.42% | 43,919 | 27,468 | 62.54% |
| 39 | 56,423 | -640 | -1.12% | 16,567 | 29.36% | 41,896 | 11,709 | 27.95% |
| 40 | 58,920 | 1,857 | 3.25% | 11,122 | 18.88% | 44,205 | 7,842 | 17.74% |
| 41 | 55,793 | -1,270 | -2.23% | 19,466 | 34.89% | 41,556 | 13,541 | 32.58% |
| 42 | 55,650 | -1,413 | -2.48% | 8,590 | 15.44% | 41,730 | 5,877 | 14.08% |
| 43 | 57,725 | 662 | 1.16% | 13,649 | 23.64% | 43,075 | 9,998 | 23.21% |
| 44 | 54,387 | -2,676 | -4.69% | 10,419 | 19.16% | 40,273 | 6,983 | 17.34% |
| 45 | 54,580 | -2,483 | -4.35% | 13,272 | 24.32% | 42,733 | 9,779 | 22.88% |
| 46 | 57,739 | 676 | 1.18% | 4,323 | 7.49% | 43,658 | 3,079 | 7.05% |
| 47 | 58,759 | 1,696 | 2.97% | 9,901 | 16.85% | 43,985 | 6,921 | 15.73% |
| 48 | 58,961 | 1,898 | 3.33% | 21,501 | 36.47% | 43,721 | 14,721 | 33.67% |
| 49 | 57,821 | 758 | 1.33% | 9,600 | 16.60% | 43,999 | 6,562 | 14.91% |
| 50 | 56,513 | -550 | -0.96% | 9,107 | 16.11% | 43,305 | 6,364 | 14.70% |
| 51 | 59,854 | 2,791 | 4.89% | 14,824 | 24.77% | 44,978 | 10,878 | 24.19% |
| 52 | 58,947 | 1,884 | 3.30% | 13,144 | 22.30% | 43,626 | 8,523 | 19.54% |

*Ver:1.0 Out/Rev date: 04/30/12 Jason Knight*
*MS Joint Reapportionment Committee - Ben Collins, OpsCoord*

Plan:          TRP_1
Plan Type:

Administrator
User:          Jason Knight/Ben Collins

# Plan Components Report

Monday, April 30, 2012                                                          8:11 AM

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 1** | | | | |
| DeSoto MS County | | | | |
| VTD: Aldens *(part)* | 4,185 | 1,075 | 3,155 | 754 |
| VTD: Alphaba Cockrum | 1,533 | 64 | 1,108 | 54 |
| VTD: Bridgetown | 3,253 | 303 | 2,461 | 223 |
| VTD: DeSoto Central | 10,431 | 2,425 | 7,069 | 1,529 |
| VTD: Endora | 2,991 | 257 | 2,300 | 190 |
| VTD: Hernando Central | 4,681 | 435 | 3,320 | 298 |
| VTD: Hernando East | 7,549 | 477 | 5,544 | 348 |
| VTD: Hernando West | 4,362 | 977 | 3,158 | 719 |
| VTD: Horn Lake South *(part)* | 3,205 | 669 | 2,481 | 470 |
| VTD: Lake Cormorant | 1,119 | 208 | 800 | 140 |
| VTD: Lewisburg East | 820 | 45 | 609 | 25 |
| VTD: Lewisburg West | 1,851 | 335 | 1,317 | 248 |
| VTD: Love | 2,093 | 211 | 1,637 | 159 |
| VTD: Nesbit East | 1,577 | 465 | 1,214 | 358 |
| VTD: Nesbit West | 2,743 | 427 | 2,121 | 353 |
| VTD: Oak Grove | 565 | 50 | 419 | 42 |
| VTD: Walls | 5,896 | 1,839 | 4,068 | 1,140 |
| **DeSoto MS County Subtotal** | **58,854** | **10,262** | **42,781** | **7,050** |
| **District 1 Subtotal** | **58,854** | **10,262** | **42,781** | **7,050** |
| **District 2** | | | | |
| DeSoto MS County | | | | |
| VTD: Aldens *(part)* | 410 | 9 | 304 | 6 |
| VTD: Cherry Valley | 2,612 | 327 | 1,900 | 179 |
| VTD: Elmore | 1,543 | 210 | 1,242 | 138 |
| VTD: Greenbrook North | 5,490 | 1,699 | 3,900 | 1,137 |
| VTD: Greenbrook South | 8,196 | 1,060 | 6,011 | 679 |
| VTD: Horn Lake Central | 3,122 | 754 | 2,230 | 481 |
| VTD: Horn Lake East | 4,569 | 1,722 | 3,143 | 1,063 |
| VTD: Horn Lake Intermediate School | 4,643 | 1,502 | 3,173 | 917 |
| VTD: Horn Lake North | 5,461 | 2,154 | 3,617 | 1,305 |
| VTD: Horn Lake South *(part)* | 1,072 | 131 | 828 | 84 |
| VTD: Horn Lake West | 4,834 | 1,585 | 3,243 | 931 |
| VTD: Plum Point | 3,377 | 526 | 2,624 | 374 |
| VTD: Southhaven North | 5,203 | 1,171 | 3,707 | 650 |
| VTD: Southhaven South | 3,535 | 1,756 | 2,451 | 1,083 |
| VTD: Southhaven West | 4,753 | 1,267 | 3,464 | 867 |
| **DeSoto MS County Subtotal** | **58,820** | **15,873** | **41,837** | **9,894** |
| **District 2 Subtotal** | **58,820** | **15,873** | **41,837** | **9,894** |
| **District 3** | | | | |
| Benton MS County | 8,729 | 3,252 | 6,572 | 2,322 |

Plan:   TRP_1
Type:

Administrator:
User:            Jason Knight/Ben Collins

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 3 (continued)** | | | | |
| Pontotoc MS County | | | | |
| VTD: Bankhead | 976 | 264 | 731 | 197 |
| VTD: Bethel | 1,322 | 221 | 987 | 165 |
| VTD: Buchanan | 1,203 | 47 | 847 | 27 |
| VTD: Cherry Creek | 1,173 | 68 | 827 | 43 |
| VTD: Ecru | 1,442 | 158 | 1,027 | 120 |
| VTD: Friendship | 920 | 71 | 679 | 47 |
| VTD: Hoyle | 1,248 | 447 | 955 | 342 |
| VTD: Hurricane | 855 | 7 | 661 | 4 |
| VTD: Longview | 549 | 241 | 424 | 181 |
| VTD: Oak Hill | 512 | 51 | 374 | 36 |
| VTD: Pontotoc 1 | 364 | 30 | 266 | 16 |
| VTD: Pontotoc 2 | 1,395 | 169 | 933 | 93 |
| VTD: Pontotoc 3 | 1,664 | 267 | 1,208 | 158 |
| VTD: Pontotoc 4 | 1,410 | 301 | 1,002 | 219 |
| VTD: Pontotoc 5 | 3,790 | 807 | 2,784 | 552 |
| VTD: Sherman | 822 | 112 | 620 | 66 |
| VTD: Turnpike | 784 | 32 | 594 | 25 |
| VTD: Woodland | 429 | 18 | 326 | 13 |
| VTD: Zion | 1,025 | 178 | 770 | 136 |
| **Pontotoc MS County Subtotal** | 21,883 | 3,489 | 16,015 | 2,440 |
| Union MS County | 27,134 | 3,935 | 20,144 | 2,777 |
| **District 3 Subtotal** | 57,746 | 10,676 | 42,731 | 7,539 |
| **District 4** | | | | |
| Alcorn MS County | 37,057 | 4,221 | 28,036 | 2,928 |
| Tippah MS County | 22,232 | 3,544 | 16,589 | 2,490 |
| **District 4 Subtotal** | 59,289 | 7,765 | 44,625 | 5,418 |
| **District 5** | | | | |
| Itawamba MS County | | | | |
| VTD: Armory | 1,380 | 66 | 1,041 | 35 |
| VTD: Bounds | 76 | 0 | 57 | 0 |
| VTD: Clay | 1,381 | 11 | 1,060 | 11 |
| VTD: Copeland | 993 | 1 | 739 | 1 |
| VTD: Friendship | 827 | 17 | 615 | 10 |
| VTD: Fulton Dist.1 Courthouse | 1,376 | 237 | 1,222 | 234 |
| VTD: Fulton Dist.4 Am. Legion | 2,378 | 144 | 1,924 | 102 |
| VTD: Fulton Dist.5 Firestation | 897 | 169 | 705 | 130 |
| VTD: Mantachie | 1,840 | 27 | 1,394 | 16 |
| VTD: Mt. Gilead | 304 | 0 | 223 | 0 |
| VTD: Ozark | 187 | 0 | 136 | 0 |
| VTD: Pineville | 1,476 | 0 | 1,152 | 0 |
| VTD: Pleasanton | 256 | 0 | 196 | 0 |
| VTD: Ryan | 667 | 0 | 521 | 0 |
| VTD: Tilden | 545 | 8 | 414 | 8 |
| **Itawamba MS County Subtotal** | 14,583 | 680 | 11,399 | 547 |
| Prentiss MS County | 25,276 | 3,488 | 19,391 | 2,600 |
| Tishomingo MS County | 19,593 | 519 | 15,055 | 398 |
| **District 5 Subtotal** | 59,452 | 4,687 | 45,845 | 3,545 |

| Plan: TRP_1<br>Type: | Administrator:<br>User: Jason Knight/Ben Collins<br>POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 6** | | | | |
| Itawamba MS County | | | | |
| VTD: Centerville | 697 | 34 | 526 | 30 |
| VTD: Fawn Grove | 1,065 | 3 | 785 | 3 |
| VTD: Kirkville | 1,153 | 0 | 869 | 0 |
| VTD: Ratliff | 456 | 0 | 333 | 0 |
| **Itawamba MS County Subtotal** | **3,371** | **37** | **2,513** | **33** |
| Lee MS County | | | | |
| VTD: Auburn | 2,571 | 49 | 1,935 | 32 |
| VTD: Baldwin | 1,483 | 575 | 1,177 | 431 |
| VTD: Beech Springs | 1,214 | 255 | 959 | 186 |
| VTD: Belden | 3,106 | 748 | 2,325 | 526 |
| VTD: Birmingham Ridge | 1,903 | 136 | 1,378 | 92 |
| VTD: Bissell | 5,342 | 508 | 4,109 | 353 |
| VTD: Blair | 2,109 | 294 | 1,510 | 212 |
| VTD: Corrona | 628 | 0 | 454 | 0 |
| VTD: Davis Box | 330 | 138 | 246 | 96 |
| VTD: East Heights | 721 | 79 | 559 | 52 |
| VTD: Eggville | 629 | 3 | 491 | 3 |
| VTD: Euclautubba | 537 | 5 | 400 | 3 |
| VTD: Fellowship | 1,316 | 54 | 948 | 33 |
| VTD: Flowerdale | 777 | 42 | 560 | 39 |
| VTD: Friendship | 413 | 20 | 315 | 13 |
| VTD: Gilvo 1 | 231 | 10 | 189 | 8 |
| VTD: Gilvo 5 | 310 | 5 | 242 | 4 |
| VTD: Guntown | 1,782 | 287 | 1,278 | 190 |
| VTD: Hebron | 786 | 8 | 599 | 5 |
| VTD: Mooreville 1 | 1,990 | 28 | 1,391 | 20 |
| VTD: Mooreville 5 | 961 | 15 | 737 | 12 |
| VTD: Oak Hill | 2,949 | 446 | 2,263 | 315 |
| VTD: Palmetto A & B *(part)* | 895 | 104 | 664 | 68 |
| VTD: Pratts | 699 | 35 | 527 | 22 |
| VTD: Richmond | 935 | 109 | 706 | 89 |
| VTD: Saltillo | 4,608 | 367 | 3,304 | 239 |
| VTD: Tupelo 1 | 781 | 4 | 598 | 4 |
| VTD: Tupelo 2 *(part)* | 5,492 | 1,087 | 4,064 | 692 |
| VTD: Tupelo 3 *(part)* | 6,571 | 1,610 | 4,936 | 1,059 |
| VTD: Tupelo 4 North *(part)* | 168 | 48 | 140 | 38 |
| VTD: Tupelo 5 | 2,573 | 1,169 | 1,919 | 805 |
| VTD: Unity | 1,134 | 11 | 790 | 7 |
| **Lee MS County Subtotal** | **55,944** | **8,249** | **41,713** | **5,648** |
| **District 6 Subtotal** | **59,315** | **8,286** | **44,226** | **5,681** |
| **District 7** | | | | |
| Itawamba MS County | | | | |
| VTD: Bigbee Fork | 314 | 7 | 225 | 5 |
| VTD: Cardsville | 343 | 5 | 266 | 5 |
| VTD: Carolina | 679 | 82 | 519 | 60 |
| VTD: Dorsey | 1,048 | 3 | 788 | 3 |
| VTD: Evergreen | 722 | 256 | 531 | 179 |
| VTD: Greenwood | 758 | 244 | 545 | 166 |

| Plan:   TRP_1 | Administrator: | | |
|---|---|---|---|
| Type: | User:        Jason Knight/Ben Collins | | |
| | POPULATION | Black | [18+_Pop] | [18+_Blk] |

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 7 (continued)** | | | | |
| Itawamba MS County (continued) | | | | |
| VTD: Hampton | 82 | 1 | 71 | 1 |
| VTD: James Creek | 139 | 0 | 114 | 0 |
| VTD: New Salem | 273 | 59 | 208 | 51 |
| VTD: Oakland | 265 | 8 | 199 | 3 |
| VTD: Tremont | 513 | 7 | 384 | 5 |
| VTD: Turon | 134 | 0 | 106 | 0 |
| VTD: Wigginton | 177 | 2 | 133 | 2 |
| **Itawamba MS County Subtotal** | **5,447** | **674** | **4,089** | **480** |
| Lee MS County | | | | |
| VTD: Brewer | 689 | 50 | 540 | 33 |
| VTD: Kedron | 939 | 230 | 703 | 180 |
| VTD: Nettleton | 1,787 | 224 | 1,322 | 159 |
| VTD: Palmetto A & B (part) | 71 | 43 | 40 | 17 |
| VTD: Petersburg | 658 | 83 | 484 | 61 |
| VTD: Plantersville | 1,884 | 813 | 1,485 | 611 |
| VTD: Tupelo 2 (part) | 655 | 363 | 456 | 229 |
| VTD: Tupelo 3 (part) | 1,803 | 1,012 | 1,247 | 618 |
| VTD: Tupelo 4 North (part) | 4,746 | 3,391 | 3,225 | 2,187 |
| VTD: Tupelo 4 South | 4,086 | 3,254 | 2,656 | 2,076 |
| VTD: Verona | 2,972 | 1,690 | 2,172 | 1,126 |
| **Lee MS County Subtotal** | **20,290** | **11,153** | **14,330** | **7,297** |
| Monroe MS County | | | | |
| VTD: Aberdeen 3 | 1,601 | 692 | 1,269 | 473 |
| VTD: Amory 1 | 1,368 | 75 | 1,060 | 52 |
| VTD: Amory 2 | 4,217 | 672 | 3,228 | 451 |
| VTD: Amory 5 | 1,405 | 1,344 | 974 | 940 |
| VTD: Becker | 2,244 | 196 | 1,707 | 132 |
| VTD: Bigbee 1 | 454 | 15 | 356 | 13 |
| VTD: Boyds | 835 | 13 | 649 | 7 |
| VTD: Central Grove | 839 | 513 | 608 | 363 |
| VTD: Darracott | 233 | 69 | 195 | 48 |
| VTD: Gibson | 823 | 603 | 596 | 459 |
| VTD: Hatley | 2,785 | 108 | 2,147 | 88 |
| VTD: Nettleton (28095503) | 2,026 | 693 | 1,521 | 526 |
| VTD: North Aberdeen 4 | 2,064 | 1,442 | 1,565 | 1,029 |
| VTD: Parham | 627 | 57 | 485 | 41 |
| VTD: Prairie | 1,062 | 851 | 778 | 634 |
| VTD: Smithville | 2,099 | 114 | 1,583 | 88 |
| VTD: South Aberdeen 4 | 2,421 | 2,027 | 1,721 | 1,399 |
| VTD: Williams | 210 | 0 | 166 | 0 |
| VTD: Willis | 1,245 | 881 | 934 | 656 |
| VTD: Wren | 1,950 | 272 | 1,470 | 193 |
| **Monroe MS County Subtotal** | **30,508** | **10,637** | **23,012** | **7,592** |
| **District 7 Subtotal** | **56,245** | **22,464** | **41,431** | **15,369** |
| **District 8** | | | | |
| Calhoun MS County | 14,962 | 4,149 | 11,223 | 2,931 |
| Chickasaw MS County | 17,392 | 7,319 | 12,820 | 5,114 |

Plan:    TRP_1
Type:

Administrator:
User:    Jason Knight/Ben Collins

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 8 (continued)** | | | | |
| Lee MS County | | | | |
| VTD: Old Union | 1,010 | 458 | 736 | 314 |
| VTD: Palmetto A & B *(part)* | 2,395 | 1,251 | 1,630 | 772 |
| VTD: Pleasant Grove | 1,918 | 900 | 1,434 | 667 |
| VTD: Shannon | 1,353 | 608 | 961 | 423 |
| **Lee MS County Subtotal** | 6,676 | 3,217 | 4,761 | 2,176 |
| Pontotoc MS County | | | | |
| VTD: Algoma | 875 | 140 | 631 | 103 |
| VTD: Beckham | 1,177 | 103 | 858 | 79 |
| VTD: Judah | 554 | 2 | 404 | 2 |
| VTD: North Randolph | 658 | 3 | 462 | 2 |
| VTD: Robbs | 459 | 32 | 350 | 20 |
| VTD: South Randolph | 608 | 8 | 419 | 6 |
| VTD: Springville | 1,109 | 115 | 783 | 79 |
| VTD: Thaxton | 973 | 80 | 724 | 58 |
| VTD: Toccopola | 471 | 22 | 348 | 17 |
| VTD: Troy | 1,190 | 137 | 883 | 96 |
| **Pontotoc MS County Subtotal** | 8,074 | 642 | 5,862 | 462 |
| Yalobusha MS County | | | | |
| VTD: Coffeeville 4 | 876 | 671 | 662 | 495 |
| VTD: One North | 1,939 | 485 | 1,479 | 325 |
| VTD: One South | 819 | 313 | 618 | 227 |
| VTD: Three North West | 1,738 | 361 | 1,333 | 247 |
| VTD: Two Water Valley | 2,477 | 1,379 | 1,787 | 992 |
| **Yalobusha MS County Subtotal** | 7,849 | 3,209 | 5,879 | 2,286 |
| **District 8 Subtotal** | 54,953 | 18,536 | 40,545 | 12,969 |
| **District 9** | | | | |
| Lafayette MS County | 47,351 | 11,201 | 38,591 | 8,346 |
| Panola MS County | | | | |
| VTD: Batesville 3 | 1,083 | 278 | 819 | 202 |
| VTD: Cold Springs | 363 | 273 | 251 | 184 |
| VTD: Coles Point | 901 | 15 | 700 | 7 |
| VTD: East Batesville 4 | 930 | 191 | 704 | 121 |
| VTD: East Batesville 5 | 2,195 | 361 | 1,681 | 254 |
| VTD: East Sardis | 1,006 | 160 | 820 | 102 |
| VTD: North Batesville A | 1,714 | 718 | 1,230 | 451 |
| VTD: North Springport | 1,902 | 552 | 1,391 | 362 |
| VTD: Pleasant Mount | 1,098 | 578 | 821 | 405 |
| **Panola MS County Subtotal** | 11,192 | 3,126 | 8,417 | 2,088 |
| **District 9 Subtotal** | 58,543 | 14,327 | 47,008 | 10,434 |
| **District 10** | | | | |
| Marshall MS County | | | | |
| VTD: Bethlehem | 681 | 65 | 493 | 53 |
| VTD: Chulahoma | 930 | 716 | 715 | 542 |
| VTD: Cornersville | 279 | 4 | 224 | 3 |
| VTD: Early Grove | 519 | 289 | 385 | 197 |
| VTD: Hudsonville | 651 | 362 | 508 | 279 |
| VTD: Laws Hill | 402 | 177 | 299 | 125 |

| Plan: TRP_1 | Administrator: | | |
|---|---|---|---|
| Type: | User: | Jason Knight/Ben Collins | |
| | POPULATION | Black | [18+_Pop] | [18+_Blk] |

**District 10 (continued)**

Marshall MS County (continued)

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| VTD: Marianna | 1,079 | 594 | 833 | 445 |
| VTD: Mt. Pleasant | 1,932 | 505 | 1,491 | 359 |
| VTD: N. Holly Springs Dist. 1 | 3,527 | 2,862 | 2,993 | 2,396 |
| VTD: N. Holly Springs Dist. 2 | 1,490 | 1,125 | 1,060 | 751 |
| VTD: Potts Camp | 1,926 | 602 | 1,408 | 425 |
| VTD: Redbanks | 1,875 | 503 | 1,428 | 365 |
| VTD: Slayden | 1,074 | 407 | 836 | 316 |
| VTD: South Holly Springs | 2,942 | 1,779 | 2,207 | 1,236 |
| VTD: Wall Hill | 1,550 | 912 | 1,150 | 676 |
| VTD: Warsaw | 1,540 | 663 | 1,120 | 472 |
| VTD: Waterford | 1,069 | 446 | 816 | 339 |
| VTD: Watson | 971 | 328 | 771 | 259 |
| VTD: West Holly Springs | 2,006 | 1,753 | 1,507 | 1,301 |
| **Marshall MS County Subtotal** | **26,443** | **14,092** | **20,244** | **10,539** |
| Tate MS County | 28,886 | 8,755 | 21,427 | 6,194 |
| **District 10 Subtotal** | **55,329** | **22,847** | **41,671** | **16,733** |

**District 11**

Coahoma MS County

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| VTD: Clarksdale 1-4 | 2,180 | 1,529 | 1,531 | 986 |
| VTD: Clarksdale 2-4 | 3,800 | 2,329 | 2,682 | 1,470 |
| VTD: Clarksdale 3-3 | 1,289 | 1,169 | 904 | 804 |
| VTD: Clarksdale 3-4 | 1,803 | 1,701 | 1,215 | 1,125 |
| VTD: Clarksdale 4-2 | 4,337 | 4,169 | 2,899 | 2,781 |
| VTD: Clarksdale 4-3 | 582 | 329 | 461 | 248 |
| VTD: Clarksdale 5-4 | 4,008 | 3,195 | 2,767 | 2,079 |
| VTD: Jonestown | 1,495 | 1,435 | 1,017 | 969 |
| VTD: Lyons | 1,857 | 763 | 1,381 | 514 |
| **Coahoma MS County Subtotal** | **21,351** | **16,619** | **14,857** | **10,976** |

Panola MS County

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| VTD: Como | 2,760 | 2,028 | 2,073 | 1,457 |
| VTD: Courtland | 2,612 | 1,752 | 1,866 | 1,197 |
| VTD: Crenshaw | 1,193 | 685 | 861 | 457 |
| VTD: Curtis | 1,067 | 822 | 778 | 578 |
| VTD: Enon | 359 | 87 | 252 | 54 |
| VTD: Longtown | 692 | 386 | 484 | 243 |
| VTD: Macedonia-Concord | 470 | 378 | 345 | 278 |
| VTD: North Batesville B | 2,761 | 2,391 | 1,757 | 1,485 |
| VTD: Pleasant Grove | 493 | 166 | 390 | 123 |
| VTD: South Sardis | 2,575 | 1,854 | 1,833 | 1,226 |
| VTD: Tocowa | 1,707 | 485 | 1,252 | 332 |
| VTD: West Sardis | 1,488 | 1,357 | 1,052 | 941 |
| **Panola MS County Subtotal** | **18,177** | **12,391** | **12,943** | **8,371** |
| Quitman MS County | 8,223 | 5,724 | 6,070 | 4,000 |
| Tunica MS County | 10,778 | 7,918 | 7,561 | 5,186 |
| **District 11 Subtotal** | **58,529** | **42,652** | **41,431** | **28,533** |

**District 12**

Bolivar MS County

| Plan: TRP_1<br>Type: | Administrator:<br>User:<br>POPULATION | Jason Knight/Ben Collins<br>Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 12 (continued)** | | | | |
| Bolivar MS County  (continued) | | | | |
| VTD: Benoit | 893 | 648 | 626 | 419 |
| VTD: Beulah | 410 | 354 | 281 | 234 |
| VTD: Duncan/Alligator | 787 | 563 | 589 | 396 |
| VTD: East Rosedale | 1,362 | 1,233 | 914 | 811 |
| VTD: Gunnison | 797 | 566 | 560 | 365 |
| VTD: Pace | 1,168 | 815 | 994 | 675 |
| VTD: Scott | 301 | 156 | 234 | 124 |
| VTD: Stringtown | 114 | 45 | 89 | 36 |
| VTD: West Rosedale | 586 | 428 | 458 | 327 |
| **Bolivar MS County Subtotal** | **6,418** | **4,808** | **4,745** | **3,387** |
| Coahoma MS County | | | | |
| VTD: Bobo | 370 | 199 | 283 | 151 |
| VTD: Cagle Crossing | 171 | 50 | 136 | 42 |
| VTD: Coahoma | 487 | 460 | 332 | 310 |
| VTD: Dublin | 469 | 160 | 377 | 135 |
| VTD: Farrell | 358 | 278 | 254 | 193 |
| VTD: Friar's Point | 1,647 | 1,520 | 1,182 | 1,081 |
| VTD: Lula | 713 | 303 | 597 | 244 |
| VTD: Rena Lara | 366 | 55 | 303 | 44 |
| VTD: Roundaway | 158 | 73 | 115 | 56 |
| VTD: Sherard | 61 | 35 | 51 | 32 |
| **Coahoma MS County Subtotal** | **4,800** | **3,133** | **3,630** | **2,288** |
| Washington MS County | | | | |
| VTD: American Legion | 3,192 | 2,561 | 2,227 | 1,680 |
| VTD: Brent Center | 1,755 | 1,721 | 1,209 | 1,187 |
| VTD: Buster Brown Comm. Center | 3,660 | 2,925 | 2,505 | 1,886 |
| VTD: Christ Wesleyan Methodist Church | 3,986 | 1,746 | 2,946 | 1,141 |
| VTD: Elks Club | 4,714 | 4,276 | 3,313 | 2,954 |
| VTD: Extension Building | 2,182 | 2,121 | 1,492 | 1,447 |
| VTD: Grace Methodist Church | 3,481 | 2,540 | 2,512 | 1,691 |
| VTD: Greenville Ind. College | 3,024 | 2,931 | 2,238 | 2,153 |
| VTD: Leland Rotary Club | 2,629 | 1,658 | 1,965 | 1,149 |
| VTD: Metcalfe City Hall | 1,069 | 1,018 | 697 | 666 |
| VTD: Potter House Church | 1,689 | 1,593 | 1,177 | 1,095 |
| VTD: St. James Epis. Church | 4,651 | 2,878 | 3,436 | 1,963 |
| VTD: Swiftwater Baptist Church | 1,324 | 104 | 991 | 83 |
| VTD: Tampa Drive | 1,417 | 859 | 997 | 564 |
| VTD: Wards Recreation Center | 4,319 | 2,015 | 3,195 | 1,327 |
| **Washington MS County Subtotal** | **43,092** | **30,946** | **30,900** | **20,986** |
| **District 12 Subtotal** | **54,310** | **38,887** | **39,275** | **26,661** |
| **District 13** | | | | |
| Bolivar MS County | | | | |
| VTD: Boyle | 3,202 | 1,662 | 2,337 | 1,162 |
| VTD: Cleveland Courthouse | 627 | 62 | 518 | 36 |
| VTD: Cleveland Eastgate | 1,249 | 1,217 | 886 | 857 |
| VTD: East Central Cleveland | 782 | 779 | 552 | 549 |
| VTD: East Cleveland | 2,917 | 2,482 | 2,241 | 1,841 |
| VTD: Merigold | 659 | 291 | 488 | 211 |

| | | | |
|---|---|---|---|
| Plan: TRP_1 | Administrator: | | |
| Type: | User: | Jason Knight/Ben Collins | |
| | POPULATION | Black | [18+_Pop] | [18+_Blk] |

**District 13 (continued)**

Bolivar MS County (continued)

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| VTD: Mound Bayou | 2,683 | 2,520 | 1,965 | 1,836 |
| VTD: North Cleveland | 1,656 | 1,298 | 1,151 | 885 |
| VTD: Renova | 396 | 363 | 285 | 264 |
| VTD: Shaw | 2,401 | 1,993 | 1,807 | 1,448 |
| VTD: Shelby | 2,360 | 2,195 | 1,597 | 1,456 |
| VTD: South Cleveland | 1,037 | 929 | 660 | 570 |
| VTD: West Central Cleveland | 1,140 | 146 | 891 | 86 |
| VTD: Winstonville | 122 | 92 | 100 | 77 |
| **Bolivar MS County Subtotal** | **21,231** | **16,029** | **15,478** | **11,278** |
| Sunflower MS County | 29,450 | 21,479 | 22,303 | 15,578 |
| Tallahatchie MS County | | | | |
| VTD: Brazil | 131 | 65 | 93 | 44 |
| VTD: Charleston Beat 2 | 1,721 | 1,256 | 1,244 | 858 |
| VTD: Sumner Beat 2 | 316 | 63 | 245 | 40 |
| VTD: Sumner Beat 5 | 374 | 244 | 283 | 177 |
| VTD: Tutwiler | 3,677 | 1,988 | 3,286 | 1,613 |
| VTD: Webb Beat 2 | 311 | 266 | 199 | 166 |
| VTD: Webb Beat 5 | 705 | 663 | 514 | 479 |
| **Tallahatchie MS County Subtotal** | **7,235** | **4,545** | **5,864** | **3,377** |
| **District 13 Subtotal** | **57,916** | **42,053** | **43,645** | **30,233** |

**District 14**

Attala MS County

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| VTD: Berea | 258 | 32 | 189 | 26 |
| VTD: Carmack | 430 | 4 | 328 | 3 |
| VTD: Ethel | 730 | 247 | 553 | 176 |
| VTD: Hesterville | 506 | 38 | 375 | 27 |
| VTD: Liberty Chapel | 532 | 135 | 382 | 95 |
| VTD: McCool | 482 | 157 | 378 | 114 |
| VTD: Providence | 634 | 82 | 510 | 63 |
| VTD: Thompson | 315 | 27 | 230 | 16 |
| VTD: Williamsville | 2,002 | 656 | 1,535 | 495 |
| VTD: Zama | 561 | 147 | 430 | 106 |
| **Attala MS County Subtotal** | **6,450** | **1,525** | **4,910** | **1,121** |
| Carroll MS County | 10,597 | 3,461 | 8,314 | 2,600 |
| Grenada MS County | | | | |
| VTD: Elliott | 1,012 | 178 | 716 | 96 |
| VTD: Futheyville | 1,291 | 304 | 964 | 222 |
| VTD: Geeslin | 1,056 | 164 | 825 | 130 |
| VTD: Gore Springs | 650 | 188 | 500 | 146 |
| VTD: Grenada Box 1 | 1,256 | 114 | 957 | 76 |
| VTD: Hardy | 719 | 35 | 546 | 28 |
| VTD: Mt. Nebo | 312 | 39 | 253 | 27 |
| VTD: Pleasant Grove | 850 | 428 | 687 | 341 |
| VTD: Providence (28043204) | 373 | 25 | 281 | 19 |
| VTD: Tie Plant | 1,985 | 874 | 1,480 | 608 |
| **Grenada MS County Subtotal** | **9,504** | **2,349** | **7,209** | **1,693** |

Leflore MS County

Plan:   TRP_1

Type:

Administrator:

User:   Jason Knight/Ben Collins

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 14 (continued)** | | | | |
| Leflore MS County  (continued) | | | | |
| VTD: Money | 286 | 87 | 237 | 73 |
| VTD: North Greenwood *(part)* | 4,488 | 401 | 3,529 | 266 |
| **Leflore MS County Subtotal** | 4,774 | 488 | 3,766 | 339 |
| Montgomery MS County | | | | |
| VTD: Alva | 86 | 36 | 68 | 24 |
| VTD: Duck Hill | 969 | 404 | 750 | 304 |
| VTD: Mt. Pisgah | 381 | 63 | 315 | 52 |
| VTD: North Duck Hill | 286 | 187 | 215 | 138 |
| VTD: North Mt. Pisgah - Sweethome | 204 | 87 | 164 | 63 |
| VTD: North Winona | 1,803 | 330 | 1,415 | 236 |
| VTD: South Winona | 1,698 | 1,200 | 1,235 | 853 |
| VTD: Southeast Winona | 27 | 0 | 19 | 0 |
| VTD: West Winona | 1,377 | 406 | 1,035 | 287 |
| **Montgomery MS County Subtotal** | 6,831 | 2,713 | 5,216 | 1,957 |
| Panola MS County | | | | |
| VTD: Eureka | 2,017 | 367 | 1,529 | 256 |
| VTD: Pope | 1,347 | 421 | 988 | 306 |
| VTD: South Springport | 1,974 | 570 | 1,486 | 409 |
| **Panola MS County Subtotal** | 5,338 | 1,358 | 4,003 | 971 |
| Tallahatchie MS County | | | | |
| VTD: Cascilla | 372 | 52 | 305 | 44 |
| VTD: Charleston Beat 1 | 1,551 | 977 | 1,079 | 617 |
| VTD: Charleston Beat 3 | 720 | 428 | 559 | 317 |
| VTD: Enid | 600 | 196 | 461 | 144 |
| VTD: Leverette | 378 | 154 | 286 | 104 |
| VTD: Murphreesboro | 412 | 87 | 321 | 69 |
| VTD: Paynes | 800 | 346 | 580 | 232 |
| VTD: Rosebloom | 211 | 6 | 170 | 6 |
| VTD: Springhill | 308 | 38 | 241 | 30 |
| VTD: Teasdale | 613 | 157 | 457 | 105 |
| **Tallahatchie MS County Subtotal** | 5,965 | 2,441 | 4,459 | 1,668 |
| Yalobusha MS County | | | | |
| VTD: Coffeeville 5 | 1,211 | 411 | 926 | 285 |
| VTD: Oakland | 1,588 | 768 | 1,241 | 558 |
| VTD: Scobey | 389 | 111 | 314 | 92 |
| VTD: Skuna-Vanns | 326 | 73 | 278 | 59 |
| VTD: Sylva Rena | 941 | 170 | 747 | 126 |
| VTD: Tillatoba | 374 | 63 | 271 | 43 |
| **Yalobusha MS County Subtotal** | 4,829 | 1,596 | 3,777 | 1,163 |
| **District 14 Subtotal** | 54,288 | 15,931 | 41,654 | 11,512 |
| **District 15** | | | | |
| Choctaw MS County | 8,547 | 2,574 | 6,470 | 1,867 |
| Montgomery MS County | | | | |
| VTD: East Winona | 1,025 | 769 | 685 | 483 |
| VTD: Kilmichael | 1,581 | 947 | 1,182 | 668 |
| VTD: Lodi | 355 | 288 | 281 | 225 |
| VTD: Nations | 529 | 57 | 409 | 47 |

Plan:  TRP 1
Type:

Administrator:
User:              Jason Knight/Ben Collins

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 15 (continued)** | | | | |
| Montgomery MS County (continued) | | | | |
| VTD: North Kilmicheal | 194 | 162 | 144 | 115 |
| VTD: Poplar Creek | 215 | 11 | 179 | 11 |
| VTD: Stewart | 195 | 20 | 159 | 14 |
| **Montgomery MS County Subtotal** | **4,094** | **2,254** | **3,039** | **1,563** |
| Oktibbeha MS County | | | | |
| VTD: Bradley | 339 | 95 | 267 | 67 |
| VTD: Central Starkville | 3,106 | 1,738 | 2,474 | 1,210 |
| VTD: Craig Springs | 256 | 14 | 205 | 6 |
| VTD: Double Springs | 427 | 41 | 345 | 28 |
| VTD: East Starkville | 3,236 | 715 | 3,125 | 693 |
| VTD: Gillespie Street Center *(part)* | 2,284 | 472 | 1,952 | 385 |
| VTD: Maben | 706 | 439 | 495 | 279 |
| VTD: North Longview | 1,085 | 189 | 826 | 135 |
| VTD: Northeast Starkville | 3,273 | 659 | 3,114 | 648 |
| VTD: Self Creek | 577 | 89 | 451 | 63 |
| VTD: South Adaton | 614 | 186 | 454 | 125 |
| VTD: South Longview | 362 | 95 | 289 | 73 |
| VTD: South Starkville | 6,669 | 1,700 | 5,325 | 1,201 |
| VTD: Sturgis | 1,171 | 264 | 934 | 214 |
| VTD: West Starkville | 7,995 | 2,581 | 6,564 | 1,905 |
| **Oktibbeha MS County Subtotal** | **32,100** | **9,277** | **26,820** | **7,032** |
| Webster MS County | 10,253 | 2,040 | 7,674 | 1,427 |
| **District 15 Subtotal** | **54,994** | **16,145** | **44,003** | **11,889** |
| **District 16** | | | | |
| Clay MS County | 20,634 | 12,017 | 15,332 | 8,392 |
| Lowndes MS County | | | | |
| VTD: Coleman A | 550 | 520 | 369 | 344 |
| VTD: Coleman B | 212 | 203 | 152 | 146 |
| VTD: Fairgrounds A | 2,213 | 2,086 | 1,302 | 1,206 |
| VTD: Fairgrounds D | 855 | 607 | 657 | 449 |
| VTD: Hunt A | 2,570 | 2,448 | 1,835 | 1,750 |
| VTD: Hunt B | 276 | 276 | 221 | 221 |
| VTD: Mitchell A | 2,446 | 2,002 | 1,795 | 1,429 |
| VTD: Mitchell B | 240 | 217 | 173 | 160 |
| VTD: Plum Grove C | 0 | 0 | 0 | 0 |
| VTD: Propst Park Community Hut | 1,157 | 1,017 | 906 | 778 |
| VTD: Union Academy A | 1,160 | 981 | 876 | 729 |
| VTD: West Lowndes B *(part)* | 254 | 75 | 207 | 61 |
| **Lowndes MS County Subtotal** | **11,933** | **10,432** | **8,493** | **7,273** |
| Noxubee MS County | | | | |
| VTD: Brooksville | 2,298 | 1,580 | 1,687 | 1,113 |
| VTD: Central District 3 | 2,519 | 1,994 | 1,804 | 1,386 |
| VTD: Cliftonville | 650 | 568 | 475 | 409 |
| VTD: Noxubee Cnty Vo-Tech Cen. | 804 | 462 | 562 | 338 |
| VTD: Prairie Point | 898 | 681 | 633 | 488 |
| **Noxubee MS County Subtotal** | **7,169** | **5,285** | **5,161** | **3,734** |
| Oktibbeha MS County | | | | |

| Plan: TRP_1 | Administrator: | | |
|---|---|---|---|
| Type: | User: Jason Knight/Ben Collins | | |
| | POPULATION | Black | [18+_Pop] | [18+_Blk] |

**District 16 (continued)**

Oktibbeha MS County (continued)

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| VTD: Bell Schoolhouse | 505 | 328 | 387 | 242 |
| VTD: Center Grove | 440 | 227 | 329 | 166 |
| VTD: Gillespie Street Center *(part)* | 1,617 | 1,103 | 1,144 | 723 |
| VTD: Hickory Grove | 3,380 | 1,245 | 2,848 | 935 |
| VTD: North Adaton | 426 | 153 | 342 | 117 |
| VTD: North Starkville 2 | 1,757 | 1,083 | 1,381 | 832 |
| VTD: North Starkville 3 | 3,250 | 1,165 | 2,517 | 776 |
| VTD: Oktoc | 1,055 | 762 | 835 | 584 |
| VTD: Osborn | 1,450 | 946 | 1,084 | 690 |
| VTD: Sessums | 1,353 | 949 | 1,032 | 685 |
| VTD: Southeast Oktibbeha | 338 | 193 | 246 | 140 |
| Oktibbeha MS County Subtotal | 15,571 | 8,154 | 12,145 | 5,890 |
| District 16 Subtotal | 55,307 | 35,888 | 41,131 | 25,289 |

**District 17**

Lowndes MS County

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| VTD: Air Base A | 679 | 183 | 492 | 122 |
| VTD: Air Base B | 1,773 | 854 | 1,286 | 597 |
| VTD: Air Base C | 1,354 | 146 | 972 | 99 |
| VTD: Air Base D | 121 | 18 | 90 | 15 |
| VTD: Air Base E | 45 | 10 | 33 | 6 |
| VTD: Artesia | 599 | 456 | 430 | 325 |
| VTD: Brandon A | 3,171 | 1,114 | 2,575 | 841 |
| VTD: Brandon B | 537 | 110 | 487 | 101 |
| VTD: Brandon C | 238 | 69 | 198 | 52 |
| VTD: Brandon D | 48 | 12 | 34 | 7 |
| VTD: Caledonia | 5,162 | 483 | 3,737 | 370 |
| VTD: Columbus High School A | 1,831 | 1,308 | 1,316 | 872 |
| VTD: Columbus High School B | 1,255 | 368 | 1,055 | 267 |
| VTD: Columbus High School C | 262 | 134 | 210 | 92 |
| VTD: Columbus High School D | 145 | 106 | 123 | 89 |
| VTD: Crawford A | 1,532 | 1,254 | 1,102 | 878 |
| VTD: Dowdle Gas Training Center B | 564 | 196 | 437 | 136 |
| VTD: Fairgrounds F | 118 | 75 | 82 | 48 |
| VTD: Fairgrounds G | 46 | 40 | 32 | 28 |
| VTD: Fairgrounds B | 1,150 | 690 | 834 | 492 |
| VTD: Fairgrounds C | 1,317 | 1,065 | 823 | 613 |
| VTD: Fairgrounds E | 169 | 138 | 126 | 100 |
| VTD: Hunt C | 143 | 129 | 102 | 90 |
| VTD: Lee Middle School | 4,921 | 818 | 3,899 | 581 |
| VTD: New Hope A | 2,955 | 249 | 2,146 | 164 |
| VTD: New Hope B | 2,385 | 355 | 1,708 | 245 |
| VTD: New Hope C | 1,595 | 261 | 1,264 | 200 |
| VTD: New Hope D | 386 | 19 | 297 | 12 |
| VTD: New Hope E | 165 | 48 | 122 | 36 |
| VTD: New Hope F | 0 | 0 | 0 | 0 |
| VTD: Plum Grove A | 631 | 541 | 479 | 410 |
| VTD: Plum Grove B | 10 | 0 | 10 | 0 |
| VTD: Rural Hill A | 2,209 | 605 | 1,623 | 390 |
| VTD: Rural Hill B | 1,181 | 255 | 889 | 185 |

Plan:   TRP_1  
Type:

Administrator:  
User:           Jason Knight/Ben Collins

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 17 (continued)** | | | | |
| Lowndes MS County (continued) | | | | |
| VTD: Rural Hill C | 216 | 10 | 164 | 7 |
| VTD: Sale A | 587 | 368 | 458 | 266 |
| VTD: Sale B | 293 | 137 | 251 | 103 |
| VTD: Sale C | 319 | 109 | 244 | 79 |
| VTD: Steens A | 917 | 103 | 697 | 80 |
| VTD: Steens B | 83 | 10 | 67 | 6 |
| VTD: Steens C | 878 | 249 | 663 | 175 |
| VTD: Trinity A | 1,005 | 583 | 802 | 414 |
| VTD: Trinity B | 832 | 476 | 631 | 294 |
| VTD: Union Academy B | 504 | 371 | 384 | 271 |
| VTD: Union Academy C | 385 | 167 | 292 | 110 |
| VTD: University A | 1,748 | 495 | 1,473 | 364 |
| VTD: University B | 73 | 48 | 60 | 36 |
| VTD: West Lowndes A | 944 | 263 | 743 | 185 |
| VTD: West Lowndes B *(part)* | 365 | 63 | 289 | 41 |
| **Lowndes MS County Subtotal** | 47,846 | 15,561 | 36,231 | 10,894 |
| Monroe MS County | | | | |
| VTD: Athens | 614 | 89 | 436 | 71 |
| VTD: Bartahatchie | 615 | 2 | 485 | 2 |
| VTD: Greenwood Springs | 1,079 | 17 | 788 | 11 |
| VTD: Hamilton | 2,601 | 457 | 1,971 | 352 |
| VTD: Lackey | 1,572 | 218 | 1,215 | 157 |
| **Monroe MS County Subtotal** | 6,481 | 783 | 4,895 | 593 |
| **District 17 Subtotal** | 54,327 | 16,344 | 41,126 | 11,487 |
| **District 18** | | | | |
| Leake MS County | | | | |
| VTD: East Carthage | 1,673 | 356 | 1,261 | 245 |
| VTD: Ebenezer | 897 | 473 | 645 | 346 |
| VTD: Edinburg | 1,063 | 5 | 752 | 4 |
| VTD: Freeny | 1,249 | 59 | 885 | 40 |
| VTD: Madden | 1,168 | 160 | 887 | 115 |
| VTD: North Carthage | 2,160 | 592 | 1,470 | 359 |
| VTD: Renfroe | 800 | 98 | 612 | 72 |
| VTD: Salem | 858 | 133 | 633 | 96 |
| VTD: Singleton | 1,512 | 458 | 1,095 | 308 |
| VTD: South Carthage | 1,150 | 384 | 922 | 334 |
| VTD: Sunrise | 719 | 20 | 538 | 18 |
| VTD: Walnut Grove | 3,151 | 2,309 | 1,484 | 1,000 |
| **Leake MS County Subtotal** | 16,400 | 5,047 | 11,184 | 2,937 |
| Neshoba MS County | 29,676 | 6,207 | 21,161 | 4,058 |
| Winston MS County | | | | |
| VTD: East Winston | 1,134 | 259 | 889 | 186 |
| VTD: Lovorn Tractor *(part)* | 701 | 269 | 553 | 195 |
| VTD: Mars Hill | 1,193 | 496 | 911 | 373 |
| VTD: Nanih Waiya | 2,110 | 364 | 1,526 | 272 |
| VTD: New National Guard Armory | 393 | 99 | 285 | 54 |
| VTD: Noxapater | 1,748 | 595 | 1,334 | 444 |

Plan:   TRP_1

Type:

Administrator:

User:    Jason Knight/Ben Collins

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 18 (continued)** | | | | |
| Winston MS County (continued) | | | | |
| VTD: Shiloh | 824 | 230 | 659 | 169 |
| VTD: Wathall *(part)* | 309 | 70 | 256 | 54 |
| VTD: Zion Ridge | 931 | 810 | 688 | 592 |
| **Winston MS County Subtotal** | **9,343** | **3,192** | **7,101** | **2,339** |
| **District 18 Subtotal** | **55,419** | **14,446** | **39,446** | **9,334** |
| **District 19** | | | | |
| DeSoto MS County | | | | |
| VTD: Fairhaven | 3,615 | 1,116 | 2,505 | 743 |
| VTD: Hack's Cross | 5,828 | 1,205 | 4,047 | 792 |
| VTD: Ingram's Mill | 2,437 | 492 | 1,795 | 386 |
| VTD: Miller | 5,233 | 1,211 | 3,620 | 833 |
| VTD: Mineral Wells | 3,560 | 775 | 2,597 | 506 |
| VTD: Olive Branch North | 8,280 | 2,363 | 5,974 | 1,505 |
| VTD: Olive Branch South | 5,650 | 643 | 4,079 | 397 |
| VTD: Olive Branch West | 2,666 | 669 | 1,942 | 444 |
| VTD: Pleasant Hill North | 3,769 | 417 | 2,683 | 286 |
| VTD: Pleasant Hill South | 2,540 | 240 | 1,767 | 166 |
| **DeSoto MS County Subtotal** | **43,578** | **9,131** | **31,009** | **6,058** |
| Marshall MS County | | | | |
| VTD: Barton | 1,813 | 141 | 1,514 | 113 |
| VTD: Byhalia | 4,175 | 1,248 | 3,197 | 896 |
| VTD: Cayce | 1,902 | 875 | 1,427 | 618 |
| VTD: North Cayce | 1,827 | 587 | 1,334 | 384 |
| VTD: Victoria | 984 | 496 | 725 | 359 |
| **Marshall MS County Subtotal** | **10,701** | **3,347** | **8,197** | **2,370** |
| **District 19 Subtotal** | **54,279** | **12,478** | **39,206** | **8,428** |
| **District 20** | | | | |
| Rankin MS County | | | | |
| VTD: Castlewoods | 4,306 | 475 | 3,140 | 312 |
| VTD: Castlewoods West | 2,600 | 260 | 2,050 | 191 |
| VTD: Crossroads | 1,108 | 95 | 812 | 61 |
| VTD: East Crossgates | 3,862 | 376 | 3,020 | 247 |
| VTD: Fannin | 2,269 | 391 | 1,643 | 274 |
| VTD: Flowood | 1,727 | 439 | 1,494 | 344 |
| VTD: Grant's Ferry | 5,213 | 532 | 3,793 | 353 |
| VTD: Holbrook | 7,499 | 784 | 5,634 | 536 |
| VTD: Leesburg | 1,359 | 104 | 992 | 80 |
| VTD: Mullins | 1,180 | 698 | 867 | 506 |
| VTD: Northeast Brandon | 2,251 | 554 | 1,613 | 386 |
| VTD: Northshore | 3,637 | 320 | 2,638 | 227 |
| VTD: Oakdale | 4,644 | 711 | 3,319 | 467 |
| VTD: Pelahatchie | 3,618 | 787 | 2,695 | 571 |
| VTD: Pisgah | 2,486 | 1,029 | 1,794 | 741 |
| VTD: Reservoir East | 2,234 | 81 | 1,782 | 48 |
| VTD: Reservoir West | 3,081 | 252 | 2,459 | 160 |
| VTD: South Crossgates | 1,418 | 68 | 1,190 | 49 |
| VTD: West Crossgates | 2,602 | 224 | 2,047 | 168 |
| **Rankin MS County Subtotal** | **57,094** | **8,180** | **42,982** | **5,721** |

| Plan: TRP_1 | Administrator: | | | |
|---|---|---|---|---|
| Type: | User: Jason Knight/Ben Collins | | | |
| | POPULATION | Black | [18+ Pop] | [18+ Blk] |
| **District 20 Subtotal** | 57,094 | 8,180 | 42,982 | 5,721 |
| **District 21** | | | | |
| Attala MS County | | | | |
| VTD: Aponaug | 492 | 125 | 373 | 98 |
| VTD: East | 1,701 | 422 | 1,269 | 277 |
| VTD: McAdams | 622 | 379 | 473 | 269 |
| VTD: Newport | 585 | 305 | 461 | 224 |
| VTD: North Central | 573 | 86 | 410 | 62 |
| VTD: Northeast | 2,378 | 1,733 | 1,656 | 1,182 |
| VTD: Northwest | 2,275 | 1,173 | 1,574 | 735 |
| VTD: Possumneck | 418 | 170 | 316 | 119 |
| VTD: Sallis | 1,463 | 1,009 | 1,078 | 715 |
| VTD: South Central | 1,922 | 776 | 1,425 | 547 |
| VTD: Southwest | 685 | 505 | 533 | 377 |
| **Attala MS County Subtotal** | 13,114 | 6,683 | 9,568 | 4,605 |
| Holmes MS County | | | | |
| VTD: Beat 4 Walden Chapel | 429 | 403 | 300 | 276 |
| VTD: Coxburg | 317 | 106 | 243 | 73 |
| VTD: Durant | 2,678 | 2,148 | 1,836 | 1,394 |
| VTD: Ebenezer | 583 | 454 | 426 | 317 |
| VTD: Goodman | 1,879 | 1,479 | 1,426 | 1,048 |
| VTD: Pickens | 1,418 | 1,219 | 1,024 | 872 |
| VTD: West | 958 | 697 | 709 | 497 |
| **Holmes MS County Subtotal** | 8,262 | 6,506 | 5,964 | 4,477 |
| Leake MS County | | | | |
| VTD: Conway | 1,029 | 701 | 716 | 472 |
| VTD: Good Hope | 1,106 | 268 | 876 | 213 |
| VTD: Lena | 799 | 491 | 614 | 367 |
| VTD: Ofahoma | 734 | 643 | 540 | 464 |
| VTD: Thomastown | 820 | 459 | 619 | 335 |
| VTD: West Carthage | 2,128 | 1,504 | 1,327 | 883 |
| VTD: Wiggins | 789 | 541 | 567 | 387 |
| **Leake MS County Subtotal** | 7,405 | 4,607 | 5,259 | 3,121 |
| Madison MS County | | | | |
| VTD: Bear Creek *(part)* | 0 | 0 | 0 | 0 |
| VTD: Bible Church | 1,320 | 1,309 | 768 | 765 |
| VTD: Camden | 1,536 | 1,307 | 1,125 | 929 |
| VTD: Cameron | 162 | 96 | 133 | 75 |
| VTD: Canton Precinct 1 | 2,807 | 2,097 | 2,044 | 1,437 |
| VTD: Canton Precinct 2 | 2,656 | 1,514 | 1,981 | 1,047 |
| VTD: Canton Precinct 3 | 483 | 285 | 348 | 182 |
| VTD: Canton Precinct 4 | 2,863 | 2,557 | 1,984 | 1,742 |
| VTD: Canton Precinct 5 | 2,194 | 2,146 | 1,438 | 1,408 |
| VTD: Canton Precinct 7 | 475 | 441 | 383 | 354 |
| VTD: Cedar Grove | 296 | 38 | 239 | 27 |
| VTD: Couparle | 86 | 68 | 72 | 56 |
| VTD: Liberty | 2,259 | 1,510 | 1,762 | 1,171 |
| VTD: Luther Branson School | 1,302 | 1,090 | 928 | 754 |
| VTD: Mad. Co. Bap. Fam. LfCt | 2,088 | 1,984 | 1,259 | 1,183 |
| VTD: New Industrial Park | 617 | 434 | 444 | 310 |

| Plan: TRP_1<br>Type: | Administrator:<br>User: Jason Knight/Ben Collins<br>POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 21 (continued)** | | | | |
| Madison MS County (continued) | | | | |
| VTD: Ratliff Ferry | 1,359 | 730 | 1,042 | 522 |
| VTD: Sharon | 1,098 | 940 | 826 | 684 |
| **Madison MS County Subtotal** | **23,601** | **18,546** | **16,776** | **12,646** |
| Yazoo MS County | | | | |
| VTD: Deasonville | 824 | 536 | 618 | 377 |
| VTD: East Midway | 530 | 418 | 385 | 292 |
| VTD: Harttown | 552 | 452 | 392 | 316 |
| VTD: West Midway | 274 | 61 | 230 | 42 |
| **Yazoo MS County Subtotal** | **2,180** | **1,467** | **1,625** | **1,027** |
| **District 21 Subtotal** | **54,562** | **37,809** | **39,192** | **25,876** |
| **District 22** | | | | |
| Bolivar MS County | | | | |
| VTD: Choctaw | 381 | 307 | 300 | 235 |
| VTD: Longshot | 188 | 77 | 154 | 62 |
| VTD: Northwest Cleveland | 1,672 | 89 | 1,344 | 70 |
| VTD: Skene | 563 | 83 | 443 | 59 |
| VTD: West Cleveland | 3,692 | 527 | 3,038 | 465 |
| **Bolivar MS County Subtotal** | **6,496** | **1,083** | **5,279** | **891** |
| Humphreys MS County | | | | |
| VTD: Gooden Lake | 86 | 22 | 68 | 17 |
| VTD: Isola | 1,335 | 988 | 951 | 658 |
| VTD: Lake City (28053302) | 107 | 14 | 92 | 13 |
| VTD: Louise | 845 | 621 | 643 | 463 |
| VTD: Midnight | 303 | 161 | 228 | 116 |
| VTD: Putnam | 292 | 85 | 245 | 69 |
| VTD: Silver City | 748 | 482 | 525 | 336 |
| VTD: Southeast Belzoni | 848 | 819 | 499 | 476 |
| VTD: Southwest Belzoni | 665 | 647 | 447 | 436 |
| **Humphreys MS County Subtotal** | **5,229** | **3,839** | **3,698** | **2,584** |
| Madison MS County | | | | |
| VTD: Bear Creek *(part)* | 3,703 | 1,701 | 2,702 | 1,222 |
| VTD: Flora | 1,907 | 552 | 1,408 | 377 |
| VTD: Gluckstadt *(part)* | 3,378 | 502 | 2,521 | 341 |
| VTD: Magnolia Heights | 2,261 | 1,837 | 1,539 | 1,204 |
| VTD: Smith School | 555 | 24 | 457 | 18 |
| VTD: Virlilia | 409 | 107 | 342 | 79 |
| VTD: Yandell Road | 2,469 | 333 | 1,719 | 205 |
| **Madison MS County Subtotal** | **14,682** | **5,056** | **10,688** | **3,446** |
| Sharkey MS County | 4,916 | 3,490 | 3,660 | 2,501 |
| Washington MS County | | | | |
| VTD: Arcola City Hall | 1,160 | 646 | 865 | 478 |
| VTD: Darlove Baptist Church | 226 | 74 | 170 | 58 |
| VTD: Glen Allan Health Clinic | 851 | 438 | 650 | 307 |
| VTD: Hollandale City Hall | 2,991 | 2,500 | 2,158 | 1,735 |
| VTD: Leland Health Dpt. Clinic | 2,817 | 1,864 | 2,057 | 1,287 |
| **Washington MS County Subtotal** | **8,045** | **5,522** | **5,900** | **3,865** |

| Plan: TRP_1<br>Type: | Administrator:<br>User: Jason Knight/Ben Collins<br>POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 22 (continued)** | | | | |
| Yazoo MS County | | | | |
| VTD: 3-1 West | 1,464 | 1,395 | 959 | 898 |
| VTD: 3-2 East | 1,493 | 1,209 | 1,078 | 839 |
| VTD: 3-3 Jonestown | 946 | 927 | 576 | 564 |
| VTD: 3-4 South | 1,029 | 449 | 712 | 303 |
| VTD: Benton | 965 | 235 | 731 | 171 |
| VTD: Carter | 71 | 32 | 57 | 23 |
| VTD: Eden | 559 | 121 | 419 | 88 |
| VTD: Fairview | 69 | 23 | 59 | 21 |
| VTD: Free Run | 289 | 61 | 235 | 44 |
| VTD: Fugates | 721 | 372 | 572 | 279 |
| VTD: Holly Bluff | 318 | 147 | 239 | 104 |
| VTD: Lake City | 309 | 91 | 228 | 64 |
| VTD: Valley | 152 | 19 | 115 | 13 |
| VTD: Ward 4 | 6,998 | 4,327 | 5,929 | 3,386 |
| VTD: Ward 5 | 3,385 | 3,190 | 2,234 | 2,063 |
| VTD: Zion | 702 | 194 | 515 | 133 |
| **Yazoo MS County Subtotal** | 19,470 | 12,792 | 14,658 | 8,993 |
| **District 22 Subtotal** | 58,838 | 31,782 | 43,883 | 22,280 |
| **District 23** | | | | |
| Issaquena MS County | 1,406 | 906 | 1,125 | 702 |
| Warren MS County | 48,773 | 22,920 | 36,135 | 15,755 |
| Yazoo MS County | | | | |
| VTD: Center Ridge | 866 | 63 | 655 | 46 |
| VTD: District 4 Ward 2 | 84 | 0 | 66 | 0 |
| VTD: Dover | 631 | 97 | 460 | 77 |
| VTD: East Bentonia | 595 | 156 | 443 | 107 |
| VTD: Mechanicsburg | 680 | 58 | 528 | 53 |
| VTD: Robinette | 798 | 59 | 622 | 52 |
| VTD: Satartia | 148 | 39 | 122 | 32 |
| VTD: Tinsley | 452 | 41 | 327 | 28 |
| VTD: Ward 2 | 1,294 | 686 | 864 | 391 |
| VTD: West Bentonia | 867 | 555 | 618 | 383 |
| **Yazoo MS County Subtotal** | 6,415 | 1,754 | 4,705 | 1,169 |
| **District 23 Subtotal** | 56,594 | 25,580 | 41,965 | 17,626 |
| **District 24** | | | | |
| Grenada MS County | | | | |
| VTD: Grenada Box 2 | 1,842 | 1,190 | 1,386 | 846 |
| VTD: Grenada Box 3 | 2,704 | 1,992 | 1,995 | 1,447 |
| VTD: Grenada Box 4 | 2,820 | 2,291 | 2,088 | 1,676 |
| VTD: Grenada Box 5 | 2,926 | 755 | 2,258 | 532 |
| VTD: Holcomb | 1,479 | 355 | 1,094 | 258 |
| VTD: Sweethome | 631 | 208 | 485 | 160 |
| **Grenada MS County Subtotal** | 12,402 | 6,791 | 9,306 | 4,919 |
| Holmes MS County | | | | |
| VTD: Acona | 992 | 913 | 680 | 619 |
| VTD: Cruger | 455 | 375 | 336 | 270 |
| VTD: Lexington Beat 1 | 2,368 | 2,139 | 1,595 | 1,405 |

Plan:   TRP 1
Type:

Administrator:
User:   Jason Knight/Ben Collins

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 24 (continued)** | | | | |
| Holmes MS County  (continued) | | | | |
| VTD: Lexington Beat 4 | 2,614 | 2,291 | 1,879 | 1,599 |
| VTD: Lexington Beat 5 | 585 | 271 | 449 | 181 |
| VTD: Lexington East | 612 | 537 | 453 | 389 |
| VTD: Sandhill | 91 | 16 | 69 | 10 |
| VTD: Tchula | 2,503 | 2,326 | 1,686 | 1,533 |
| VTD: Thornton | 716 | 644 | 510 | 443 |
| **Holmes MS County Subtotal** | **10,936** | **9,512** | **7,657** | **6,449** |
| Humphreys MS County | | | | |
| VTD: Central Belzoni | 2,046 | 1,385 | 1,500 | 952 |
| VTD: Four Mile | 152 | 42 | 115 | 28 |
| VTD: North Belzoni | 1,424 | 1,209 | 998 | 826 |
| VTD: Northwest Belzoni | 524 | 512 | 362 | 352 |
| **Humphreys MS County Subtotal** | **4,146** | **3,148** | **2,975** | **2,158** |
| Leflore MS County | | | | |
| VTD: Central Greenwood | 937 | 684 | 701 | 497 |
| VTD: East Greenwood | 2,909 | 2,835 | 1,970 | 1,902 |
| VTD: Minter City | 560 | 314 | 439 | 232 |
| VTD: Morgan City/Swiftown | 498 | 324 | 363 | 218 |
| VTD: MVSU | 1,316 | 1,112 | 1,192 | 1,040 |
| VTD: North Greenwood *(part)* | 1,209 | 690 | 912 | 468 |
| VTD: North Itta Bena | 3,006 | 2,583 | 2,132 | 1,771 |
| VTD: Northeast Greenwood | 2,780 | 1,997 | 1,956 | 1,286 |
| VTD: Rising Sun | 1,073 | 1,058 | 713 | 699 |
| VTD: Schlater | 580 | 330 | 414 | 231 |
| VTD: Sidon | 776 | 625 | 525 | 390 |
| VTD: South Greenwood | 1,645 | 1,616 | 1,126 | 1,107 |
| VTD: South Itta Bena | 977 | 851 | 645 | 542 |
| VTD: Southeast Greenwood | 4,502 | 3,638 | 3,422 | 2,655 |
| VTD: Southwest Greenwood | 2,215 | 1,956 | 1,377 | 1,208 |
| VTD: West Greenwood | 2,560 | 2,241 | 1,913 | 1,655 |
| **Leflore MS County Subtotal** | **27,543** | **22,854** | **19,800** | **15,901** |
| Tallahatchie MS County | | | | |
| VTD: Blue Cane | 99 | 80 | 70 | 52 |
| VTD: Glendora | 938 | 823 | 652 | 560 |
| VTD: Philipp | 337 | 185 | 273 | 144 |
| VTD: Tippo | 484 | 344 | 348 | 231 |
| VTD: Webb Beat 4 | 320 | 261 | 227 | 177 |
| **Tallahatchie MS County Subtotal** | **2,178** | **1,693** | **1,570** | **1,164** |
| **District 24 Subtotal** | **57,205** | **43,998** | **41,308** | **30,591** |
| **District 25** | | | | |
| Hinds MS County | | | | |
| VTD: 32 | 1,238 | 162 | 993 | 78 |
| VTD: 33 | 1,176 | 3 | 901 | 2 |
| VTD: 34 | 2,242 | 51 | 1,715 | 34 |
| VTD: 35 | 2,144 | 120 | 1,617 | 84 |
| VTD: 36 | 1,671 | 1,018 | 1,269 | 712 |
| VTD: 44 | 3,992 | 2,476 | 2,907 | 1,648 |

Plan:   TRP_1                          Administrator:
Type:                                  User:        Jason Knight/Ben Collins

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 25 (continued)** | | | | |
| Hinds MS County  (continued) | | | | |
| VTD: 45 | 2,553 | 254 | 2,060 | 194 |
| VTD: 78 | 4,029 | 1,542 | 3,333 | 1,158 |
| **Hinds MS County Subtotal** | 19,045 | 5,626 | 14,795 | 3,910 |
| Madison MS County | | | | |
| VTD: Bear Creek *(part)* | 0 | 0 | 0 | 0 |
| VTD: Cobblestone | 2,692 | 371 | 2,069 | 256 |
| VTD: Gluckstadt *(part)* | 7,015 | 1,053 | 4,642 | 700 |
| VTD: Highland Colony Bap. Ch. | 3,851 | 683 | 2,798 | 501 |
| VTD: Madison 1 | 2,818 | 261 | 1,964 | 157 |
| VTD: Madison 2 | 3,466 | 170 | 2,474 | 128 |
| VTD: Madison 3 | 4,683 | 615 | 3,269 | 398 |
| VTD: Main Harbor | 1,709 | 62 | 1,455 | 46 |
| VTD: NorthBay | 1,244 | 116 | 932 | 81 |
| VTD: Ridgeland Tennis Center | 5,659 | 1,347 | 4,377 | 931 |
| VTD: SunnyBrook | 757 | 75 | 540 | 54 |
| VTD: Trace Harbor | 2,146 | 116 | 1,600 | 71 |
| VTD: Victory Baptist Church | 1,724 | 103 | 1,244 | 71 |
| VTD: Whispering Lake | 2,394 | 269 | 1,716 | 177 |
| **Madison MS County Subtotal** | 40,158 | 5,241 | 29,080 | 3,571 |
| **District 25 Subtotal** | 59,203 | 10,867 | 43,875 | 7,481 |
| **District 26** | | | | |
| Hinds MS County | | | | |
| VTD: 41 | 2,537 | 2,503 | 1,872 | 1,842 |
| VTD: 43 | 3,838 | 3,465 | 2,551 | 2,252 |
| VTD: 46 | 2,247 | 1,224 | 1,746 | 841 |
| VTD: 79 | 3,557 | 2,479 | 2,572 | 1,664 |
| VTD: 80 | 4,130 | 3,957 | 2,796 | 2,664 |
| VTD: 81 | 1,902 | 1,817 | 1,584 | 1,505 |
| VTD: 82 | 1,839 | 1,782 | 1,398 | 1,346 |
| VTD: 83 | 3,738 | 3,697 | 2,650 | 2,616 |
| VTD: 84 | 296 | 275 | 237 | 224 |
| VTD: 85 | 3,222 | 3,175 | 2,390 | 2,354 |
| VTD: Bolton | 1,650 | 1,152 | 1,272 | 854 |
| VTD: Brownsville | 783 | 405 | 597 | 313 |
| VTD: Cynthia | 1,104 | 752 | 817 | 560 |
| VTD: Edwards | 3,406 | 2,554 | 2,522 | 1,824 |
| VTD: Pinehaven *(part)* | 3,324 | 1,337 | 2,439 | 948 |
| VTD: Pocahontas | 648 | 409 | 534 | 334 |
| VTD: Timm | 1,221 | 264 | 897 | 189 |
| **Hinds MS County Subtotal** | 39,442 | 31,247 | 28,874 | 22,330 |
| Madison MS County | | | | |
| VTD: Lorman-Cavalier | 1,692 | 673 | 1,346 | 499 |
| VTD: Ridgeland 1 | 3,528 | 1,265 | 2,709 | 844 |
| VTD: Ridgeland 3 | 4,333 | 2,640 | 3,210 | 1,880 |
| VTD: Ridgeland 4 | 2,968 | 1,417 | 2,392 | 1,057 |
| VTD: Ridgeland First Meth. Ch. | 3,570 | 889 | 2,697 | 661 |
| VTD: Tougaloo | 671 | 641 | 657 | 631 |
| **Madison MS County Subtotal** | 16,762 | 7,525 | 13,011 | 5,572 |

| Plan: TRP_1 Type: | Administrator: User: Jason Knight/Ben Collins | | | |
|---|---|---|---|---|
| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
| **District 26 Subtotal** | 56,204 | 38,772 | 41,885 | 27,902 |
| **District 27** | | | | |
| Hinds MS County | | | | |
| VTD: 11 | 659 | 644 | 508 | 498 |
| VTD: 12 | 798 | 782 | 591 | 580 |
| VTD: 13 | 1,044 | 1,017 | 807 | 790 |
| VTD: 16 | 1,744 | 1,273 | 1,338 | 917 |
| VTD: 21 | 811 | 777 | 587 | 557 |
| VTD: 22 | 2,096 | 2,065 | 1,491 | 1,463 |
| VTD: 23 | 2,125 | 2,098 | 1,417 | 1,399 |
| VTD: 24 | 1,236 | 1,162 | 829 | 774 |
| VTD: 26 *(part)* | 0 | 0 | 0 | 0 |
| VTD: 27 | 1,713 | 1,686 | 1,368 | 1,349 |
| VTD: 28 | 1,861 | 1,836 | 1,535 | 1,514 |
| VTD: 29 | 976 | 948 | 764 | 741 |
| VTD: 30 | 1,003 | 993 | 745 | 735 |
| VTD: 31 | 1,474 | 1,440 | 1,140 | 1,112 |
| VTD: 38 | 1,476 | 1,238 | 1,013 | 808 |
| VTD: 39 | 1,628 | 1,596 | 1,163 | 1,137 |
| VTD: 40 | 2,103 | 2,026 | 1,620 | 1,559 |
| VTD: 42 | 2,849 | 2,598 | 2,065 | 1,859 |
| VTD: 54 | 1,280 | 1,212 | 969 | 905 |
| VTD: 55 | 1,388 | 1,349 | 979 | 946 |
| VTD: 56 *(part)* | 589 | 559 | 444 | 422 |
| VTD: 57 | 1,154 | 1,128 | 828 | 809 |
| VTD: 60 | 816 | 684 | 599 | 473 |
| VTD: 61 | 1,634 | 1,573 | 1,137 | 1,096 |
| VTD: 62 | 2,518 | 2,381 | 1,686 | 1,576 |
| VTD: 86 | 2,343 | 2,247 | 1,607 | 1,540 |
| VTD: Clinton 1 | 2,873 | 887 | 2,208 | 589 |
| VTD: Clinton 2 | 6,645 | 1,770 | 4,888 | 1,172 |
| VTD: Clinton 3 | 3,915 | 1,378 | 3,128 | 1,021 |
| VTD: Clinton 4 | 2,090 | 793 | 1,514 | 519 |
| VTD: Clinton 5 | 1,441 | 273 | 1,089 | 189 |
| VTD: Pinehaven *(part)* | 167 | 63 | 134 | 42 |
| **Hinds MS County Subtotal** | 54,449 | 40,476 | 40,191 | 29,091 |
| **District 27 Subtotal** | 54,449 | 40,476 | 40,191 | 29,091 |
| **District 28** | | | | |
| Hinds MS County | | | | |
| VTD: 18 | 927 | 898 | 697 | 677 |
| VTD: 19 | 1,023 | 1,004 | 730 | 714 |
| VTD: 20 | 1,047 | 1,027 | 798 | 784 |
| VTD: 25 | 2,128 | 2,060 | 1,478 | 1,428 |
| VTD: 26 *(part)* | 1,077 | 983 | 774 | 690 |
| VTD: 50 | 752 | 674 | 571 | 498 |
| VTD: 51 | 614 | 601 | 465 | 452 |
| VTD: 52 | 1,724 | 1,657 | 1,243 | 1,190 |
| VTD: 53 | 309 | 305 | 235 | 231 |
| VTD: 56 *(part)* | 0 | 0 | 0 | 0 |
| VTD: 58 | 1,671 | 1,635 | 1,322 | 1,287 |
| VTD: 59 | 2,300 | 2,252 | 1,531 | 1,486 |

| Plan: TRP_1 Type: | Administrator: User: Jason Knight/Ben Collins POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 28 (continued)** | | | | |
| Hinds MS County (continued) | | | | |
| VTD: 63 | 1,189 | 1,130 | 1,006 | 952 |
| VTD: 64 | 802 | 782 | 626 | 610 |
| VTD: 66 | 158 | 154 | 109 | 106 |
| VTD: 67 | 1,585 | 1,481 | 1,014 | 928 |
| VTD: 68 | 4,140 | 3,745 | 2,774 | 2,411 |
| VTD: 69 | 2,007 | 1,821 | 1,276 | 1,116 |
| VTD: 70 | 1,684 | 1,494 | 894 | 758 |
| VTD: 71 | 2,144 | 1,808 | 1,360 | 1,068 |
| VTD: 73 | 2,166 | 1,868 | 1,385 | 1,143 |
| VTD: 74 | 1,716 | 1,459 | 1,060 | 842 |
| VTD: 75 | 1,389 | 1,187 | 882 | 717 |
| VTD: 76 | 1,468 | 1,176 | 933 | 687 |
| VTD: 87 | 2,391 | 2,035 | 1,525 | 1,237 |
| VTD: 88 | 2,501 | 2,213 | 1,835 | 1,580 |
| VTD: 89 | 2,035 | 1,779 | 1,412 | 1,189 |
| VTD: 90 | 3,254 | 2,766 | 2,025 | 1,620 |
| VTD: 92 | 4,132 | 3,628 | 2,651 | 2,203 |
| VTD: 93 | 2,800 | 2,353 | 1,875 | 1,496 |
| VTD: Clinton 6 | 4,137 | 1,896 | 3,127 | 1,302 |
| VTD: Jackson State | 2,210 | 2,138 | 2,181 | 2,109 |
| **Hinds MS County Subtotal** | 57,480 | 50,009 | 39,794 | 33,511 |
| **District 28 Subtotal** | 57,480 | 50,009 | 39,794 | 33,511 |
| **District 29** | | | | |
| Hinds MS County | | | | |
| VTD: 1 | 345 | 172 | 328 | 159 |
| VTD: 10 | 679 | 670 | 492 | 489 |
| VTD: 14 | 1,348 | 101 | 1,136 | 80 |
| VTD: 15 | 442 | 26 | 387 | 26 |
| VTD: 17 | 843 | 65 | 662 | 43 |
| VTD: 2 | 461 | 439 | 389 | 371 |
| VTD: 37 | 1,644 | 879 | 1,253 | 621 |
| VTD: 4 | 861 | 856 | 643 | 639 |
| VTD: 47 | 1,781 | 1,441 | 1,401 | 1,106 |
| VTD: 5 | 1,926 | 1,009 | 1,742 | 883 |
| VTD: 6 | 1,916 | 1,106 | 1,594 | 844 |
| VTD: 72 | 2,354 | 2,101 | 1,398 | 1,184 |
| VTD: 77 | 2,897 | 2,182 | 1,891 | 1,307 |
| VTD: 8 | 1,303 | 139 | 1,181 | 128 |
| VTD: 9 | 1,961 | 84 | 1,696 | 78 |
| VTD: 91 | 2,927 | 2,686 | 2,086 | 1,879 |
| VTD: 94 | 3,832 | 3,484 | 2,687 | 2,377 |
| VTD: 95 | 877 | 556 | 646 | 364 |
| VTD: 96 | 2,613 | 1,992 | 1,892 | 1,330 |
| VTD: 97 | 1,210 | 870 | 825 | 532 |
| VTD: Byram 1 | 8,418 | 5,211 | 5,886 | 3,433 |
| VTD: Byram 2 *(part)* | 2,697 | 1,006 | 2,031 | 667 |
| VTD: Old Byram | 3,959 | 1,500 | 2,936 | 989 |
| VTD: Spring Ridge | 4,616 | 2,664 | 3,442 | 1,838 |
| VTD: Terry | 6,599 | 2,661 | 5,045 | 1,953 |

| Plan: TRP 1 | Administrator: | | |
|---|---|---|---|
| Type: | User: Jason Knight/Ben Collins | | |
| | POPULATION | Black | [18+_Pop] | [18+_Blk] |

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 29 (continued)** | | | | |
| **Hinds MS County Subtotal** | 58,509 | 33,900 | 43,669 | 23,320 |
| **District 29 Subtotal** | 58,509 | 33,900 | 43,669 | 23,320 |
| **District 30** | | | | |
| Rankin MS County | | | | |
| VTD: Crest Park | 2,883 | 430 | 2,081 | 225 |
| VTD: Cunningham Heights | 1,883 | 339 | 1,388 | 240 |
| VTD: East Brandon | 3,163 | 333 | 2,310 | 222 |
| VTD: Eldorado | 2,637 | 721 | 2,031 | 503 |
| VTD: Liberty | 2,307 | 318 | 1,923 | 251 |
| VTD: Monterey *(part)* | 234 | 67 | 179 | 45 |
| VTD: North Brandon | 5,882 | 554 | 4,195 | 403 |
| VTD: North McLaurin | 1,779 | 196 | 1,350 | 130 |
| VTD: North Pearson | 540 | 44 | 409 | 35 |
| VTD: North Richland | 2,441 | 332 | 1,879 | 257 |
| VTD: Park Place | 4,317 | 1,051 | 3,319 | 847 |
| VTD: Patton Place | 1,661 | 198 | 1,250 | 128 |
| VTD: Pearl | 1,780 | 410 | 1,334 | 278 |
| VTD: South Brandon | 2,114 | 82 | 1,582 | 50 |
| VTD: South McLaurin | 2,456 | 237 | 1,789 | 148 |
| VTD: South Pearson | 4,558 | 2,559 | 4,216 | 2,380 |
| VTD: South Richland *(part)* | 959 | 22 | 695 | 15 |
| VTD: Springhill | 3,728 | 1,635 | 2,773 | 1,150 |
| VTD: West Brandon | 7,002 | 2,368 | 4,780 | 1,528 |
| VTD: West Pearl | 3,581 | 1,274 | 2,690 | 837 |
| **Rankin MS County Subtotal** | 55,905 | 13,170 | 42,173 | 9,672 |
| **District 30 Subtotal** | 55,905 | 13,170 | 42,173 | 9,672 |
| **District 31** | | | | |
| Lauderdale MS County | | | | |
| VTD: Center Hill | 2,114 | 183 | 1,559 | 115 |
| VTD: Collinsville | 2,515 | 318 | 1,845 | 233 |
| VTD: Martin | 1,396 | 23 | 1,007 | 17 |
| VTD: Obadiah | 267 | 7 | 194 | 6 |
| VTD: West Lauderdale | 371 | 38 | 263 | 22 |
| **Lauderdale MS County Subtotal** | 6,663 | 569 | 4,868 | 393 |
| Newton MS County | 21,720 | 6,567 | 16,067 | 4,663 |
| Scott MS County | 28,264 | 10,585 | 20,630 | 7,289 |
| **District 31 Subtotal** | 56,647 | 17,721 | 41,565 | 12,345 |
| **District 32** | | | | |
| Kemper MS County | 10,456 | 6,288 | 8,015 | 4,604 |
| Lauderdale MS County | | | | |
| VTD: 10 | 984 | 798 | 654 | 505 |
| VTD: 11 | 1,292 | 1,090 | 1,000 | 827 |
| VTD: 12 | 2,329 | 2,124 | 1,671 | 1,503 |
| VTD: 14 | 1,717 | 1,402 | 1,332 | 1,034 |
| VTD: 15 | 405 | 342 | 263 | 209 |
| VTD: 20 | 986 | 856 | 771 | 650 |
| VTD: 3 | 4,412 | 3,049 | 3,168 | 1,997 |
| VTD: 4 | 1,512 | 1,245 | 1,084 | 881 |

| Plan: TRP 1 | Administrator: | | | |
| Type: | User: Jason Knight/Ben Collins | | | |
| | POPULATION | Black | [18+_Pop] | [18+_Blk] |

**District 32 (continued)**

Lauderdale MS County  (continued)

| | | | | |
|---|---|---|---|---|
| VTD: 5 | 4,341 | 1,946 | 3,149 | 1,256 |
| VTD: 6 | 4,618 | 4,041 | 3,171 | 2,726 |
| VTD: 7 | 1,482 | 1,015 | 1,114 | 701 |
| VTD: 8 | 2,206 | 1,400 | 1,738 | 1,020 |
| VTD: 9 | 3,462 | 2,906 | 2,209 | 1,752 |
| VTD: Center Ridge | 433 | 332 | 308 | 227 |
| VTD: Daleville | 528 | 353 | 400 | 276 |
| VTD: East Lauderdale | 1,983 | 601 | 1,519 | 415 |
| VTD: East Marion | 512 | 148 | 391 | 100 |
| VTD: Marion | 1,199 | 624 | 848 | 423 |
| VTD: West Dalewood | 292 | 39 | 235 | 26 |
| **Lauderdale MS County Subtotal** | **34,693** | **24,311** | **25,025** | **16,528** |
| | | | | |
| Noxubee MS County | | | | |
| VTD: Earl Nash Gym | 1,981 | 1,497 | 1,446 | 1,050 |
| VTD: Mashulaville | 626 | 369 | 469 | 268 |
| VTD: Savannah | 302 | 143 | 230 | 116 |
| VTD: Shuqualak | 1,204 | 919 | 895 | 664 |
| VTD: Sommerville | 263 | 49 | 215 | 45 |
| **Noxubee MS County Subtotal** | **4,376** | **2,977** | **3,255** | **2,143** |
| | | | | |
| Winston MS County | | | | |
| VTD: American Legion | 1,589 | 1,369 | 1,133 | 957 |
| VTD: County Agent | 2,151 | 1,800 | 1,460 | 1,187 |
| VTD: Fairground | 3,741 | 1,434 | 2,884 | 1,008 |
| VTD: Lovorn Tractor *(part)* | 188 | 155 | 127 | 96 |
| VTD: Mill Creek | 2,036 | 687 | 1,593 | 498 |
| VTD: Wathall *(part)* | 150 | 116 | 111 | 77 |
| **Winston MS County Subtotal** | **9,855** | **5,561** | **7,308** | **3,823** |
| **District 32 Subtotal** | **59,380** | **39,137** | **43,603** | **27,098** |

**District 33**

| | | | | |
|---|---|---|---|---|
| Clarke MS County | 16,732 | 5,759 | 12,604 | 4,006 |
| | | | | |
| Lauderdale MS County | | | | |
| VTD: 1 | 3,547 | 727 | 2,726 | 491 |
| VTD: 13 | 3,595 | 1,391 | 2,763 | 881 |
| VTD: 16 | 532 | 116 | 428 | 84 |
| VTD: 17 | 111 | 23 | 92 | 15 |
| VTD: 18 | 349 | 151 | 279 | 100 |
| VTD: 2 | 551 | 149 | 437 | 102 |
| VTD: Alamucha | 422 | 145 | 311 | 108 |
| VTD: Andrews Chapel | 1,510 | 348 | 1,134 | 242 |
| VTD: Bailey | 2,052 | 498 | 1,602 | 385 |
| VTD: Causeyville | 903 | 45 | 715 | 33 |
| VTD: Clarkdale | 1,241 | 68 | 937 | 55 |
| VTD: Culpepper | 829 | 23 | 607 | 18 |
| VTD: East Bonita | 957 | 295 | 783 | 230 |
| VTD: Kewanee | 533 | 264 | 396 | 192 |
| VTD: Meehan | 2,305 | 1,030 | 2,059 | 984 |
| VTD: Mt. Gilead | 1,087 | 272 | 811 | 192 |

| Plan:  TRP_1<br>Type: | Administrator:<br>User:    Jason Knight/Ben Collins | | |
|---|---|---|---|
| | POPULATION    Black | [18+_Pop] | [18+_Blk] |

**District 33 (continued)**

Lauderdale MS County (continued)

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| VTD: New Lauderdale | 3,530 | 567 | 2,724 | 438 |
| VTD: Odom | 941 | 377 | 707 | 273 |
| VTD: Pickard | 862 | 178 | 660 | 113 |
| VTD: Prospect | 1,028 | 170 | 871 | 112 |
| VTD: Russell | 1,419 | 559 | 1,068 | 386 |
| VTD: Sageville | 248 | 108 | 202 | 92 |
| VTD: South Nellieburg | 1,077 | 150 | 901 | 132 |
| VTD: South Russell | 302 | 62 | 224 | 45 |
| VTD: Suqualena | 2,547 | 375 | 1,977 | 279 |
| VTD: Toomsuba | 950 | 427 | 732 | 322 |
| VTD: Valley | 408 | 52 | 313 | 33 |
| VTD: Vimville | 2,291 | 544 | 1,729 | 374 |
| VTD: Whynot | 934 | 183 | 709 | 120 |
| VTD: Zero | 1,844 | 153 | 1,391 | 108 |
| **Lauderdale MS County Subtotal** | **38,905** | **9,450** | **30,288** | **6,939** |
| **District 33 Subtotal** | **55,637** | **15,209** | **42,892** | **10,945** |

**District 34**

Forrest MS County

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| VTD: Davis School | 2,454 | 1,841 | 1,792 | 1,310 |
| VTD: Eaton School | 1,136 | 835 | 829 | 600 |
| VTD: Eatonville | 1,349 | 239 | 1,095 | 177 |
| VTD: Glendale | 2,215 | 1,233 | 1,662 | 880 |
| VTD: Jones School | 1,037 | 972 | 802 | 755 |
| VTD: Lillie Burney School | 1,219 | 1,167 | 731 | 697 |
| VTD: North Heights | 2,380 | 1,642 | 1,873 | 1,222 |
| VTD: Rowan School | 1,693 | 1,615 | 1,143 | 1,084 |
| VTD: Salvation Army | 3,367 | 2,773 | 2,290 | 1,762 |
| VTD: Walthall School | 1,749 | 993 | 1,331 | 753 |
| VTD: Westside *(part)* | 1,220 | 1,120 | 695 | 627 |
| **Forrest MS County Subtotal** | **19,819** | **14,430** | **14,243** | **9,867** |
| Jasper MS County | 17,062 | 8,970 | 12,939 | 6,439 |

Jones MS County

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| VTD: Blackwell | 131 | 9 | 99 | 7 |
| VTD: Bruce | 755 | 24 | 579 | 19 |
| VTD: Centerville | 390 | 7 | 293 | 4 |
| VTD: Cooks Ave. Comm. Cir. | 1,048 | 1,005 | 737 | 704 |
| VTD: Gitano | 423 | 136 | 330 | 101 |
| VTD: Hebron | 1,069 | 674 | 775 | 474 |
| VTD: Kingston Church | 842 | 739 | 524 | 440 |
| VTD: Lamar School | 1,873 | 810 | 1,359 | 519 |
| VTD: Laurel Courthouse | 1,791 | 836 | 1,301 | 544 |
| VTD: Mauldin Comm. Center *(part)* | 558 | 5 | 418 | 3 |
| VTD: National Guard Armory | 2,212 | 1,736 | 1,588 | 1,162 |
| VTD: Nora Davis School *(part)* | 1,639 | 1,526 | 1,227 | 1,124 |
| VTD: North Laurel *(part)* | 0 | 0 | 0 | 0 |
| VTD: Oak Park School | 1,604 | 1,584 | 1,003 | 990 |
| VTD: Old Health Dept. | 629 | 559 | 411 | 373 |
| VTD: Pendorf *(part)* | 0 | 0 | 0 | 0 |

| Plan: TRP_1<br>Type: | Administrator:<br>User:<br>POPULATION | Jason Knight/Ben Collins<br>Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 34 (continued)** | | | | |
| Jones MS County (continued) | | | | |
| VTD: Rainey | 1,855 | 16 | 1,380 | 14 |
| VTD: Sandhill | 1,357 | 14 | 1,048 | 7 |
| VTD: Shelton | 1,215 | 227 | 937 | 170 |
| VTD: Soso | 1,738 | 790 | 1,282 | 554 |
| VTD: Stainton *(part)* | 1,687 | 844 | 1,241 | 560 |
| **Jones MS County Subtotal** | **22,816** | **11,541** | **16,532** | **7,769** |
| **District 34 Subtotal** | **59,697** | **34,941** | **43,714** | **24,075** |
| **District 35** | | | | |
| Copiah MS County | | | | |
| VTD: Crystal Springs East *(part)* | 2,450 | 642 | 1,967 | 487 |
| **Copiah MS County Subtotal** | **2,450** | **642** | **1,967** | **487** |
| Rankin MS County | | | | |
| VTD: Antioch | 436 | 12 | 319 | 4 |
| VTD: Cato | 1,776 | 385 | 1,342 | 277 |
| VTD: Clear Branch | 1,466 | 214 | 1,084 | 160 |
| VTD: Cleary | 2,577 | 103 | 1,944 | 76 |
| VTD: Dry Creek | 1,688 | 666 | 1,177 | 402 |
| VTD: East Steens Creek | 4,327 | 764 | 3,136 | 530 |
| VTD: Johns | 911 | 199 | 693 | 146 |
| VTD: Mayton | 357 | 113 | 264 | 79 |
| VTD: Monterey *(part)* | 3,070 | 854 | 2,244 | 644 |
| VTD: Mountain Creek | 785 | 102 | 590 | 82 |
| VTD: Puckett | 954 | 164 | 702 | 107 |
| VTD: Shiloh | 454 | 114 | 339 | 97 |
| VTD: South Richland *(part)* | 4,622 | 819 | 3,218 | 475 |
| VTD: Star | 1,546 | 328 | 1,171 | 237 |
| VTD: West Steens Creek | 3,649 | 447 | 2,705 | 353 |
| **Rankin MS County Subtotal** | **28,618** | **5,284** | **20,928** | **3,669** |
| Simpson MS County | 27,503 | 9,666 | 20,252 | 6,624 |
| **District 35 Subtotal** | **58,571** | **15,592** | **43,147** | **10,780** |
| **District 36** | | | | |
| Claiborne MS County | 9,604 | 8,104 | 7,335 | 6,042 |
| Copiah MS County | | | | |
| VTD: Beauregard | 1,627 | 312 | 1,171 | 218 |
| VTD: Carpenter | 545 | 422 | 433 | 328 |
| VTD: Centerpoint | 1,657 | 593 | 1,278 | 457 |
| VTD: Crystal Springs East *(part)* | 1,528 | 812 | 1,099 | 519 |
| VTD: Crystal Springs North | 945 | 666 | 713 | 471 |
| VTD: Crystal Springs South | 3,364 | 2,353 | 2,510 | 1,692 |
| VTD: Crystal Springs West | 1,674 | 746 | 1,287 | 539 |
| VTD: Dentville | 309 | 72 | 252 | 49 |
| VTD: Gallman | 3,256 | 1,611 | 2,431 | 1,104 |
| VTD: Georgetown North | 469 | 283 | 358 | 205 |
| VTD: Hazlehurst East | 2,337 | 2,050 | 1,628 | 1,416 |
| VTD: Hazlehurst North | 673 | 442 | 480 | 277 |
| VTD: Hazlehurst South | 754 | 468 | 571 | 341 |
| VTD: Hazlehurst West | 2,955 | 2,212 | 2,191 | 1,560 |

| Plan: TRP_I | Administrator: | | | |
|---|---|---|---|---|
| Type: | User: | Jason Knight/Ben Collins | | |
| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
| **District 36** (continued) | | | | |
| Copiah MS County (continued) | | | | |
| VTD: Martinsville | 816 | 495 | 576 | 335 |
| **Copiah MS County Subtotal** | **22,909** | **13,537** | **16,978** | **9,511** |
| Hinds MS County | | | | |
| VTD: Byram 2 (part) | 426 | 57 | 328 | 45 |
| VTD: Cayuga | 494 | 312 | 375 | 232 |
| VTD: Chapel Hill | 1,384 | 620 | 1,068 | 452 |
| VTD: Dry Grove | 1,271 | 407 | 1,011 | 318 |
| VTD: Learned | 999 | 425 | 750 | 304 |
| VTD: Raymond 1 | 3,305 | 1,553 | 2,448 | 1,054 |
| VTD: Raymond 2 | 5,417 | 2,655 | 4,619 | 2,332 |
| VTD: St. Thomas | 461 | 435 | 347 | 326 |
| VTD: Utica 1 | 1,294 | 613 | 1,003 | 446 |
| VTD: Utica 2 | 1,309 | 1,035 | 970 | 748 |
| **Hinds MS County Subtotal** | **16,360** | **8,112** | **12,919** | **6,257** |
| Jefferson MS County | 7,726 | 6,620 | 5,901 | 4,940 |
| **District 36 Subtotal** | **56,599** | **36,373** | **43,133** | **26,750** |
| **District 37** | | | | |
| Adams MS County | | | | |
| VTD: Airport | 1,252 | 868 | 977 | 666 |
| VTD: Beau Pre | 1,557 | 645 | 1,149 | 459 |
| VTD: Bellemont | 3,229 | 982 | 2,670 | 753 |
| VTD: Carpenter | 1,040 | 682 | 830 | 524 |
| VTD: Concord | 1,261 | 1,171 | 916 | 850 |
| VTD: Convention Center | 897 | 518 | 660 | 362 |
| VTD: Courthouse | 1,120 | 173 | 989 | 151 |
| VTD: Duncan Park | 2,007 | 830 | 1,555 | 555 |
| VTD: Kingston | 1,213 | 167 | 983 | 118 |
| VTD: Liberty Park | 1,537 | 277 | 1,172 | 177 |
| VTD: Maryland | 1,623 | 1,461 | 1,062 | 939 |
| VTD: Morgantown | 969 | 678 | 714 | 456 |
| VTD: Oakland | 2,282 | 1,108 | 1,707 | 708 |
| VTD: Palestine | 1,979 | 953 | 1,486 | 725 |
| VTD: Washington | 3,084 | 481 | 2,851 | 391 |
| **Adams MS County Subtotal** | **25,050** | **10,994** | **19,721** | **7,834** |
| Amite MS County | | | | |
| VTD: Crosby | 334 | 198 | 251 | 140 |
| VTD: East Fork | 882 | 332 | 704 | 261 |
| VTD: East Gloster | 633 | 201 | 493 | 132 |
| VTD: East Liberty | 396 | 141 | 332 | 116 |
| VTD: Homochitto | 174 | 29 | 145 | 26 |
| VTD: Liberty | 826 | 260 | 650 | 184 |
| VTD: New Zion | 636 | 114 | 487 | 88 |
| VTD: Oneil | 314 | 7 | 264 | 6 |
| VTD: Smithdale | 801 | 243 | 621 | 173 |
| VTD: South Liberty | 967 | 293 | 739 | 215 |
| VTD: Tangipahoa | 614 | 120 | 482 | 88 |
| VTD: Zion Hill | 517 | 39 | 418 | 32 |

Plan:   TRP_1
Type:

Administrator:
User:        Jason Knight/Ben Collins

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 37 (continued)** | | | | |
| **Amite MS County Subtotal** | 7,094 | 1,977 | 5,586 | 1,461 |
| Franklin MS County | 8,118 | 2,791 | 6,075 | 1,948 |
| Pike MS County | | | | |
| VTD: 13 | 1,343 | 675 | 994 | 495 |
| VTD: 14 | 1,483 | 307 | 1,066 | 216 |
| VTD: 15 | 1,239 | 245 | 867 | 148 |
| VTD: 20 | 1,709 | 550 | 1,344 | 445 |
| VTD: 21 | 1,675 | 151 | 1,182 | 106 |
| VTD: 22 | 848 | 160 | 699 | 118 |
| VTD: 23 | 1,039 | 226 | 795 | 164 |
| VTD: 25 | 1,024 | 248 | 890 | 186 |
| VTD: 26 | 814 | 223 | 620 | 145 |
| VTD: 27 | 513 | 184 | 394 | 130 |
| VTD: 3 | 2,261 | 902 | 1,517 | 585 |
| VTD: 4 | 1,054 | 300 | 745 | 211 |
| **Pike MS County Subtotal** | 15,002 | 4,171 | 11,113 | 2,949 |
| **District 37 Subtotal** | 55,264 | 19,933 | 42,495 | 14,192 |
| **District 38** | | | | |
| Adams MS County | | | | |
| VTD: By-Pass Firestation | 1,889 | 1,371 | 1,359 | 939 |
| VTD: Foster Mound | 1,626 | 1,522 | 1,231 | 1,142 |
| VTD: Northside School | 1,411 | 1,391 | 1,058 | 1,041 |
| VTD: Pine Ridge | 1,175 | 947 | 873 | 693 |
| VTD: Thompson | 1,146 | 1,062 | 860 | 797 |
| **Adams MS County Subtotal** | 7,247 | 6,293 | 5,381 | 4,612 |
| Amite MS County | | | | |
| VTD: Amite River | 626 | 486 | 495 | 381 |
| VTD: Ariel | 404 | 265 | 297 | 199 |
| VTD: Berwick | 525 | 398 | 380 | 293 |
| VTD: East Centreville | 724 | 296 | 533 | 210 |
| VTD: Gloster | 1,323 | 1,011 | 1,005 | 751 |
| VTD: Riceville | 765 | 388 | 542 | 277 |
| VTD: Street | 539 | 116 | 413 | 87 |
| VTD: Tickfaw | 231 | 126 | 190 | 98 |
| VTD: Walls | 900 | 364 | 735 | 289 |
| **Amite MS County Subtotal** | 6,037 | 3,450 | 4,590 | 2,585 |
| Pike MS County | | | | |
| VTD: 1 | 1,732 | 947 | 1,235 | 646 |
| VTD: 10 | 2,029 | 1,405 | 1,490 | 977 |
| VTD: 11 | 1,147 | 555 | 882 | 398 |
| VTD: 12 | 591 | 487 | 419 | 334 |
| VTD: 16 | 1,734 | 1,651 | 1,185 | 1,135 |
| VTD: 17 | 947 | 472 | 749 | 340 |
| VTD: 18 | 613 | 435 | 437 | 293 |
| VTD: 19 | 1,332 | 702 | 1,049 | 544 |
| VTD: 2 | 1,656 | 1,141 | 1,217 | 801 |
| VTD: 24 | 1,745 | 1,729 | 1,024 | 1,013 |
| VTD: 28 | 1,427 | 663 | 1,074 | 460 |

| Plan: TRP_1<br>Type: | Administrator:<br>User:<br>POPULATION | Jason Knight/Ben Collins<br>Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 38 (continued)** | | | | |
| Pike MS County  (continued) | | | | |
| VTD: 29 | 1,197 | 374 | 931 | 279 |
| VTD: 30 | 970 | 400 | 724 | 273 |
| VTD: 31 | 854 | 303 | 657 | 207 |
| VTD: 32 | 1,048 | 426 | 816 | 325 |
| VTD: 5 | 1,359 | 1,091 | 963 | 718 |
| VTD: 6 | 1,298 | 976 | 838 | 586 |
| VTD: 7 | 907 | 854 | 585 | 550 |
| VTD: 8 | 1,483 | 1,143 | 1,029 | 774 |
| VTD: 9 | 1,333 | 888 | 1,016 | 649 |
| **Pike MS County Subtotal** | 25,402 | 16,642 | 18,320 | 11,302 |
| Walthall MS County | | | | |
| VTD: Dexter | 1,354 | 426 | 1,013 | 300 |
| VTD: Dinan | 1,763 | 1,401 | 1,230 | 939 |
| VTD: Dist.3 Tylertown | 573 | 109 | 476 | 80 |
| VTD: Improve | 820 | 215 | 638 | 160 |
| VTD: Lexie | 1,268 | 239 | 984 | 154 |
| VTD: Mesa | 106 | 7 | 85 | 5 |
| VTD: Midway | 476 | 95 | 360 | 66 |
| VTD: North Kirklin | 997 | 567 | 731 | 396 |
| VTD: North Knoxo | 1,677 | 1,457 | 1,163 | 992 |
| VTD: Saint Paul | 389 | 273 | 281 | 191 |
| VTD: South Kirklin | 426 | 151 | 289 | 90 |
| VTD: South Knoxo | 199 | 73 | 154 | 58 |
| VTD: West Tylertown | 860 | 514 | 617 | 338 |
| **Walthall MS County Subtotal** | 10,908 | 5,527 | 8,021 | 3,769 |
| Wilkinson MS County | 9,878 | 6,992 | 7,607 | 5,200 |
| **District 38 Subtotal** | 59,472 | 38,904 | 43,919 | 27,468 |
| **District 39** | | | | |
| Copiah MS County | | | | |
| VTD: Georgetown South | 801 | 289 | 614 | 202 |
| VTD: Shady Grove | 798 | 139 | 584 | 95 |
| VTD: Strong Hope-Union | 766 | 44 | 590 | 27 |
| VTD: Wesson | 1,725 | 332 | 1,332 | 278 |
| **Copiah MS County Subtotal** | 4,090 | 804 | 3,120 | 602 |
| Lawrence MS County | 12,929 | 3,974 | 9,663 | 2,777 |
| Lincoln MS County | 34,869 | 10,443 | 25,766 | 7,398 |
| Walthall MS County | | | | |
| VTD: Darbun | 261 | 82 | 194 | 51 |
| VTD: Dist.4 Tylertown | 907 | 140 | 709 | 99 |
| VTD: Dist.4 West | 701 | 121 | 539 | 92 |
| VTD: East Tylertown | 131 | 3 | 107 | 3 |
| VTD: Enon | 590 | 105 | 415 | 67 |
| VTD: Hope | 528 | 459 | 375 | 323 |
| VTD: Sartinville | 435 | 189 | 315 | 122 |
| VTD: Varnell | 982 | 247 | 693 | 175 |
| **Walthall MS County Subtotal** | 4,535 | 1,346 | 3,347 | 932 |
| **District 39 Subtotal** | 56,423 | 16,567 | 41,896 | 11,709 |

Plan:   TRP  1
Type:

| | Administrator: | | | |
| | User: Jason Knight/Ben Collins | | | |
| | POPULATION | Black | [18+_Pop] | [18+_Blk] |

**District 40**

| Marion MS County | 27,088 | 8,752 | 20,156 | 6,168 |
| Pearl River MS County | | | | |
| VTD: Anchor Lake/West Union | 1,506 | 23 | 1,142 | 16 |
| VTD: Buck Branch | 1,318 | 13 | 1,007 | 8 |
| VTD: Carriere | 2,299 | 175 | 1,645 | 120 |
| VTD: Ford's Creek | 308 | 16 | 252 | 14 |
| VTD: Henleyfield | 1,599 | 37 | 1,257 | 27 |
| VTD: Hide-A-Way North Hills | 2,729 | 113 | 2,168 | 92 |
| VTD: McNeill 3 | 1,590 | 59 | 1,139 | 38 |
| VTD: McNeill 5 | 955 | 25 | 692 | 19 |
| VTD: Mill Creek | 1,620 | 35 | 1,171 | 25 |
| VTD: Nicholson | 2,752 | 273 | 2,044 | 164 |
| VTD: Ozona | 1,880 | 60 | 1,375 | 44 |
| VTD: Picayune 1 East | 1,980 | 788 | 1,532 | 610 |
| VTD: Picayune 2 | 2,696 | 263 | 2,029 | 167 |
| VTD: Picayune 4 West | 1,183 | 57 | 919 | 36 |
| VTD: Picayune 5 | 2,685 | 293 | 2,075 | 193 |
| VTD: Pine Grove | 2,784 | 104 | 2,125 | 76 |
| VTD: Sycamore | 1,948 | 36 | 1,477 | 25 |
| **Pearl River MS County Subtotal** | **31,832** | **2,370** | **24,049** | **1,674** |
| **District 40 Subtotal** | **58,920** | **11,122** | **44,205** | **7,842** |

**District 41**

| Covington MS County | 19,568 | 6,825 | 14,481 | 4,646 |
| Forrest MS County | | | | |
| VTD: Rawls Springs | 2,080 | 853 | 1,542 | 563 |
| **Forrest MS County Subtotal** | **2,080** | **853** | **1,542** | **563** |
| Jefferson Davis MS County | 12,487 | 7,477 | 9,539 | 5,367 |
| Lamar MS County | | | | |
| VTD: Rocky Branch | 1,038 | 204 | 764 | 152 |
| VTD: Sumrall | 4,129 | 331 | 3,000 | 231 |
| **Lamar MS County Subtotal** | **5,167** | **535** | **3,764** | **383** |
| Smith MS County | 16,491 | 3,776 | 12,230 | 2,582 |
| **District 41 Subtotal** | **55,793** | **19,466** | **41,556** | **13,541** |

**District 42**

| Forrest MS County | | | | |
| VTD: Barrontown-Macedonia | 4,427 | 337 | 3,239 | 242 |
| VTD: Leeville | 2,050 | 132 | 1,470 | 91 |
| VTD: Petal Masonic Lodge | 2,536 | 159 | 1,889 | 94 |
| VTD: West Petal | 1,692 | 350 | 1,251 | 227 |
| **Forrest MS County Subtotal** | **10,705** | **978** | **7,849** | **654** |
| Jones MS County | | | | |
| VTD: Antioch | 775 | 1 | 582 | 1 |
| VTD: Calhoun | 2,912 | 26 | 2,251 | 24 |
| VTD: Cameron Center | 1,258 | 460 | 912 | 289 |
| VTD: County Barn | 1,711 | 385 | 1,400 | 320 |
| VTD: Currie | 283 | 269 | 219 | 208 |
| VTD: Ellisville Court House | 1,508 | 428 | 1,252 | 359 |

Plan:  TRP_1
Type:

Administrator:
User:    Jason Knight/Ben Collins

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 42 (continued)** | | | | |
| Jones MS County  (continued) | | | | |
| VTD: Erata | 689 | 320 | 524 | 247 |
| VTD: Glade School | 1,852 | 145 | 1,440 | 96 |
| VTD: Johnson | 1,093 | 13 | 811 | 5 |
| VTD: Landrum Comm. Ctr. | 702 | 3 | 537 | 3 |
| VTD: Matthews | 943 | 109 | 710 | 73 |
| VTD: Mauldin Comm. Center *(part)* | 1,408 | 333 | 1,063 | 253 |
| VTD: Moselle | 2,018 | 266 | 1,481 | 200 |
| VTD: Myrick | 1,977 | 24 | 1,477 | 14 |
| VTD: Nora Davis School *(part)* | 0 | 0 | 0 | 0 |
| VTD: North Laurel *(part)* | 3,429 | 1,187 | 2,566 | 716 |
| VTD: Ovett | 1,522 | 32 | 1,135 | 22 |
| VTD: Pendorf *(part)* | 1,113 | 108 | 762 | 62 |
| VTD: Pinegrove | 1,426 | 114 | 1,132 | 104 |
| VTD: Pleasant Ridge | 1,170 | 18 | 890 | 12 |
| VTD: Powers Comm. Ctr. | 1,715 | 368 | 1,288 | 263 |
| VTD: Roosevelt | 860 | 593 | 618 | 401 |
| VTD: Rustin | 1,026 | 4 | 769 | 4 |
| VTD: Sandersville Civic Center | 1,557 | 149 | 1,166 | 110 |
| VTD: Shady Grove | 5,588 | 1,658 | 4,037 | 1,012 |
| VTD: Sharon | 2,133 | 248 | 1,661 | 185 |
| VTD: South Jones | 1,226 | 316 | 956 | 215 |
| VTD: Stainton *(part)* | 10 | 0 | 7 | 0 |
| VTD: Tuckers | 1,575 | 13 | 1,162 | 8 |
| VTD: Union | 1,466 | 22 | 1,073 | 17 |
| **Jones MS County Subtotal** | 44,945 | 7,612 | 33,881 | 5,223 |
| **District 42 Subtotal** | 55,650 | 8,590 | 41,730 | 5,877 |
| **District 43** | | | | |
| George MS County | 22,578 | 1,829 | 16,518 | 1,320 |
| Greene MS County | 14,400 | 3,749 | 11,244 | 3,191 |
| Wayne MS County | 20,747 | 8,071 | 15,313 | 5,487 |
| **District 43 Subtotal** | 57,725 | 13,649 | 43,075 | 9,998 |
| **District 44** | | | | |
| Lamar MS County | | | | |
| VTD: Arnold Line | 3,022 | 1,009 | 2,064 | 563 |
| VTD: Baxterville | 838 | 5 | 604 | 2 |
| VTD: Bellevue | 1,866 | 27 | 1,429 | 19 |
| VTD: Breland | 5,934 | 1,669 | 4,275 | 1,119 |
| VTD: Greenville | 1,517 | 4 | 1,118 | 3 |
| VTD: Lake Serene | 3,966 | 264 | 2,803 | 165 |
| VTD: Lamar Park | 3,306 | 1,137 | 2,613 | 818 |
| VTD: Lumberton | 3,005 | 1,312 | 2,171 | 881 |
| VTD: Midway | 2,681 | 208 | 1,895 | 117 |
| VTD: N E Lamar | 3,584 | 1,296 | 2,862 | 880 |
| VTD: Oak Grove | 3,368 | 328 | 2,394 | 203 |
| VTD: Okahola | 1,178 | 283 | 816 | 170 |
| VTD: Oloh | 1,221 | 43 | 901 | 28 |
| VTD: Pine Grove | 1,055 | 17 | 756 | 7 |

| Plan: TRP 1 | Administrator: | | | |
| --- | --- | --- | --- | --- |
| Type: | User: | Jason Knight/Ben Collins | | |
| | POPULATION | Black | [18+_Pop] | [18+_Blk] |

**District 44** (continued)

Lamar MS County (continued)

| | | | | |
| --- | --- | --- | --- | --- |
| VTD: Purvis | 3,881 | 615 | 2,934 | 438 |
| VTD: Richburg | 3,384 | 488 | 2,431 | 328 |
| VTD: South Purvis | 3,013 | 72 | 2,267 | 43 |
| VTD: Wesley Manor | 3,094 | 1,556 | 2,511 | 1,135 |
| VTD: Yawn | 578 | 15 | 442 | 10 |
| **Lamar MS County Subtotal** | **50,491** | **10,348** | **37,286** | **6,929** |

Pearl River MS County

| | | | | |
| --- | --- | --- | --- | --- |
| VTD: Byrd Line | 382 | 5 | 311 | 2 |
| VTD: Gum Pond | 1,689 | 22 | 1,282 | 15 |
| VTD: Hickory Grove | 336 | 19 | 270 | 15 |
| VTD: Oak Hill | 1,230 | 21 | 933 | 19 |
| VTD: Poplarville 3 *(part)* | 259 | 4 | 191 | 3 |
| **Pearl River MS County Subtotal** | **3,896** | **71** | **2,987** | **54** |
| **District 44 Subtotal** | **54,387** | **10,419** | **40,273** | **6,983** |

**District 45**

Forrest MS County

| | | | | |
| --- | --- | --- | --- | --- |
| VTD: Blair High School | 3,724 | 1,929 | 3,104 | 1,460 |
| VTD: Brooklyn | 1,140 | 30 | 845 | 25 |
| VTD: Camp School | 948 | 362 | 796 | 277 |
| VTD: Carnes | 1,535 | 16 | 1,122 | 13 |
| VTD: Dantzler | 993 | 13 | 737 | 10 |
| VTD: Dixie | 3,803 | 324 | 2,851 | 213 |
| VTD: Dixie Pine-Central | 2,638 | 1,781 | 1,932 | 1,289 |
| VTD: East Petal | 3,415 | 297 | 2,482 | 177 |
| VTD: Highland Park | 3,375 | 1,577 | 2,852 | 1,185 |
| VTD: Maxie | 369 | 67 | 295 | 58 |
| VTD: Mclaurin | 804 | 64 | 623 | 53 |
| VTD: Pinecrest | 4,462 | 1,509 | 4,015 | 1,287 |
| VTD: Sunrise | 5,363 | 646 | 3,886 | 455 |
| VTD: Thames School | 3,214 | 404 | 2,599 | 268 |
| VTD: Timberton | 607 | 78 | 461 | 59 |
| VTD: USM Golf Course | 1,075 | 337 | 961 | 305 |
| VTD: Westside *(part)* | 2,046 | 744 | 1,689 | 490 |
| VTD: Woodley School | 2,819 | 643 | 2,347 | 444 |
| **Forrest MS County Subtotal** | **42,330** | **10,821** | **33,597** | **8,068** |
| Perry MS County | 12,250 | 2,451 | 9,136 | 1,711 |
| **District 45 Subtotal** | **54,580** | **13,272** | **42,733** | **9,779** |

**District 46**

| | | | | |
| --- | --- | --- | --- | --- |
| Hancock MS County | 43,929 | 3,138 | 33,431 | 2,214 |

Harrison MS County

| | | | | |
| --- | --- | --- | --- | --- |
| VTD: 201 | 3,242 | 73 | 2,325 | 38 |
| VTD: 212 | 497 | 5 | 375 | 4 |
| VTD: 301 | 2,174 | 557 | 1,635 | 422 |
| VTD: 304 | 1,992 | 335 | 1,566 | 247 |
| VTD: 305 | 2,544 | 136 | 1,900 | 106 |
| VTD: 306 | 1,734 | 33 | 1,275 | 20 |
| VTD: 315 | 1,627 | 46 | 1,151 | 28 |

| Plan: TRP 1 | Administrator: | | | |
|---|---|---|---|---|
| Type: | User: | Jason Knight/Ben Collins | | |
| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
| **District 46 (continued)** | | | | |
| **Harrison MS County Subtotal** | 13,810 | 1,185 | 10,227 | 865 |
| **District 46 Subtotal** | 57,739 | 4,323 | 43,658 | 3,079 |
| **District 47** | | | | |
| Jackson MS County | | | | |
| VTD: Gulf Hills | 7,822 | 1,101 | 5,774 | 703 |
| VTD: Larue | 493 | 10 | 357 | 5 |
| VTD: Latimer | 6,965 | 265 | 5,068 | 164 |
| VTD: St. Martin | 5,587 | 690 | 4,265 | 501 |
| **Jackson MS County Subtotal** | 20,867 | 2,066 | 15,464 | 1,373 |
| Pearl River MS County | | | | |
| VTD: Caesar | 980 | 4 | 706 | 2 |
| VTD: Derby | 1,462 | 173 | 1,178 | 145 |
| VTD: Picayune 1 South | 3,400 | 2,396 | 2,470 | 1,668 |
| VTD: Picayune 4 East | 2,055 | 344 | 1,460 | 192 |
| VTD: Poplarville 1 | 1,508 | 577 | 1,047 | 346 |
| VTD: Poplarville 2 | 1,809 | 302 | 1,518 | 283 |
| VTD: Poplarville 3 *(part)* | 1,359 | 72 | 1,035 | 53 |
| VTD: Progress | 609 | 1 | 484 | 1 |
| VTD: Salem | 3,687 | 102 | 2,703 | 71 |
| VTD: Savannah | 1,064 | 20 | 815 | 17 |
| VTD: Steep Hollow | 1,090 | 17 | 816 | 9 |
| VTD: Whitesand 1 | 724 | 421 | 547 | 313 |
| VTD: Whitesand 2 | 359 | 2 | 287 | 2 |
| **Pearl River MS County Subtotal** | 20,106 | 4,431 | 15,066 | 3,102 |
| Stone MS County | 17,786 | 3,404 | 13,455 | 2,446 |
| **District 47 Subtotal** | 58,759 | 9,901 | 43,985 | 6,921 |
| **District 48** | | | | |
| Harrison MS County | | | | |
| VTD: 206 | 1,887 | 371 | 1,523 | 233 |
| VTD: 302 | 2,791 | 955 | 2,140 | 651 |
| VTD: 303 | 1,860 | 338 | 1,504 | 241 |
| VTD: 307 | 1,908 | 149 | 1,479 | 106 |
| VTD: 308 | 2,130 | 150 | 1,641 | 100 |
| VTD: 309 | 2,311 | 214 | 1,678 | 121 |
| VTD: 310 | 2,709 | 310 | 2,065 | 241 |
| VTD: 311 | 3,587 | 258 | 2,650 | 149 |
| VTD: 312 | 2,147 | 143 | 1,623 | 93 |
| VTD: 313 | 1,453 | 121 | 1,087 | 84 |
| VTD: 314 | 3,332 | 113 | 2,577 | 80 |
| VTD: 401 *(part)* | 1,250 | 870 | 890 | 594 |
| VTD: 402 | 2,368 | 1,246 | 1,759 | 883 |
| VTD: 403 | 568 | 218 | 480 | 175 |
| VTD: 404 | 5,166 | 2,777 | 3,462 | 1,733 |
| VTD: 405 | 3,531 | 2,685 | 2,495 | 1,826 |
| VTD: 407 | 2,101 | 1,783 | 1,436 | 1,206 |
| VTD: 408 | 1,509 | 860 | 1,150 | 613 |
| VTD: 409 | 7,993 | 3,443 | 5,574 | 2,212 |
| VTD: 410 | 5,423 | 1,988 | 4,286 | 1,471 |
| VTD: 411 | 2,058 | 1,924 | 1,558 | 1,467 |

| Plan: TRP_1<br>Type: | Administrator:<br>User: Jason Knight/Ben Collins<br>POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| District 48 (continued) | | | | |
| Harrison MS County (continued) | | | | |
| VTD: 412 | 879 | 585 | 664 | 442 |
| Harrison MS County Subtotal | 58,961 | 21,501 | 43,721 | 14,721 |
| District 48 Subtotal | 58,961 | 21,501 | 43,721 | 14,721 |
| District 49 | | | | |
| Harrison MS County | | | | |
| VTD: 202 | 2,406 | 52 | 1,831 | 29 |
| VTD: 203 | 2,219 | 336 | 1,633 | 244 |
| VTD: 204 | 5,880 | 1,343 | 4,346 | 922 |
| VTD: 205 | 542 | 57 | 466 | 43 |
| VTD: 207 | 1,692 | 360 | 1,303 | 216 |
| VTD: 208 | 1,053 | 33 | 833 | 24 |
| VTD: 209 | 1,899 | 33 | 1,475 | 21 |
| VTD: 210 | 6,081 | 589 | 4,379 | 397 |
| VTD: 211 | 8,160 | 1,256 | 6,112 | 833 |
| VTD: 213 | 5,103 | 870 | 3,702 | 507 |
| VTD: 214 | 3,247 | 301 | 2,547 | 233 |
| VTD: 215 | 731 | 82 | 618 | 58 |
| VTD: 401 (part) | 0 | 0 | 0 | 0 |
| VTD: 406 | 1,651 | 1,110 | 1,274 | 855 |
| VTD: 503 | 7,182 | 1,606 | 5,671 | 1,094 |
| VTD: 504 | 2,799 | 343 | 2,237 | 246 |
| VTD: 505 | 4,753 | 878 | 3,685 | 610 |
| VTD: 510 (part) | 2,423 | 351 | 1,887 | 230 |
| Harrison MS County Subtotal | 57,821 | 9,600 | 43,999 | 6,562 |
| District 49 Subtotal | 57,821 | 9,600 | 43,999 | 6,562 |
| District 50 | | | | |
| Harrison MS County | | | | |
| VTD: 101 | 265 | 27 | 222 | 15 |
| VTD: 102 | 852 | 213 | 657 | 143 |
| VTD: 103 | 700 | 368 | 556 | 285 |
| VTD: 104 | 1,771 | 1,150 | 1,279 | 812 |
| VTD: 105 | 631 | 115 | 538 | 96 |
| VTD: 106 | 524 | 255 | 421 | 195 |
| VTD: 107 | 1,207 | 272 | 904 | 142 |
| VTD: 108 | 2,064 | 327 | 1,661 | 222 |
| VTD: 109 | 3,435 | 530 | 3,279 | 500 |
| VTD: 110 | 4,487 | 916 | 3,156 | 604 |
| VTD: 111 | 11,373 | 1,738 | 8,358 | 1,123 |
| VTD: 112 | 1,764 | 73 | 1,354 | 48 |
| VTD: 113 | 554 | 28 | 406 | 18 |
| VTD: 114 | 1,609 | 177 | 1,306 | 144 |
| VTD: 501 | 1,263 | 226 | 931 | 158 |
| VTD: 502 | 5,082 | 956 | 3,980 | 645 |
| VTD: 506 | 4,375 | 228 | 3,301 | 156 |
| VTD: 507 | 3,203 | 207 | 2,405 | 148 |
| VTD: 508 | 3,387 | 56 | 2,556 | 41 |
| VTD: 509 | 6,305 | 1,048 | 4,781 | 722 |
| VTD: 510 (part) | 1,662 | 197 | 1,254 | 147 |

| Plan:   TRP_1 | Administrator: | | |
|---|---|---|---|
| Type: | User:  Jason Knight/Ben Collins | | [18+_Blk] |
| | POPULATION | Black | [18+_Pop] | |

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 50 (continued)** | | | | |
| Harrison MS County Subtotal | 56,513 | 9,107 | 43,305 | 6,364 |
| District 50 Subtotal | 56,513 | 9,107 | 43,305 | 6,364 |
| **District 51** | | | | |
| Jackson MS County | | | | |
| VTD: Big Point | 3,830 | 27 | 2,797 | 22 |
| VTD: Carterville | 329 | 12 | 238 | 7 |
| VTD: Chico | 2,133 | 896 | 1,570 | 603 |
| VTD: Chico A | 1,432 | 603 | 985 | 369 |
| VTD: East Central | 9,040 | 478 | 6,493 | 333 |
| VTD: Eastside | 1,311 | 524 | 1,094 | 410 |
| VTD: Escatawpa | 4,303 | 1,057 | 3,337 | 691 |
| VTD: Escatawpa A | 3 | 0 | 3 | 0 |
| VTD: Escatawpa B | 0 | 0 | 0 | 0 |
| VTD: Fountainbleau *(part)* | 1,834 | 162 | 1,322 | 100 |
| VTD: Gautier A | 264 | 5 | 211 | 3 |
| VTD: Griffin Heights | 944 | 374 | 769 | 269 |
| VTD: Gulf Hills A | 3,327 | 380 | 2,500 | 264 |
| VTD: Gulf Hills B | 109 | 4 | 90 | 4 |
| VTD: Helena | 2,472 | 166 | 1,945 | 104 |
| VTD: Hickory Hills A | 499 | 29 | 414 | 19 |
| VTD: Hwy 57 | 240 | 0 | 171 | 0 |
| VTD: Hwy 57 A | 521 | 11 | 377 | 7 |
| VTD: Jefferson Street | 2,280 | 2,023 | 1,705 | 1,497 |
| VTD: North Pascagoula | 700 | 74 | 547 | 54 |
| VTD: North Vancleave | 3,409 | 263 | 2,537 | 209 |
| VTD: North Vancleave A | 465 | 0 | 340 | 0 |
| VTD: Ocean Springs Civic Center | 3,102 | 284 | 2,310 | 200 |
| VTD: Orange Grove | 1,809 | 83 | 1,458 | 60 |
| VTD: Orange Grove A | 722 | 275 | 530 | 190 |
| VTD: Rec Center | 1,542 | 1,212 | 1,247 | 966 |
| VTD: Rec Center A | 88 | 44 | 73 | 37 |
| VTD: Red Hill | 414 | 0 | 292 | 0 |
| VTD: Red Hill A | 115 | 0 | 81 | 0 |
| VTD: South Vancleave | 4,090 | 101 | 2,995 | 70 |
| VTD: South Vancleave A | 1,827 | 48 | 1,379 | 39 |
| VTD: Sue Ellen | 2,371 | 2,211 | 1,879 | 1,746 |
| VTD: Union Hall | 2,694 | 2,454 | 1,990 | 1,808 |
| VTD: Wade A | 193 | 23 | 149 | 13 |
| VTD: YMBC/Dantzler | 1,442 | 1,001 | 1,150 | 784 |
| Jackson MS County Subtotal | 59,854 | 14,824 | 44,978 | 10,878 |
| District 51 Subtotal | 59,854 | 14,824 | 44,978 | 10,878 |
| **District 52** | | | | |
| Jackson MS County | | | | |
| VTD: American Legion | 816 | 84 | 632 | 59 |
| VTD: Arlington | 1,245 | 677 | 836 | 402 |
| VTD: Arlington A | 5 | 1 | 4 | 1 |
| VTD: Eastlawn | 2,509 | 226 | 1,876 | 136 |
| VTD: Fair | 3,339 | 2,069 | 2,549 | 1,468 |
| VTD: Fair A | 132 | 59 | 99 | 39 |
| VTD: Fair B | 105 | 55 | 76 | 41 |

Plan: TRP_1  
Type:

Administrator:  
User:   Jason Knight/Ben Collins

| | POPULATION | Black | [18+_Pop] | [18+_Blk] |
|---|---|---|---|---|
| **District 52 (continued)** | | | | |
| Jackson MS County (continued) | | | | |
| VTD: Fountainbleau *(part)* | 5,099 | 851 | 3,413 | 463 |
| VTD: Gautier | 8,473 | 2,356 | 6,404 | 1,539 |
| VTD: Gautier B | 223 | 26 | 186 | 20 |
| VTD: Gautier C | 3,826 | 2,200 | 2,590 | 1,361 |
| VTD: Girl Scout | 1,373 | 719 | 977 | 484 |
| VTD: Girl Scout A | 654 | 194 | 497 | 141 |
| VTD: Gulf Park Estates | 6,004 | 466 | 4,318 | 289 |
| VTD: Gulf Park Estates A | 154 | 4 | 103 | 4 |
| VTD: Hickory Hill | 3,755 | 880 | 2,706 | 548 |
| VTD: Nazarene | 2,143 | 757 | 1,491 | 445 |
| VTD: Ocean Springs Armory | 5,332 | 455 | 4,215 | 352 |
| VTD: Ocean Springs Civic Center A | 7,507 | 427 | 5,712 | 313 |
| VTD: Ocean Springs Comm Center | 454 | 15 | 387 | 11 |
| VTD: Pinecrest | 1,135 | 259 | 852 | 168 |
| VTD: Pinecrest A | 1,009 | 119 | 757 | 80 |
| VTD: Presbyterian | 1,022 | 44 | 824 | 27 |
| VTD: Presbyterian A | 21 | 3 | 21 | 3 |
| VTD: Presbyterian B | 153 | 25 | 113 | 13 |
| VTD: Sacred Heart | 1,731 | 166 | 1,330 | 109 |
| VTD: Villia Maria | 728 | 7 | 658 | 7 |
| **Jackson MS County Subtotal** | 58,947 | 13,144 | 43,626 | 8,523 |
| **District 52 Subtotal** | 58,947 | 13,144 | 43,626 | 8,523 |
| **State totals** | 2,967,297 | 1,098,385 | 2,211,742 | 767,499 |

# EXHIBIT 7

## SUPPLEMENTAL REPORT OF PETER A. MORRISON, PH.D.

## in THOMAS, et al. v. BRYANT, et al.

January 18, 2019

1. I have been retained as an expert in the case of *Thomas et al., Plaintiffs vs. Bryant et al., Plaintiffs* by Tommie S. Cardin of the Butler Snow Law Firm. I have been asked to evaluate Plaintiffs' First Amended Complaint seeking to invalidate SD 22 as violative of Section 2 of the Voting Rights Act. My evaluation relies on the following sources: (1) official demographic data from the US Census Bureau, (2) official electoral data from the Mississippi Secretary of State "Election and Voting" website (accessed at: www.sos.ms.gov/Elections-Voting/Pages/Election-Results-By-Year.aspx), (3) publicly available historical documents reporting election results, and (4) Plaintiffs' Complaint and expert reports by Mr. Cooper.

2. I am an applied demographer and am retired from The RAND Corporation, where I was Senior Demographer and the founding director of RAND's Population Research Center. I have provided testimony in litigation pertaining to the Voting Rights Act and districting plans and have constructed and/or evaluated numerous proposed local redistricting plans. I have made invited presentations on demographic aspects of redistricting to members and/or staff of the U. S. House of Representatives Subcommittee on the Census, the County Counsels' Association of California, the League of California Cities, the National League of Cities, and the Population Association of America. I have served on the U.S. Census Bureau Advisory Committee on Population Statistics, 1989-1995; and as an invited participant on the Bureau's Working Group on 2010 Race and Ethnicity. I have been elected as President of the Southern Demographic Association and to the Board of Directors of the Population Association of America, which are the two leading associations of professional demographers; and have taught students at the RAND Graduate School. I am being compensated at a rate of $250/hour for my work in reviewing the materials and preparing this report. I will be compensated at a rate of $400/hour for any testimony.

3. Attached Appendix A lists all cases in which I have testified by declaration, deposition, or at trial in the past four years. Attached Appendix B summarizes my academic background, including all publications in the last ten years.

# I.  FINDINGS AND CONCLUSIONS

4.  Plaintiffs allege that African-American voters in Senate District 22 ("SD 22") are politically cohesive, and that White bloc voting usually prevents African-American voters from electing their candidate of choice in SD 22 elections.  Plaintiffs assert that SD 22 can be modified to provide African-American voters an equal opportunity to elect candidates of their choice. Plaintiffs propose to accomplish that modification by interchanging 16 precincts between existing SD 22 and SD 23, leaving the remainder of the Senate plan untouched.

## SUMMARY OF FINDINGS AND CONCLUSIONS

5.  **Defendant's SD 22 is part of a lawful plan that was drawn in 2012.  SD 22 and that plan remain lawful.**  Redistricting is an undertaking to (re)draw district boundaries every decade, following the decennial Census and is based upon then-current data. SD 22 is part of a statewide redistricting plan adopted by the Mississippi Legislature in May 2012 and precleared by the U.S. Department of Justice on September 14, 2012. Plaintiffs propose to replace an existing lawfully-drawn district with an alternative district, drafted by Mr. Cooper.

6.  **African-American preferred candidates (of whatever race) frequently run for office and usually win in the territory comprising SD 22.  These demographic facts discredit Plaintiffs' claim that Whites usually defeat African-American preferred candidates by consistently voting together as a bloc.**[1]  I have identified 152 separate instances in which a candidate favored by AA voters has been elected to local public office throughout the territory included in State Senate District 22 since 2007. Those 152 instances exceed half of all the instances in which an AA candidate sought election to local office throughout State Senate District 22 since 2007. This universe of candidacies for local office provides a solid scientific basis for evaluating Plaintiffs' claim that Whites usually defeat AA-preferred candidates by consistently voting together as a bloc.

7.  **In crafting proposed alternative SD 22, Mr. Cooper has subordinated traditional redistricting principles and instead given predominant emphasis to race in constructing his Illustrative Plan.**  He manipulated district boundaries for the sole purpose of increasing African-Americans' share of voting-age persons from 50.8% to 62%. To do so, however, would split county lines and the boundaries of at least one incorporated city, and damage the compactness of adjacent SD 23.

8.  **Mr. Cooper's proposed alternative SD 22 would necessarily dilute the voting strength of African-American voters in adjacent SD 23.**  SD 23 is part of a lawful plan that was drawn in 2012 to afford AAs an influential 42% share of the eligible voters in SD 23. Mr. Cooper's proposed modifications to this plan would reduce that influential 42% share to only 31%. That would constitute an unlawful dilution of AAs' voting strength in SD 23.

---

[1] I use the terms "African-American preferred" and "African-American favored" synonymously. I refer to "African Americans" ahead as "AA" and also as "Black" (consistent with Census Bureau terminology).

9.  **Overall, Plaintiffs' proposed alternative would strip African-American voters of two districts in which they are now influential.**  AAs now constitute 51.3% and 46.6% of *2015 voting-age citizens* in these two districts under the existing 2012 plan.  Plaintiffs proposal would "pack" AAs into a single district (SD 22), where they would constitute 62% of voters; and "crack" their existing concentration in the other district (SD 23), severely diluting their influence there.

## STATEWIDE HISTORICAL CONTEXT

10.  In Mississippi, African-American political participation has reached successively higher peaks in recent years (see Table 1).  From 2004-2010, 72% to 82% of African-American eligible voters were registered to vote; thereafter, the percentage has ranged from 81% to 91%.  African-Americans who actually voted has ranged from 49% to 73% (2004-2010) and from 47% to 82% (2012-2016).  These successively higher peaks in recent years parallel national trends.[2]  Mississippi has more minority elected officials than any other state.[3]  These data furnish convincing evidence that African Americans in Mississippi have access to the political process and have participated in that process at ever higher rates in recent years.  In addition to demonstrating progressive improvement, the data show that existing socioeconomic differences no longer diminish AAs' participation in the political process as they did in the past

Table 1

| Political Participation by Race in Mississippi: 2004-2016 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Race | 2004 | 2006 | 2008 | 2010 | 2012 | 2014 | 2016 |
| *Percent Registered to Vote* | | | | | | | |
| Black | 76% | 72% | 82% | 74% | 91% | 83% | 81% |
| White | 74% | 71% | 75% | 74% | 82% | 73% | 79% |
| *Percent Voting* | | | | | | | |
| Black | 67% | 50% | 73% | 49% | 82% | 47% | 69% |
| White | 60% | 40% | 68% | 48% | 72% | 40% | 68% |
| Note: Race refers to Black alone and White alone non-Hispanic VAP (2004-10)/CVAP (2010-16). | | | | | | | |
| Source: US Census Bureau, Current Population Survey, Voting and Registration Tables. | | | | | | | |
| https://www.census.gov/topics/public-sector/voting/data/tables.html | | | | | | | |

---

[2] This conclusion is supported by the Amicus Brief filed by Professors Gaddie, Bullock, and Anolabehere in *Alabama Legislative Black Caucus*.  See pp. 11-12, where they addressed the increased levels of voter participation, registration, and turnout.  Alabama's data on these points parallels Mississippi's.  Years earlier, Chief Justice Roberts echoed the turnout conclusion on a broader national level in *Shelby County v. Holder* ("By 2009, the racial gap in voter registration and turnout [was] lower in the States originally covered by §5 than it [was] nationwide."  Since then, Census Bureau data show that African-American voter turnout has come to exceed White voter turnout in five of the six States originally covered by §5.

[3] This was so as of 2009.  See C. S. Bullock III and R. K. Gaddie, *The Triumph of Voting Rights in the South* (Norman: University of Oklahoma Press, 2009), pp. 34-57.  (At p. 56: "More blacks hold public office in the Magnolia State (nearly nine hundred) than anywhere else in the United States...").

## EVALUATION OF PLAINTIFFS' ALLEGATIONS

11. Central to Section 2 of the VRA is the question of whether candidates favored by African American voters fail to get elected, and if so why? In this section, I address two specific testable questions: (i) Do *African American-favored candidates* fail to get elected when they run for local office throughout SD 22? (ii) Do white voters *usually defeat* the African-American favored candidate by consistently voting together as a bloc?

## IDENTIFICATION OF AFRICAN AMERICAN-PREFERRED CANDIDATES

12. A variety of different methodologies are used to identify the African-American-preferred candidate in a given election. Each method relies upon a particular type of data and minimum number of observations.

13. Mississippi Senate District 22 includes portions of six Mississippi counties. Each of these six counties affords the analyst only a few precincts as observations for identifying which candidate (if any) in a given election was the preferred candidate of African-American voters. With so few observations, political scientists' method of *ecological inference* may yield inconclusive results—just as a biased coin, flipped just a dozen times, may not prove it is biased beyond a reasonable doubt.

14. In several of these six counties, the demographers' method of *homogeneous precincts* can indicate (with differing certainty) which candidate in a particular election was African Americans' preferred candidate. Courts have acknowledged that the African-American-favored candidate need not be an African American; and that homogeneous precincts reveal African American-favored candidates who are not themselves African-American. Even a single homogeneous precinct affords a supplementary validation check on other methods identifying the candidate whom African-American voters favored in a particular election.

15. The method of homogeneous precincts I have used is well suited to the data that are available. I have applied this method in accordance with established demographic practice: Any precinct where African-Americans constitute at least 90% of that precinct's eligible voters is a *homogeneously African-American* precinct. I classify any candidate who was the top vote getter in such districts as African-Americans' favored candidate (absent evidence to the contrary).

## DETECTION OF WHITE BLOC VOTING

16. My method of choice here acknowledges that *circumstantial* evidence may show White bloc voting (WBV). I grant that WBV *may* exist wherever circumstantial evidence so indicates. For any given election, then, the question is: *Did the African-American-favored candidate lose and was WBV a possibility?*

## OVERALL OUTCOMES FOR AFRICAN AMERICAN-FAVORED CANDIDATES

17.  In these six counties comprising SD 22, African American-favored candidates have won election to at least 41 local offices in 2007; at least 17 of those wins were contested races. AA-favored candidates have won election to at least 53 local offices in 2011; at least 22 of those wins were in contested races.  (See Table 2 below and Appendix Table 1; corresponding data for 2015 are being tabulated for inclusion.)

18.  This universe of candidacies for local office in each successive year provides a scientific basis for evaluating Plaintiffs' claim that White bloc voting usually defeats African-American-favored candidates who run for office.  Table 2 summarizes these data for 2007, 2011, and 2015. I reserve the right to correct these data in my forthcoming deposition testimony.

Table 2

| County | No. of African-American Favored Candidates Elected | | | | | |
| | 2007 Elections | | 2011 Elections | | 2015 Elections | |
| | No. | % contested | No. | % contested | No. | % contested |
|---|---|---|---|---|---|---|
| Bolivar | 8 | 38% | 13 | 23% | 13 | 38% |
| Humphreys | 5 | 40% | 7 | 43% | 9 | 78% |
| Madison | 4 | 50% | 4 | 50% | 3 | 33% |
| Sharkey | 7 | 86% | 7 | 71% | 10 | 70% |
| Washington | 15 | 13% | 15 | 33% | 17 | 41% |
| Yazoo | 2 | 100% | 7 | 57% | 8 | 25% |
| Total | 41 | 41% | 53 | 42% | 60 | 48% |
| Source: Appendix Table 1. | | | | | | |

19.  The data in Table 2 show that candidates favored by African-American voters have been elected to local office on a regular basis throughout State Senate District 22 since at least 2007. Specifically, these data (and especially the data from Appendix Table 1 summarized here) document that (i) AA and AA-favored candidates frequently run for local office and win; (ii) the number of AA and AA-favored candidates serving as elected office holders has steadily increased since 2007, from 41 to 53 to 60; and (iii) instances in which an AA or AA-favored candidate has been defeated by a White-favored voter are exceedingly few.  (Only 4 such defeats appear among the universe of candidacies shown in Appendix Table 1.)  *These facts discredit Plaintiffs' claim that Whites usually defeat AA-favored candidates by consistently voting together as a bloc.*

20.  The data supporting these conclusions are official statements of vote, which show results of every local election held in these six counties in every general election since November 2007.

5

(accessed at www.sos.ms.gov/Elections-Voting/Pages/Election-Results-By-Year.aspx ).  This universe of local elections affords a large, representative statistical basis for evaluating local patterns of voting throughout SD 22 as of 2007 and 2011 with respect to the two questions in Paragraph 11 above: (i) Do *African-American favored candidates* fail to get elected when running for local office throughout SD 22?  (ii) Do white voters *usually defeat* the African-American-favored candidate by consistently voting together as a bloc?

21.  I have compiled and cross-checked historical records in order to classify each candidate in this large universe by race (shown in Appendix Table 1).  The racial identity of some candidates necessarily remains unknown or undocumented.  Appendix Table 2 (under preparation) will present a complete updated list of candidates whose racial identities is known with a high degree of scientific certainty.  Any candidate not on that list is classified hereafter as "unknown" (a shorthand for "not known with high scientific certainty").

## FINDINGS BASED UPON 2007, 2011, AND 2015 ELECTIONS

22.  Referring first to the 2007 election, I can confidently identify the African-American (or African American-favored) candidate in the 17 contested local elections (see Appendix Table 1).  In other such elections, 20 viable candidates of unknown race ran and lost.[4]  Some of those 20 losing candidates of unknown race may have been racially African-American or African-American-favored candidates.  The fact that 3 of these 20 were Republicans lessens the most extreme possibility (that all 20 were AA or AA-favored candidates).  Assuming those 3 were not the favored candidate of AA voters, that leaves at most 17 *possibly* AA-favored candidates who lost.

23.  By comparison, I can document 17 other candidates known to be the favored choice of African-American voters who were in fact elected.  Referring to the 17 losing candidates of unknown race, it is implausible that not a single one of them is White.  Therefore, I conclude with a high degree of confidence that White bloc voting (WBV) does not usually result in the defeat of the majority African-American favored candidates.

24.  Regarding the 2011 and 2015 elections, I followed the same logic and calculated that fewer than half of African-American (or African-American-preferred) candidates of unknown race lost.

25.  Clearly, candidates favored by African-American voters have been elected on a regular basis throughout State Senate District 22 since at least 2007.  With reference to the two questions posed initially at Paragraph 11 above:

(i) Do *African-American favored candidates* fail to get elected when they run for local office within SD 22?  *Answer:* **Not usually.**

(ii) Do white voters *usually defeat* the African-American-favored candidate in those elections by consistently voting together as a bloc?
*Answer:* **No.**

---

[4] By my definition, a viable candidate is one who received at least one-tenth of all votes cast.

**FURTHER OBSERVATIONS ON MR. COOPER'S REPORT**

26.  Plaintiffs' expert William Cooper proposes to amend SD 22 without considering the derivative consequences of interchanging territory with SD 23. One cannot justly ignore those derivative consequences, since they bear directly on the traditional districting principles referenced at the time that Mississippi state senate districts were drawn.[5] These are: (1) **Compactness**: Keeping the distance between all the parts of a constituency to a minimum; (2) **Preserving counties and other political subdivisions**: Respecting county, city, and town boundaries; (3) **Preserving communities of interest**: Respecting geographical areas, such as unincorporated communities, neighborhoods of a city, or regions of a state whose residents have shared political interests.

27.  *Mr. Cooper's proposed alternative SD 22 gives predominant emphasis to race, thereby subordinating other traditional redistricting principles.* Quoting Mr. Cooper:

> "17. In sum, the Illustrative Plan demonstrates that an alternative majority-Black Senate District 22 can be drawn with a BVAP [Black voting-age population] that is 11 percentage points higher than the 50.77% BVAP district under the 2012 Plan."
> [Cooper Report, page 7]

Mr. Cooper has sought to maximize African-Americans' share of the eligible voters in SD 22 with no thought to balancing traditional districting principles when modifying SD 22 and SD 23. More generally, this highlights Mr. Cooper's flawed assumption that African-American are fungible pockets of like-minded voters, to be moved about among districts.

28.  *Regarding compactness, Mr. Cooper repeatedly misstates his proposed plan.* Quoting him once again:

> "22. District 22 and District 23 as reconfigured under the Illustrative Plan comply with the one-person one-vote rule, are contiguous, are **more compact than in the current configuration,** and **do not dilute minority voting strength.**"
> [Cooper Report, page 8. Emphasis added]

In paragraph 22 above, Mr. Cooper misstates the consequences of his proposed changes for compactness. He cites the Reock score, which measures the extent to which the shape of a

---

[5] As reflected in the Section 5 Senate Submission, the Standing Joint Committee adopted the following redistricting criteria to guide the redistricting process: (1) Each district's population should be less than 5% above or below the mean population of a district; (2) Districts should be composed of contiguous territory; (3) The redistricting plans should comply with all applicable state laws and federal laws including Sections 2 and 5 of the Voting Rights Act and the Mississippi and United States Constitutions. Mississippi state law sets forth the traditional redistricting principles that shall be followed in Miss. Code Ann. § 5-3-101.

district is spread out from its center. A district's Reock score falls within the range of zero to 1; a score closer to 1 indicates a district that is *more* compact. Quoting Mr. Cooper (at paragraph 20):

> "Under the Reock compactness measure, Illustrative Plan District 22 scores .26 and District 23 scores .20. In comparison, 2012 Plan SD 22 scores .25 and SD 23 scores .34."
> [Cooper Report, page 8]

29. By his own measure, then, Mr. Cooper's proposed alternative SD 23 is *less* compact, i.e., its Reock score of .20 is *lower*, than that of SD 23 as adopted in 2012 (Reock score: .34). In a concluding paragraph, he misstates this established fact:

> "26. I also conclude that a 62% BVAP-majority Senate district can be drawn by exchanging whole precincts between SD 22 and SD 23 as drawn under the 2012 Plan. The resulting districts are reasonably compact, ***particularly in comparison to the existing districts.***"
> [Cooper Report, page 11. Emphasis added]

30. Mr. Cooper further misstates that his proposed plan does not dilute minority voting strength:

> "22. District 22 and District 23 as reconfigured under the Illustrative Plan comply with the one-person one-vote rule, are contiguous, are more compact than in the current configuration, and ***do not dilute minority voting strength.***"
> [Cooper Report, page 8. Emphasis added]

His statement at para. 22 above is incorrect. Plaintiffs' proposed alternative would strip African-American voters in each of two districts--SD 22 and SD 23--in which they are now influential. According to Cooper, African-Americans were 50.8% and 42.0% of 2010 voting-age persons in these two districts as now configured.[6] It is my understanding that some political scientists might regard SD 22 as an "opportunity" district and SD 23 as an influence district. (Political scientists differ on exact definitions here.)

31. Cooper's proposed plan would modify these two existing districts, "packing" African-Americans into one district (SD 22), where they would constitute 62% of voters; and "cracking" their concentration in the other district (SD 23), rendering them no longer influential.

32. ***Regarding preservation of counties and other political subdivisions, it appears that Mr. Cooper's plan would split both Warren County and, within it, the City of Vicksburg.*** See Figure 1 below

33. Overall, Mr. Cooper has subordinated traditional redistricting principles and instead given predominant emphasis to race in constructing his Illustrative Plan. He manipulated district

---

[6] For the record, African-Americans now constitute, respectively, 51.3% and 46.6% of *2015 voting-age citizens* in these two districts as now configured.

boundaries for the sole purpose of increasing African-Americans' share of voting-age persons from 50.8% to 62%.

34.  To do so, however, he would split county lines and the boundaries of at least one incorporated city, and damage the compactness of adjacent SD 23. His proposed alternative SD 22 would necessarily dilute the voting strength of African-American voters in adjacent SD 23, reducing that influential 42% share to just 31%. That would constitute an unlawful dilution of African-Americans' voting strength in SD 23.

35.  His proposed alternative would strip African-American voters of two districts in which they now constitute 51.3% and 46.6% of *2015 voting-age citizens* under the existing 2012 plan. By today's measures, African-American voters enjoy both "opportunity" (a 51.3% majority) and "influence" (a 46.6% share).

36.  Instead, he would "pack" African-Americans into a single district (SD 22), where they would constitute 62% of the voters; and "crack" an existing concentration of African-American voters in the other district (SD 23), severely diluting their influence there (from 46.6% to about 31%.

Signature:

Peter A. Morrison
January 18, 2019

## APPENDIX A

*See Attachment*

### Peter A. Morrison, Ph. D.

## CASES I HAVE TESTIFIED IN SINCE AUGUST 2012

1. ZORAIDA RIOS-ANDINO et al. v. ORANGE COUNTY. UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION. Expert Report on behalf of Defendant.

2. JAMES FIGGS AND ROBERT JACKSON v. QUITMAN COUNTY, MS. UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF MISSISSIPPI, GREENVILLE DIVISION. Affidavit in Support of Defendants' Motion for Summary Judgment.

3. U.S. v. TOWNHOMES OF KINGS LAKE, HOA, INC. et al. MIDDLE DISTRICT OF FLORIDA. DJ# 175-17M-499. Declaration on behalf of Plaintiff U.S. Department of Justice.

4. EVENWEL v. PERRY, UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS.
Declaration on behalf of Plaintiffs seeking to enjoin Texas from conducting further state Senate elections under Plan S172 and asking the court to require the Texas Legislature to reapportion state senatorial voting districts in conformity with the Fourteenth Amendment.

5. EVENWEL et al. v. ABBOTT et al., UNITED STATES SUPREME COURT.
"Brief of Demographers Peter A. Morrison, et al. as *Amici Curiae* in Support of Appellants," in Evenwel et al. v. Abbott et al.

6. PAULETTE KREMMEL v. FAIRLIFE LLC, UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF ILLINOIS. Declaration on behalf of Defendant.

7. DR. PANKAJ JAIN, Plaintiff v. COPPELL INDEPENDENT SCHOOL DISTRICT, et al., U.S. District Court, Northern District of Texas, Dallas Division. Declaration on behalf of Defendant.

8. Glatt v. City of Pasco, et al., U.S. District Court, Eastern District of Washington. Declaration on behalf of Defendant. (Court ruled in favor of Defendant)

9. Bishop, et al. v. Shorter University, Inc., Civil Action No. 4:15-CV-0033-HLM, United States District Court for the Northern District of Georgia, Rome Division. Declaration on behalf of Defendant.

10. Feldman et al. v. Arizona Secretary of State's Office et al., United States District Court, District of Arizona. Declaration on behalf of Defendant.

11. Timothy Dadey et al. v. City of Costa Mesa, Case No. 30-2014-00757962-CU-CR-CJC and Timothy Dadey et al. v. City of Costa Mesa, Case No. 30-2014-00758104, pending in the Superior Court of the State of California for the County of Orange. Deposition testimony.

12. Anne Harding et al. v. County of Dallas, Texas et al. U.S. District Court, Northern District of Texas, Dallas Division. C.A. No. 3: 15-CV-00131-D. Deposition and trial testimony on behalf of Plaintiffs.

13. Pico Neighborhood, et al. v. City of Santa Monica, et al. Superior Court of the State of California for the County of Los Angeles, No. BC616804. Deposition and trial testimony on behalf of Defendant.

(Updated: December 26, 2018)

11

**APPENDIX B**

*See Attachment*

# PETER A. MORRISON

## CONTACT INFORMATION

E-MAIL: PETERMORRISON@ME.COM

VOICE: (508) 228-8018; CELL: (310) 266-9580

## EDUCATION

B.A., Sociology, 1962, Dartmouth College
Ph.D., Sociology, 1967, Brown University

## PROFESSIONAL EXPERIENCE

2009-present — President, Peter A. Morrison & Associates, Inc., Nantucket, MA
1969-2009 — Senior Staff Demographer and Resident Consultant, The RAND Corporation, Santa Monica, California
1979-1990 — Founding Director, Population Research Center, RAND
1967-1969 — Assistant Professor, Department of Sociology, and Research Associate, Population Studies Center, University of Pennsylvania, Philadelphia

## AREAS OF EXPERTISE

Dr. Morrison's principal expertise centers on applications of demographic analysis in tracking socioeconomic trends and envisioning their consequences for public policy and business.

Domestic applications include demographic analysis for electoral redistricting; store site selection; human resource analysis; evaluating employment discrimination claims, minority representation within jury pools, and school desegregation remedies; forecasting school enrollments; and using census and administrative data to monitor local community demographic contexts.

International applications include business concerns with corporate strategic planning, globally emerging middle-class consumer markets, and demographic precursors of expanding consumer markets; comparing and evaluating individual markets; and identifying potential business opportunities spurred by forthcoming demographic change.

Dr. Morrison conducts studies for the private sector and offers executive briefings on these topics through his consulting firm, founded in 1984. Clients have included American Express, American Stores, Corning, Inc., Ford Motor Co., Marriott International, NBC, New Directions for News, Times Mirror, University of California, and CIBC Securities (Canada).

13

2

Previously, Dr. Morrison was a faculty member at the University of Pennsylvania. He also has taught periodically at UCLA, the RAND Graduate School, and the Helsinki School of Economics. He also lectures before academic and business audiences and gives invited testimony before subcommittees of the U.S. Senate and House of Representatives. He has made invited presentations to the National Science Board, the Conference Board, the National League of Cities, the National Conference of State Legislatures, the University of California Management Institute, the American Bar Association, American Society of Newspaper Editors, newsroom seminars for the Casey Journalism Center, County Counsels Association of California, American College of Surgeons, National Association of Homebuilders, Missouri Legislative Forum, World Future Society, and Volunteers of America.

He has served as advisor to the Committee for Economic Development, the Congressional Research Service, and committees of the National Academy of Sciences, U.S. Census Bureau, Department of Agriculture, National Institutes of Health, California Energy Commission, California Governor's Council on Growth Management, Center for California Studies, and United Way.

## PROFESSIONAL ORGANIZATIONS/HONORS

Invited participant, U.S. Census Bureau Working Group on 2010 Race and Ethnicity

Member, L.A. Unified School District Enrollment Analysis Technical Advisory Committee

Visiting Lecturer, Helsinki School of Economics and Business Administration, summer 2001

U.S. Census Bureau Advisory Committee on Population Statistics, 1989-1995 (Chair, 1990).

Population Association of America: Board of Directors, 1978-1980; Public Affairs Committee, 1979-1986; Chair, Nominations Committee, 1981-1982; annual Program Organizing Committee, 1995, 1998; Local Arrangements Committee, 2000; Committee on Applied Demography, 1995-1999, Chair, 1998; Development Committee, 2006-2012.

Southern Demographic Association: Board of Directors, 1999-present; Vice President, 2001; President, 2003.

Center for Spatially Integrated Social Science, UC Santa Barbara: Advisory Board, 2000-

Research Advisory Board, Committee for Economic Development, 1988-1991.

Regents' Lecturer, UCLA, Spring 1987.

Social Science Research Council's Committee on the Survey of Income and Program Participation, 1985-1988.

National Advisory Child Health and Human Development Council, National Institute of Health, 1984-1987.

Population Research Committee, National Institute of Child Health and Human Development, 1977-1979.

14

Committee on Behavioral and Social Aspects of Energy Consumption and Production, National Academy of Sciences, 1980-1982.

Committee on Urbanization and Population Redistribution, International Union for Scientific Study of Population, Chairman, 1976-1979.

Advisory Subcommittee for Applied Social and Behavioral Sciences, National Science Foundation, 1978-1981.

Future of Rural America Advisory Committee, FHA, 1978-1981.

Editorial Advisory Committee, *Urban Studies,* 1985-1995.

Editorial Advisory Board, *J. Australian Population Assoc., 1995-1998.*

## RECENT MEDIA APPEARANCES/COVERAGE:

*Interviews:* CNBC; New York Times; Los Angeles Times; USA Today; Time Magazine; Seattle Times; AMA/Marketing News

*Commentary:* Washington Post; New York Times; Wall Street Journal; International Herald Tribune; Pittsburgh Post-Gazette; Los Angeles Times; Atlanta Constitution; Houston Chronicle; San Jose Mercury News; Providence Journal; San Antonio Express-News

*Articles:* "United Nations of Nantucket," *N Magazine* (Winter 2016).
(access at: www.n-magazine.com/united-nations-nantucket/ )

## RECENT PRESENTATIONS:

- 10/13/2016: "A Demographic Accounting Model for Class Action Litigation," presented at 2016 Southern Demographic Association meetings, Athens, GA. (coauthored with Thomas Bryan).

- 10/22/2015:  At Nantucket Historical Association's "Food for Thought" series:
**"Immigration on Nantucket: What You Should Know"**
https://www.youtube.com/watch?v=u17rINVweZs  (Morrison presentation starts at minute 2:10)

- 01/08/2015: To Waterbury, CT **"Alderman by District Reapportionment Commission"** Meeting
https://www.youtube.com/watch?v=aj6qE3JECg0&feature=youtu.be
(Morrison presentation start at minute 23:10)

- 01/14/2015: To Waterbury, CT **"Aldermen by District Reapportionment Commission"** meeting:
https://www.youtube.com/watch?v=98Vp4y11_sc  (Morrison presentation starts at minute 9:10)

- 12/2014: **"Investing in Nantucket's Future"**  http://vp.telvue.com/preview?id=T02542&video=223735
(Morrison presentation starts at minute 1:30)

- 11/2013:  **"Growing Old: How Aging Populations Will Transform Our Lives and Times"**
http://www.youtube.com/watch?v=kJvS_hhgLDk&feature=c4-overview-vl&list=PLjgJVmnztYsTqYVn_jjBhCGxA5-7DMtGw (Morrison presentation starts at minute 1:05)

## SELECTED RECENT PUBLICATIONS/PAPERS/POLICY BRIEFS

*Most of my publications (or abstracts) are accessible at these sites:*

https://www.researchgate.net/profile/Peter_Morrison2/publications?sorting=newest&page=2

www.rand.org/pubs/authors/m/morrison_peter_a.html

"Estimating Nantucket's Effective Population," under review by *Population Research & Policy Review* (coauthor).

"Distinguishing 'False Positives' Among Majority-Minority Election Districts in Statewide Congressional Redistricting," 2017 Southern Demographic Association meetings (coauthor).

"A Comparison of Methods for Classifying and Modeling Respondents Who Endorse Multiple Racial/Ethnic Categories: A Healthcare Experience Application," in press, *Medical Care* (coauthor).

"Can Puerto Ricans Spark a Latino Political Backlash?" op-ed in *San Antonio Express-News*, February 13, 2018 (coauthored with Charles S. Bullock, III).
*Access at:* https://www.researchgate.net/publication/323200663_Can_Puerto_Ricans_spark_a_Latino_political_backlash

"Focus on Teaching: The Legend of the Calamity-Induced Baby Boom," PAA Affairs, Spring 2017. *Access at:* https://www.researchgate.net/publication/315683457_Focus_on_Teaching_The_Legend_of_the_Calamity-Induced_Baby_Boom

"The Demography of Trump' s Wall," *N-IUSSP*, April 3, 2017 (coauthor).
*Access at:* www.niussp.org/article/demography-trumps-wallle-mur-de-trump-et-ses-consequences-demographiques/

"Three Myths of U.S. Immigration," op-ed in *San Antonio Express-News*, March 4, 2017 (coauthored with Dudley L. Poston, Jr.).
*Access at:* www.mysanantonio.com/opinion/commentary/article/Three-myths-of-U-S-immigration-10975928.php

"From Legal Theory to Practical Application: A How-To for Performing Vote Dilution Analysis," *Social Science Quarterly* (2017), coauthor.
*Assess at:* https://www.researchgate.net/publication/315631377_From_Legal_Theory_to_Practical_Application_A_How-To_for_Performing_Vote_Dilution_Analyses_From_Legal_Theory_to_Practical_Application

"Foreward" to D. A. Swanson, ed., *The Frontiers of Applied Demography* (2017)
*Assess at:* https://www.researchgate.net/publication/311486631_Foreward_to_The_Frontiers_of_Applied_Demography_2017

"Projecting Future Demand for Assisted Living in the US: A Case Study," chapter 6 in D. A. Swanson, ed., *The Frontiers Applied Demography* (2017).
*Access at:*
https://www.researchgate.net/publication/311800586_Projecting_Future_Demand_for_Assisted_Living_chap_6_in_THE_FRONTIERS_OF_APPLIED_DEMOGRAPHY

"Health Care Access: The Hollow Promise," op-ed in *Starkville Daily News*, 10/18/2016 (coauthored with Ron Cossman).
*Access at:* https://www.researchgate.net/publication/309458235_Health_Care_Access_The_Hollow_Promise

"We have the data to make voting fair. Let's use it." op-ed in *The Washington Post,* 10/22/2015
*Access at:* http://www.washingtonpost.com/news/in-theory/wp/2015/10/22/we-have-the-data-to-make-voting-fair-lets-use-it/

5

Supreme Court of the United States. "Brief of Demographers Peter A. Morrison, Thomas M. Bryan, William A. V. Clark, Jacob S. Siegel, David A. Swanson, and The Pacific Research Institute as *Amici Curiae* in Support of Appellants," in *Evenwel et al. v. Abbott et al.* *Access at:* http://www.scotusblog.com/wp-content/uploads/2015/08/Demographers-Amicus.pdf

"Exploring the Blizzard Babies Phenomenon," op-ed in *Providence Journal*, March 3, 2015. *Access at:* www.providencejournal.com/article/20150303/OPINION/150309836

"A Method to Forecast Hispanic Voting Strength at Local Scales," presented at Applied Demography Conference, San Antonio, Texas, January 8-10, 2014.

"Quantifying the Effect of Age Structure on Voter Registration," *Social Science Quarterly* (2014). *Access at:* http://onlinelibrary.wiley.com/doi/10.1111/ssqu.12059/abstract

"Forecasting Hispanics' Ripening Voting Strength at Local Scales," presented at 2012 Annual Meeting of Southern Demographic Association, Williamsburg, VA

"Gauging Hispanics' Effective Voting Strength in Proposed Redistricting Plans: Lessons Learned Using ACS Data," (coauthored with T. Bryan), for National Academy of Sciences Workshop on the Benefits (and Burdens) of the American Community Survey, Case Studies/Agenda Book, chap. 5 (2012). *Access at:* http://sites.nationalacademies.org/cs/groups/dbassesite/documents/webpage/dbasse_073124.pdf

"Chinese Workers Could Replace Mexican Immigrants," op-ed in *Houston Chronicle*, Aug. 12, 2011 (coauthored with Dudley Poston, Jr.). *Access at:* www.chron.com/opinion/outlook/article/Chinese-workers-could-replace-Mexican-immigrants-2077827.php

"Integrating Census Data to Support a Motion for Change of Venue," *Population Research & Policy Review* (coauthored with Dean Judson), 2011. *Access at:* http://paa2011.princeton.edu/papers/111043

"An Evaluation of Additive and Hierarchical Classifications of Race/Ethnicity as Measured on Census 2000," coauthor (under review).

"Using the Census Bureau's Surname List to Improve Estimates of Race/Ethnicity and Associated Disparities," *Health Services and Outcomes Research Methodology* 9(2), pp.69-83 (coauthor). *Access at:* www.rand.org/pubs/external_publications/EP20090611.html

"Teaching Business Demography Using Case Studies," presented at the International Union for the Scientific Study of Population Seminar on Applications of Demography in Business, Sydney Australia, October 2007 (coauthor). Appears in *Population Research & Policy Review.* *Access at:* http://link.springer.com/article/10.1007/s11113-009-9155-4

"Targeting Spatial Clusters of Elderly Consumers in the USA," presented at the International Union for the Scientific Study of Population Seminar on Applications of Demography in Business, Sydney Australia, October 2007 (coauthored with Thomas Bryan). Appears in *Population Research & Policy Review. Access at:* http://link.springer.com/article/10.1007/s11113-009-9149-2

"Assessing the Need for a New Medical School: A Case Study in Applied Demography," *Population Research & Policy Review* (coauthor).

"A New Method for Estimating Race/Ethnicity and Associated Disparities Where Administrative Records Lack Self-Reported Race/Ethnicity," coauthor, *Health Services Research Journal* 43(5), Oct. 2008. *Access at:* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2653886/

6

"Forecasting the Supply of and Demand for Physicians in the Inland Southern California Area" (coauthor), RAND Technical Report TR524, 2007.

"Evaluating a Claim of Discriminatory Annexation Using Demographic Analysis: An Instructional Case," at 2005 annual Southern Demographic Association meetings.

"Evaluating Evidence of Discrimination in Multi-Ethnic Housing Markets," *Population Research & Policy Review,* 2008 (coauthored with William A. V. Clark).

"Methods for Gauging the Target Populations that Community Colleges Serve," *Population Research & Policy Review* 26(1), 2007 (coauthored with L. Santibañez, G. Gonzalez, S. J. Carroll).

"Lingering Effects of Discrimination: Tracing Persistence Over Time in Local Populations," *Population Research & Policy Review*, 2006.

"China: Bachelor Bomb," *New York Times*, op-ed 09/14/2005 (coauthored with Dudley Poston)
   *Access at:* http://www.rand.org/blog/2005/09/china-bachelor-bomb.html

"Small-Area and Business Demography," chapter in D. Poston and M. Micklin, *Handbook of Population*, 2005 (coauthored with Stan Smith).

"Future Demographic Challenges to California School Districts," presented at 2005 annual Population Association of America meetings, session on School Demography.

"Demographic Overview of California's K-12 Public School Student Population," chap. 2 in S. J. Carroll et al., *California's K-12 Public Schools: How Are They Doing?* RAND MG-186, 2005.

"Counting on Demography: Fostering Applications of the Social Sciences," invited plenary address at the 2005 Southwestern Social Science Association meetings, New Orleans

"How Migration Flows Shape the Elderly Population of Metropolitan Pittsburgh," at 2004 annual Southern Demographic Association meetings, Hilton Head, SC (coauthored with Chris Briem)

"The Bright Lights in Pittsburgh's Future," op ed appearing in *Pittsburgh Post-Gazette*, Sept. 19, 2004 (coauthored with Barry Balmat)

"New Approaches to Spotting Enclaves of the Elderly Who Have Aged in Place," presented at 2004 Population Association of America meetings (coauthored with Tom Bryan).

"Developing an Arab-American Surname List: Potential Demographic and Health Research Applications," at 2003 Southern Demographic Association meetings (coau. with B. Kestenbaum, D. Lauderdale, A. Abrahamse, S. El-Badry).

"A Demographic Overview of Metropolitan Pittsburgh," RAND Issue Paper IP-256 (2003).

"Confronting a Race-Based School Admissions Policy," *Chance* 16(1), 2003.

"An Overview of Business Demography in the U.S.A.," invited paper for the Australian Population Association's 11th Biennial Conference, Sydney, October 2002.

18

7

"Internal Migration and Short-Distance Mobility," Chapter 19 in D. Swanson, et al., *The Methods and Materials of Demography*, rev. ed., 2003 (coau. with T.M. Bryan and D.A. Swanson).

"Business Demography," in P. Demeny and J. McNicholl, eds., *Encyclopedia of Population*, 2003 (coauthored with Stan Smith).

"A National Legacy of Migration," in Carla Blank, *Rediscovering America* (2003).

Review of J. S. Siegel, *Applied Demography: Applications to Business, Government, Law, and Public Policy* in *Population and Development Review* 28(1), 2002.

"A Demographic Perspective on Our Nation's Future," RAND Documented Briefing, 2001.

"Using First Names to Estimate Racial Proportions in Populations," presented at the 2001 Population Association of America meetings.

"At-Large Elections Under Legal Challenge: Where Demographic Analysis Fits In," presented at the 2000 Population Association of America meetings.

"Meeting Local Information Needs: A Case Study in Team Applied Demography," *Applied Demography Newsletter*, Population Association of America, Spring 2002 (coauthored).

"Gauging Future Prospects for a Neighborhood Vehicle: Where Demographic Analysis Fits In," at 1999 Southern Demographic Association meetings, San Antonio.

"Forecasting Enrollments for Immigrant Entry-Port School Districts," *Demography*, Nov. 2000.

"Charting Alternatives to a Segregated School Admissions Policy: Where Demographic Analysis Fits In," at 1998 Population Association of America meetings, Chicago (abridged version appears in *Chance*).

"Unveiling the Demographic 'Action' in Class Actions," *Population Research and Policy Review*, 1999.

"Family Policies and Demographic Realities," chapter in J.W. Hughes and J.J. Seneca, eds., *America's Demographic Tapestry: Baseline for the New Millennium*, Rutgers Univ. Press, 1999.

"Applying Demographic Analysis in Affirmative Action Disputes: An Instructional Case," *Population Research and Policy Review*, 1998.

"Demographic Influences on Latinos' Political Empowerment: Comparative Local Illustrations," *Population Research and Policy Review*, 1998.

"Demographic Change and School District Response: Assessing Alleged Discriminatory Effects of Boundary Changes," under review (with W.A.V. Clark).

"Forecasting Enrollments During Court-Ordered Desegregation," *Population Research and Policy Review*, 1996.

"Applying Demographic Analysis to Store Site Selection," *Population Research and Policy Review,* 1996 (with A. F. Abrahamse).

"Tracking Growth of Emerging Consumer Markets Worldwide: Where Demographic Analysis Fits In," presented at Sixth International Conference on Applied and Business Demography, Bowling Green, OH (coauthored).

"Tying Knots in the American Tapestry," Op-ed article, *Los Angeles Times,* Sept. 18, 1995.
     *Access at: http://articles.latimes.com/1995-09-18/local/me-47167_1_ethnic-identity*

"Broadening Client Perspectives on Business Concerns," *Applied Demography,* Summer 1995.

"Demographic Foundations of Political Empowerment in Multi-Minority Cities," *Demography,* May, 1995 (with W.A.V. Clark).

"Demographic Perspectives on the Voting Rights Act," RAND P-7905, 1995 (briefing cohosted by U. S. House Subcommittee on Census and The Population Resource Center, Oct.19,1994).

*Demographics: A Casebook for Business and Government*, Westview Press, 1994 (coeditor).

"Empowered or Disadvantaged?  Applications of Demographic Analysis to Political Redistricting," chapter in *Demographics* (cited above).

"A Riot of Color: The Demographic Setting of Civil Disturbance in Los Angeles," RAND P-7819 (with Ira S. Lowry).  Condensed version appears in Mark Baldassare (ed.), *The Los Angeles Riots: Lessons for the Urban Future*, Westview, 1994.
     *Access at: https://www.researchgate.net/publication/311800927_A_Riot_of_Color_The_Demographic_Setting*

"Surname Analysis for Estimating Local Concentration of Hispanics and Asians," *Population Research and Policy Review*, 1994 (with A. F. Abrahamse).
     *Access at: https://www.researchgate.net/publication/270279296_Surname_Analysis_for_Estimating_Local_Concentrations*

"The Demographic Context of Army Family Support Policy," chapter in M.J. Eitelberg and S.L. Mehay (eds.), *Marching Toward the 21st Century* (Greenwood Press, 1994).

"Strategic Sleuths," *Forecast Magazine*, Nov/Dec 1993.

"Congress and the Year 2000:  Peering into the Demographic Future," *Business Horizons*, Nov/Dec 1993 (condensation of RAND N-3279 cited below).

"A California That Can Work:  People, Productivity, and Energy," RAND P-7828 (invited testimony before the California Energy Commission, June 1993).

"Goodbye Past, Hello Future:  California's Demographic Shift," Op-ed article, *Los Angeles Times*, September 13, 1993.

"More than Meets the Eye," *Chance*, May 1993.

9

"Employment Discrimination:  How Demographic Analysis Fits In," presented at Fourth International Conf. on Applied Demography, Bowling Green, Ohio, September 1992.

"Is 'Aging in Place' a Blueprint for the Future?"  Association of American Geographers Meeting, San Diego, RAND, P-7794, 1992.

"Gauging Hispanic Voting Strength:  Pitfalls and Paradoxes," *Population Research and Policy Review*, 1992 (with W.A.V. Clark).

"Local Redistricting: The Demographic Context of Local Boundary Drawing," *National Civic Review*, Winter/Spring 1992 (with W.A.V. Clark).

"Mirroring the Mosaic:  Redistricting in a Context of Cultural Pluralism," RAND, P-7789, 1992.

"Testimony before House Subcommittee on Census and Population," RAND, P-7784, 1992.

"Healthier Childhoods and Family Responsibility:  Two Issue Papers," RAND, P-7788, 1992.

"How Demographic Analysis Supports Redistricting," for Mandatory Continuing Legal Education course sponsored by County Counsels Association of California, January 1992.

"California's Future:  More to Come," Op-ed article, *The Los Angeles Times*, Dec. 3, 1991.
   *Access at:* http://articles.latimes.com/1991-12-03/local/me-416_1_future-growth

*Soldiers' Families:  Tracking Their Well-Being During Peacetime and War*, RAND, N-3405-A, 1992 (coauthor).

"California's Demographic Outlook:  Implications for Growth Management," RAND, P-7738, 1991.

"The Changing Demographic Context of Postsecondary Education," RAND, P-7737, 1991.

"The Demographer's Role in the Local Boundary-Drawing Process," RAND, P-7711, 1991 (coauthor).

"Looking In From Outside:  Enhancing Demographic Perspectives on Business Concerns," given at 1991 Population Association of America meetings.

"Demographic Paradoxes in the Los Angeles Voting Rights Case," *Evaluation Review*, 1991 (with W.A.V. Clark).

"Future Images—Childhood, The Workplace, Our Communities," RAND P-7656, 1990.

"The Changing Demographic Context of Municipal Governance," RAND P-7654, 1990.

"Pitfalls in Estimating Eligible Voters Among Hispanics," coauthored, given at 1990 Population Association of America meetings.

"Demographic Factors Reshaping Ties to Family and Place," *Research on Aging*, Dec. 1990.

"Applied Demography: Its Growing Scope and Future Direction," *The Futurist*, March/April 1990.

"A Demographic Perspective on Future Issues," *Congressional Research Service CRS Review*, Jan/Feb 1990.

"Leaving School Early: 'Stopping Out' and Dropping Out Among American Youth," given at the 1989 American Sociological Association meetings (with Jane Mauldon).

*A Taste of the Country: A Collection of Calvin Beale's Writings*, editor and author of introduction (Penn State Univ. Press), 1990.

*Families in the Army: Looking Ahead*, RAND, R-3691-A, 1989 (coauthor).

"Quantifying Legal Standards in Section 2 Voting Rights Cases," paper given at Population Association of America.

*Congress and the Year 2000: A Demographic Perspective on Future Issues*, RAND, N-3279, March 1991.

"What Tomorrow's Demographers Will Be Called Upon to Do," RAND P-7469, 1988.

*Beyond Stereotypes: Who Becomes a Single Teenage Mother?*, RAND R-3489, 1988 (coau.).

"Government Must Help Families With Long-term Care for Elderly," op-ed article, *The Atlanta Constitution*, April 19, 1988.

"Teens Willing to Consider Single Parenthood: Who is at Greatest Risk?" *Family Planning Perspectives*, Jan/Feb, 1988 (coauthor).

*The Current Demographic Context of Federal Social Programs*, RAND, N-2785, 1988.

"Demographic Factors Reshaping the U.S. Market for New Housing," RAND, P-7467, 1988.

"Applied Demography: Its Current Scope and Future Direction in the United States," RAND Paper, 1988.

*Public Libraries Face California's Ethnic and Racial Diversity*, RAND, R-3656, 1988 (coauthor, Chapter 4).

"Changing Demographics: What to Watch For," *Business Economics*, 1987.

"Continuity and Change Across the Population Sciences," RAND, P-7281, 1986.

"Pro-Family Laws May Miss the Mark," op-ed article in *The Wall Street Journal*, Dec. 5, 1986.

*Changing Family Structure: Who Cares for America's Dependents?* RAND, N-2518, 1986.

"Accounting for the Educational Shortfalls of Mothers," *Journal of Marriage and the Family*, 1986 (coauthored).

11

"The Prism of Migration," *Social Science Quarterly*, 1986 (with Julie DaVanzo).
Access at: https://www.researchgate.net/publication/284957921_The_prism_of_migration_Dissimilarities_between_return_and_onward_movers

*How Demographic Shifts Will Affect the IRS and Its Mission*, RAND, P-7170, 1985.
Access at: http://www.popline.org/node/421417

"Characteristics of Migrants from Metropolitan to Nonmetropolitan Areas in the U.S.A.," *Espace Populations Societes*, 1985 (with Kevin McCarthy).

*Demographics and Business Decisionmaking: Prospects and Possibilities for the 1980s*, RAND, P-7017, 1984. Appears in *Marketing Review*, Fall 1985.

"Tracking People," *Group Practice Journal*, July/August 1984.

*Demographic Forces Reshaping Small Communities in the 1980s*, RAND, N-1887, 1982 (coauthor). Appears in *Southwestern Review of Management and Economics,* 1984.

*Population Movements: Their Forms and Functions in Urbanization and Development*, published by Ordina for International Union for the Scientific Study of Population, 1983 (editor and author of Chap. 1).

*Current Demographic Trends and Federal Policy: An Overview*, RAND, N-2030, 1983.

"Is Population Deconcentration Lengthening Commuting Distances?" *Population Research and Policy Review*, 1983 (with Kevin McCarthy).

*Migration Sequences: Who Moves Back and Who Moves On?*, RAND, R-2548-NICHD, 1982 (with Julie DaVanzo).

*Demographic Challenges in America's Future*, RAND, R-2911, 1982 (with William P. Butz).

"Different Approaches to Monitoring Local Demographic Change," chapter in E. S. Lee and H. F. Goldsmith, eds., *Population Estimates: Methods for Small Area Analysis*, Sage, 1982.

"The Energy Situation and the World of Californians," in *Regional Perspectives on Energy Issues*, (The Conference Board, July 1982).

*Demographic Certainties and Uncertainties in the Future of Social Security*, RAND, N-1742-NICHD, 1981 (invited Senate testimony). Appears in *Challenge: The Magazine of Economic Affairs*, Jan.-Feb., 1982.

"There Are Just Too Many Uncertainties," op-ed article, *The Sacramento Bee*, 9/20/81.

*Teenage Parenthood: A Review of Risks and Consequences*, RAND N-1714, 1981 (coau.).

*Teenage Parents: Their Ambitions and Attainments*, RAND, R-2771, 1981 (coau.).

"Return and Other Sequences of Migration in the U.S.," *Demography*, 1981 (coau.).

12

"How Demographers Can Help Legislators," *Policy Analysis*, 1980.

*Accommodating the Demography of the 1980s*, Midcontinent Perspective Series, Midwest Research Institute, December 1980.

*City Data: A Catalog of Data Sources for Small Cities*, RAND, R-2612, 1980 (coauthored).
    Access at: *https://www.rand.org/content/dam/rand/pubs/reports/2008/R2612.pdf*

*Effects of Postsecondary Experiences on Aspirations, Attitudes, and Self-Conceptions,* RAND R-2616, 1980 (coauthor).

*Consequences of Parenthood in Late Adolescence: Findings from the National Longitudinal Study of High School Seniors,* RAND, N-1343-NICHD, 1979 (coauthored).

"Demographic Trends Impinging on Energy Use," chapter in Charles T. Unseld et al., *Sociopolitical Effects of Energy Use and Policy*, National Academy of Sciences, Washington, D.C., 1979.

*The Future Demographic Context of the Health Care Delivery System*, RAND, N-1347, 1979.

"The Transition to Zero Population Growth in the Midwest," chapter in C. C. Roseman (ed.), *Population Redistribution in the Midwest*.

"Current Demographic Change in Regions of the United States," chapter in V. L. Arnold (ed.), *Alternatives to Confrontation: A National Policy Toward Regional Change*; condensed version appears in *American Demographics*, May 1979.

*Overview of Demographic Trends Shaping the Nation's Future*, RAND, P-6128, 1978 (testimony before Joint Economic Committee of Congress).
    Access at: http://www.popline.org/node/440950

*The Current Demographic Context of National Growth and Development*, RAND, P-5514, 1975 (Congressional testimony); published in condensed form in L. S. Bourne and J. W. Simmons (eds.), *Systems of Cities*, Oxford Univ. Press, 1978, Chap. 6.6.

"Emerging Public Concerns Over U.S. Population Movements in an Era of Slowing Growth," in T. Espenshade and W. Serow (eds.), *The Economic Consequences of Slowing Population Growth*, 1978.

"The Image of 'Elsewhere' in the American Tradition of Migration" (coauthored), in W. H. McNeill and R. S. Adams (eds.), *Human Migration: Patterns, Policies, Implications*, Indiana University Press, Bloomington, Indiana, 1978.

"New York State's Transition to Stability: The Demographic Outlook," in Ben Chinitz (ed.), *The Declining of New York in the 1970s: A Demographic and Economic Analysis*, Praeger, 1978.

13

*Toward A Policy Planner's View of the Urban Settlement System*, RAND, P-5357, 1975; condensed version appears in L. S. Bourne and J. W. Simmons (eds.), *Systems of Cities*, Oxford University Press, 1978, Chap. 7.3.

"The Changing Demographic and Economic Structure of Nonmetropolitan Areas in the U.S.," *International Regional Science Review*, 2(2), 1977 (with Kevin McCarthy).

"Forecasting Population of Small Areas:  An Overview," in *Population Forecasting for Small Areas*, Oak Ridge Associated Universities, Oak Ridge, Tennessee, 1977.

"Demographic Trends That Will Shape Future Housing Demand," *Policy Sciences*, 1977.

"The Functions and Dynamics of the Migration Process" (Chap. 4); and "Urban Growth and Decline in the U.S.:  A Study of Migration's Effects in Two Cities" (Chap. 14), in A. Brown and E. Neuberger (eds.), *Internal Migration:  A Comparative Perspective*, Academic Press, 1977.

*San Jose and St. Louis in the 1960s:  A Case Study of Changing Urban Populations*, RAND, R-1313-NSF, 1973; adaptation appears in S. Goldstein and D. Sly (eds.), *Patterns of Urbanization: Comparative Country Studies*, International Union for Scientific Study of Population, Liege, Belgium, 1977.

*Rural Renaissance in America?  The Revival of Population Growth in Remote Areas*, Population Reference Bureau, Inc., 1976.

*National Longitudinal Study of High School Seniors:  An Agenda for Policy Research*, RAND, R-1964-HEW, 1976 (coauthored).

*The Demographic Context of Educational Policy Planning*, Occasional Paper of the Aspen Institute for Humanistic Studies, 1976.

"A Method for Monitoring Small-Area Population Changes in Cities," *Review of Public Data Use*, April 1975 (coauthored).

*Recent Research Insights into Local Migration Flows*, RAND, P-5379, 1975 (coauthored).

*Population Movements and the Shape of Urban Growth:  Implications for Public Policy*, RAND, R-1072-CPG, 1972 (Commission on Population Growth and the American Future, *Research Reports*, Vol. V, 1973); adaptation appears in J. Friedmann and W. Alonso, *Regional Policy: Readings in Theory and Applications*, MIT Press, 1975.

"Urban Growth and Decline:  San Jose and St. Louis in the 1960s," *Science*, 1974.

*Review of Federal Programs to Alleviate Rural Deprivation*, RAND, R-1651, 1974 (coauth.).

"Guiding Urban Growth: Policy Issues and Demographic Constraints," RAND P-5212, 1974.
*Access at:*  https://www.academia.edu/29836028/Guiding_urban_growth_Policy_issues_and_demographic_constraints

14

"A Demographic Assessment of New Cities and Growth Centers as Population Redistribution Strategies," *Public Policy*, 1973.

*Dimensions of the Population Problem in the United States* RAND, R-864-CPG, 1972 (Comm. on Population Growth and the Amer. Future, *Research Reports*, Vol. V, 1973).

*How Population Movements Shape National Growth*, RAND, P-5007, 1973 (Congressional Seminar on National Growth Policy).

*Migration from Distressed Areas: Its Meaning for Regional Policy*, RAND, R-1103, 1973.

"Theoretical Issues in the Design of Population Mobility Models," *Environment and Planning*, 1973.

*The Impact and Significance of the Rural-Urban Migration in the United States*, RAND, P-4752, 1972 (testimony before U.S. Senate Subcommittee on Migratory Labor and Public Welfare).

"Chronic Movers and the Future Redistribution of Population," *Demography*, 1971.

*Demographic Information for Cities: A Manual for Estimating and Projecting Local Population Characteristics*, RAND R-618, 1971. https://www.rand.org/pubs/reports/R0618.html

"The Role of Migration in California's Growth," in K. Davis and F. Styles (eds.), *California's Twenty Million: Research Contributions to Public Policy*, Institute of International Studies, University of California, Berkeley, 1971.

"Duration of Residence and Prospective Migration," *Demography*, 1967.

(Updated: 12/16/2018)

26

**APPENDIX TABLE 1**

| BLACK FAVORED CANDIDATES FOR LOCAL OFFICE: BOLIVAR COUNTY | | | | | Homogenous Black pcts.? (* = yes) | Unopposed =1 | Contested =1 |
|---|---|---|---|---|---|---|---|
| Office Sought & Candidate's Name | Race | Won/Lost | Contested or Unopposed | Comments | | | |
| **BOLIVAR COUNTY - 2007** | | | | | * | | |
| Chancery Clerk: Haynes | Black | Won | Contested | Heavily favored by voters in the White homogeneous pct. | | | 1 |
| Circuit Court: Kelly | Black | Won | Unopposed | | | 1 | |
| County Prosec Atty: Thomas | Black | Won | Contested | Won despite indications of White bloc voting | | | 1 |
| Coroner: Brown | Black | Won | Unopposed | includes strong white support | | 1 | |
| Supervisor D3: Coleman | Black | Won | Contested | | | | 1 |
| Supervisor D4: McBride | Black | Won | Unopposed | | | 1 | |
| Justice Ct. Judge D1: Ward, Sr. | Black | Won | Unopposed | | | 1 | |
| Justice Ct. Judge D3: Taylor | Black | Won | Unopposed | | | 1 | |
| *Summary (Bolivar 2007): 8 Black/Black-preferred candidates elected, 3 of them in contested elections.* | | | | | | Total: 5 | 3 |
| **BOLIVAR COUNTY - 2011** | | | | | * | | |
| Chancery Clerk: Haynes | Black | Won | Unopposed | | | 1 | |
| Circuit Court: Kelly | Black | Won | Unopposed | | | 1 | |
| County Prosec Atty: Thomas | Black | Won | Unopposed | | | 1 | |
| Coroner: Brown | Black | Won | Contested | | | | 1 |
| Supervisor D3: Billings | Black | Won | Contested | | | | 1 |
| Supervisor D4: McBride | Black | Won | Unopposed | | | 1 | |
| Justice Ct. Judge D1: Ward, Sr. | Black | Won | Unopposed | | | 1 | |
| Justice Ct. Judge D3: Taylor | Black | Won | Unopposed | | | 1 | |
| District Attny D11: Mitchell | Black | Won | Unopposed | | | 1 | |
| Sheriff: Williams, Sr. | Black | Won | Contested | | | | 1 |
| Supervisor D1: Williams | Black | Won | Unopposed | | | 1 | |
| Supervisor D5: King | Black | Won | Unopposed | | | 1 | |
| Constable 3: Scott | Black | Won | Unopposed | | | 1 | |
| *Summary (Bolivar 2011): 13 Black/Black-preferred candidates elected, 3 of them in contested elections.* | | | | | | Total: 10 | 3 |
| **BOLIVAR COUNTY - 2015** | | | | | * | | |
| Chancery Clerk: Haynes | Black | Won | Unopposed | | | 1 | |
| Circuit Court: Kelly | Black | Won | Unopposed | | | 1 | |
| County Prosec Atty: Thomas | Black | Won | Unopposed | | | 1 | |
| Coroner: Seals, Jr. | Black | Won | Contested | | | | 1 |
| Justice Ct. Judge D1: Ward, Sr. | Black | Won | Unopposed | | | 1 | |
| Justice Ct. Judge D3: Taylor | Black | Won | Unopposed | | | 1 | |
| District Attny D11: Mitchell | Black | Won | Unopposed | | | 1 | |
| Sheriff: Williams, Sr. | Black | Won | Contested | | | | 1 |
| Supervisor D1: Calvin-Williams | Black | Won | Contested | | | | 1 |
| Supervisor D3: Billings | Black | Won | Unopposed | | | 1 | |
| Supervisor D4: McBride | Black | Won | Unopposed | | | 1 | |
| Supervisor D5: King | Black | Won | Contested | | | | 1 |
| Tax Coll. & Assessor Havens | Black | Won | Contested | Losing candidate is White | | | 1 |
| *Summary (Bolivar 2015): 13 Black/Black-preferred candidates elected, 5 of them in contested elections.* | | | | | | Total: 8 | 5 |
| Source: Official Recapitulations of Mississippi County general elections, accessed at www.sos.ms.gov/Elections-Voting/Pages/Election-Results-By-Year.aspx | | | | | | Grand Total: 23 | 11 |

| BLACK FAVORED CANDIDATES FOR LOCAL OFFICE: HUMPHREYS COUNTY | | | | | Homogenous Black pcts.? (* = yes) | Unopposed =1 | Contested =1 |
|---|---|---|---|---|---|---|---|
| Office Sought & Candidate's Name | Race | Won/ Lost | Contested or Unopposed | Comments | | | |
| **HUMPHREYS COUNTY - 2007** | | | | | * | | |
| *Chancery Clerk: Browder* | Black | Won | Unopposed | | | 1 | |
| *Circuit Clerk: James-Jones* | Black | Won | Unopposed | | | 1 | |
| *Sheriff: Roseman* | Black | ;Won | Contested | *Top vote-getter in every precinct* | | | 1 |
| *Supervisor D5: Broomfield:* | Black | Won | Unopposed | | | 1 | |
| *Justice Court Judge: Cummings* | Black | Won | Contested | *Top vote-getter in every precinct* | | | 1 |
| *Summary (Humphreys 2011): 5 Black/Black-preferred candidates elected, 2 of them in contested elections.* | | | | | Total: | 3 | 2 |
| **HUMPHREYS COUNTY - 2011** | | | | | * | | |
| *Chancery Clerk: Browder* | Black | Won | Unopposed | | | 1 | |
| *Circuit Clerk: James-Jones* | Black | Won | Unopposed | | | 1 | |
| *Sheriff: Roseman* | Black | Won | Contested | *Top vote-getter in every precinct* | | | 1 |
| *Supervisor D5: Broomfield* | Black | Won | Unopposed | | | 1 | |
| *Justice Court Judge: Brown-Cummings* | Black | Won | Unopposed | | | 1 | |
| *Supervisor D3: Brown* | Black | Won | Contested | | | | 1 |
| *District Attny D21: Oliver* | Black | Won | Contested | | | | 1 |
| *Summary (Humphreys 2011): 7 Black/Black-preferred candidates elected, 3 of them in contested elections.* | | | | | Total: | 4 | 3 |
| **HUMPHREYS COUNTY - 2015** | | | | | | | |
| *Chancery Clerk: Browder* | Black | Won | Unopposed | | | 1 | |
| *Circuit Clerk: James-Jones* | Black | Won | Unopposed | | | 1 | |
| *Sheriff: Roseman* | Black | Won | Unopposed | | | 1 | |
| *Supervisor D1: Bankhead* | Black | Won | Unopposed | | | 1 | |
| *Supervisor D3: Johnson* | Black | Won | Contested | | | | 1 |
| *Supervisor D5: Broomfield* | Black | Won | Unopposed | | | 1 | |
| *Justice Ct. Judge-N: Gates* | Black | Won | Contested | | | | 1 |
| *Justice Ct. Judge-S: Brown-Cummings* | Black | Won | Unopposed | | | 1 | |
| *Constable-North: Williams* | Black | Won | Unopposed | | | 1 | |
| *Summary (Humphreys 2015): 9 Black/Black-preferred candidates elected, 2 of them in contested elections.* | | | | | Total: | 7 | 2 |
| Source: Official Recapitulations of Mississippi County general elections, accessed at www.sos.ms.gov/Elections-Voting/Pages/Election-Results-By-Year.aspx | | | | | Grand Totals: | 14 | 7 |

28

| BLACK FAVORED CANDIDATES FOR LOCAL OFFICE: MADISON COUNTY | | | | | Homo-genous Black pcts.? (1=yes) | Unopposed =1 | Contested =1 |
|---|---|---|---|---|---|---|---|
| Office Sought & Candidate's Name | Race | Won/ Lost | Contested or Unopposed | Comments | | | |
| MADISON COUNTY - 2007 | | | | | 1 | | |
| Supervisor D4: Banks | Black | Won | Contested | | | | 1 |
| Supervisor D5: Griffin | Black | Won | Unopposed | | | 1 | |
| Justice Court Judge 2: Chinn | Black | Won | Contested | | | | 1 |
| Constable Dist. 2: Sims | Black | Won | Unopposed | | | 1 | |
| *Summary (Madison 2007): 4 Black/Black-preferred candidates elected, 2 of them in contested elections.* | | | | | | | |
| MADISON COUNTY - 2011 | | | | | 0 | | |
| Supervisor D4: Banks | Black | Won | Contested | | | | 1 |
| Supervisor D5: Griffin | Black | Won | Contested | | | | 1 |
| Justice Ct. Judge 2: Chinn | Black | Won | Unopposed | | | 1 | |
| Constable Dist. 2: Sims | Black | Won | Unopposed | | | 1 | |
| *Summary (Madison 2011): 4 Black/Black-preferred candidates elected, 2 of them in contested elections.* | | | | | | | |
| MADISON COUNTY - 2015 | | | | | | | |
| Supervisor D5: Griffin | Black | Won | Contested | | | | 1 |
| Justice Ct. Judge 2: Griffin | Black | Won | Unopposed | | | 1 | |
| Constable Dist. 2: Sims | Black | Won | Unopposed | | | 1 | |
| *Summary (Madison 2015): 3 Black/Black-preferred candidates elected, 1 of them in contested elections.* | | | | | | | |
| Source: Official Recapitulations of Mississippi County general elections, accessed at www.sos.ms.gov/Elections-Voting/Pages/Election-Results-By-Year.aspx | | | | | Grand Total: | 6 | 5 |

## BLACK FAVORED CANDIDATES FOR LOCAL OFFICE: SHARKEY COUNTY

| Office Sought & Candidate's Name | Race | Won/ Lost | Contested or Unopposed | Comments | Homogenous Black pcts.? (1=yes) | Unopposed =1 | Contested =1 |
|---|---|---|---|---|---|---|---|
| | | | | | 1 | | |
| **SHARKEY COUNTY - 2007** | | | | | | | |
| District Attorney D9: Smith | White | Won | Contested | *Was Black-preferred candidate in ea of the 5 Black homogeneous dists.* | | | 1 |
| State Senate Dist 22: Hill | Black | Won | Contested | *Was Black-preferred candidate in ea of the 5 Black homogeneous dists.* | | | 1 |
| Circ. & Chancry Clerk: Williams | Black | Won | Unopposed | | | 1 | |
| Sheriff: Adams | Black | Won | Contested | *Was Black-preferred candidate in ea of the 5 Black homogeneous dists.* | | | 1 |
| Supervisor D2: Jones | Black | Won | Contested | *Was Black-preferred candidate in ea of the 5 Black homogeneous dists.* | | | 1 |
| Supervisor D3: Matthews | Black | Won | Contested | | | | 1 |
| Just. Ct Judge Post 2: Secoy | unknown | Won | Contested | *Was Black-preferred candidate in ea of the 5 Black homogeneous dists.* | | | 1 |
| *Summary (Sharkey 2007): 7 Black/Black-preferred candidates elected, 6 of them in contested elections.* | | | | | | 1 | 6 |
| **SHARKEY COUNTY - 2011** | | | | | | | |
| | | | | | 1 | | |
| Constable Dist Post 1: Alford | Black | Won | Unopposed | | | 1 | |
| Circ. & Chancry Clerk: Williams | Black | Won | Unopposed | | | 1 | |
| Sheriff: Adams | Black | Won | Contested | | | | 1 |
| Supervisor D2: Smith | Black | Won | Contested | | | | 1 |
| Supervisor D3: Matthews | Black | Won | Contested | | | | 1 |
| Supervisor D4: Evans | Black | Lost | Contested | LOST | | | 1 |
| Supervisor D5: Smith | Black | Won | Contested | | | | 1 |
| *Summary (Sharkey 2011): 7 Black/Black-preferred candidates elected, 5 of them in contested elections.* | | | | | | 2 | 5 |
| **SHARKEY COUNTY - 2015** | | | | | | | |
| | | | | | 1 | | |
| Constable Dist Post 1: Alford | Black | Won | Contested | Alford won all 7 pcts, | | | 1 |
| Constable Dist Post 2: Mashall | Unknown | Won | Contested | Marshall apparently is Black-favored cadidate (heavy favorite in HB pcts.) | | | 1 |
| Circ. & Chancry Clerk: Williams | Black | Won | Unopposed | | | 1 | |
| Sheriff: Adams | Black | Won | Contested | Note: all 3 contestants are Black | | | 1 |
| Supervisor D2: Smith | Black | Won | Contested | | | | 1 |
| Supervisor D3: Matthews | Black | Won | Unopposed | | | 1 | |
| Supervisor D4: Johnson | Black | Lost | Contested | White winner may be Black-favored candidate (see homog. Black dist. RF-4th | | | 1 |
| Supervisor D5: Smith | Black | Won | Contested | | | | 1 |
| Justice Court Judge 1: Smith | Unknown | Won | Contested | Smith (Dem.) apparently is Black-favored cadidate (heavy favorite in HB pcts.) | | | 1 |
| Coroner: Eason | Black | Won | Unopposed | | | 1 | |
| *Summary (Sharkey 2015): 7 Black/Black-preferred candidates elected, 5 of them in contested elections.* | | | | | | 3 | 7 |
| Source: Official Recapitulations of Mississippi County general elections, accessed at www.sos.ms.gov/Elections-Voting/Pages/Election-Results-By-Year.aspx | | | | | Grand Total | 6 | 18 |

## BLACK FAVORED CANDIDATES FOR LOCAL OFFICE: WASHINGTON COUNTY

| Office Sought & Candidate's Name | Race | Won/ Lost | Contested or Unopposed | Comments | Homo-genous Black pcts.? (1=yes) | Unopposed =1 | Contested =1 |
|---|---|---|---|---|---|---|---|
| **WASHINGTON COUNTY - 2007** | | | | | 1 | | |
| District Attorney 04: Richardson | Black | Won | Unopposed | | | 1 | |
| Chancery Clerk: Hansell | Black | Won | Unopposed | | | 1 | |
| Circuit Clerk: Esters-Parker | Black | Won | Unopposed | | | 1 | |
| Coroner: Johnson | Black | Won | Contested | | | | 1 |
| County Attorney: Hawkins | Black | Won | Contested | | | | 1 |
| Sheriff: Gaston | Black | Won | Unopposed | | | 1 | |
| Tax Assessor: Seard | Black | Won | Unopposed | | | 1 | |
| Tax Collector: Lee | Black | Won | Unopposed | | | 1 | |
| Supervisor Dist. 3: Rankins | Black | Won | Unopposed | | | 1 | |
| Supervisor Dist. 4: Amos | Black | Won | Unopposed | | | 1 | |
| Justice Ct. Judge JC1: Carter | Black | Won | Unopposed | | | 1 | |
| Justice Ct. Judge JC2: Young | Black | Won | Unopposed | | | 1 | |
| Justice Ct. Judge JC3: Bush | Black | Won | Unopposed | | | | |
| Constable JC-1: Watkins | Black | Won | Unopposed | | | 1 | |
| Constable JC-2: Anderson | Black | Won | Unopposed | | | 1 | |
| *Summary (Washington 2007): 15 Black/Black-preferred candidates elected, 2 of them in contested elections.* | | | | | | 12 | 2 |
| **WASHINGTON COUNTY - 2011** | | | | | | | |
| District Attorney 04: Richardson | Black | Won | Unopposed | | | 1 | |
| Chancery Clerk: Hansell | Black | Won | Contested | | | | 1 |
| Circuit Clerk: Esters-Parker | Black | Won | Unopposed | | | 1 | |
| Coroner: Johnson | Black | Won | Unopposed | | | 1 | |
| County Attorney: Hawkins | Black | Won | Unopposed | | | 1 | |
| Sheriff: Gaston, Sr. | Black | Won | Contested | | | | 1 |
| Tax Assessor: Seard | Black | Won | Unopposed | | | 1 | |
| Tax Collector: Lee | Black | Won | Unopposed | | | 1 | |
| Supervisor Dist. 3: Wesley | Black | Won | Unopposed | | | 1 | |
| Supervisor Dist. 4: Amos | Black | Won | Contested | | | | 1 |
| Justice Ct. Judge JC1: Carter | Black | Won | Unopposed | | | 1 | |
| Justice Ct. Judge JC2: Simpson | Black | Won | Unopposed | | | 1 | |
| Justice Ct. Judge JC3: Bush | Black | Won | Contested | | | | 1 |
| Constable JC-1: Watkins | Black | Won | Unopposed | | | 1 | |
| Constable JC-2: Anderson | Black | Won | Contested | | | | 1 |
| *Summary (Washington 2011): 15 Black/Black-preferred candidates elected, 5 of them in contested elections.* | | | | | | 10 | 5 |
| **WASHINGTON COUNTY - 2015** | | | | | | | |
| Chancery Clerk: Hansell | Black | Won | Unopposed | | | 1 | |
| Circuit Clerk: Esters-Parker | Black | Won | Unopposed | | | 1 | |
| Coroner: Johnson | Black | Won | Contested | | | | 1 |
| County Attorney: Hawkins | Black | Won | Unopposed | | | 1 | |
| Sheriff: Gaston, Sr. | Black | Won | Contested | | | | 1 |
| Tax Assessor: Seard | Black | Won | Unopposed | | | 1 | |
| Tax Collector: Lee | Black | Won | Unopposed | | | 1 | |
| Supervisor Dist. 1: Johnson | Black | Lost | Contested | | | | 1 |
| Supervisor Dist. 2: Benson III | Black | Won | Contested | | | | 1 |
| Supervisor Dist. 3: McGee | Black | Won | Unopposed | | | 1 | |
| Supervisor Dist. 4: Amos | Black | Won | Contested | | | | 1 |
| Supervisor Dist. 5: Redmond | Black | Won | Contested | | | | 1 |
| Justice Ct. Judge JC1: Carter | Black | Won | Unopposed | | | 1 | |
| Justice Ct. Judge JC2: Simpson | Black | Won | Unopposed | | | 1 | |
| Justice Ct. Judge JC3: Bush | Black | Won | Unopposed | | | 1 | |
| Constable 1: Watkins | Black | Won | Contested | | | | 1 |
| Constable 3: Walker | Black | Won | Unopposed | | | 1 | |
| *Summary (Washington 2015): 17 Black/Black-preferred candidates elected, 7 of them in contested elections.* | | | | | | 10 | 7 |
| Source: Official Recapitulations of Mississippi County general elections, accessed at www.sos.ms.gov/Elections-Voting/Pages/Election-Results-By-Year.aspx | | | | | Grand Total | 32 | 14 |

31

| BLACK FAVORED CANDIDATES FOR LOCAL OFFICE: YAZOO COUNTY | | | | | Homo-geneous Black pcts.? (1=yes) | Unopposed =1 | Contested =1 |
|---|---|---|---|---|---|---|---|
| Office Sought & Candidate's Name | Race | Won/ Lost | Contested or Unopposed | Comments | | | |
| **YAZOO COUNTY - 2007** | | | | | 1 | | |
| *Supervisor Dist. 3: Wright* | Black | Won | Contested | | | | 1 |
| *Supervisor Dist. 5: Collins* | Black | Won | Contested | | | | 1 |
| *Summary (Yazoo 2007): 2 Black/Black-preferred candidates elected, both in contested elections.* | | | | | Total: | 0 | 2 |
| **YAZOO COUNTY - 2011** | | | | | | | |
| *District Attny D21: Oliver* | Black | Won | Contested | | | | 1 |
| *Chancery Clerk: Carver* | White | Won | Contested | Carver is Black-preferred candidate (based upon 3 homogeneous Black pcts.) | | | 1 |
| *Circuit Clerk: Coleman* | Black | Won | Unopposed | | | 1 | |
| *Justice Court Judge: Neely* | Black | Won | Contested | Neely is Black-preferred candidate (based upon 3 homogeneous Black pcts.) | | | 1 |
| *Sheriff: Sheriff* | Black | Won | Contested | | | | 1 |
| *Constable Northern: Smith* | White | Won | Contested | Not Black-preferred candidate (based upon 3 homogeneous Black pcts.) | | | 1 |
| *Supervisor Dist. 3: Wright* | Black | Won | Unopposed | | | 1 | |
| *Supervisor Dist. 4: Dew* | White | Won | Contested | No homogeneous precincts for identifying preferred candidate | | | 1 |
| *Supervisor Dist. 5: Collins* | Black | Won | Unopposed | | | 1 | |
| *Summary (Yazoo 2011): 7 Black/Black-preferred candidates elected, 4 of them in contested elections.* | | | | | Total: | 3 | 6 |
| **YAZOO COUNTY - 2015** | | | | | | | |
| *District Attny D21: Oliver* | Black | Won | Unopposed | | | 1 | |
| *Chancery Ct. Judge: Jones* | Black | Lost | Contested | Walker (White winner) is NOT Black-preferred candidate as in 2011 | | | 1 |
| *Circuit Clerk: Coleman* | Black | Won | Unopposed | | | 1 | |
| *Justice Ct.Judge S.: Neely* | Black | Lost | Contested | Neely is Black-preferred candidate (based upon 3 homogeneous Black pcts.) | | | 1 |
| *Sheriff: Sheriff* | Black | Won | Contested | | | | 1 |
| *Constable N.: Peterson* | Black | Won | Unopposed | | | 1 | |
| *Constable S.: Starling* | Black | Won | Unopposed | | | 1 | |
| *Supervisor Dist. 3: Wright* | Black | Won | Unopposed | | | 1 | |
| *Supervisor Dist. 5: Collins* | Black | Won | Unopposed | | | 1 | |
| *Summary (Yazoo 2015): 7 of 8 Black/Black-preferred candidates elected, 2 of them in contested elections.* | | | | | Total: | 6 | 3 |
| Source: Official Recapitulations of Mississippi County general elections, accessed at www.sos.ms.gov/Elections-Voting/Pages/Election-Results-By-Year.aspx | | | | | Grand Total: | 9 | 11 |

**APPENDIX TABLE 2**

[under preparation]

45751015.v1

# EXHIBIT 8

08/20/2012

Mr. Chris Herron
Chief, Voting-Civil Rights Division
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenues, N W
Washington, D C 20530

Dear Mr. Herron,

This letter is a request for the Department of Justice to look hard at the Mississippi Senate Redistricting plan. This plan has violated section 5and 2 of the Voting Right Bill. Please take at look at District 21, 22, 34, City of Yazoo MS, and the overall plan that reduce blacks voting strength.

Fact:
Mississippi has over 37% black population with a large percentage being in the Mississippi Delta. District 21 was moved out of Yazoo City which was the beginning of the Mississippi Delta. Yazoo City was in District 21 which had a 66.02%- 18+BLK. Now the new State Plan reduces Yazoo City to a 50.77, which will not allow us to elect a black. District 22 is 50.77% black. This district consists of all black towns and cities in the Mississippi Delta. This includes Hollandale, Belzoni, Louise, Isola, Rolling folk, Yazoo City and many other smaller towns. Most of these cities and towns are over 80 to 90% Black. Example- Yazoo City's population is around 11,000-85% black with a black Mayor and four out of five black Aldermen.

Mississippi's plan says District 22 is one of the 15 black senate Districts. They failed to tell that it is a Federal Prison in Yazoo City with a population way over 2000 inmates. These inmates cannot vote and will make this district fall below 50% black. The Senator in this District is white and lives in Hollandale a majority black city and no black has been able to win in this district. The reason is they all way go out of the community of common interest to fine white voters when they have enough black voters in these cities and towns. District 22 denies black voters by going over 80 miles from a white Senator's hometown, a rural community to an urban community in Madison County- (Gluckstadt MS) - nine miles from Jackson, Mississippi the State Capital. This area is an upscale white community, with no common interest to the very poor Mississippi Delta.

Finally, the State Plan clearly reduces over 17 impact districts with 30to 40% black population. These districts were doing well and had influences with numbers.

Once again please do not approve Mississippi's plan.

Sincerely,
Joseph C. Thomas

EXHIBIT 2
WIT: _____
DATE: _____
Brooks Court Reporting

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JOSEPH THOMAS; VERNON AYERS;
and MELVIN LAWSON;

        Plaintiffs,

v.

PHIL BRYANT, Governor of the State of
Mississippi; DELBERT HOSEMANN,
Secretary of State of the State of Mississippi;
and JIM HOOD, Attorney General of
of the State of Mississippi, all in the official
capacities of their own offices and in their
official capacities as members of the State
Board of Election Commissioners,

        Defendants.

Civil Action
No. 3:18cv441-CWR-FKB

## FIRST AMENDED COMPLAINT

### I.    INTRODUCTION

1.     This is a challenge under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301

("Section 2"), to the boundary lines of Mississippi State Senate District 22, which dilute African-

American voting strength and deprive African-American voters of an equal opportunity to elect

candidates of their choice.   That district was utilized in the 2015 legislative elections and will be

used again in the 2019 legislative elections unless enjoined by this Court.   Absent such an

injunction, the violation of Section 2 of the Voting Rights Act will be perpetuated until the

subsequent election in 2023. The district can easily be redrawn to cure the Section 2 violation by

modifying it and one or two adjacent districts.   The Plaintiffs seek declaratory and injunctive

relief so that the 2019 election from State Senate District 22 can be held from a plan that complies with the Voting Rights Act.

## II.    THE PARTIES

**The Plaintiffs**

2.      Plaintiff Joseph Thomas is an African-American resident and registered voter of Yazoo County.  He resides and votes in Mississippi Senate District 22.  He was a candidate in 2015 in the general election for Mississippi Senate District 22.  He was supported by the vast majority of African-American voters but nevertheless was defeated by the white candidate as a result of white bloc voting against him.  Because of the violation of Section 2 of the Voting Rights Act alleged in this complaint, he and other African-American voters in the district do not have an equal opportunity to elect candidates of their choice.

3.      Plaintiff Vernon Ayers is an African-American resident and registered voter of Washington County.  He resides and votes in Mississippi Senate District 22.   Because of the violation of Section 2 of the Voting Rights Act alleged in this complaint, he and other African-American voters in the district do not have an equal opportunity to elect candidates of their choice.

4.      Plaintiff Melvin Lawson is an African-American resident and registered voter of Bolivar County.  He resides and votes in Mississippi Senate District 22.   Because of the violation of Section 2 of the Voting Rights Act alleged in this complaint, he and other African-American voters in the district do not have an equal opportunity to elect candidates of their choice.

2

**The Defendants**

5.    Defendant PHIL BRYANT is the Governor of the State of Mississippi and is sued in his official capacity. The Governor is the State's chief executive officer. MISS. CONST. art. 5, § 116.

6.    Defendant DELBERT HOSEMANN is the Secretary of State of the State of Mississippi and is sued in his official capacity. The Secretary of State is the State's chief election officer and is responsible for administering elections in the State of Mississippi. MISS. CODE ANN. § 23-15-211.1.

7.    Defendant JIM HOOD is the Attorney General of the State of Mississippi and is sued in his official capacity. The Attorney General is the State's chief law enforcement officer.

8.    The Governor, the Secretary of State, and the Attorney General comprise the State Board of Election Commissioners of the State of Mississippi. MISS. CODE ANN. § 23-15-211. As such, they are responsible for implementing and enforcing Mississippi's election laws.

### III.    JURISDICTION

9.    This Court has jurisdiction of this action pursuant to (1) 28 U.S.C. § 1343(a), because this action seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act; and (2) 28 U.S.C. § 1331, because this action arises under the laws of the United States.

10.    This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

11.    This Court has personal jurisdiction over the Defendants, all of whom are citizens of the State of Mississippi.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## IV.    FACTS AND BACKGROUND

13.    Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [a minority] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b). An electoral regime that dilutes the voting strength of a minority community deprives the members of that community of their right to an equal opportunity to elect representatives of their choice within the meaning of Section 2.

14.    The State of Mississippi is at least 35% African-American in voting age population. However, only 25% of the members of the Mississippi Senate --- 13 of 52 --- are African-American.

15.    In one of the State Senate districts, District 22, African-American voters have been unable to elect candidates of their choice because of white bloc voting. African Americans make up a very slim majority of the voting age population (50.8 percent) of District 22, but it is what the Supreme Court has called a "majority [that] lack[s] real electoral opportunity." *LULAC v. Perry,* 548 U.S. 399, 428 (2006). The lack of opportunity is the result of white bloc voting and lower African-American turnout that are vestiges of the historical discrimination and extreme socio-economic disparities that have been inflicted upon African-Americans over a long period of time.

**District 22 Geography and Demographics**

16.    Senate District 22 is located in the western part of the state and stretches across parts of six counties: Bolivar, Humphreys, Madison, Sharkey, Washington, and Yazoo.  Only Sharkey County is entirely in District 22.

17.    The district is one of largest in the state: it stretches over 100 miles from northwest to southeast, from the heart of the Mississippi Delta to Madison County's northern suburbs of Jackson. Only one other Senate district is longer (the 38th district).

18.    District 22 both contains some very poor African-American areas, but also some very wealthy white areas in the southern portion of Madison County.   The addition of those predominantly white areas from Madison County helps to limit the district's black voting age population to the present level of 50.8%, which combines with white bloc voting and lower African-American turnout to dilute African-American voting strength in the district.

**Mississippi's Legislative Elections**

19.    The Mississippi Legislature is a bicameral legislature, made up of a 52-member Senate and a 122-member House of Representatives.  The legislators serve four-year terms.

20.    There is a majority vote requirement for Mississippi's primary elections. Miss. Code Ann. § 23-15-305. If no candidate receives a majority of the vote, then the State holds a runoff election between the top two candidates. *Id.*

21.    The candidate who receives the most votes wins general elections. Miss. Code Ann. § 23-15-605.

22.    Mississippi's elections for most state and county offices occur every four years in odd numbered years.  The most recent Senate election was in 2015 and the next election is in 2019. The current redistricting plan for State Senate elections, including the plan for District 22, has only been used for one election (in 2015) and is scheduled to be used in one more (in 2019).

**Voting Patterns**

23.    A white Republican, Eugene Clark, has represented the district for the past 15 years, having been elected four times.  He has been elected each time as the result of white bloc voting while the vast majority of African-American voters has always supported his opponent. In these elections, African-American residents of District 22 consistently have lower participation rates than the District's white residents.

24.    In 2003, Clark defeated the next top vote getter, Mala Brooks, a black Democrat, by 9,004 votes (55.7%) to 5,288 (32.7%), while a black independent, Mark Crawford, received 1870 votes (11.6%).

25.    In 2007, Clark defeated Sandra Jaribu Hill, a black Democrat, by 7,266 votes (58.7%) to 5,116 (41.3%).

26.    In 2011, Clark beat George Hollowell, a white Democrat, by 7,033 votes (53.9%) to 6,021 (46.1%).

27.    In 2015, Clark beat Joseph Thomas, a black Democrat, by 8,149 votes (53.8%) to 6,985 (46.2%).

28.    African-American voters in District 22 are politically cohesive, having voted overwhelmingly for a single candidate of choice over other candidates in recent elections.

29.    Past elections in Mississippi, particularly in District 22 and its surrounding area, have been marked by a clear pattern of racially polarized voting. As demonstrated by the election results, the  consistent patterns of bloc voting, and the turnout differentials, District 22 as currently configured does not give African-American voters an equal opportunity to elect candidates of their choice.  Although African-American voters are politically cohesive, bloc

voting by white citizens in District 22 consistently defeats the candidates preferred by African-Americans in these elections.

**The Ability to Draw a Fair District**

30.    If District 22 had a significantly increased black voting age population, African-American voters would have an equal opportunity to elect candidates of their choice.    The African-American population in District 22 and adjacent areas is such that District 22 could be redrawn with a black voting age population of approximately 60% rather than the existing 50.8%.    Such a district could be redrawn with changes only to one or two adjacent districts so that the vast majority of Mississippi's senate redistricting plan would remain unaltered.    The resulting districts would be more compact than the current redistricting plan.    This alteration would cure the Section 2 violation in District 22, and it would not create Voting Rights Act violations in any other districts.

**Totality of the Circumstances**

31.    There is a lengthy and documented history of voter discrimination against African-Americans in Mississippi. Federal Courts have long acknowledged this history and found that Mississippi has violated federal voting rights protections. E.g., United States v. Mississippi, 380 U.S. 128, 131-36 (1965) (detailing the history of racially discriminatory election practices in Mississippi); Young v. Fordice, 520 U.S. 273, 291 (1997) (finding that Mississippi violated Section 5 of the Voting Rights Act when the State altered its registration procedure without seeking preclearance); Allen v. State Board of Elections, 393 U.S. 544, 571 (1969) (holding that Mississippi violated Section 5 of the Voting Rights Act when it did not seek federal approval before enforcing a new election law);  Mississippi State Chapter, Operation PUSH, Inc. v. Mabus, 932 F.2d 400, 402 (5th Cir. 1991) ("Mississippi has a long history of using voter

qualifications and registration procedures to impede black citizens' participation in the political process."); Martin v. Allain, 658 F. Supp. 1183, 1192 (S.D. Miss. 1987) ("Mississippi has a long history of official discrimination touching on the right of black citizens to vote and participate in the democratic process."); Jordan v. Winter, 604 F. Supp. 807, 811-12 (N.D. Miss. 1984) ("Mississippi's long history of de jure and de facto race discrimination is not contested.").

32.     African-Americans in Mississippi and in District 22 generally bear the effects of discrimination in areas such as education, employment, and health, and generally lag behind white residents in those areas. The history of discrimination and these socioeconomic disparities have hindered their ability to participate in the political process, and African Americans participation is lower than white participation in District 22.  Mississippi's elections for most state and local offices are held in odd-numbered non-presidential election years, which means turnout is much lower than in presidential election years.

33.     Historically and up to the present day, racially polarized voting has infected elections throughout Mississippi, particularly when African-American candidates are running against white candidates.

34.     No African-American candidate has ever been elected to statewide office in Mississippi in the Twentieth Century.   African-Americans are under-represented in the Mississippi legislature compared to their proportion of the general population.  Although the State is 35% African-American in voting age population, only 13 of 52 (25%) Mississippi state senators are African-American.  No African-American has been elected to the Mississippi Senate from a majority white district except Eric Powell, who was elected from District 4 in 2007, but subsequently was defeated in 2011 when he ran as an incumbent and was defeated again when he ran for the same seat again in 2015.  Otherwise, no African-American has been elected to the

Mississippi Senate in a district with an African-American voting age population of the level of District 22, which is 50.8% black. An African-American candidate was elected to the Mississippi Senate from District 34, which is 55.1%. All others presently serving are from districts at least 61% African-American.

## V.    VIOLATION

35.    Plaintiffs repeat and re-allege each allegation contained in the foregoing paragraphs of this complaint.

36.    As set forth in this complaint, African-American voters in District 22 are politically cohesive, and white bloc voting has prevented them from electing candidates of their choice. The district can easily be modified to give African-American voters an equal opportunity to elect candidates of their choice. This can occur with changes to only one or two adjacent districts, leaving the remainder of the Senate plan untouched.

37.    The totality of the circumstances establishes that the current districting plan has the effect of denying African-American voters an equal opportunity to elect representatives of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

38.    One election was held under this plan in 2015. Unless enjoined by this Court, another will be held in 2019, thus perpetuating the Section 2 violation until 2023.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that the Court:

a.    Declare that the current districting plan violates Section 2 of the Voting Rights Act;

b.    Enjoin Defendants, their agents and successors in office, and all persons acting in concert with them, from administering, implementing, or conducting any future elections in Mississippi State Senate District 22 under the current districting plan;

c.    Provide state officials with the opportunity to enact a new districting plan for District 22 that complies with Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

d.    Order the implementation of a new districting plan for District 22 that complies with Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

e.    Award Plaintiffs their reasonable attorneys' fees, pursuant to statute, and the costs and disbursements of maintaining this action; and,

f.    Order such additional relief as the interests of justice may require.

July 25, 2018                                             Respectfully submitted,

*s/ Beth L. Orlansky*                                    *s/ Robert B. McDuff*
BETH L. ORLANSKY, MSB 3938                               ROBERT B. MCDUFF, MSB 2532
MISSISSIPPI CENTER FOR JUSTICE                           767 North Congress Street
P.O. Box 1023                                            Jackson, MS 39202
Jackson, MS 39205-1023                                   (601) 969-0802
(601) 352-2269                                           rbm@mcdufflaw.com
borlansky@mscenterforjustice.org                         *Lead Counsel*

KRISTEN CLARKE                                           ELLIS TURNAGE, MSB 8131
JON GREENBAUM                                            TURNAGE LAW OFFICE
EZRA D. ROSENBERG                                        108 N. Pearman Ave
ARUSHA GORDON                                            Cleveland, MS 38732
LAWYERS'COMMITTEE FOR CIVIL                              (662) 843-2811
RIGHTS UNDER LAW                                         eturnage@etlawms.com
1401 New York Ave., NW, Suite 400
Washington, D.C. 20005                                   PETER KRAUS
(202) 662-8600                                           CHARLES SIEGEL
erosenberg@lawyerscommittee.org                          CAITLYN SILHAN
agordon@lawyerscommittee.org                             WATERS KRAUS
                                                         3141 Hood Street, Suite 700
*PHV applications to be filed*                           Dallas, TX 75219
                                                         (214) 357-6244
                                                         pkraus@waterskraus.com
                                                         csiegel@waterskraus.com
                                                         csilhan@waterskraus.com
                                                         *Admitted Pro Hac Vice*

                                                         *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Robert B. McDuff, hereby certify that on July 25, 2018 I electronically filed a copy of the First Amended Complaint with the Clerk of Court using the ECF system which sent notification of such filing to all counsel of record. Additionally, the foregoing was served by email and hand delivery on:

Harold Pizzetta
Office of the Attorney General
Sillers Building
550 High Street
Jackson, MS 39201

s/Robert B. McDuff

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JOSEPH THOMAS, et al.**                                               **PLAINTIFFS**

**V.**                                               **CAUSE NO. 3:18-CV-441-CWR-FKB**

**PHIL BRYANT, et al.**                                               **DEFENDANTS**

### ORDER

On July 9, 2018, plaintiffs Joseph Thomas, Vernon Ayers, and Melvin Lawson filed this suit claiming that the boundaries of Mississippi Senate District 22 are drawn in violation of Section 2 of the Voting Rights Act. The new boundaries they propose would affect District 22 and two adjacent Districts.

On August 8, 2018, in their answer, defendants Governor Phil Bryant, Attorney General Jim Hood, and Secretary of State Delbert Hosemann admitted that this Court has subject matter jurisdiction and can grant declaratory and injunctive relief. The parties proceeded to brief motions, exchange written discovery, designate experts, argue the defendants' dispositive motion,[1] take depositions, and prepare for a trial set to begin on February 6, 2019.

Now, days before trial, two of the defendants (Bryant and Hosemann) have brought in new lawyers to present a new defensive theory.[2] They contend that this suit challenges "the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body," which, if true, would require a three-judge court. 28 U.S.C. § 2284(a). Unless such a court is convened, they argue that the case must be dismissed for lack of subject matter jurisdiction.

---

[1] During oral argument, counsel never questioned whether this Court had jurisdiction to hear this claim. That hearing was held on January 16, 2019, eight days before the defendants filed the present motion.

[2] Hood's representative has joined in their motion.

Of course, the plaintiffs have not asserted any constitutional claims. The plaintiffs also do not seek to reapportion congressional districts or a statewide legislative body.

The defendants nevertheless proceed with two lines of attack. They first argue that a Section 2 claim should be considered *like* a constitutional claim for the purpose of convening a three-judge court. In the alternative, they contend that the text and legislative history of § 2284(a) reveal that Congress wanted three-judge courts to be convened in cases like ours.[3]

Three-judge courts are "an exceptional procedure." *Phillips v. United States*, 312 U.S. 246, 248 (1941). They are rare in part because Congress has been "mindful that the requirement of three judges . . . entails a serious drain upon the federal judicial system," *id.* at 250, and in part because convening such a court "may often result in a delay in a matter needing swift initial adjudication," *Allen v. State Bd. of Elections*, 393 U.S. 544, 561 (1969) (citation omitted). The Supreme Court has "long held that congressional enactments providing for the convening of three-judge courts must be strictly construed." *Id.* (citing *Phillips*, 312 U.S. at 246).

Having considered the defendants' arguments and authorities against this standard, the Court finds that a three-judge court is not required in this case.

First, there is no justification for treating Section 2 and constitutional claims as identical. They are different causes of action with different evidentiary requirements. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425, 442 (2006). As Chief Judge Bowdre recently concluded in a similar case, a "challenge only under Section 2 . . . is not a constitutional

---

[3] Part of the defendants' argument turns on speculation about what a single U.S. Senator "would have" wanted to happen in these cases. Docket No. 45 at 5. As Justice Scalia and Bryan A. Garner explain, however, "[t]he search for what the legislature 'would have wanted' is invariably either a deception or a delusion." *Reading Law: The Interpretation of Legal Texts* 95 (2012). "What the legislature 'would have wanted' it did not provide, and that is an end of the matter." *Id.* at 94.

challenge" and does not require a three-judge court. *Chestnut v. Merrill*, --- F. Supp. 3d ---, 2019 WL 338909, at *5 (N.D. Ala. Jan. 28, 2019).[4]

As "master of the complaint," it is the plaintiff's choice to bring or forego a constitutional claim. *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (quotation marks and citation omitted). In this case, the plaintiffs have elected not to pursue one. Neither the defendants nor the Court can force them to change their minds. *See Fortune v. XFit Brands, Inc.*, No. 3:18-CV-545-CWR-LRA, 2018 WL 6332640, at *3 (S.D. Miss. Dec. 4, 2018) ("If the plaintiff's decisions were so easily invalidated, so easily written off by the court or her opponent, she should not bother to file a complaint.").

Second, the defendants argue that § 2284(a) requires a three-judge court to hear *any* cause of action which seeks to redraw a portion of a statewide legislative body. In other words, they claim that Congress intended standalone Section 2 claims to be heard by a three-judge court.

The defendants are incorrect. The plain language of the statute requires a three-judge court when plaintiffs challenge "*the constitutionality of* the apportionment of congressional districts or the apportionment of any statewide legislative body." 28 U.S.C. § 2284(a) (emphasis added). The term "the constitutionality of" modifies all of the phrases which follow it, per the series-qualifier canon of construction.[5] *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012).

That is hardly the end of this exercise in textualism, however. The Supreme Court has cautioned that "there are two opposing canons on almost every point." *Lockhart v. United States*,

---

[4] The new lawyers explained that similar arguments had been presented to the judge in *Chestnut*, and stated that the defendants "now join the election officials of our neighboring States in seeking enforcement of § 2284(a)." Docket No. 45 at 2. Days later Chief Judge Bowdre rejected those arguments.

[5] Despite its "fancy name," the series-qualifier canon "reflects the completely ordinary way that people speak and listen, write and read." *Lockhart v. United States*, 136 S. Ct. 958, 970 (2016) (Kagan, J., dissenting).

136 S. Ct. 958, 968 (2016) (quoting Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed*, 3 Vand. L. Rev. 395, 401 (1950)). Today's case is no different.

The defendants contend that the series-qualifier canon results in needless words, in violation of the surplusage canon. *See* Scalia & Garner at 174. It is a fair point. If "the constitutionality of" is indeed carried over to all following phrases, the second use of "the apportionment of" is rendered unnecessary. The statute would be more precise without repeating "the apportionment of."

The Supreme Court nevertheless urges vigilance with the surplusage canon. "Our hesitancy to construe statutes to render language superfluous does not require us to avoid surplusage at all costs. It is appropriate to tolerate a degree of surplusage." *Lockhart*, 136 S. Ct. at 966 (quotation marks, citation, and brackets omitted). The leading treatise agrees: "Sometimes drafters *do* repeat themselves and *do* include words that add nothing of substance, either out of a flawed sense of style[6] or to engage in the ill-conceived but lamentably common belt-and-suspenders approach." Scalia & Garner at 176-77. Justice Scalia and Mr. Garner warn that "a clever interpreter could create unforeseen meanings or legal effects from this stylistic mannerism." *Id.* at 177.

The defendants' argument *is* very clever. Without admitting as much, the defendants ask the Court to rewrite § 2284(a) and transform it into this: *a three-judge court is required when plaintiffs challenge the apportionment of any statewide legislative body or the constitutionality of the apportionment of congressional districts.* Unfortunately for them, that is not what Congress wrote and this Court cannot rewrite the statute to suit their needs. "Allowing laws to be rewritten

---

[6] *Cf. King v. Burwell*, 135 S. Ct. 2480, 2501 (2015) ("Pure applesauce.") (Scalia, J., dissenting).

by judges is a radical departure from our democratic system." *Id.* at 83. "So this court will apply the law before it and will not read new provisions into—or strike existing words from—the statutes at issue." *Chestnut*, 2019 WL 338909, at *5.

Finally, this Court's conclusion is buttressed by several other decisions reading § 2284(a) the same way. *E.g.*, *Rural W. Tenn. African-Am. Affairs Council v. Sundquist*, 209 F.3d 835, 838 (6th Cir. 2000) ("RWTAAC then amended its complaint to challenge the House Plan on the sole ground that it violated § 2 of the Voting Rights Act. Because the amended complaint contained no constitutional claims, the three-judge court disbanded itself."); *Page v. Bartels*, 248 F.3d 175, 189 (3d Cir. 2001), *as amended* (June 25, 2001) (finding that § 2284(a) "only requires a three-judge district court for certain constitutionally-based apportionment challenges"); *Kidd v. Cox*, No. 1:06-CV-997-BBM, 2006 WL 1341302, at *4 (N.D. Ga. May 16, 2006) ("In pertinent part, § 2284(a) requires that a three-judge court be convened 'when an action is filed challenging the constitutionality of . . . the apportionment of any statewide legislative body.'") (ellipses in original). This Court sees no reason to deviate from these authorities.

The motion is denied.

**SO ORDERED**, this the 5th day of February, 2019.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JOSEPH THOMAS, et al.                                    **PLAINTIFFS**

V.                                    **CAUSE NO. 3:18-CV-441-CWR-FKB**

PHIL BRYANT, et al.                                    **DEFENDANTS**

## ORDER

The plaintiffs in this case allege that the boundaries of Mississippi Senate District 22 violate § 2 of the Voting Rights Act. A trial on this claim was held on February 6 and 7, 2019. The Court anticipates issuing a full memorandum opinion next week.

The purpose of this Order is to advise the Mississippi Legislature that the evidence supports the plaintiffs' allegations. As presently drawn, District 22 does not afford the plaintiffs "an equal opportunity to participate in the political processes and to elect candidates of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986) (quotation marks and citation omitted).

The plaintiffs have put forward three alternate Plans that would remedy the § 2 violation, comply with Supreme Court precedent, and satisfy traditional redistricting criteria. Plans 1 and 2 would affect only Districts 22 and 23. Plan 3 would affect Districts 22, 23, and 13.

The Legislature is entitled to the first opportunity to redraw District 22, and, if it chooses, extend the March 1 qualification deadline for candidates in the affected Districts. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 416 (2006). As Judge Jolly wrote in a congressional redistricting case, "[a]lthough it may be difficult for the Legislature to adopt a plan," a "legislative plan is unequivocally to be preferred over a court-ordered plan . . . . Without commenting on the ultimate role of the federal courts should the Legislature act, we encourage

the Legislature to act." *Smith v. Clark*, 189 F. Supp. 2d 503, 511–12 (S.D. Miss. 2002) (three-judge court).

To the extent the defendants' attorneys have not already done so, now would be an appropriate time to see if a political solution can be put into place.

**SO ORDERED**, this the 13th day of February, 2019.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

# EXHIBIT 12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

JOSEPH THOMAS, et al.                       **PLAINTIFFS**

V.                           **CAUSE NO. 3:18-CV-441-CWR-FKB**

PHIL BRYANT, et al.                      **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

In July 2018, plaintiffs Joseph Thomas, Vernon Ayers, and Melvin Lawson filed this suit alleging that the boundaries of Mississippi Senate District 22 violate § 2 of the Voting Rights Act. Defendants Governor Phil Bryant, Attorney General Jim Hood, and Secretary of State Delbert Hosemann deny the allegation and dispute that any violation can be remedied in time for the 2019 election. The parties presented evidence at trial on February 6 and 7, 2019.[1]

On February 13, after a thorough review of the evidence and arguments, the Court advised the parties and the Mississippi Legislature that the plaintiffs had proven their case. The Legislature was invited to redraw District 22 prior to consideration of any judicial remedy. The Court's findings of fact and conclusions of law are presented below.

I.     **Factual and Procedural History**

A.     **The Parties**

Plaintiff Joseph Thomas is a native of Yazoo City, Mississippi. He is a banker by profession, a community advocate by avocation, and in his spare time, a published historian of African-Americans in Yazoo City and Mississippi.[2]

---

[1] Discovery was completed on an expedited basis. *See* Docket No. 28. The trial was held at the first opportunity after accounting for the attorneys' conflicts and the Court's firm trial settings. At the hearing on the defendants' dispositive motion, defense counsel recognized that all have worked as expeditiously as possible.

[2] *See* Joseph C. Thomas, *Afro-American Sons & Daughters 1849-1949* (1997).

In 2003, Thomas turned his attention to public office. He ran for and won election as Mississippi State Senator for District 21. The District included Thomas's part of Yazoo County and predominantly African-American portions of Madison County, among other places, so its "Black Voting Age Population" (BVAP) was relatively high. He ran again in 2007 but lost in the primary to another African-American candidate. Thomas then sat out the 2011 cycle.

The decennial redistricting process resulted in changes to the Senate map in 2012. Thomas's residence wound up in District 22.

Thomas learned that District 22 now extended into areas of Madison and Bolivar Counties that ultimately led it to have a BVAP of only 50.8%. He was concerned that although technically a majority, such a low BVAP would negatively impact African-Americans' ability to elect their candidate of choice. After all, in District 22, African-Americans' candidate of choice had lost in the 2003, 2007, and 2011 elections.

Thomas contacted the U.S. Department of Justice and urged it to reject the new boundaries. He was not successful. DOJ precleared the plan in September 2012.

In 2015, Thomas decided to throw his hat in the ring. He ran in District 22 against Eugene "Buck" Clarke, the incumbent chairman of the Senate Appropriations Committee. Thomas thought it would be an uphill battle, but "ran hard" and spent "quite a bit" of his own money, he testified. He lost 54% to 46%. Thomas says he was "real disappointed" that his outreach to the majority-white precincts in Madison and Bolivar Counties had not garnered more votes.

Thomas did not file a Voting Rights Act lawsuit in 2015, 2016, or 2017. He testified that he was unaware that an individual could file a § 2 suit until he had a conversation with one of the attorneys in this case in summer 2018. This suit was filed several weeks later.

2

Plaintiff Melvin Lawson is also a voter in District 22. He has worked and volunteered for political campaigns, including his brother's campaign for Bolivar County Supervisor and Thomas's Senate campaign. Through this experience Lawson found that it is more difficult to get Delta voters to the polls in odd-numbered election years, *i.e.*, years without Congressional and Presidential races, because in odd-numbered years there are fewer transportation options available on Election Day.

In 2018, Lawson overheard concerned citizens talking about District 22. Weeks later he ran into attorney Ellis Turnage, co-counsel for the plaintiffs in this action, who told him about this suit. Lawson was interested and joined as a plaintiff.

We know little about plaintiff Vernon Ayers other than this: he is a registered voter in District 22. Neither side has elaborated on his situation.

Each plaintiff is African-American.

Defendants Governor Phil Bryant, Attorney General Jim Hood, and Secretary of State Delbert Hosemann constitute the State Board of Election Commissioners.[3] All three are sued in their official capacities.

**B.    District 22**

District 22 is the second-largest Senate District in Mississippi, encompassing 2,166 square miles and spanning more than 100 miles from tip to toe. It begins in Bolivar County, runs through Washington, Humphreys, Sharkey, and Yazoo Counties, and finds its end in Madison County. The District looks like this:

---

[3] *See* Miss. Code Ann. § 23-15-211.

3

SENATE DISTRICT 22



Most of District 22 lies in the heart of the Mississippi Delta, the unique alluvial plain

occupying the northwest quadrant of the state. The Delta is impossible to completely define, but

my colleagues' description from 1982 is a good start:

> The Mississippi Delta consists of 19 Delta and part-Delta contiguous counties as
> follows: Bolivar, Carroll, Coahoma, DeSoto, Grenada, Holmes, Humphreys,

4

Issaquena, Leflore, Panola, Quitman, Sharkey, Sunflower, Tallahatchie, Tate, Tunica, Warren, Washington, and Yazoo. This is a distinct geographical area of the state traditionally featuring an agricultural economy concerned with flood control of the Mississippi River. The geography of the Delta has been colorfully and somewhat accurately described as "beginning in the lobby of the Peabody Hotel at Memphis, Tennessee, and ending at Catfish Row in Vicksburg, Mississippi." Since early times, concentrations of blacks have resided in the Delta area.[4]

John Dittmer calls the Delta "both a clearly defined geographical area and a state of mind."[5] The benefits of "some of the richest soil in the nation" were shared unequally: the land was worked by "tens of thousands of poor black families" for the benefit of "a relatively small number of white[]" landowners.[6] The Delta was "a place of appalling poverty for the blacks who tilled the land."[7]

As Mississippi has changed over the years, it remains true that "[b]lacks in Mississippi, especially in its Delta region, generally have less education, lower incomes, and more menial occupations than whites."[8] Updated socio-economic data for District 22 will be discussed below.

The plaintiffs introduced evidence confirming that the Delta is "totally different" from Madison County. Lawson agreed that the differences are geographical and cultural. The Delta is rural, agrarian, and contains "the largest concentration of black voting age population" in Mississippi.[9] Madison County is populous and suburban, bordering the State's Capitol City, Jackson.

The Madison County precincts situated in District 22, such as the Gluckstadt area, are especially different. A prior redistricting court designated them as a "high-growth area" of the State.[10] Cotton and soybeans are growing in the Delta. The population is not.

---

[4] *Jordan v. Winter*, 541 F. Supp. 1135, 1139 n.1 (N.D. Miss. 1982) (three-judge court).
[5] John Dittmer, *Local People: The Struggle for Civil Rights in Mississippi* 10 (1994).
[6] *Id.*
[7] Yasuhiro Katagiri, *The Mississippi State Sovereignty Commission: Civil Rights and States' Rights* 39 (2001).
[8] *Jordan v. Winter*, 604 F. Supp. 807, 812 (N.D. Miss. 1984) (three-judge court).
[9] *Smith v. Clark*, 189 F. Supp. 2d 529, 543 (S.D. Miss. 2002) (three-judge court).
[10] *Id.* at 544.

5

In the 2015 election, Thomas won the predominately African-American precincts in Washington, Sharkey, Humphreys, and Yazoo Counties. He lost the predominantly white precincts in Madison and Bolivar Counties.

### C.    The Experts

#### 1.    The Plaintiffs' Experts

The plaintiffs called two experts to testify at trial. Both were qualified by education and experience to give expert opinions in their respective fields, and have previously provided expert testimony in voting cases.

First to testify was Dr. Maxwell Palmer, a political scientist at Boston University. Dr. Palmer analyzed District 22's voting patterns with a technique called "ecological inference" (EI).

At heart, EI "is the process of extracting clues about individual behavior from information reported at the group or aggregate level."[11] It is useful in voting cases because "the secret ballot hinders the [research] process and surveys in racially polarized contexts are known to be of little value."[12] EI "estimates the underlying propensity of each group to turn out for an election and to vote for a particular candidate using the estimation technique of maximum likelihood."[13] The process is generally accepted in voting cases in this Circuit.[14]

Dr. Palmer testified that EI is a superior statistical method to use in this case. He said that among other benefits, EI allowed him to run 100,000 simulations of each election in the sample, and provided valuable statistical checks, such as confidence intervals, on the results.

---

[11] Gary King et al., *Ecological Inference: New Methodological Strategies* 1 (2004).
[12] *Id.*
[13] *Rodriguez v. Harris Cty., Tex.*, 964 F. Supp. 2d 686, 759 (S.D. Tex. 2013).
[14] *E.g.*, *Benavidez v. City of Irving, Tex.*, 638 F. Supp. 2d 709, 725, 731-32 (N.D. Tex. 2009); *Hall v. Louisiana*, 108 F. Supp. 3d 419, 433 (M.D. La. 2015) ("Experts from both Plaintiffs and Defendants employed the widely recognized Ecological Inference procedure developed by Dr. Gary King to derive their conclusions of voter preferences in this case.").

Dr. Palmer used precinct-level voting and Census data to analyze 10 elections in District 22. They consist of the 2003, 2007, and 2015 Senate District 22 elections (*i.e.*, the "endogenous" elections most relevant to this case), as well as the 2003 Lieutenant Governor and Treasurer elections, the 2007 Insurance Commissioner election, the 2011 Governor election, and the 2015 Agriculture Commissioner, Secretary of State, and Governor elections (*i.e.*, the "exogenous" elections with some relevance to this case).[15] All 10 featured contests between white and black candidates. The goal of the endogenous/exogenous comparison was to see if findings were consistent between the Senate races and statewide races also held in odd years in District 22.

This analysis led Dr. Palmer to present the following conclusions:

*First*, there is "strong evidence" that African-American voters in District 22 are politically cohesive, but that their candidates of choice are defeated by white bloc voting. Every African-American candidate lost in the 10 elections in the sample, for example.[16] Dr. Palmer also found that African-American and white voters in the District are highly racially polarized.[17] In the 2015 State Senate race, 92.8% of African-American voters chose Thomas, while only 11.4% of white voters did the same.

*Second*, there is a sizable turnout gap between African-American and white voters in District 22.[18] On average, white turnout is 10.2 percentage points higher than black turnout. This conclusion was statistically significant in three out of the four Senate District 22 races analyzed.

---

[15] The 2011 Senate race in District 22 was between two white candidates. Dr. Palmer found that 83% of African-American voters supported the Democrat and 84% of white voters supported the Republican. The Democrat lost.
[16] Among the endogenous elections, Thomas's 46% result in 2015 made him the highest-performing African-American candidate. Looking at the exogenous elections, Gary Anderson was the most popular African-American candidate in District 22; he earned 49.1% of the District's vote in the 2003 Treasurer race and 49% of the District's vote in the 2007 Insurance Commissioner election.
[17] This finding is statistically significant.
[18] The turnout analysis included the 2011 Senate District 22 election.

*Third*, African-Americans would have a "realistic opportunity" to elect their candidate of choice if the BVAP in District 22 was increased to 62%.

On cross-examination it became clear that the plaintiffs did not ask Dr. Palmer to determine whether a BVAP lower than 62% would be sufficient to elect the African-American community's candidate of choice; rather, the plaintiffs asked him to analyze the expected outcome of a 62% BVAP. Dr. Palmer's report states that the 62% threshold was derived from the map constructed by the plaintiffs' expert mapmaker. We turn now to that expert.

William Cooper was the plaintiffs' second and final expert witness. Cooper uses geographic information system (GIS) technology to create electoral maps.

In this case, the plaintiffs asked Cooper to determine whether District 22's boundaries could be reconfigured to increase the BVAP while honoring traditional redistricting criteria and minimizing disruption to adjacent Districts. The plaintiffs also asked Cooper to gather relevant socio-economic data for District 22.

Cooper concluded that yes, although African-American voters in District 22 are already sufficiently numerous and geographically compact as to constitute a majority, the District could be redrawn to increase the BVAP by at least 10 additional percentage points. He then prepared three maps demonstrating how District 22 could be reconfigured.

Plan 1 moves the Madison County precincts and eight Yazoo County precincts from District 22 to District 23. In exchange, the Issaquena County precincts and eight Warren County precincts would move in the opposite direction. A total of 28 out of Mississippi's 1,962 precincts (1.4%) would be shifted. No precinct lines would be redrawn. Approximately 70% of the population of District 22 would remain in District 22, while approximately 67% of the

population of District 23 would stay put. A total of 27,000 voters in these Districts would be affected.

Under Plan 1, the BVAP would rise to 61.98%.

Plan 1 is pasted below. The thick blue lines represent the Districts as currently constituted. The gold and pink areas show how the Districts would change.

**PLAINTIFFS' ILLUSTRATIVE PLAN 1**

Cooper developed Plans 2 and 3 in response to the defendants' arguments during discovery. The defendants' expert had contended (among other things) that Plan 1 was unwieldy because it would split the City of Vicksburg between Districts 22 and 23. So in Plan 2, Cooper proposed another way to redraw those Districts that, while achieving the goals of Plan 1, would offset the splitting of Vicksburg by reuniting all of Yazoo City into a single District. Plan 2 ends up with a BVAP of 61.3%.

Plan 3 takes that idea one step further. While Vicksburg would again be split, Plan 3 redraws the boundaries to reunite Yazoo City *and* Cleveland, Mississippi—both of which are currently divided—resulting in a net decrease in split cities. The resulting BVAP is 66.1%.

The downside of Plan 3 is that it also involves adjusting the borders of District 13, thereby affecting more counties, precincts, and voters. It essentially presents a trade-off between municipal unification and pre-election disruption.

Plans 2 and 3 are shown below. Again, the thick blue lines represent the Districts as currently constituted, while the gold, pink, and in Plan 3, green areas indicate how the Districts would change.

PLAINTIFFS' ILLUSTRATIVE PLAN 2[19]          PLAINTIFFS' ILLUSTRATIVE PLAN 3



---

[19] At this scale Plans 1 and 2 may look identical, but Plan 2 features a small golden-colored section immediately to the left of the word "YAZOO."

10

All of Cooper's illustrative plans satisfy traditional redistricting criteria. They are contiguous, reasonably compact, reasonably shaped, satisfy one-person one-vote, and do not dilute minority voting strength. The incumbent Senator in District 23 remains in the same District. (The incumbent in District 22, Buck Clarke, is not running for reelection although his residence remains in the District.)

"To the extent possible, consistent with the constitutional and statutory requirements, federal redistricting courts attempt to preserve local political boundaries—city and county lines," since those lines often reflect "communities of interest."[20]

> In addition to the communities of interest represented by counties and municipalities, there are other communities of interest which share common concerns with respect to one or more identifiable features such as geography, demography, ethnicity, culture, socio-economic status or trade. The preservation of regional communities of interest within a single district enhances the ability of constituents with similar regional interests to obtain effective representation of those interests.[21]

Cooper testified that Plan 1 better respects communities of interest than the current map. Issaquena County and part of Warren County are more like the other Counties in District 22, he said, while the Madison County precincts are closer in nature to the wealthier parts of Warren County already sited in District 23.

Finally, Cooper reviewed Census data showing a variety of substantial socio-economic disparities between African-Americans and whites in District 22 that likely reduce voter turnout.

The statistics are bleak. The African-American poverty rate in District 22 is nearly five times the white poverty rate. Educational attainment for African-Americans is depressingly low. African-Americans who work full time make a *median* wage of $20,256 a year, while the median

---

[20] *Smith*, 189 F. Supp. 2d at 542 (citations omitted).
[21] *Id.* at 543 (quotation marks, citations, and brackets omitted).

white full-time worker makes nearly double—$40,485.[22] These and similar disparities, some of

which are reproduced below, reflect two populations that reside alongside each other yet

experience vastly different opportunities and outcomes:

### SOCIO-ECONOMIC PROFILE OF DISTRICT 22

|  | African-Americans | Whites |
|---|---|---|
| Poverty Rate | 41.2% | 8.8% |
| Median Household Income | $23,741 | $66,736 |
| SNAP Participation | 40.3% | 4.3% |
| High School Dropout Rate | 28.7% | 9.8% |
| Bachelor's Degree Attainment | 14.0% | 38.6% |
| Median Full-time Wage | $20,256 | $40,485 |
| Adults Without Health Insurance | 29.1% | 11.5% |

Cooper proceeded to explain that the inclusion of Madison County voters added

significantly to these disparities. County-level statistics reveal that Madison County's median

household income is more than twice as much as any other County in District 22.[23] In Madison

County, for example, the median household brings in $68,600 annually, a full $40,000 more than

the median household in neighboring Yazoo County ($28,330). After Madison County, the

second-wealthiest County in the District is Sharkey County, with a $30,033 median household

income. Obviously, that is less than half of Madison County's figure.

The Mississippi Department of Employment Security has created a helpful map

demonstrating county-level income differences as they existed in 2017. It shows that Madison

County had the highest per-capita income that year in all of Mississippi:

---

[22] This means that half of working African-Americans in District 22 make below $20,256 a year.
[23] The statistics for the Gluckstadt area may be higher than the countywide figures, but they are not in evidence.

### PER CAPITA INCOME BY COUNTY



We now turn to the other side of this battle of the experts.

### 2.    The Defendants' Expert

The defendants' sole expert was Dr. Peter A. Morrison, an applied demographer from Nantucket, Massachusetts. Dr. Morrison is retired from the RAND Corporation.

Dr. Morrison took a different approach to whether white bloc voting usually defeats African-American-preferred candidates. He did not look at the Senate District 22 elections, but instead compiled the results of local elections *within* the boundaries of District 22. From 2007-

onward, he found "152 separate instances in which a candidate favored by AA voters has been elected to local public office throughout the territory included in" District 22.

In Humphreys County, for example, Dr. Morrison examined the records of the 2007, 2011, and 2015 elections for local offices such as Chancery Clerk, Circuit Clerk, and Sheriff. From those records he identified a sample of 21 elections in which an African-American candidate ran and won. Of those, 14 races were uncontested and 7 were contested.

Dr. Morrison testified that based on this "simple counting operation—that's what demographers do," African-Americans are capable of winning elections within District 22. When asked about the possibility of white bloc voting defeating African-American-preferred candidates, he explained that he could not "see how that could possibly be the case" given the number of African-American elected officials. "The numbers speak for themselves."

Dr. Morrison took issue with Plan 1. He argued that splitting Vicksburg would subordinate traditional redistricting criteria to race. Dr. Morrison also claimed that African-Americans in District 23 would be harmed because their "influential" 42% BVAP would be reduced to 31%. "Overall," he wrote, "Plaintiffs' proposed alternative [Plan 1] would strip African-American voters of two districts in which they are now influential."

Finally, Dr. Morrison gathered Census data about voter turnout in Mississippi. Surveys from even-numbered election years spanning 2004-2016 show that African-Americans self-reported higher turnout rates than white voters. "These data furnish convincing evidence that African Americans in Mississippi have access to the political process and have participated in that process at ever higher rates in recent years," Dr. Morrison concluded.

14

**D.     Stipulations**

In case the Court's discussion has inadvertently omitted anything, the parties' stipulations are reproduced here in their entirety:

The Mississippi Senate is composed of 52 members, each of whom is elected from a single-member district. Elections for the Mississippi Legislature are held every four years in odd-numbered years at the same time other elections for most state and local elections are held.

The current plan for the Mississippi Senate was adopted in 2012.[24] The first election under it was held in 2015. The next election under it will be held in 2019. Under the current plan for the Mississippi Senate, District 22 consists of all of Sharkey County and parts of Bolivar, Washington, Humphreys, Yazoo, and Madison Counties. Under the current plan, District 22 is 50.77% African American in voting age population using 2010 census data.

Eugene "Buck" Clarke has represented Mississippi State Senate District 22 for approximately 15 years since January 2004. He is white.

In the 2003 general election for District 22, according to the official certified returns from the Mississippi Secretary of State, Eugene Clarke received 9,004 votes and defeated African-American candidates Mala Brooks and Mark Crawford, who received 5,288 votes and 1,870 votes, respectively.

In the 2007 general election for District 22, according to the official certified returns from the Mississippi Secretary of State, Eugene Clarke received 7,266 votes and defeated African-American candidate Sandra Jaribu Hill, who received 5,116 votes.

---

[24] At trial, the parties clarified that the Mississippi Senate adopted a plan in 2011, but it was not adopted by the Mississippi House and therefore never became final.

In the 2011 general election for District 22, according to the official certified returns from the Mississippi Secretary of State, Eugene Clarke received 7,033 votes and defeated white candidate George Hollowell, who received 6,021 votes.

In the 2015 general election for District 22, according to the official certified returns from the Mississippi Secretary of State, Eugene Clarke received 8,149 votes and defeated African-American Democratic candidate Joseph Thomas, who received 6,985 votes.

Plaintiff Vernon Ayers is an African-American resident and registered voter in Washington County who votes in District 22.

\* \* \*

At the end of trial, the parties also stipulated that the Mississippi Senate has never had more than 13 African-American members. The defendants argued that this fact, while true, was irrelevant. The objection is overruled. The relevance of this fact will become apparent later.

## II.    Legal Standard

A state violates § 2 of the Voting Rights Act:

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.[25]

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."[26]

The plaintiffs must begin by proving the three *Gingles* requirements. First is that "the racial group is sufficiently large and geographically compact to constitute a majority in a single-

---

[25] 52 U.S.C. § 10301(b).
[26] *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

16

member district."[27] Second, the plaintiffs must prove that "the racial group is politically

cohesive."[28] The third requirement is that "the majority votes sufficiently as a bloc to enable it

usually to defeat the minority's preferred candidate."[29] "[T]he *Gingles* factors cannot be applied

mechanically and without regard to the nature of the claim."[30]

Courts are then to consider "the Senate factors":

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals; [and]

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.[31]

The Senate factors are "neither comprehensive nor exclusive," and "there is no

requirement that any particular number of factors be proved, or that a majority of them point one

---

[27] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006) (quotation marks and citation omitted).
[28] *Id.*
[29] *Id.* (brackets and ellipses omitted).
[30] *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).
[31] *Gingles*, 478 U.S. at 36–37 (quotation marks and citations omitted).

way or the other."[32] They simply "provide salient guidance from Congress and the Supreme

Court on how to examine the current effects of past and current discrimination and how those

effects interact with a challenged law.[33] The ultimate question continues to be "whether as a

result of the challenged practice or structure plaintiffs do not have an equal opportunity to

participate in the political processes and to elect candidates of their choice."[34]

"The Fifth Circuit has noted that it will be only the very unusual case in which the

Plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish

a violation of § 2 under the totality of the circumstances."[35]

## III.    Discussion[36]

### A.    The Board of Election Commissioners

The defendants first contend that they are improper parties because none of them caused

or can remedy the boundaries of District 22. Since 1965, however, state redistricting cases in

Mississippi have "always been directed primarily against the state executive officers charged

with administering Mississippi's election laws . . . the then members of the State Board of

Election Commissioners and their subordinates."[37] That is because although the Board has "no

power to create reapportionment," it does "control the continued election of members to a

legislative body found to be unconstitutionally constituted," and is "the only agency with

---

[32] *Id.* at 45 (quotation marks and citation omitted).

[33] *Veasey v. Abbott*, 830 F.3d 216, 246 (5th Cir. 2016) (en banc).

[34] *Gingles*, 478 U.S. at 44 (quotation marks and citation omitted).

[35] *Benavidez*, 638 F. Supp. 2d at 713 (quotation marks and citation omitted).

[36] Parts III A and B resolve arguments first raised in the defendants' September 2018 motion for summary judgment.

[37] *Connor v. Winter*, 519 F. Supp. 1337, 1340 n.1 (S.D. Miss. 1981) (three-judge court). Our defendants' argument was actually made by the dissenting Judge in *Connor. See id.* at 1346 (Cox, J., dissenting) ("The majority herein has again cast a sovereign state into perilous and turgid waters to first be cast upon the rocky shores of Scylla because they were powerless to make the necessary changes, then only to be thrust into the dark brown vortex of Charybdis, when because of their impotency they are required to pay plaintiffs attorneys' fees, litigation expenses, and costs.").

statewide power to prevent the ballot placement of candidates for election to a malapportioned legislature."[38] The defendants' reply brief is silent on this caselaw. We will move on.

### B.     Affirmative Defenses

The defendants next argue that the statute of limitations has expired. They contend that this case should have been filed within three years of the Department of Justice's September 2012 preclearance of the Senate map. Alternatively, the defendants say that laches should end this case because the plaintiffs' "six-year delay" in bringing this lawsuit is inexcusable and prejudicial.

### 1.     Statute of Limitations

The Court assumes for present purposes that a Voting Rights Act suit "for injunctive relief brought by a private litigant could be barred by the running of an analogous state statute of limitations."[39] Even so, the plaintiffs' suit is timely because: (1) they filed within three years of the last District 22 election "which improperly implemented" the Act,[40] and (2) they allege that District 22's boundaries present a continuing violation of § 2 that will harm them again in the upcoming 2019 election cycle.[41]

### 2.     Laches

### a.     Substantive Law

"Laches is an inexcusable delay on the part of the plaintiff that results in prejudice to the defendant."[42] "It assures that old grievances will some day be laid to rest, that litigation will be

---

[38] *Id.* at 1343.
[39] *Dotson v. City of Indianola*, 514 F. Supp. 397, 401 (N.D. Miss. 1981) (three-judge court). *But see Jeffers v. Clinton*, 730 F. Supp. 196, 201 n.5 (E.D. Ark. 1989) (three-judge court) (noting that the state defendants presented a laches defense in lieu of a statute of limitations defense).
[40] *Dotson*, 514 F. Supp. at 401.
[41] *See Blackmoon v. Charles Mix Cty.*, 386 F. Supp. 2d 1108, 1115 (D.S.D. 2005).
[42] *Radiator Specialty Co. v. Pennzoil-Quaker State Co.*, 207 F. App'x 361, 362 (5th Cir. 2004) (citation omitted).

decided on the basis of evidence that remains reasonably accessible and that those against whom claims are presented will not be unduly prejudiced by delay in asserting them."[43]

To succeed with a laches defense, the defendants must show "(1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted."[44] "Whether laches bars an action in a given case depends upon the circumstances of that case."[45]

"Measuring prejudice entails balancing equities."[46] "When a district court is making an equity determination such as laches, the scope of its powers is broad, for breadth and flexibility are inherent in equitable remedies."[47] "The Court must weigh the facts and interests on both sides, summon up the discretion of a chancellor, remember that it is a court of conscience and not of legal stricture, and come as close as it can to a fair result. Frequently there are some good arguments on both sides, and that is the case here."[48]

There is some uncertainty as to whether laches applies where there is a statute of limitations. A statute of limitations "itself takes account of delay," and the "principal application" of laches "was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation."[49] In the redistricting context, the nature of laches as a "gap-filling, not legislation-overriding" doctrine suggests that it is best considered as a defense to

---

[43] *Envtl. Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 481 (5th Cir. 1980).
[44] *Id.* at 478 (citations omitted).
[45] *Id.*
[46] *Id.* at 479.
[47] *Radiator Specialty*, 207 F. App'x at 362 (quotation marks and citation omitted).
[48] *Jeffers*, 730 F. Supp. at 202.
[49] *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014); *see also Alexander*, 614 F.2d at 478; *Dotson*, 514 F. Supp. at 400 (discussing and rejecting a laches argument predicated upon "the plaintiffs' delay exceed[ing] the applicable limitations period").

last-minute requests for injunctive relief, and should not be wielded more than a year before an election—as our defendants have done by filing a dispositive laches motion in September 2018.[50]

Other authority suggests that laches is unavailable in cases like ours, where the plaintiffs allege an ongoing injury and seek a permanent injunction. In *Miller v. Board of Commissioners*, for example, the Middle District of Georgia held that "laches does not apply to voting rights actions wherein aggrieved voters seek permanent injunctive relief insofar as the electoral system in dispute has produced a recent injury or presents an ongoing injury to the voters."[51]

To put any doubts to rest, though, the Court will proceed to analyze the defense.

### b.    Analysis

The laches argument quickly fails as to plaintiffs Ayers and Lawson. There is no evidence that either had any indication of a problem with District 22's boundaries and slept on his rights. The mere fact that they are voters in District 22 is not enough, and there is no basis to conclude that DOJ preclearance vests voters with the knowledge of a claim sufficient to hold them accountable via laches.

On the other hand, the defendants make a compelling case that plaintiff Thomas unnecessarily delayed bringing this suit. Prior to preclearance, he expressed to DOJ his belief that the boundaries violated the Voting Rights Act. He then did not act on that belief after DOJ precleared the plan.

Thomas testified that in 2012, he did not know that private parties could bring a § 2 suit. He learned about this legal remedy in mid-2018. Laches, however, "does not depend on

---

[50] *Petrella*, 572 U.S. at 680; *see Blackmoon*, 386 F. Supp. 2d at 1115 (concluding that voting rights cases in which the laches defense prevailed involved plaintiffs who "waited until either elections or deadlines relating to elections were imminent before filing their claims").
[51] 45 F. Supp. 2d 1369, 1373 (M.D. Ga. 1998) (citation and emphasis omitted).

subjective awareness of the legal basis on which a claim can be made."[52] It instead asks whether plaintiffs have "an adequate indication" of the problem, which means "[information] enough to alert them to the claim that the authorities were not acting legally."[53] The evidence shows that Thomas had that information. His unawareness of the law in 2012, while credible, is not enough to excuse his delay in pursuing a remedy.

Yet there are other facts that render Thomas's delay excusable. Thomas did not perceive a legal violation in 2012 and then sit on his laurels. He decided to take a risk and enter the 2015 election in an attempt to prove that an African-American *could* win District 22 despite its boundaries. In other words, the time between 2012 and 2015 is excusable, if not laudable, because Thomas sought to remedy the problem through the political process.[54]

The defendants hammer the idea that District 22's BVAP cannot constitute a § 2 violation because, as the Supreme Court wrote, "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics."[55] But "pull, haul, and trade to find common political ground" is exactly what Thomas did in the 2015 election cycle. He should be credited for turning to the political process first—for attempting to make this litigation unnecessary—rather than penalized for the time that elapsed between preclearance in 2012 and the November 2015 election.

---

[52] *Alexander*, 614 F.2d at 479.

[53] *Id.*

[54] In notable contrast is the defendants' principal case, in which the plaintiff admitted that he delayed filing suit because he was not "a political person" and "kept thinking at some point that somebody would step up to protect the interest of Lincoln Parish." *Maxwell v. Foster*, No. 98-1378, 1999 WL 33507675, at *3 (W.D. La. Nov. 24, 1999) (brackets omitted).

[55] *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994). Twenty-five years later, Americans are likely more aware that racism can spike just as it can wane. *See, e.g.*, John Eligon, *Hate Crimes Increase for the Third Consecutive Year, F.B.I. Reports*, N.Y. Times, Nov. 13, 2018.

What remains is prejudice. "It is difficult to say that a government agency can be prejudiced by forcing it to comply with the law," the Fifth Circuit has observed.[56] But plainly there are circumstances where prejudice to the government warrants application of the doctrine. In *Alexander*, for example, the court found that a suit against the Army Corps of Engineers was properly dismissed because the plaintiffs had inexcusably delayed while the Corps spent $176 million on the project in question.[57] And in the defendants' principal case, *Maxwell v. Foster*, the court found laches appropriate because the plaintiffs had inexplicably delayed a suit seeking to declare the *entire* state legislative map unconstitutional. No. 98-1378, 1999 WL 33507675, at *4 (W.D. La. Nov. 24, 1999).

The evidence in our case weighs against a finding of undue prejudice. The plaintiffs filed this suit in July 2018. That was 16 months before the 2019 general election, 13 months before the primaries, and eight months before the qualification deadline. This timeframe is more than enough to litigate their single-district, single-count claim.[58] It is not remotely comparable to the $176 *million* sum the *Alexander* court noted or the statewide relief the plaintiffs in *Maxwell* sought.

The Court will turn to the merits.

**C.      Section 2 of the Voting Rights Act**

**1.      The *Gingles* Preconditions**

The evidence on the first and second *Gingles* preconditions is not contested.

---

[56] *Alexander*, 614 F.2d at 480.

[57] *Id.*

[58] There is the matter of the flip-side of the argument. Thomas filed this suit only after running in the first election under the current boundaries. Had he filed before running, the defendants would almost certainly be asking the Court to dismiss the action because it is a district that theoretically can be won by an African-American. *He should at least try first*, they would say. In 2015, however, Thomas tried, and he now makes a compelling case (as explained more fully below) as to why new boundaries should be drawn.

African-Americans in District 22 are already a sufficiently large and geographically compact group as to constitute a majority in a single-member district; the present BVAP exceeds 50%. The plaintiffs' three alternative maps show that the BVAP can be increased without impairing the District's compactness.[59]

It also is undisputed that African-American voters in District 22 are politically cohesive. Dr. Palmer's analysis is sound and Dr. Morrison did not attempt to opine otherwise, as he admitted that he has never run EI and does not perform that kind of analysis. Dr. Morrison also did not dispute Dr. Palmer's finding of racially polarized voting.

The parties genuinely dispute the third *Gingles* precondition: whether white bloc voting usually defeats the African-American community's candidate of choice. But the defendants' expert opinions on this point turned out to be flawed in important ways.

We should start by observing that some of Dr. Morrison's methods were unreliable and led him to incorrect facts. In several instances he inaccurately coded winning officials as having lost, or incorrectly coded a candidate's race—an error apparently caused by the fact that he discerned a candidate's race via Facebook and other public websites.[60] At other times, he did not have any evidence as to whether a candidate was in fact preferred by the African-American community, and simply assumed that black candidates were preferred by the black community.

---

[59] Although Dr. Morrison noted at trial that he did not contest the first *Gingles* precondition, his report asserted that Plan 1 would "damage" District 23's compactness. This assertion is not borne out by the facts. Cooper's supplemental report shows that redrawn Districts 22 and 23 would satisfy the Polsby-Popper test and have Reock scores well-within the range of Mississippi's 2012 Senate and House maps.

[60] This kind of coding is truly perilous. *Cf. Fish v. Kobach*, 309 F. Supp. 3d 1048, 1092–93 (D. Kan. 2018) ("Richman and a graduate student assistant went through the suspense list and determined which names were, in their view, foreign. Neither Dr. Richman nor his assistant had any experience in identifying so-called foreign names. By his own admission, their determinations were subjective and based primarily on whether the name was 'anglophone,' meaning originating in the British Isles. Dr. Richman also testified that their work was performed quickly, and that they made many mistakes along the way. A review of their coding revealed inconsistencies; for example, of five individuals with the last name of 'Lopez,' two were coded as foreign and three were coded as non-foreign. On cross examination, Dr. Richman admitted that he would have coded Carlos Murguia, a United States District Judge sitting in this Court, as foreign.").

Dr. Morrison's decision to include uncontested races in his analysis is curious, too; on cross-examination he admitted that these only shed light "indirectly" on the third *Gingles* precondition.[61, 62]

The more significant problem lies in the scope of Dr. Morrison's review. In looking at local elections *within* Counties, he never stepped back to consider whether white voters across *the entirety of* District 22 engage in bloc voting. It is no surprise that voters in Humphreys County would elect an African-American Circuit Clerk. But Senate District 22 spans five other Counties. Dr. Morrison never considered how the aggregate population of District 22 tends to vote when electing a Senator to represent the entire area.

Dr. Morrison is an experienced demographer. He knows the problems with his testimony: he admitted that endogenous elections have more persuasive value than the local elections he compiled, he did not look at voter turnout in odd-numbered years, and he conceded that the Census explicitly cautions that survey respondents overreport their voting behavior.[63] He may also be hemmed in by the instructions given to him by his clients.

Whatever Dr. Morrison's reasons, though, in this matter his review was too narrow. He is like a climatologist arguing that December is a warm month solely because December 9, 10, 18, and 31 were warm days; the limited facts he has gathered do not support his broad conclusions. It is not credible to draw a conclusion about white bloc voting in District 22 based exclusively on

---

[61] Uncontested elections present "special circumstances." *Gingles*, 478 U.S. at 51, 57.

[62] It also is not clear if Dr. Morrison's definition of viable candidate satisfies Fifth Circuit caselaw. *Compare* Defendants' Exhibit 14 at 6 n.4 *with Teague v. Attala Cty., Miss.*, 92 F.3d 283, 289 (5th Cir. 1996). The Court does not recall hearing evidence on this point and declines to make any findings on it.

[63] Dr. Morrison testified that the plaintiffs' alternate maps engage in packing and cracking. He is incorrect. There is neither, since African-Americans would not "constitute an excessive majority" in District 22, *Voinovich*, 507 U.S. at 154 (quotation marks and citation omitted), and because District 23 would remain an influence district, *see Smith*, 189 F. Supp. 2d at 536-37. The fact that BVAP in District 23 would "necessarily be reduced" in a redrawn map is no basis to enter judgment for the defendants; some "loss of influence" is "found in every § 2 case." *Clark v. Calhoun Cty., Miss.*, 21 F.3d 92, 95 (5th Cir. 1994).

the fact that there are some black elected officials in parts of the District.[64] The Fifth Circuit

rejected this reasoning 25 years ago when it found that "municipal elections in Bruce and

Vardaman do not demonstrate that black citizens have an equal opportunity to elect their

preferred candidates to county-wide offices."[65]

The defendants certainly attempted to discredit Dr. Palmer's competing report. They

pointed out that in the 2015 Senate District 22 election, approximately 1,500 voters in Bolivar

County received ballots for the wrong Senate race. Dr. Palmer freely agreed that this was a

"significant election administration error" which justified his decision to exclude those precincts,

in that race, from the EI analysis. He explained that the analysis remains valid because EI

identifies the pattern of behavior running through a series of elections over time.[66] The

defendants presented no evidence indicating that Dr. Palmer's approach was in error or would

cast any shadow on his conclusions.[67]

Considering all of the expert testimony, the Court finds Dr. Palmer's thorough and largely

unrebutted analysis to be persuasive. It accepts his findings as to white bloc voting and rejects

Dr. Morrison's alternate perspective.[68] The result is that the plaintiffs have established that white

---

[64] Perhaps due to the concerns raised on cross-examination, defense counsel did not attempt to rehabilitate Dr. Morrison's testimony and waived redirect of his only expert.

[65] *Clark*, 21 F.3d at 97. "Thus, in analyzing voting patterns in Calhoun County, the district court should accord greater weight to the virtual absence of black electoral success in county-wide elections as opposed to their limited electoral success in municipal elections." *Id.*

[66] *See Gingles*, 478 U.S. at 57 ("[A] pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election."); *Teague*, 92 F.3d at 288–89 ("Vote dilution is a determination that must be made over time and over the course of many elections.").

[67] Defense counsel later speculated that Thomas's efforts to draw white crossover votes had *succeeded*—maybe white voters in Bolivar County *would* vote for black candidates if only given the chance, he said—but the votes had gone uncounted because these voters were given the wrong ballot. Counsel for the plaintiffs called it "fantastical" to assume that these predominantly white precincts would have voted for Thomas, given the long, documented history of white bloc voting in Mississippi. Of course, none of this argument constitutes evidence. What is in evidence, however, is Thomas's testimony that he also pursued white crossover votes in Madison County—a place without election maladministration—and still did not garner enough to prevail.

[68] *See Monroe v. City of Woodville, Miss.*, 881 F.2d 1327, 1330 (5th Cir. 1989) ("At the outset, we note that the district judge discounted the statistical evidence presented by the appellants as severely flawed. The weaknesses he observed are particularly damaging to the appellants' case because this information constituted the bulk of their

bloc voting in District 22 defeats the African-American community's candidate of choice. The plaintiffs have proven all three *Gingles* preconditions.

### 2.    The Senate Factors

The next considerations are the Senate factors, which through different angles try to shed light on whether African-Americans in District 22 have an equal opportunity to elect their candidate of choice. Answering this ultimate question "depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process."[69]

First, Mississippi plainly has a long history of official discrimination against African-Americans seeking to vote.[70] To their credit, the defendants acknowledged this fact.

The plaintiffs supplemented this history with reports from Fred Banks, a former Legislator and Justice of the Mississippi Supreme Court, and John Horhn, a State Senator for the past 26 years. Banks and Horhn described the slow gains African-Americans made in running for and winning seats in the Mississippi Legislature. They also described racial appeals they experienced and observed during their decades in elective office.[71] Their reports will be discussed more below.

Second, Dr. Palmer presented expert testimony that voting in District 22 features "a high level of racial polarization." The defendants' expert did not challenge this factor.

The third and fourth factors are irrelevant. Neither side presented evidence that District 22 has unusual practices that enhance the opportunity for racial discrimination or a candidate slating process.

---

evidence on the issues of black political cohesiveness and white bloc voting. Dr. Love, appellants' statistical expert, faced difficulties in producing useful data for the court.").

[69] *Gingles*, 478 U.S. at 45 (quotation marks and citations omitted).

[70] *See Teague*, 92 F.3d at 293–94 ("That Mississippi has a long and dubious history of discriminating against blacks is indisputable.").

[71] Defense counsel objected to the reports' descriptions of racial appeals, believing them to be stale. The following discussion will show that the Court has considered the reports but given them appropriate weight.

Fifth, the plaintiffs presented evidence of substantial socio-economic disparities between District 22's African-American and white populations. There are vast differences between the two groups on education, employment, income, housing, and health indices, among others, that ultimately reflect the effects of slavery and segregation.

The plaintiffs, although "not required to prove a causal connection between these factors and a depressed level of political participation," introduced evidence that these socio-economic factors likely negatively impact voter turnout and that African-American communities in the Delta are less likely to have transportation options that facilitate voter turnout in odd-year elections.[72] Their evidence is consistent with the Supreme Court's recognition "that political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes."[73]

The defendants' expert sought to minimize the on-the-ground realities by pointing to statewide data showing that African-American Mississippians report higher voter turnout than white Mississippians in even-year elections. These data points fail to persuade. They look at the wrong jurisdiction, the wrong election years, and rely upon known issues with self-reported voting surveys—issues that EI, in contrast, seeks to overcome. The fifth Senate factor supports the plaintiffs.

The sixth Senate factor asks about overt or subtle racial appeals. The Banks and Horhn reports described several overt racial appeals made in elections up to 2004, but the plaintiffs did not put on evidence of any recent racial appeals.[74]

---

[72] *Id.* at 294.

[73] *Gingles*, 478 U.S. at 69 (citations omitted).

[74] There have been overt racial appeals in Mississippi elections since 2004. During the hotly-contested Initiative 42 campaign in 2015, for example, State Representative Bubba Carpenter told the Tishomingo County Midway

Seventh, the plaintiffs presented evidence that African-Americans have not been elected to the Senate from District 22. The defendants' attempt to reframe the issue and look at local offices within District 22—which, not incidentally, have higher BVAPs—is not persuasive for the reasons already discussed at length.

Even after considering all of these factors, the Supreme Court has instructed district courts to be cautious about finding a § 2 violation where the "districting scheme" features "majority-minority districts in substantial proportion to the minority's share of voting-age population."[75] Electoral maps that "apparently provid[e] political effectiveness in proportion to voting-age numbers" typically do not "deny equal political opportunity" and should not be the basis for liability.[76]

That concern is unwarranted here. The 2010 Census data showed that Mississippi was 59.1% white and 40.9% non-white. After redistricting with these data, therefore, one might have expected fresh maps to result in an upper legislative chamber with something like 31 white Senators and 21 non-white Senators. But there are only 15 majority-minority Senate Districts and

---

Republican Rally that "[i]f 42 passes in its form, a judge in Hinds County, Mississippi, predominantly black—it's going to be a black judge—they're going to tell us where the state education money goes." Sam R. Hall, *Rep. Carpenter injects race into Initiative 42*, The Clarion-Ledger, Oct. 18, 2015. His pitch was an appeal to racism and fear, not a statement of fact: the Hinds County bench was divided equally between "blacks" and whites.

As recently as November 2018, U.S. Senator Cindy Hyde-Smith was criticized for saying, at a public campaign rally in Tupelo, that she was so loyal to one of her friends (who she then brought out from the audience) that "I would fight a circular saw for him. . . . If he invited me to a public hanging, I'd be on the front row." Caleb Debillion, *Hyde-Smith deflects questions about 'public hanging' comments*, Daily Journal, Nov. 12, 2018. Some thought she was making an "inartful compliment." *Did Cindy Hyde-Smith's inartful compliment of a supporter go too far?*, Y'all Politics, Nov. 11, 2018. Others thought she was making a "sick" reference to lynching, *see* Matthew Haag, *Mississippi Senator's 'Public Hanging' Remark Draws Backlash Before Runoff*, N.Y. Times, Nov. 12, 2018—a sensitive subject given that her opponent in the runoff election was African-American and Mississippi has a history of "brutal and terrifying lynchings." Eric Etheridge, *Judge Carlton Reeves: Resurrecting the Nightmarish Specter of Lynchings in Mississippi*, Breach of Peace, Feb. 11, 2015, https://breachofpeace.com/blog/?p=612.

These examples are not in evidence and will not be considered further. Even if they were in evidence, on this record, the Court would still find that no racial appeals, overt or implied, have been recently made in District 22 or have had an effect on any District 22 election within the timeframe of the plaintiffs' case.

[75] *De Grandy*, 512 U.S. at 1013.

[76] *Id.* at 1014.

the Senate has never had more than 13 African-American members.[77] In plain English, Mississippi's Senate is much whiter than Mississippi.

Congress has emphasized that the representation gap is not itself a sufficient reason to redistrict the Senate and create additional majority-minority districts. Section 2 of the Voting Rights Act explicitly denies "a right to have members of a protected class elected in numbers equal to their proportion in the population."[78] The representation gap instead suggests that the Mississippi Senate does not provide political effectiveness in proportion to minority voting-age numbers and, therefore, that the defendants do not qualify for the kind of § 2 immunity the Supreme Court set forth in *De Grandy*.

\* \* \*

Having satisfied the three *Gingles* preconditions, and given the persuasive evidence on Senate factors one, two, five, and seven, the plaintiffs have established that District 22's lines result in African-Americans having less opportunity than other members of the electorate to elect the State Senator of their choice.

### D.    Additional Arguments

The defendants seek judgment as a matter of law by contending that "as a matter of simple mathematics," a minority group that has a voting-age population of 50% or more cannot prove a denial of equal opportunity under § 2. Put bluntly, the claim is that African-Americans' low turnout in odd-year elections is their problem. The Fifth Circuit, however, foreclosed this line of reasoning in *Monroe v. City of Woodville, Mississippi*.[79] "Unimpeachable authority from

---

[77] Demography is not necessarily destiny, of course. It should go without saying that voters can (and do) cross racial lines to vote for their candidate of choice: communities of color sometimes elect white politicians, and vice versa. In the Jackson region, District 29 is a majority-minority area (with a BVAP of 53.4%) that continues to elect a white person to the Senate.

[78] 52 U.S.C. § 10301(b).

[79] 881 F.2d 1327, 1329 (5th Cir. 1989).

our circuit has rejected any *per se* rule that a racial minority that is a majority in a political

subdivision cannot experience vote dilution."[80] Put differently, "low minority voter turnout does

not militate against finding a Section 2 violation."[81]

The defendants then argue that finding a § 2 violation in this case will open the

floodgates for plaintiffs to challenge every majority-minority district in Mississippi. But this is at

odds with Dr. Morrison's (accurate) observation that Mississippi has a substantial number of

African-American elected officials. In the hundreds of municipal and county districts in which

they sit, the presumptive plaintiffs will be unable to prove a § 2 violation precisely because they

will have experienced electoral success despite the legacy of discrimination. The Court

fundamentally disagrees that this ruling will have significant reach outside of Districts 22 and 23.

### E.     Remedies

As the Court recited in its February 13 Order, the Legislature is entitled to the first

opportunity to redraw District 22 and, if it chooses, extend the March 1 qualification deadline for

candidates in the affected Districts.[82] "Although it may be difficult for the Legislature to adopt a

plan," a "legislative plan is unequivocally to be preferred over a court-ordered plan . . . . [W]e

encourage the Legislature to act."[83]

## IV.     Conclusion

The plaintiffs have established by a preponderance of the evidence that the present

boundaries of Mississippi Senate District 22 violate § 2 of the Voting Rights Act. The Court will

decline to order any specific relief while the Mississippi Legislature considers whether to redraw

---

[80] *Id.* at 1333 (citation omitted). Practically speaking, this prohibits entrenched political powers from drawing a series of extremely marginal majority-minority districts with the expectation that the majority-minority group will be unable to turn out in numbers sufficient to ever elect a candidate of their choice.
[81] *Benavidez*, 638 F. Supp. 2d at 725 (collecting cases).
[82] *See LULAC*, 548 U.S. at 416.
[83] *Smith*, 189 F. Supp. 2d at 511-12.

31

the District and extend the candidate qualification deadline. A hearing will be set for the near future.

      **SO ORDERED**, this the 16th day of February, 2019.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

# EXHIBIT 13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**JOSEPH THOMAS; VERNON AYERS;**
**and MELVIN LAWSON**                                                  **PLAINTIFFS**

**v.**                                                         **NO. 3:18-cv-00441-CWR-FKB**

**PHIL BRYANT, Governor of the State of**
**Mississippi; DELBERT HOSEMANN,**
**Secretary of State of the State of Mississippi;**
**and JIM HOOD, Attorney General of the**
**State of Mississippi, all in the official capacities**
**of their own offices and in their official**
**capacities as members of the State Board**
**of Election Commissioners**                                         **DEFENDANTS**

### DEFENDANTS' MOTION TO STAY ORDER PENDING APPEAL

For the reasons set forth in the memorandum brief submitted concurrently herewith, defendants Phil Bryant and Delbert Hosemann move that this Court stay its order [Dkt. # 61] in this matter pending resolution of those defendants' appeal to the Fifth Circuit Court of Appeals pursuant to Fed. R. Civ. P. 62(c)(1).

Attached hereto in support hereof as Exhibit 1 is the affidavit of Kimberly P. Turner, Assistant Secretary of State for the Election Division.

This the 19th day of February, 2019.

Respectfully submitted,

Michael B. Wallace
MICHAEL B. WALLACE (MSB #6904)
CHARLES E. COWAN (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, MS 39205-0651
(601) 968-5534
mbw@wisecarter.com
cec@wisecarter.com

ATTORNEYS FOR DEFENDANTS PHIL
BRYANT, GOVERNOR OF THE STATE OF
MISSISSIPPI, AND DELBERT HOSEMANN,
SECRETARY OF STATE OF THE STATE OF
MISSISSIPPI

TOMMIE S. CARDIN (MSB #5863)
B. PARKER BERRY (MSB #104251)
BUTLER SNOW LLP
Suite 1400 1020
Highland Colony Park
Ridgeland, MS 39157
Post Office Box 6010
Ridgeland, MS 39158-6010
Tel: (601) 985-4570
Fax: (601) 985-4500
E-mail: tommie.cardin@butlersnow.com
E-mail: parker.berry@butlersnow.com

ATTORNEYS FOR ALL DEFENDANTS

2

## AFFIDAVIT OF KIMBERLY P. TURNER

STATE OF MISSISSIPPI

COUNTY OF HINDS

Personally appeared before me, Kimberly P. Turner, an adult resident citizen of the State of Mississippi, and hereby makes this affidavit upon personal knowledge, stating as follows:

1. My name is Kimberly P. Turner. I have personal knowledge of the facts attested to in this Affidavit. I am over the age of 21 and competent to testify accordingly. I am the Assistant Secretary of State for the Elections Division of the Mississippi Secretary of State's Office. The Elections Division performs various functions in conjunction with Mississippi elections, including training elections officials, receiving campaign finance and lobbying reports, maintaining and continuing development of the Statewide Elections Management System, receiving certified elections returns and assisting local election officials in carrying out their elections-related responsibilities.

2. To postpone the March 1, 2019 candidate qualifying date and implement redistricting on the eve of an election undoubtedly poses a great risk to the conduct of the upcoming August 6, 2019 Primary Elections. The 2019 Elections are the most challenging and time-consuming for State and County election officials by reason of the number of offices and the number of candidates seeking election.

3. There are several established deadlines pursuant to state and federal law that must be met by state and local election officials in connection with the upcoming statewide Primary Elections on August 6, 2019.

02157258

**EXHIBIT**

1

4. The first Primary Election ballot and a potential Primary Runoff Election ballot must be sent to all deployed military and overseas voters for whom Circuit Clerks have received a request no later than Saturday, June 22, 2019. See Miss. Code Ann. §§ 23-15-683, -685. -691, -699; see also 52 USC § 20301 et seq.

5. With the June 22, 2019 pending federal deadline, the official ballot must be published in the Statewide Election Management System (hereinafter "SEMS") no later than June 17, 2019. See Miss. Code Ann. § 23-15-331. The publication of the official ballot requires the coordination of the Secretary of State's Office with regard to state, state district and legislative candidates which publishes the official ballot first in SEMS thereafter making the same available to the local Circuit Clerks' Offices which then add county, county district, local and special elections to the official ballot.

6. A delay in the publication of the official ballot from the Secretary of State's Office results in a delay in the preparation of the official ballot by all eighty-two counties.

7. It is only from the publication of the official ballot in SEMS that the County Election Officials are able to print the official paper ballot for use on Election Day and during the absentee voting period of 45-days and prepare the databases for the voting machines.

8. Before publication of the official ballot, all candidates (state, state district, legislative, county and county district) who have sought nomination through a Primary Election must be determined qualified by either the respective State Party Executive Committee or the respective County Party Executive Committee. See Miss. Code Ann. § 23-15-299.

9. The qualification of candidates is a time-consuming and arduous task which involves the statutorily-required determination of residency requirements, voter registration and possible criminal background checks with regard to each candidate before his or her name may be placed upon the official ballot. Furthermore, with regard to state, state district and legislative candidates, each respective State Executive Committee must convene its members from across the State to officially approve the determination of qualifications of its candidates before the name may be provided to the Secretary of State.

10. Qualification must obviously occur before publication.

11. If redistricting is imposed during this time as well, no election may be created nor ballot published until those redistricting efforts are completed.

12. In the case of changing a legislative district, specific maps and street indexes with address ranges are needed to even begin the process. These address ranges are assigned to a "split" and those "splits" assigned to the county precincts in SEMS. A "split" is a unique combination of up to 25 districts for that precinct.

13. In addition to making the change for one district, the county election official making the changes must also make sure all of the other districts remain intact. In some cases, this will mean creating additional splits in a precinct, creating new address ranges to fit the address ranges for the district and then potentially moving one range at a time to the appropriate split.

14. Redistricting precludes the creation of an election in SEMS. Absent the creation of an election in SEMS, neither the State nor the Counties may enter races or candidates and therefore neither may publish a ballot.

**FURTHER AFFIANT SAYETH NOT.**

DATED:  February 19, 2019.

_____
Kimberly P. Turner

Sworn to and subscribed before me on this the 19th day of February, 2019.

_____
Notary Public

My Commission Expires:

_____

# EXHIBIT 14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**JOSEPH THOMAS, et al,**

        **Plaintiffs**

**vs.**                                 **Civil Action No. 3:18cv441-CWR-FKB**

**PHIL BRYANT, Governor of**
**Mississippi, et al.,**

        **Defendants.**

## PLAINTIFFS' MOTION TO EXTEND
## QUALIFYING DEADLINE IN TWO SENATE DISTRICTS

Because nearly two weeks have passed without the Mississippi Legislature taking action to remedy the violation announced by this Court in its order of February 13, and reiterated in its order of February 16, 2019, this Court will be required to impose a remedial plan for Senate District 22 which will affect the adjacent Senate District 23. In order to afford potential candidates an opportunity to make any decisions about qualifying in light of the district lines ordered by the Court, the Plaintiffs move to postpone from March 1, 2019 to March 15, 2019 the candidate qualifying deadline for Senate Districts 22 and 23. If the Court intends to strongly consider imposing a remedy that encompasses District 13 as well, the Court could also postpone the deadline in that district. No other districts need be affected.

Because the Defendants have been aware of this issue for some time, the Plaintiffs request that the Court order the Defendants to respond to this motion by the close of business on February 26, 2019.

In its February 13 order, the Court announced its finding of a violation and stated that the legislature would have the first opportunity to redraw the district and if it chooses, to extending the qualifying deadline for candidates in the affected districts. The Court reiterated this in its February 16 opinion explaining the reasons for its holding. In a telephone status conference held on February 21, counsel for the State Defendants stated that the legislative leadership had been informed of the Court's ruling but had not provided any response. None of the parties have received any indication from any source that the legislature, which is in session, is taking any action to remedy the violation.

Some candidates already have qualified for Senate District 22. Defense counsel stated in the February 21 status conference that he was aware of one person qualifying as a Republican. The undersigned has been informed by Plaintiff Joseph Thomas that he has qualified as a Democrat and Mr. Thomas stated that he has been told that two others have qualified as Democrats.

The Plaintiffs have submitted proposed redistricting plans to the Court as part of the liability phase. Any of those are available for the Court to adopt as a remedy. The Plaintiffs do not intend to propose any others. During the February 21 status conference, counsel for the State Defendants stated that they will inquire of their clients as to whether they wish to propose a remedial plan for the Court's consideration. Counsel for the Plaintiffs and Defendants agreed they would confer and, if the Defendants are going to propose a plan, counsel will attempt to agree on a remedial schedule to propose to the Court. As of this day, February 25, counsel for the State Defendants has informed the undersigned that his clients have not yet decided whether to propose a remedial plan.

In light of the failure of the legislature to take action, and with no decision yet being made as to whether the State Defendants will propose a plan, it appears that the qualifying deadline should be extended for a brief period of time in Senate Districts 22 and 23. If the Court intends to strongly consider imposing a remedy that encompasses District 13 as well, the Court could also postpone the deadline in that district. Similarly if the Defendants request that District 13 be included, the Plaintiffs have no objection. No other districts need be affected.

The Plaintiffs propose the deadline be extended for 14 days, from March 1 to March 15. If it turns out that it should be extended a little further in light of subsequent remedial developments, the Court can do so at the appropriate time. The Plaintiffs believe this 14 day deadline should be sufficient and that if any further extension is necessary, it can be a short one.

Because the Defendants have been aware of this issue for some time, the Plaintiffs request that the Court order the Defendants to respond to this motion by the close of business on February 26, 2019.

A short memorandum of law is being submitted in support of this motion.

February 25, 2019,

BETH L. ORLANSKY, MSB 3938
MISSISSIPPI CENTER FOR JUSTICE
P.O. Box 1023
Jackson, MS 39205-1023
(601) 352-2269
borlansky@mscenterforjustice.org

KRISTEN CLARKE
JON GREENBAUM
EZRA D. ROSENBERG
ARUSHA GORDON
POOJA CHAUDHURI
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1401 New York Ave., NW, Suite 400
Washington, D.C. 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
agordon@lawyerscommittee.org
*Admitted Pro Hac Vice*

Respectfully submitted,

*s/ Robert B. McDuff*
ROBERT B. MCDUFF, MSB 2532
767 North Congress Street
Jackson, MS 39202
(601) 969-0802
rbm@mcdufflaw.com

ELLIS TURNAGE, MSB 8131
TURNAGE LAW OFFICE
108 N. Pearman Ave
Cleveland, MS 38732
(662) 843-2811
eturnage@etlawms.com

PETER KRAUS
CHARLES SIEGEL
CAITLYN SILHAN
WATERS KRAUS
3141 Hood Street, Suite 700
Dallas, TX 75219
(214) 357-6244
pkraus@waterskraus.com
csiegel@waterskraus.com
csilhan@waterskraus.com
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2019, I electronically filed a copy of the foregoing

using the ECF system which sent notification of such filing to all counsel of record.

<u>s/Robert B. McDuff</u>

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JOSEPH THOMAS, et al.                                        PLAINTIFFS

V.                                      CAUSE NO. 3:18-CV-441-CWR-FKB

PHIL BRYANT, et al.                                         DEFENDANTS

### ORDER

By noon tomorrow, the defendants shall update the Court on the Legislature's progress, if any, in redrawing Senate District 22.

By 2:00 PM tomorrow, the defendants shall respond to the plaintiffs' motion to extend the qualifying deadline.

The Court expects to rule on all of the pending motions before February 28, 2019.

**SO ORDERED**, this the 25th day of February, 2019.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

# EXHIBIT 16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**JOSEPH THOMAS; VERNON AYERS;**
**and MELVIN LAWSON**                                                    **PLAINTIFFS**

**v.**                                                    **NO. 3:18-cv-00441-CWR-FKB**

**PHIL BRYANT, Governor of the State of**
**Mississippi; DELBERT HOSEMANN,**
**Secretary of State of the State of Mississippi;**
**and JIM HOOD, Attorney General of the**
**State of Mississippi, all in the official capacities**
**of their own offices and in their official**
**capacities as members of the State Board**
**of Election Commissioners**                                          **DEFENDANTS**

## MEMORANDUM OF GOVERNOR PHIL BRYANT AND SECRETARY OF STATE DELBERT HOSEMANN IN OPPOSITION TO PLAINTIFFS' MOTION TO EXTEND QUALIFYING DEADLINE IN TWO SENATE DISTRICTS

Governor Phil Bryant and Secretary of State Delbert Hosemann, two of the defendants, respectfully submit this response in opposition to plaintiffs' motion to extend the qualifying deadline in two Senate districts. [Dkt. # 66]. The request for an extension of the March 1, 2019, qualifying deadline is premature until both this Court and the United States Court of Appeals for the Fifth Circuit have ruled on defendants' pending motions to stay this Court's February 16, 2019, memorandum opinion and order. [Dkt # 61]. Further, until the Mississippi Legislature has had an opportunity to propose a remedy and this Court has had an opportunity to consider such a remedy, the district or districts, in addition to Senate District 22, that may be impacted is unknown. Senate District 22 is contiguous with eight existing Senate Districts.

It is remarkable that, in support of their motion for this Court's precipitous intervention in Mississippi's election process, plaintiffs rely on a decision in which the Court refused to

intervene. *Watkins v. Mabus*, 771 F. Supp. 789 (S.D. Miss. 1991). Although the legislative apportionment adopted in 1982 had become unconstitutional as a result of the 1990 census, this Court permitted that plan to be used in the 1991 elections, ordering that legislative elections would be held under "the apportionment plan now in effect (1982 plan)." *Id.*, at 797. That is exactly what this Court ought to do here.

While the Court was hearing evidence and arguments that led to its ultimate decision not to intervene, the Court did temporarily enjoin the qualifying deadline of July 19, 1991, *id.*, at 797, ultimately extending it to August 12, 1991. *Id.*, at 797.[1] The Legislature did not share plaintiffs' view of the ease of "hold[ing] elections even where the qualifying deadlines are five weeks from the primary." [Dkt. # 67 at 2.] Before the next legislative elections, the Legislature amended the law to advance the filing deadline to the current date of March 1. 1994 Miss. Gen. Laws ch. 564 § 90, codified as Miss. Code Ann. § 23-15-299. Lest there be any mistake, the short title of the bill in part declared its purpose "TO REVISE THE TIME FOR PAYMENT OF ASSESSMENTS BY CANDIDATES IN PARTY PRIMARY ELECTIONS." That amendment was approved by the United States under § 5 of the Voting Rights Act, 51 U.S.C. § 10503. To suggest to this Court that the deadline is insignificant is to ignore the experience of the legislators who dealt with the consequences the last time this Court changed qualifying deadlines.

This Court has not disputed defendants' demonstration that "none of them caused or can remedy the boundaries of District 22." [Dkt. # 61 at 18.] As defendants in this action, however, they do have a right to be heard on any remedy this Court may order. However, sole responsibility for adopting legislative redistricting laws in Mississippi resides with the

---

[1] It is certainly true that a court of equity may extend the qualifying deadlines, as the Supreme Court authorized in *Connor v. Johnson*, 402 U.S. 690 (1971). That case, however, had already been pending at least since 1965, *Connor v. Johnson*, 256 F. Supp. 962 (S.D. Miss. 1966), unlike this case, in which defendants saw plaintiffs' proposed plans barely two months ago.

Legislature.

As directed by this Court [Dkt. # 68], defendants have contacted the leadership of the two chambers of the Legislature. Although defendants do not represent the Legislature, they are authorized to report that, should the stay motions pending before this Court and the Fifth Circuit be denied, the Senate desires the opportunity to enact a new redistricting plan redrawing Senate District 22. Defendants, as litigants in this Court, expect to be in a position to support that plan.

Plaintiffs will suffer no cognizable injury from awaiting the action of the Legislature. Having waited six years to file suit, they can hardly complain of waiting a few more days. This Court held in *Watkins* that a violation of § 2 of the Voting Rights Act, 51 U.S.C. § 10503, even where established, does not inflict irreparable injury. 771 F. Supp. at 805 n.16, citing *Chisom v. Roemer*, 853 F.2d 1186, 1188-89 (5th Cir. 1988).[2] If plaintiffs can demonstrate any harm from a delay, this Court can repair it.

The Legislature faces a particularly difficult task in responding to this Court's order, because the order gives no indication of what remedy is required.[3] As the Court observed, plaintiffs presented no evidence of "whether a BVAP lower than 62% would be sufficient to elect the African-American community's candidate of choice." [Dkt. # 61 at 8]. Nor did the Court answer that question, probably because, as this Court well knows, African-Americans are not entitled to elect a candidate of their choice, but only to an equal opportunity to do so. Nothing in this Court's order suggests what level of BVAP would be sufficient, in this Court's view, to provide that equal opportunity.

Nevertheless, if a stay is not forthcoming, the Legislature will do its best to adopt a

_____

[2] That statute in 1991 was indisputably unconstitutional. District 22, by contrast, is indisputably constitutional.

[3] One reason this Court permitted elections to proceed in 1991 was that it had not established the criteria that should govern any remedy. *Watkins*, 771 F. Supp. at 799.

lawful plan. In the meantime, this Court should take no action, except to rule on the pending motion for stay. [Dkt. # 63].

This the 26th day of February, 2019.

Respectfully submitted,

s/ Michael B. Wallace
MICHAEL B. WALLACE (MSB #6904)
CHARLES E. COWAN (MSB #104478)
T. RUSSELL NOBILE (MSB #100682)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, MS 39205-0651
(601) 968-5500
mbw@wisecarter.com
cec@wisecarter.com
trn@wisecarter.com

ATTORNEY FOR DEFENDANTS PHIL
BRYANT, GOVERNOR OF THE STATE OF
MISSISSIPPI, AND DELBERT HOSEMANN,
SECRETARY OF STATE OF THE STATE OF
MISSISSIPPI

TOMMIE S. CARDIN (MSB #5863)
B. PARKER BERRY (MSB #104251)
BUTLER SNOW LLP
Suite 1400 1020
Highland Colony Park
Ridgeland, MS 39157
Post Office Box 6010
Ridgeland, MS 39158-6010
Tel: (601) 985-4570
Fax: (601) 985-4500
E-mail: tommie.cardin@butlersnow.com
E-mail: parker.berry@butlersnow.com

ATTORNEYS FOR ALL DEFENDANTS

4

### CERTIFICATE OF SERVICE

I, Michael B. Wallace, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record.

This the 26th day of February, 2019.

*s/ Michael B. Wallace*
Michael B. Wallace

# EXHIBIT 17

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**JOSEPH THOMAS, et al.**                                            **PLAINTIFFS**

**V.**                                            **CAUSE NO. 3:18-CV-441-CWR-FKB**

**PHIL BRYANT, et al.**                                            **DEFENDANTS**

## ORDER

The Mississippi Legislature has not redrawn the boundaries of Senate District 22, and the candidate qualification deadline is approaching. The Court therefore orders as follows:

1.    The candidate qualification deadline is extended to March 15, 2019, for all persons seeking to qualify for Mississippi Senate Districts 22 and 23. No other deadlines, jurisdictions, or offices are affected.

2.    The boundaries of Districts 22 and 23 are amended to conform to plaintiffs' illustrative Plan 1. The defendants shall publish and transmit the Plan to the affected Circuit Clerks and other relevant officials.

A separate Final Judgment shall issue this day.

**SO ORDERED**, this the 26th day of February, 2019.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

# EXHIBIT 18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**JOSEPH THOMAS, et al.**                                        **PLAINTIFFS**

**V.**                                        **CAUSE NO. 3:18-CV-441-CWR-FKB**

**PHIL BRYANT, et al.**                                        **DEFENDANTS**

### <u>ORDER</u>

Before the Court is a motion to stay filed by two of the three defendants. After

considering the record evidence, arguments, and applicable law, the motion will be denied.

## I.   Background

In July 2018, the plaintiffs filed this § 2 case challenging the boundaries of Mississippi

Senate District 22. Over the following months, all of the lawyers and parties worked diligently to

gather evidence and marshal arguments—not just to resolve the case before the November 2019

election, but to have it resolved before the March 1, 2019 candidate qualification deadline.

Those efforts were successful. A trial was held in early February 2019. One week later,

the Court notified the parties and the Legislature that the testimony and other evidence largely

supported the plaintiffs' allegations.[1] A full memorandum opinion issued on February 16, 2019.

The Mississippi Legislature was provided the first opportunity to redraw the District and

extend the March 1 qualification deadline.[2] It has so far declined to act and there is no progress

on the horizon. Accordingly, alongside this ruling, the Court has issued an Order extending the

---

[1] For the record, the plaintiffs did not allege intentional racial discrimination. The question was whether the boundaries of District 22, the statistical evidence of two decades of voting patterns in that District, and the social and historical conditions of that area interacted "to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

[2] *But see* Emily Wagster Pettus, *No fast action on judge's redistricting order in Mississippi*, Assoc. Press, Feb. 14, 2019 ("Mississippi lawmakers are in no hurry to redraw a state Senate district after a judge ruled that the district dilutes black voting power. The Senate Elections Committee Chairman, Republican Kevin Blackwell of Hernando, told The Associated Press on Thursday that he's waiting to see if the state will appeal the judge's order.").

qualification deadline for Districts 22 and 23 to March 15, 2019, and requiring the defendants to

redraw Districts 22 and 23 in accordance with the plaintiffs' illustrative Plan 1. A separate Final

Judgment will follow.

One dispute remains. Two out of the three defendants—the Governor and the Secretary of

State—have appealed and argue that the Court's ruling should be stayed pending that appeal. The

Attorney General has not appealed or joined in their motion.

## II.    Legal Standard

The law governing motions to stay pending appeal is well-established:

> We consider four factors in deciding a motion to stay pending appeal: (1) whether
> the stay applicant has made a strong showing that he is likely to succeed on the
> merits; (2) whether the applicant will be irreparably injured absent a stay; (3)
> whether issuance of the stay will substantially injure the other parties interested in
> the proceeding; and (4) where the public interest lies. The first two factors . . . are
> the most critical.

*Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (quotation marks and citation omitted).

"A stay is an intrusion into the ordinary processes of administration and judicial review,

and accordingly is not a matter of right, even if irreparable injury might otherwise result to the

appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (quotation marks and citation omitted). "It

is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the

circumstances of the particular case. The party requesting a stay bears the burden of showing that

the circumstances justify an exercise of that discretion." *Id.* at 433–34 (quotation marks,

citations, and brackets omitted).

"[T]he movant need not always show a 'probability' of success on the merits; instead, the

movant need only present a substantial case on the merits when a serious legal question is

involved and show that the balance of the equities weighs heavily in favor of granting the stay."

*Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (citations omitted).

## III.    Discussion

At the outset, it must be noted that the movants' brief presents an idiosyncratic view of the record. They say the plaintiffs' statistical expert arrived at inaccurate estimates, but they introduced no evidence to dispute his actual methodology, which is generally accepted in this Circuit. They complain that "the Court declared that black voters 'are less likely to have transportation options that facilitate voter turnout in odd-year elections.'" The Court wrote that because it was unrebutted trial testimony. Elsewhere, the movants speculate about whether the Census Bureau has ever "suggested that blacks are more likely to over-report their participation than whites." The time for speculation has passed.

The movants' strongest argument relies upon a series of voting cases instructing lower courts to be wary of changing the status quo "on the eve of an election." *Veasey*, 769 F.3d at 892, 894 (collecting cases).

In *Veasey*, the Fifth Circuit stayed a Texas district court ruling that would have affected statewide voter identification rules "just nine days before early voting." *Id.* at 892. "[I]t will be extremely difficult, if not impossible, for the State to adequately train its 25,000 polling workers at 8,000 polling places about the injunction's new requirements in time for the start of early voting on October 20 or even election day on November 4," the court reasoned. *Id.* at 893.

The principle of electoral caution is not limited to voter identification cases, but extends to redistricting controversies like ours:

> Further, in the apportionment context, the Supreme Court has instructed that, in awarding or withholding immediate relief, a court is entitled to and *should* consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. Accordingly, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately

3

      effective relief in a legislative apportionment case, even though the existing
apportionment scheme was found invalid.

*Id.* (quotation marks, citations, and brackets omitted). The bottom line is that district courts must

recognize "the Supreme Court's hesitancy to allow . . . eleventh-hour judicial changes to election

laws." *Id.* at 895.

      Given these authorities, a stay pending appeal would likely be appropriate if voting in

District 22 had started or was imminent. A stay would probably also be warranted if the Court

was ruling on this case in September or October, on the cusp of the November general election.

That is not the situation. We are months away from the primaries and months more away from

the general election.

      There are, in fact, quite a few differences between the *Veasey* line of cases and this

matter. The plaintiffs have not brought a constitutional case of statewide reach, but instead filed a

one-count suit identifying one problem in one of Mississippi's 52 Senate Districts. That problem

can be remedied by moving 1.4% of Mississippi's 1,962 electoral precincts into an adjacent

Senate District. The affected voters have the entire campaign season to get acquainted with the

candidates, to the extent the candidates are not already known to them—this *is* Mississippi, after

all. And moving these precincts will not affect the incumbents. The District 22 incumbent is not

running for re-election for other reasons, while the District 23 incumbent is favored to win under

any redrawn map and may even run unopposed.

      The available evidence regarding "the mechanics and complexities of state election

law[]" also does not justify a stay. The State's elections consultant provided an affidavit

explaining that any affected counties would need time to move the affected precincts. She stated

that "the timeline for election creation is generally about 55 days before an election day." The

Assistant Secretary of State for the Elections Division provided an affidavit stating that the

4

official ballot for the primary elections must be finalized by June 17, 2019. Before that can

happen, the candidates must be determined to be qualified and approved by their political party.

That takes some time. How much time, the record does not reveal.

This evidence likely would have carried more weight if the plaintiffs had asked for

broader relief. What the affiants did not know (and could not have known at the time) was that so

few precincts would move, and that the qualification deadline would be extended by only 14

days. There is no evidence in these affidavits or elsewhere that such modest steps will harm the

efficient conduct of the 2019 election cycle. The Court simply cannot agree with movants'

counsel's assertion that this will result in "chaos."

The traditional factors also weigh against issuance of a stay.

First, the movants have not made a strong showing that they are likely to succeed on

appeal. Two of the three *Gingles* factors were uncontested at trial and the third heavily favored

the plaintiffs once the defendants' expert was subjected to cross-examination. The movants'

statute of limitations defense lacks support in the case law, while the laches argument can (at

best) knock out one of the three plaintiffs. The movants' textual reinterpretation of 28 U.S.C.

§ 2284(a) has never been adopted by a single court and runs contrary to the leading treatise on

textualism. The Court's memorandum opinion explained at length how the movants' remaining

legal arguments are inconsistent with the binding case law of this Circuit.

The final three factors are collectively in equipoise. Here, as is so often the case, "both

sides cloak themselves in the mantle of irreparable harm," "claim the public interest supports

them," and argue "that their prospective harm is greater than the harm to the other." *Voting for

Am., Inc. v. Andrade*, 488 F. App'x 890, 894 (5th Cir. 2012).

The second factor supports the issuance of a stay. It was only last year that the Supreme

Court found that "the inability to enforce its duly enacted plans clearly inflicts irreparable harm

on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018).[3] Without a stay, Mississippi

will not be able to implement the District 22 map it previously enacted into law.

The third factor cuts the other way, since a stay would substantially injure the other

parties to this litigation. In *Veasey*, the Fifth Circuit's discussion of this prong reaffirmed that

"the right to vote is the right to participate in an electoral process that is necessarily structured to

maintain the integrity of the democratic system." 769 F.3d at 896 (quotation marks, citation, and

brackets omitted). Here, the evidence showed that the plaintiffs and other African-Americans in

District 22 were unable to vote their candidate of choice into office in the 2003, 2007, 2011, and

2015 election cycles because of the structure of the District. Given the importance of voting and

the years that have elapsed without the electoral opportunity intended by § 2, the better course of

action seems to be to not injure the plaintiffs for another election cycle.

Finally, the public interest factor is inconclusive. In *Nken*, an asylum case in which the

petitioner sought a stay of removal, the Supreme Court observed that "[o]f course there is a

public interest in preventing aliens from being wrongfully removed, particularly to countries

where they are likely to face substantial harm," just as "[t]here is always a public interest in

prompt execution of removal orders." 556 U.S. at 436. And in *Perez*, last year's redistricting

case, the Court wrote that the district court "should have respected the legislative judgments

embodied in" the State's duly enacted maps, before adding, critically, "to the extent allowed by

---

[3] The Fifth Circuit has articulated this point somewhat differently, writing that "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey*, 769 F.3d at 895 (quotation marks and citation omitted).

The *Veasey* court also found that "the State has a significant interest in ensuring the proper and consistent running of its election machinery." *Veasey*, 769 F.3d at 896. As discussed above, the evidence in this case does not show that amending District 22's boundaries will impair this legitimate interest.

the Constitution and the VRA." 138 S. Ct. at 2316 (citation omitted). These authorities confirm

that it is difficult to draw hard and fast rules about where the public interest lies in these cases,

since we should generally presume the government's lawful conduct and nevertheless order

appropriate remedies where the government has run afoul of federal law. The more salient issue

on this factor may again be "the timing" of the court's order in relation to the election, given the

public interest in avoiding disruption on the eve of an election. *Veasey*, 769 F.3d at 895–96.

Having considered these factors, which to some extent favor a stay and in other, greater

respects, counsel against a stay, the undersigned is not persuaded that a stay should issue.

## IV.    Conclusion

The thread running through the defendants' theory of the case, from their laches defense

to the movants' stay application, has been prejudice. *We are too close to the next election*, they

say. This is a basic § 2 case, though, and the judiciary is generally capable of resolving a "a run-

of-the-mill case" filed 16 months before a general election. *Id.* at 892.

This Court has considered the record evidence, the limited scope of the remedy, and the

practical impact this ruling will have on county and state election officials trying to do their jobs

with fidelity to the law and the people they serve. It sees a small-bore remedy and months of

time in which to implement it. The motion for stay pending appeal is, therefore, denied.

**SO ORDERED**, this the 26th day of February, 2019.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

7

# EXHIBIT 19

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JOSEPH THOMAS, et al.**                                                              **PLAINTIFFS**

**V.**                                                    **CAUSE NO. 3:18-CV-441-CWR-FKB**

**PHIL BRYANT, et al.**                                                              **DEFENDANTS**

**FINAL JUDGMENT**

Having resolved all of the claims and defenses in this case, this matter is due to be closed.

Accordingly,

**IT IS HEREBY ORDERED AND ADJUDGED** that judgment is entered in favor of

plaintiffs Joseph Thomas, Vernon Ayers, and Melvin Lawson and against defendants Governor

Phil Bryant, Attorney General Jim Hood, and Secretary of State Delbert Hosemann, all in their

official capacities.

**SO ORDERED AND ADJUDGED**, this the 26th day of February, 2019.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

# EXHIBIT 20

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**JOSEPH THOMAS; VERNON AYERS;
and MELVIN LAWSON**                                    **PLAINTIFFS**

**v.**                                            **NO. 3:18-cv-00441-CWR-FKB**

**PHIL BRYANT, Governor of the State of
Mississippi; DELBERT HOSEMANN,
Secretary of State of the State of Mississippi;
and JIM HOOD, Attorney General of the
State of Mississippi, all in the official capacities
of their own offices and in their official
capacities as members of the State Board
of Election Commissioners**                          **DEFENDANTS**

**MOTION OF DEFENDANTS PHIL BRYANT AND DELBERT HOSEMANN
FOR STAY OF FINAL JUDGMENT PENDING APPEAL**

COME NOW Governor Phil Bryant and Secretary of State Delbert Hosemann, two of the

defendants herein, and respectfully move this Court, pursuant to Fed. R. Civ. P. 62(c)(1), for a

stay of this Court's final judgment [Dkt. # 76], entered February 26, 2019, and all injunctive

relief merged therein, pending resolution of their appeal, and would show unto the Court in

support thereof the following:

1.      Governor Bryant and Secretary of State Hosemann timely filed their notice of

appeal on February 27, 2019.  [Dkt. # 78].

2.      In their memorandum in opposition to plaintiffs' motion to extend qualifying

deadline in two Senate districts, filed on February 26, 2019, appellants advised this Court of their

desire to exercise their "right to be heard on any remedy this Court may order."  [Dkt. # 72 at 2].

However, because this Court entered its injunctive order [Dkt. # 74] and final judgment [Dkt. #

76] without a hearing, appellants had no opportunity to present evidence relevant to this Court's

exercise of its equitable powers.

3.      As plaintiffs acknowledge, this Court had been advised that plaintiff Joseph Thomas has qualified to run as a Democrat in District 22 and that at least one person has qualified to run in District 22 as a Republican.  [Dkt. # 66 at 2].  Attached hereto as Exhibit 1 is an affidavit of the Chairman of the Executive Committee of the Mississippi Republican Party. Two persons have qualified as candidates in District 22:  John Hayes Dent, Jr., of the Valley Precinct in Yazoo County, and Gary Dwayne Self of the Mount Hope Missionary Baptist Church Precinct in Madison County.  William Briggs Hopson of the Beechwood Precinct in Warren County has filed to run in District 23.

4.      This Court's injunctive order transfers all Madison County precincts into District 23 and also moves the Valley Precinct of Yazoo County into District 23, with the result that no person has qualified to run as a Republican in District 22 as redrawn by this Court. Notwithstanding this Court's prediction that "the District 23 incumbent is favored to win under any redrawn map and may even run unopposed" [Dkt. # 75 at 4], this Court has now moved into District 23 two persons who have already registered their desire to run for the Senate, although they will have to qualify again should they wish to run in the redrawn District 23.

5.      The effect of the remedy granted to plaintiff Joseph Thomas by this Court at his request is, at least for the time being, to eliminate all of his Republican opposition in District 22 as redrawn by this Court.  While the Court "sees a small-bore remedy and months of time in which to implement it" [Dkt. # 75 at 7], nothing in the record remotely suggests that any resident of redrawn District 22 not already planning to run against plaintiff Joseph Thomas will have time to organize and finance a campaign between now and the new deadline of March 15, 2019.  To uphold such a narrowly-targeted "one-count suit identifying one problem" [Dkt. # 75 at 4] in the

absence of injured and unrepresented parties violates basic principles of equity.

6.      The order and final judgment of February 26, 2019, also disregarded appellants'
report that "the Senate desires the opportunity to enact a new redistricting plan redrawing Senate
District 22." [Dkt. # 72 at 3].  The Court gave no explanation of its unwillingness to grant the
Senate that opportunity.  This Court's refusal to give the Senate a reasonable time to act violates
principles of legislative deference established in *Upham v. Seamon*, 465 U.S. 37 (1982), and
*League of United Latin American Citizens v. Clements*, 986 F.2d 728, 814-15 (5th Cir. 1993).

7.      Because the basis for this motion has been succinctly stated herein, appellants ask
leave not to file a separate memorandum in its support.

WHEREFORE, PREMISES CONSIDERED, appellants respectfully move this Court
for a stay of its final judgment and all injunctive relief merged therein, pending resolution of
their appeal.

This the 28th day of February, 2019.

Respectfully submitted,

*s/ Michael B. Wallace*
MICHAEL B. WALLACE (MSB #6904)
CHARLES E. COWAN (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, MS  39205-0651
(601) 968-5534
mbw@wisecarter.com

ATTORNEY FOR DEFENDANTS PHIL
BRYANT, GOVERNOR OF THE STATE OF
MISSISSIPPI, AND DELBERT HOSEMANN,
SECRETARY OF STATE OF THE STATE OF
MISSISSIPPI

TOMMIE S. CARDIN (MSB #5863)
B. PARKER BERRY (MSB #104251)
BUTLER SNOW LLP

3

Suite 1400 1020
Highland Colony Park
Ridgeland, MS 39157
Post Office Box 6010
Ridgeland, MS 39158-6010
Tel: (601) 985-4570
Fax: (601) 985-4500
E-mail: tommie.cardin@butlersnow.com
E-mail: parker.berry@butlersnow.com

ATTORNEYS FOR ALL DEFENDANTS

**CERTIFICATE OF SERVICE**

I, Michael B. Wallace, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record.

This the 28th day of February, 2019.

*s/ Michael B. Wallace*
Michael B. Wallace

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| **JOSEPH THOMAS, et al.** | **PLAINTIFFS** |
| **VERSUS** | **CAUSE NO. 3:18-CV-441-CWR-FKB** |
| **PHIL BRYANT, et al.** | **DEFENDANTS** |

### AFFIDAVIT OF LUCIEN SMITH

STATE OF MISSISSIPPI

COUNTY OF HINDS

1.  My name is Lucien Smith. I am an adult resident citizen of Hinds County, Mississippi. I am over the age of 21 and competent to testify.

2.  I am the duly elected Chairman of the Mississippi Republican Party.

3.  At present, two candidates have filed Qualifying Statements of Intent ("qualifying statements") to run for the Mississippi Senate, District 22.

4.  John Hayes Dent, Jr., filed his qualifying statement to run in District 22 on January 22. Our records reflect that Mr. Dent resides in Yazoo County in the Valley Precinct (Number 1-8). Gary Dwayne Self filed his qualifying statement to run for this District on February 22. Our records reflect that Mr. Self resides in Madison County in the Mount Hope Missionary Baptist Church Precinct (Number 415).

5.  At present, one candidate has filed a qualifying statement to run for Mississippi Senate, District 23.



6. William Briggs Hopson filed his qualifying statement for this district on January 16. Our records reflect that Mr. Hopson resides in Warren County in the Beechwood Precinct (Number 531).

Further affiant sayeth naught.

Lucien Smith

SWORN TO AND SUBSCRIBED BEFORE ME, this 27th day of February, 2019.

NOTARY PUBLIC

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 85075
REBECCA C. SANFORD
Commission Expires
Feb. 12, 2020
RANKIN COUNTY

2

# EXHIBIT 21

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**JOSEPH THOMAS, et al.**                                                 **PLAINTIFFS**

**V.**                                              **CAUSE NO. 3:18-CV-441-CWR-FKB**

**PHIL BRYANT, et al.**                                                 **DEFENDANTS**

## <u>ORDER</u>

This afternoon, two of the three defendants filed a second motion to stay pending appeal.[1] They contend that the remedy ordered by the Court, Plan 1, will prejudice them because the two Republicans who filed to run for Senate District 22 now find themselves in District 23.[2] The movants have attached a February 27, 2019 affidavit from the Chairman of the Mississippi Republican Party.

It is not clear why this information is being presented for the first time on February 28. The affidavit says that Hayes Dent, the better-known of the two Republicans to qualify, filed his candidacy papers more than a month ago, on January 22. The defendants could have raised any concerns with his residency during the trial on February 6 and 7, during the parties' telephone conference with the Court on February 21, or in any of their numerous letters and filings since then. Why they did not is baffling.[3]

It also is surprising that the movants now claim an interest in remedies. The February 21 teleconference—which Secretary Hosemann personally joined—explicitly covered whether the parties sought additional hearings and whether the defendants would be submitting their own

---

[1] The other defendant, the State's chief legal officer, remains on the sidelines.

[2] The movants assert that these individuals will have to file their qualification papers again.

[3] Incumbent District 23 Senator Briggs Hopson arrived at the trial just after it concluded. Mr. Dent never appeared.

Plan. The parties convinced the Court that no further hearings were necessary.[4] The defendants said they would confer to be sure, then made no request at all. The lack of urgency was apparent.

The resulting impression is that the movants sought to raise these new issues only when their first motion for stay pending appeal was denied. Indeed, movants' counsel advised the Court that the Legislature would take up the Court's suggestion to redraw District 22 *only if* the motions for stay were denied here and in the Fifth Circuit. With the impending qualification deadline, and because the Legislature had not redrawn the district or announced that it would take up the matter, the Court felt compelled to move forward with a remedy. Docket No. 74.

There are additional issues that warrant discussion at a hearing. Most importantly, it is not clear that this Court has jurisdiction given the two Notices of Appeal that have already been filed. If jurisdiction is proper, the parties should address whether the additional evidence can be considered, since it is not "newly discovered" and, for that matter, comes from a non-party that has not intervened in this litigation.

A final observation may be worth mentioning. In reviewing the evidence in this case, the Court saw no significant difference between illustrative Plans 1 and 2.[5] If Plan 2 would better protect the movants' partisan interests, assuming that is something they can assert in this litigation, then by all means the parties should see if some sort of compromise can be reached. As in every case over which this Court presides, the parties are encouraged to seek an amicable resolution.

---

[4] That teleconference followed the Court's ruling that it would "decline to order any specific relief while the Mississippi Legislature considers whether to redraw the District and extend the candidate qualification deadline." Docket No. 61.

[5] Plan 3 was the least desirable option, in the Court's view, because it would have affected an additional Senate District and impacted more counties, precincts, and voters.

The plaintiffs shall respond to the pending motion by close of business tomorrow, March 1, 2019. A hearing will be held on Monday, March 4, 2019 at 9:00 A.M.

**SO ORDERED**, this the 28th day of February, 2019.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

3

# EXHIBIT 22

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**JOSEPH THOMAS, et al,**

     **Plaintiffs**

**vs.**                  **Civil Action No. 3:18cv441-CWR-FKB**

**PHIL BRYANT, Governor of**
**Mississippi, et al.,**

     **Defendants.**

## PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION OF DEFENDANTS BRYANT AND HOSEMANN FOR STAY OF FINAL JUDGMENT PENDING APPEAL

The Governor and Secretary of State move "for a stay of this Court's final judgment [Dkt. # 76], entered February 26, 2019, and all injunctive relief merged therein." [Dkt. # 80 at 1]. In other words, they seek a stay of everything the Court has ordered, including its order that the State stop conducting elections pursuant to the racially discriminatory configuration of Senate District 22. For the reasons already stated in Plaintiffs' opposition to the prior motion for stay [dkt. 65], and in this Court's order denying that stay [dkt. 75], this latest motion for a stay should also be denied. There is no likelihood that the appeal by these Defendants will be successful, there is no irreparable harm, and the equities continue to weigh against a stay.

Defendants have not requested any alternative relief. For example, while they complain that the Court "refus[ed] to give the Senate a reasonable time to act," [dkt. # 80 at 2], they do not move in the alternative for the Court to stay or modify its order on remedy so that the Senate will have even more time than it already has had to adopt a remedial plan.

As indicated by the Court's order issued last night [dkt. 85], the legislature has had ample time to adopt a remedial plan yet has done nothing. Despite this Court's announcement February 13 of its finding of a Section 2 violation, the legislative leadership said nothing until February 26 when, in response to a further inquiry from this Court, it stated that it wished to undertake its duty *if* the motions for stay were denied. This is somewhat ironic. The Governor and the Secretary of State have proclaimed there is no time to implement a remedy. But the legislative leadership obviously believes there is enough time to await a decision on the stay motions and then adopt and implement a plan.

Nothing has prevented the legislature from adopting a remedy. (It could have done so contingent upon the denial of a stay). Indeed, it still could do so and depending on the timing, Federal Rule of Civil Procedure 59 authorizes the filing of a motion to alter or amend the judgment in light of the adoption of a plan and the Court could then consider all of the relevant factors.

Of course, time is important, as the Defendants have frequently emphasized. With the qualifying deadline approaching, the Court was justified in moving promptly when the legislature took no action until 13 days had passed and then said simply that it would not do anything until there was a ruling on the stay motions.

Regardless of whether the legislature would consider the residence of the Republican candidates in any plan that it chooses to draw, this Court is not required to do so. Neither Plaintiffs' counsel nor the expert who drew Plaintiffs' plans were aware of the residences of the people who ended up qualifying in the Republican primary and that had nothing to do with the configuration of the plans submitted by Plaintiffs.

The Governor and Secretary of State say that "[n]othing in the record remotely suggests that any resident of redrawn District 22 not already planning to run against Plaintiff Joseph Thomas will have time to organize and finance a campaign between now and the new deadline of March 15, 2019." [Dkt. 80 at 2].    Apart from the fact that many candidates organize and finance their campaigns after they qualify, anyone interested in the potential lines of this district could easily have obtained copies of the potential plans put forward by Plaintiffs so that they could be in a position to decide what to do once a plan was adopted.    Indeed, the plan adopted by the Court was disclosed to Defendants in early December.    Of course, the legislature could have adopted a different remedial plan immediately after the Court's February 13 announcement and set the qualifying deadline whenever it believed appropriate (with the new plan contingent upon the denial of a stay).

With respect to the Court's question about its authority after a notice of appeal is filed, Plaintiffs believe the Court has jurisdiction to issue a stay pending appeal even after the filing of a notice of appeal.    *See* Fed. R. App. Proc. 8; Fed. R. Civ. Proc. 62.    Plaintiffs also believe the Court has jurisdiction to consider a motion to alter or amend the judgment under Fed. R. Civ. Proc. 59 even after the filing of a notice of appeal.    *See* Fed. R. App. Proc. 4(a)(4)(B)(i).

March 1, 2019,

Respectfully submitted,

BETH L. ORLANSKY, MSB 3938
MISSISSIPPI CENTER FOR JUSTICE
P.O. Box 1023
Jackson, MS 39205-1023
(601) 352-2269
borlansky@mscenterforjustice.org

*s/ Robert B. McDuff*
ROBERT B. MCDUFF, MSB 2532
767 North Congress Street
Jackson, MS 39202
(601) 969-0802
rbm@mcdufflaw.com

KRISTEN CLARKE
JON GREENBAUM
EZRA D. ROSENBERG
ARUSHA GORDON
POOJA CHAUDHURI
LAWYERS'COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1401 New York Ave., NW, Suite 400
Washington, D.C. 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
agordon@lawyerscommittee.org
*Admitted Pro Hac Vice*

ELLIS TURNAGE, MSB 8131
TURNAGE LAW OFFICE
108 N. Pearman Ave
Cleveland, MS 38732
(662) 843-2811
eturnage@etlawms.com

PETER KRAUS
CHARLES SIEGEL
CAITLYN SILHAN
WATERS KRAUS
3141 Hood Street, Suite 700
Dallas, TX 75219
(214) 357-6244
pkraus@waterskraus.com
csiegel@waterskraus.com
csilhan@waterskraus.com
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

4

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2019, I electronically filed a copy of the foregoing using the ECF system which sent notification of such filing to all counsel of record.

s/Robert B. McDuff

# EXHIBIT 23

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**JOSEPH THOMAS; VERNON AYERS;**
**and MELVIN LAWSON**                                                    **PLAINTIFFS**

**v.**                                                    **NO. 3:18-cv-00441-CWR-FKB**

**PHIL BRYANT, Governor of the State of**
**Mississippi; DELBERT HOSEMANN,**
**Secretary of State of the State of Mississippi;**
**and JIM HOOD, Attorney General of the**
**State of Mississippi, all in the official capacities**
**of their own offices and in their official**
**capacities as members of the State Board**
**of Election Commissioners**                                                    **DEFENDANTS**

### SUPPLEMENTAL MEMORANDUM OF DEFENDANTS PHIL BRYANT
### AND DELBERT HOSEMANN IN SUPPORT OF
### MOTION FOR STAY OF FINAL JUDGMENT PENDING APPEAL

Governor Phil Bryant and Secretary of State Delbert Hosemann, two of the defendants herein ("Defendants"), respectfully submit this supplemental memorandum in support of their Motion to Stay Final Judgment Pending Appeal [Dkt. #80] to address jurisdictional and evidentiary issues raised by the Court in its Order issued on February 28, 2019 [Dkt. # 85]. In that Order, the Court cited two issues "that warrant discussion at a hearing."[1] [Dkt. #85 at 2]. The first issue is whether the Court "has jurisdiction given the two Notices of Appeal that have already been filed." [*Id.*]. Second, "[i]f jurisdiction is proper, the parties should address whether additional evidence can be considered, since it is not "newly discovered" and, for that matter, comes from a non-party that has not intervened in this litigation." [*Id.*].

---

[1] On February 28, 2019, the Court issued a text order scheduling a hearing to address Defendants' Motion for Stay on Monday, March 4, 2019 at 9:00 am.

## JURISDICTION

Defendants have now filed two Motions for Stay and Notices of Appeal in the Court's docket.[2] The first notice of appeal [Dkt. #62] and motion for stay [Dkt. #63] resulted from the Court's February 16, 2019 Memorandum Opinion and Order [Dkt. #61]. The Court denied [Dkt. #75] the first motion to stay and the Fifth Circuit held that it lacked jurisdiction to consider the first appeal as the issues were rendered moot by virtue of this Court's subsequently-entered Final Judgment on February 26, 2019 [Dkt. #76]. In response, Defendants filed their second notice of appeal [Dkt. #78] and motion to stay [Dkt. #80]. The second stay motion is the one currently pending before the Court. Accordingly, the first issue to consider is what effect the filing of the second notice of appeal has on the jurisdiction of the District Court to consider the pending motion to stay.

As a general rule, the filing of a notice of appeal divests a district court of jurisdiction over aspects of the case involved in the appeal. *See Griggs v. Provident Consumer Disc. Co.,* 459 U.S. 56 (1982). "The filing of a valid notice of appeal from a final order of the district court divests that court of jurisdiction to act on the matters involved in the appeal, except to aid the appeal, correct clerical errors, or enforce its judgment so long as the judgment has not been stayed or superseded." *Fed. Ins. Co. v. Singing River Health Sys.,* 2015 WL 6674868, at *4 (S.D. Miss. Nov. 2, 2015) (quoting *Ross v. Marshall,* 426 F.3d 745, 752 (5th Cir. 2005)); *see also Coastal Corp. v. Texas Eastern Corp.,* 869 F.2d 817, 819 (5th Cir. 1989) (citing the "general rule[ ] [that] a notice of appeal ousts the district court of jurisdiction over the judgment or order appealed[]").

Defendants are seeking a stay pursuant to Rule 62(c) of the Federal Rules of Civil

---

[2] The record is replete with correspondence, orders and other pleadings evidencing the sequence of events occurring since the conclusion of the trial on the merits. Thus, Defendants will forego a lengthy reiteration and narrow the focus to the salient facts.

Procedure, which provides an exception to the general rule. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 578–79 (5th Cir. 1996). Rule 62(c) provides, in part: "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, dissolves or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." In discussing application of Rule 62(c) in the midst of a pending appeal, the Fifth Circuit has held that the district court's authority does not extend to the dissolving the injunction and any modification or alteration of the same is strictly limited to "maintaining the status quo." *Id.* at 578 (citing *Coastal Corp.*, 869 F.2d at 819–20). The rationale behind such limitation is clear: dissolving the injunction or modifying it beyond the status quo would divest the court of appeals from jurisdiction while the matter remained pending before it. *Id.* at 820.

Here, since an injunction has issued ordering a remedy via final judgment and that judgment is now on appeal, the Court's purview under Rule 62(c) is limited to suspending or modifying such injunction. And, any modification to the court-ordered remedial plan beyond maintaining the status quo is prohibited. In fact, Plaintiffs are in agreement that this Court has jurisdiction to issue a stay pending appeal even after the filing of a notice of appeal as they have set forth in their Response in Opposition to Defendants' Motion for Stay. *See* [Dkt. #87]. Accordingly, Defendants move the Court to suspend the remedial injunctive relief via a stay pending the appeal.

## EVIDENCE

In analyzing whether to suspend the injunctive relief via granting Defendants' Motion for Stay, evidence which is relevant to the factors the Court must consider is admissible. Irreparable

3

harm and interest of the public are certainly factors in the stay analysis. [3]  The evidence submitted by Defendants as part of their Motion for Stay is straightforward factual evidence of candidates who have qualified to run for the current District 22 and 23 senate seats. The effect of the remedy issued by the Court is to move two of the candidates who have qualified for the District 22 seat into District 23. Defendants had no way of anticipating what specific relief the Court would ultimately grant given the variations of districts that could be adopted. And, having informed the Court that the Senate desired to enact a plan redrawing District 22 in the event a stay was denied cast further uncertainty on any ultimate remedy. This evidence could not have been presented before the final judgment nor should it have been presented given the Defendants' lack of ability to predict what would be the ultimate remedy. This evidence is relevant to support Defendants' harm and injury resulting from the imposition of the Court's remedy and should therefore be considered by the Court in determining whether to grant their Motion for Stay.

## CONCLUSION

Pursuant to Rule 62(c), this Court has limited jurisdiction to consider whether to suspend the injunctive relief sought in Defendants' Motion for Stay. The Court may consider any evidence relevant to the factors for determining the propriety of granting the Motion for Stay. For the reasons set forth herein, Defendants respectfully request that the Court grant their Motion for Stay of Judgment Pending Appeal.

---

[3] The Court's Order [Dkt. 85] questions whether the affidavit attached to Defendants' Motion to Stay can be considered, since it is not "newly discovered[.]" However, the "newly discovered" requirement comes from Rule 60(b) concerning relief from a final judgment, which is not the requisite rule at issue herein. Instead, Defendants are utilizing Rule 62(c) to seek injunctive relief pending appeal. As stated, part of the analysis for determining whether a stay is appropriate is to consider the harm to Defendants and the interest of the public. The affidavit attached to Defendants' stay motion sets forth those very requirements for the Court's needed consideration. *See* Fed. R. App. Pro. 8(a); *Ruiz v. Estelle*, 650 F.2d 555, 567 (5th Cir. 1981) (finding that under Rule 8(a) the district court should have the opportunity to rule on evidence presented with the motion to stay).

This the 1st day of March, 2019.

Respectfully submitted,

*s/ Tommie S. Cardin*

TOMMIE S. CARDIN (MSB #5863)
B. PARKER BERRY (MSB #104251)
BUTLER SNOW LLP
Suite 1400 1020
Highland Colony Park
Ridgeland, MS 39157
Post Office Box 6010
Ridgeland, MS 39158-6010
Tel: (601) 985-4570
Fax: (601) 985-4500
E-mail: tommie.cardin@butlersnow.com
E-mail: parker.berry@butlersnow.com

ATTORNEYS FOR ALL DEFENDANTS


MICHAEL B. WALLACE (MSB #6904)
CHARLES E. COWAN (MSB #104478)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, MS  39205-0651
(601) 968-5534
mbw@wisecarter.com

ATTORNEY FOR DEFENDANTS PHIL
BRYANT, GOVERNOR OF THE STATE OF
MISSISSIPPI, AND DELBERT HOSEMANN,
SECRETARY OF STATE OF THE STATE OF
MISSISSIPPI

## CERTIFICATE OF SERVICE

I, Tommie S. Cardin, hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record.

This the 1st day of March, 2019.

_s/ Tommie S. Cardin_____

Tommie S. Cardin

46407523.v1

# EXHIBIT 24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**JOSEPH THOMAS, et al,**

      **Plaintiffs**

**vs.**                                    **Civil Action No. 3:18cv441-CWR-FKB**

**PHIL BRYANT, Governor of**
**Mississippi, et al.,**

      **Defendants.**

## PLAINTIFFS' SUPPLEMENTAL RESPONSE
## IN OPPOSITION TO MOTION OF DEFENDANTS BRYANT
## AND HOSEMANN FOR STAYING OF FINAL JUDGMENT PENDING APPEAL

In their supplemental memorandum [doc. 88], the Governor and Secretary of State

correctly quote the case law indicating that any modification of an injunction pursuant to Fed R.

Civ. Proc. 62(c) must be limited to maintaining the status quo. Thus, under Rule 62(c), the Court

has only the option of maintaining the pre-injunction status quo by granting their motion for stay,

which would mean the 2019 election would be conducted under the pre-existing plan that the

Court has held violates the Voting Rights Act, or the option of denying the motion for a stay.

The Court should deny the stay for all of the reasons previously given by the Plaintiffs and by the

Court.

If this Court denies the stay, these Defendants once again will seek a stay from the Fifth

Circuit Court of Appeals. In so doing, they likely will argue --- as they have in their stay motion

now pending in this Court [doc. 80 at 3] --- that this Court failed to follow the principle of

legislative deference expressed in the case law by declining to give the legislature more time

after the legislative leadership responded to this Court's February 25 order by saying (in the

words of defense counsel) that "in the event that the stay motions . . . are denied, the Senate

desires the opportunity to . . . enact a redistricting plan redrawing District 22." [February 26,

2019 letter of defense counsel Michael Wallace to Judge Reeves, attached as an exhibit to

supplemental response].

    However, the Court has the option of further emphasizing its adherence to the principle

of legislative deference by stating, as part of its order denying the stay, that the legislature still

has an opportunity to draw a plan and set a new qualifying deadline if it does so quickly.  (As

mentioned previously, the legislature could adopt the plan with contingency language that

nullifies it if a stay pending appeal ultimately is granted).  If the legislature were to do so, the

State Defendants could file a motion to alter or amend the judgment under Fed. R. Civ. Proc. 59

and the Court could then consider the appropriate factors including whether the plan remedies

the violation.  Given the need to move quickly, the Plaintiffs suggest that if the Court chooses

this course of action, the legislature be informed that any new plan should be adopted and

transmitted to the Court and the parties no later than the end of this week, March 8.  Obviously,

if the legislature fails to adopt an adequate remedial plan by any deadline set by this Court, the

Court's judgment would remain in place and Illustrative Plan 1 would be used in the upcoming

election.

    Of course, the Court had already provided the legislature with notice of its option to draw

a plan and the legislature did nothing for the next 13 days.  But given that the legislature did

express some interest on February 26 on drawing a plan if the stay was denied, and given that the

Court had not previously set a deadline for the legislature to act, providing the legislature with

another brief opportunity would further confirm the Court's adherence to the principle of

legislative deference.

March 3, 2019                                          Respectfully submitted,

BETH L. ORLANSKY, MSB 3938                            *s/ Robert B. McDuff*
MISSISSIPPI CENTER FOR JUSTICE                         ROBERT B. MCDUFF, MSB 2532
P.O. Box 1023                                          767 North Congress Street
Jackson, MS 39205-1023                                 Jackson, MS 39202
(601) 352-2269                                         (601) 969-0802
borlansky@mscenterforjustice.org                       rbm@mcdufflaw.com

KRISTEN CLARKE                                         ELLIS TURNAGE, MSB 8131
JON GREENBAUM                                          TURNAGE LAW OFFICE
EZRA D. ROSENBERG                                      108 N. Pearman Ave
ARUSHA GORDON                                          Cleveland, MS 38732
POOJA CHAUDHURI                                        (662) 843-2811
LAWYERS'COMMITTEE FOR CIVIL                            eturnage@etlawms.com
RIGHTS UNDER LAW
1401 New York Ave., NW, Suite 400                     PETER KRAUS
Washington, D.C. 20005                                 CHARLES SIEGEL
(202) 662-8600                                         CAITLYN SILHAN
erosenberg@lawyerscommittee.org                        WATERS KRAUS
agordon@lawyerscommittee.org                           3141 Hood Street, Suite 700
*Admitted Pro Hac Vice*                                Dallas, TX 75219
                                                       (214) 357-6244
                                                       pkraus@waterskraus.com
                                                       csiegel@waterskraus.com
                                                       csilhan@waterskraus.com
                                                       *Admitted Pro Hac Vice*

                                                       *Attorneys for Plaintiffs*

3

### CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2019, I electronically filed a copy of the foregoing using the ECF system which sent notification of such filing to all counsel of record.

s/Robert B. McDuff



# WISE CARTER
### WISE CARTER CHILD & CARAWAY, P.A.
#### ATTORNEYS AT LAW

MICHAEL B. WALLACE                                    MBW@WISECARTER.COM
JACKSON, MISSISSIPPI                               DIRECT LINE: (601)968-5534
                                                    FACSIMILE: (601)944-7738

February 26, 2019

**VIA EMAIL & U.S. MAIL**
Honorable Carlton W. Reeves
United States District Court
Southern District of Mississippi
501 East Court Street, Suite 5.500
Jackson, MS 39201
reeves_chambers@mssd.uscourts.gov

Re:    *Joseph Thomas, et al. v. Phil Bryant, et al.*; In the United States District Court for
       the Southern District of Mississippi, Northern Division; Civil Action No.
       3:18cv441-CWR-FKB

Dear Judge Reeves:

Pursuant to the order issued last night, counsel for defendants this morning contacted the legislative leadership.

Although we do not represent the Legislature, we are authorized to report that, in the event that the stay motions, now pending before this Court and the Fifth Circuit are denied, the Senate desires the opportunity to perform its constitutional duty and enact a redistricting plan redrawing Senate District 22.

We thank the Court for its attention to this matter.

Sincerely,

WISE CARTER CHILD & CARAWAY, P.A.

Michael B. Wallace

MBW/kp

cc:    All Counsel of Record (via email)

# EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JOSEPH THOMAS, et al,

      **Plaintiffs**

**vs.**                          **Civil Action No. 3:18cv441-CWR-FKB**

PHIL BRYANT, Governor of
Mississippi, et al.,

      **Defendants.**


**PLAINTIFFS' SECOND SUPPLEMENTAL RESPONSE
IN OPPOSITION TO MOTION OF DEFENDANTS BRYANT AND
HOSEMANN FOR STAYING OF FINAL JUDGMENT PENDING APPEAL**

      The Governor and Secretary of State have previously stated that postponing the

qualifying deadline will require party executive committees to convene twice to approve and

certify candidate qualifications --- first for the offices with a qualifying deadline of March 1 and

then again for Senate District 22 and any others with a postponed deadline.  But the Secretary of

State's own election calendar, which is attached as Exhibit 1 to this second supplement,

demonstrates that this is not accurate.  The calendar states that the executive committees must

submit a list of those who qualify on March 5 for the March 1 qualifying deadline.  But the

deadline for *certifying* the qualifications of the candidates is not until June 7.  The calendarsstates

the following with respect to June 7:  "**Qualified Candidate List(s) Deadline, 5:00 p.m.**: State

Executive Committees provide to the Secretary of State's Office a list by name, mailing address

and office sought, of candidates for State, State District and Legislative Offices *who have been

certified as qualified* by each respective State Executive Committee and is therefore eligible to

be placed upon the Primary Election ballot. "  (Emphasis added).  Thus, the party executive

committees will only need to convene one time (and presumably that can be done by phone or

email as well as in person).

March 4, 2019                                    Respectfully submitted,

                                                *s/ Robert B. McDuff*
BETH L. ORLANSKY, MSB 3938                       ROBERT B. MCDUFF, MSB 2532
MISSISSIPPI CENTER FOR JUSTICE                   767 North Congress Street
P.O. Box 1023                                    Jackson, MS 39202
Jackson, MS 39205-1023                           (601) 969-0802
(601) 352-2269                                   rbm@mcdufflaw.com
borlansky@mscenterforjustice.org
                                                ELLIS TURNAGE, MSB 8131
KRISTEN CLARKE                                   TURNAGE LAW OFFICE
JON GREENBAUM                                    108 N. Pearman Ave
EZRA D. ROSENBERG                                Cleveland, MS 38732
ARUSHA GORDON                                    (662) 843-2811
POOJA CHAUDHURI                                  eturnage@etlawms.com
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW                                 PETER KRAUS
1401 New York Ave., NW, Suite 400                CHARLES SIEGEL
Washington, D.C. 20005                           CAITLYN SILHAN
(202) 662-8600                                   WATERS KRAUS
erosenberg@lawyerscommittee.org                  3141 Hood Street, Suite 700
agordon@lawyerscommittee.org                     Dallas, TX 75219
*Admitted Pro Hac Vice*                          (214) 357-6244
                                                pkraus@waterskraus.com
                                                csiegel@waterskraus.com
                                                csilhan@waterskraus.com
                                                *Admitted Pro Hac Vice*

                                                *Attorneys for Plaintiffs*

2

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2019, I electronically filed a copy of the foregoing using the ECF system which sent notification of such filing to all counsel of record.

s/Robert B. McDuff



## Mississippi Secretary of State's Office
## Elections Division
## (800) 829-6786
## www.sos.ms.gov

# 2019 ELECTIONS CALENDAR

**This calendar is provided for planning purposes only. Dates are subject to change or revision. Please refer to the proper citation to the Mississippi Code, the Mississippi Constitution, the United States Code and other cited sources for more complete legal requirements of the calendar entries posted below. Contact the Secretary of State's Office for updates or further information.**

**Mississippi election officials are required by State and Federal law to perform certain duties. This calendar is intended to serve only as an informational tool for election officials and the general public. Omission of any date that requires action by election officials in the State of Mississippi does not relieve these officials of their obligations to perform these duties under the law.**

Calendar entries pertaining to Campaign Finance deadlines are printed in green.

## JANUARY

**1st**    **STATE HOLIDAY**

Terms Begin:  Supreme Court Justice, Circuit Court Judge, Chancery Court Judge and County Court Judge.  (*Miss. Code Ann. §§ 9-5-1, 9-7-1, 9-9-5, 9-4-5*)

**2nd**    Qualifying Period Begins:  First day candidates may qualify for Statewide, State District, Legislative, County and County District Offices in the respective office(s). (*Miss. Code Ann. §§ 23-15-299, 23-15-359*)

**7th**    Term Begins: Court of Appeals Justices. (*Miss. Code Ann. § 9-4-5(2)(c)*)

**8th**    Legislative Session Begins. (*MS Const. 1890 § 36; Miss. Code Ann. § 5-1-7*)

**9th**    Circuit Clerks' Association Annual Seminar in Jackson (January 9 through January 11)

10th    Campaign Finance Reporting Deadline, 5:00 p.m.: Periodic Reports due in the appropriate office for 2018 Judicial Candidates and political committees which supported or opposed a 2018 judicial candidate. *(Miss. Code Ann. § 23-15-807(b)(ii) and (e))*

15th    Voter Roll Maintenance: County Election Commissioners meet to conduct voter roll maintenance and purge ineligible voters from SEMS. *(Miss. Code Ann. § 23-15-153(1)(a))*

21st    **STATE HOLIDAY**

23rd    Election Commissioners' Annual Meeting and Certification Training (January 23 through January 25).

30th    Lobbyist and Lobbyists' Client(s) Annual Reporting Deadline, 5:00 p.m.: Annual Report for lobbyists and clients due in the Secretary of State's Office electronically.

31st    Campaign Finance Reporting Deadline, 5:00 p.m.: Annual Report due in the appropriate office for candidates, current officeholders and political committees, excluding 2018 Judicial Candidates and those political committees which supported or opposed a 2018 judicial candidate. *(Miss. Code Ann. § 23-15-807(b)(iii))*

# FEBRUARY

18th    **STATE HOLIDAY**

25th    Lobbyist and Lobbyists' Client(s) Mid-Session Reporting Deadline, 5:00 p.m.: Mid-Session Report for lobbyists and clients due in the Secretary of State's Office electronically.

# MARCH

1st    Qualifying Deadline, 5:00 p.m.: Party Primary and independent candidates for State, State District, Legislative, County and County District Offices. State Executive Committees forward to the Secretary of State's Office copies of all candidates' statements of intent no later than 6:00 p.m. *(Miss. Code Ann. §§ 23-15-299(3), 23-15-299(4)(b), 23-15-359(3))*

5th    Candidate List(s) Deadline, 5:00 p.m.: State Executive Committees provide to the Secretary of State's Office a list by name, mailing address and office sought, of candidates for State, State District and Legislative Offices who filed qualifying papers on or before the qualifying deadline. *(Miss. Code Ann. § 23-15-296)*

# APRIL

**7**th   *Sine Die*:  Legislative Session Ends *(Miss. Const. 1890 § 36)*

**10**th   Lobbyist and Lobbyists' Client(s) End-of-Session Reporting Deadline, 5:00 p.m.:
End-of-Session Report for lobbyists and clients due in the Secretary of State's Office
electronically.

**29**th   **STATE HOLIDAY**

# MAY

**10**th   Campaign Finance Reporting Deadline, 5:00 p.m.:  Periodic Reports due in the
appropriate office for 2019 candidates and political committees supporting or
opposing 2019 candidates. *(Miss. Code Ann. § 23-15-807(b)(ii)(e))*

**27**th   **STATE HOLIDAY**

# JUNE

**7**th   Permanently Disabled Voters List:  Circuit Clerks deliver the list to the County
Election Commissioners to purge ineligible voters.  *(Miss. Code Ann. § 23-15-629(3))*

Absentee Ballot Applications Available:  Applications for the August Primary
Elections must be available in the Circuit Clerks' Offices to eligible absentee voters.
*(Miss. Code Ann.
§ 23-15-625)*

Qualified Candidate List(s) Deadline, 5:00 p.m.:  State Executive Committees provide
to the Secretary of State's Office a list by name, mailing address and office sought, of
candidates for State, State District and Legislative Offices who have been certified as
qualified by each respective State Executive Committee and is therefore eligible to
be placed upon the Primary Election ballot.

**10**th   Campaign Finance Reporting Deadline, 5:00 p.m.:  Periodic Reports due in the
appropriate office for 2019 candidates and political committees supporting or
opposing 2019 candidates. *(Miss. Code Ann. § 23-15-807(b)(ii)and (e))*

**17**th   Primary Election Sample Ballot Deadline:  The Secretary of State's Office publishes
the Primary Election sample ballot in SEMS.  *(Miss. Code Ann. § 23-15-331)*

**22nd**    UOCAVA 45- Day Deadline: Circuit Clerks' Offices must send by email, mail or fax absentee ballots for the first and second (runoff) Primary Elections to UOCAVA voters who have requested an absentee ballot by state application, Federal Post Card Application (FPCA) or Federal Write-In Absentee Ballot (FWAB) since January 1, 2019. (*Miss. Code Ann. §§ 23-15-685*)

Absentee Ballots Available: Absentee ballots must be available in the Circuit Clerks' Offices as of this date. Absentee ballots must be mailed within 24 hours to voters who submitted an application before ballots became available, once ballots are available. (*Miss. Code Ann. § 23-15-715*)

Permanently Disabled Voters List: Election Commissioners return revised list to Circuit Clerks for Primary Elections. (*Miss. Code Ann. § 23-15-629(3)*)

**24th**    Temporary MS Voter ID Card: Circuit Clerks' Offices must print in color on TVIC paper the Temporary MS Voter ID Card to those voters who submit an application for the MS Voter ID Card during the 45-days preceding the Primary Elections.

**27th**    Absentee Ballot Deadline for Permanently Disabled Voters: Circuit Clerks' Offices mail absentee ballots to voters on the county's revised permanently disabled voters list. (*Miss. Code Ann. § 23-15-629(4)*)

# JULY

**1st**    Voter Registration: Circuit Clerks' Offices may remain open from 8:00 a.m. until 7:00 p.m., including the lunch/noon hour, for voter registration. (*Miss. Code Ann. § 23-15-37(2)*)

Voter Roll Maintenance: County Election Commissioners meet to conduct voter roll maintenance and purge ineligible voters from SEMS. (*Miss. Code Ann. § 23-15-153(1)(c)*)

**2nd**    Voter Registration: Circuit Clerks' Offices may remain open from 8:00 a.m. until 7:00 p.m., including the lunch/noon hour, for voter registration. (*Miss. Code Ann. § 23-15-37(2)*)

**3rd**    Voter Registration: Circuit Clerks' Offices may remain open from 8:00 a.m. until 7:00 p.m., including the lunch/noon hour, for voter registration. (*Miss. Code Ann. § 23-15-37(2)*)

**4th**    **STATE HOLIDAY**

**5th**    Voter Registration: Circuit Clerks' Offices may remain open from 8:00 a.m. until 7:00 p.m., including the lunch/noon hour, for voter registration. (*Miss. Code Ann. § 23-15-37(2)*)

6th    <u>Voter Registration</u>:  Circuit Clerks' Offices MUST remain open from 8:00 a.m. until
       12:00 p.m. for voter registration.  *(Miss. Code Ann. § 23-15-37(2))*

8th    <u>Voter Registration Deadline, 5:00 p.m.</u>:  Applicants who register in-person in the
       Circuit Clerks' Offices no later than 5:00 p.m. today and those who mail registration
       applications post-marked no later than today (7/8/2019) are eligible to vote in the
       August Primary Elections.  *(Miss. Code Ann. §§ 23-15-37(2), 23-15-47(2)(a))*

10th   <u>Campaign Finance Reporting Deadline, 5:00 p.m.</u>:  Periodic Reports due in the
       appropriate office for 2019 candidates and political committees supporting or
       opposing 2019 candidates. *(Miss. Code Ann. § 23-15-807(b)(ii)(e))*

23rd   <u>Appointment of Poll Workers</u>:  Deadline by which County Election Officials appoint
       poll managers for the Primary Elections.  *(Miss. Code Ann. § 23-15-265)*

       <u>Publication of Notice of Poll Worker Training</u>:  County Election Officials must post
       notice of the time and location of poll manager training at the Courthouse and
       publish the same in a newspaper at least five (5) days prior to the date of the
       training. *(Miss. Code Ann. § 23-15-239(1)(4))*

26th   <u>Publication of Notice of L&A Testing</u>:  County Election Officials must provide public
       notice of the time and location of L&A testing at least five (5) days prior to the date
       of the testing.  Candidates, candidate representatives, political parties, news media
       and the public are permitted to observe L&A testing.  *(Miss. Code Ann. § 23-15-
       531.6(3)(b))*

27th   <u>UOCAVA Voter Registration Deadline</u>:  To be eligible to vote in the upcoming
       Primary Elections, Circuit Clerks' Offices must be in actual receipt of a completed
       FPCA from a UOCAVA voter.  *(Miss. Code Ann. § 23-15-677(2))*

       <u>Circuit Clerks' Offices OPEN for Absentee Voting</u> from 8:00 a.m. until 12:00 p.m.
       *(Miss. Code Ann. § 23-15-653)*

29th   <u>Primary Runoff Election, Voter Registration Deadline, 5:00 p.m.</u>:  Applicants who
       register in-person in the Circuit Clerks' Offices no later than 5:00 p.m. today and
       those who mail registration applications post-marked no later than today
       (7/29/2019) are eligible to vote in the August Primary Runoff Elections.  *(Miss. Code
       Ann. §§ 23-15-37(2), 23-15-47(2)(a))*

30th   <u>Campaign Finance Pre-Election Reporting Deadline, 5:00 p.m.</u>:  Pre-Election Reports
       are due from ALL 2019 Primary Election candidates and political committees
       supporting or opposing those candidate in the appropriate office.  *(Miss. Code Ann. §
       23-15-807(b)(1) and (e))*

# AUGUST

**1st**   Poll Manager Training Deadline:  No poll manager or resolution board member may serve in the Primary Election(s) unless he/she has received training within the twelve (12) months immediately preceding the date of the election. *(Miss. Code Ann. § 23-15-239(1)(a))*

**3rd**   In-Person Absentee Voting Deadline, 12:00 p.m.:  Circuit Clerks' Offices OPEN from 8:00 a.m. until 12:00 p.m. *(Miss. Code Ann. § 23-15-653)*

**4th**   L&A Testing Deadline. *(Miss. Code Ann. § 23-15-531.6(3)(a))*

Campaign Finance 48-Hour Reporting Deadline:  Forty-Eight Hour Reports due for candidates and committees supporting or opposing those candidates for contributions received on or after Sunday, July 28 at 12:01 a.m. through Sunday, August 4 at 12:01 a.m. *(Miss. Code Ann. § 23-15-807(b)(1))*

**5th**   Absentee Ballot by Mail Deadline, 5:00 p.m.:  Circuit Clerks' Offices must be in actual receipt of absentee ballots returned by mail for ballots to be timely.  This is not a postmark deadline but an actual receipt deadline. *(Miss. Code Ann. § 23-15-637)*

**6th**   **PRIMARY ELECTION DAY** for Statewide, State District, Legislative, County and County District Offices.  Polling places open from 7:00 a.m. until 7:00 p.m. *(Miss. Code Ann. § 23-15-1031)*

UOCAVA Absentee Ballot Deadline, 7:00 p.m.:  Absentee ballots received by the Circuit Clerks' Offices by 7:00 p.m. from only UOCAVA voters by email, fax or mail are timely, and should be delivered to the voters' respective precincts for processing by the poll managers. *(Miss. Code Ann. § 23-15-699(6))*

**7th**   Late Received Absentee Ballots:  The applications and unopened absentee ballot envelopes received by the Circuit Clerks' Office after the applicable deadlines must be stamped with the date and hour of receipt and retained for twenty-two (22) months. *(Miss. Code Ann. § 23-15-647)*

Qualifying Period Begins:  First day candidates may qualify for County School Board, Municipal Separate School District Trustee, Special Municipal Separate School District Trustee, or Consolidated/Consolidated Line School District Trustee, if any. *(Miss. Code Ann. §§ 37-5-9, 37-7-211, 37-7-225, 37-7-711)*

**13th**   Voter ID Affidavit Ballot Deadline, 5:00 p.m.: Last day affidavit voters who cast an affidavit ballot by reason of photo ID may present an acceptable form of photo ID or complete an affidavit of religious objection in the Circuit Clerk's Office. *(Miss. Const. 1890 § 249-A)*

Appointment of Poll Workers for Primary Runoff Elections: Deadline by which County Election Officials appoint poll managers for the Runoff Elections. *(Miss. Code Ann. § 23-15-265)*

Publication of Notice of Poll Worker Training for Primary Runoff Elections: County Election Officials must post notice of the time and location of poll manager training at the Courthouse and publish the same in a newspaper at least five (5) days prior to the date of the training. *(Miss. Code Ann. § 23-15-239(1)(4))*

Publication of Notice of L&A Testing for Primary Runoff Election: County Election Officials must provide public notice of the time and location of L&A testing at least five (5) days prior to the date of the testing. Candidates, candidate representatives, political parties, news media and the public are permitted to observe L&A testing.

**15th**   Canvass of Returns and Announcement of Results: County Election Officials forward certified election results to the respective State Executive Committee and Secretary of State. *(Miss. Code Ann. § 23-15-597)*

**16th**   Tabulated Statement of Party Vote: Deadline by which State Executive Committees declare primary election results, forward to the Secretary of State the tabulated statements of the vote, announce the names of the party nominees and submit the names of candidates for the Primary Runoff Elections. *(Miss. Code Ann. § 23-15-599)*

Primary Runoff Election Sample Ballot: The Secretary of State's Office publishes the Primary Runoff Election sample ballot in SEMS.

**17th**   Circuit Clerks' Offices OPEN for Primary Runoff Election Absentee Voting from 8:00 a.m. until 12:00 p.m. *(Miss. Code Ann. § 23-15-653)*

Circuit Clerks' Office must mail an absentee ballot available through SEMS to all voters on the county's permanently disabled voters list and to those voters who completed an absentee ballot application before the Runoff Election ballot was available. *(Miss. Code Ann. §§ 23-15-629(4), 23-15-715)*

**20th**   Campaign Finance Pre-Election Reporting Deadline, 5:00 p.m.: Pre-Election Reports are due from only Primary Runoff Election candidates and political committees supporting or opposing those candidate in the appropriate office. *(Miss. Code Ann. § 23-15-807(b)(1) and (e))*

**22nd**  Poll Manager Training Deadline for Primary Runoff Election:  No poll manager or resolution board member may serve in the Primary Runoff Election(s) unless he/she has received training within the twelve (12) months immediately preceding the date of the election. *(Miss. Code Ann. § 23-15-239(1)(a))*

**24th**  In-Person Absentee Voting Deadline, 12:00 p.m., for Primary Runoff Election: Circuit Clerks' Offices OPEN from 8:00 a.m. until 12:00 p.m. *(Miss. Code Ann. § 23-15-653)*

**25th**  L&A Testing Deadline for Primary Runoff Election. *(Miss. Code Ann. § 23-15-531.6(3)(a))*

Campaign Finance 48-Hour Reporting Deadline:  Forty-Eight Hour Reports due for candidates and committees supporting or opposing those candidates for contributions received on or after Sunday, August 18 at 12:01 a.m. through Sunday, August 25 at 12:01 a.m. *(Miss. Code Ann. § 23-15-807(b)(1))*

**26th**  Absentee Ballot by Mail Deadline, 5:00 p.m., for Primary Runoff Election:  Circuit Clerks' Offices must be in actual receipt of absentee ballots returned by mail for ballots to be timely.  This is not a postmark deadline but an actual receipt deadline. *(Miss. Code Ann. § 23-15-637)*

**27th**  **PRIMARY RUNOFF ELECTION DAY** for Statewide, State District, Legislative, County and County District Offices.  Polling places open from 7:00 a.m. until 7:00 p.m. *(Miss. Code Ann. § 23-15-1031)*

UOCAVA Absentee Ballot Deadline, 7:00 p.m., for Primary Runoff Election:  Absentee ballots received by the Circuit Clerks' Offices by 7:00 p.m. only from UOCAVA voters by email, fax or mail are timely, and should be delivered to the voters' respective precincts for processing by the poll managers. *(Miss. Code Ann. § 23-15-699(6))*

**28th**  Late Received Absentee Ballots:  The applications and unopened absentee ballot envelopes received by the Circuit Clerks' Offices after the applicable deadlines must be stamped with the date and hour of receipt and retained for twenty-two (22) months. *(Miss. Code Ann. § 23-15-647)*

# SEPTEMBER

**2nd**  **STATE HOLIDAY**

**4th**  Voter ID Affidavit Ballot Deadline, 5:00 p.m.:  Last day affidavit voters who cast an affidavit ballot by reason of voter ID may present an acceptable form of photo ID or complete an affidavit of religious objection in the Circuit Clerk's Office. *(Miss. Const. 1890 § 249-A)*

5th    <u>Canvass of Returns and Announcement of Primary Runoff Election Results</u>:  County Election Officials forward certified election results to the respective State Party Executive Committee and the Secretary of State.  *(Miss. Code Ann. § 23-15-597)*

6th    <u>Tabulated Statement of Party Vote</u>:  Deadline by which State Executive Committees declare primary runoff election results, forward to the Secretary of State the tabulated statements of the vote, announce the names of the party nominees and submit the names of candidates for the General Election.  *(Miss. Code Ann. § 23-15-599)*

    <u>Qualifying Deadline, 5:00 p.m.</u>:  Candidates for County School Board, Municipal Separate School District Trustee, Special Municipal Separate School District Trustee, or Consolidated/Consolidated Line School District Trustee, if any. *(Miss. Code Ann. §§ 37-5-9, 37-7-211, 37-7-225, 37-7-711)*

    <u>Permanently Disabled Voters List</u>:  Circuit Clerks deliver the list of permanently disabled voters to the Election Commissioners to purge ineligible voters.  *(Miss. Code Ann. § 23-15-629(3))*

    <u>Absentee Ballot Applications Available</u>:  Applications for the November General Election must be made available to eligible absentee voters.  *(Miss. Code Ann. § 23-15-625)*

9th    <u>Voter Roll Maintenance</u>:  County Election Commissioners meet to conduct voter roll maintenance and purge ineligible voters from SEMS.  *(Miss. Code Ann. § 23-15-153(1)(d))*

11th    <u>General Election Sample Ballot Deadline</u>:  The Secretary of State's Office publishes the General Election sample ballot in SEMS.  *(Miss. Code Ann. § 23-15-367(3))*

    Circuit Clerks' Association Annual Summer Conference (Sept. 11 through Sept. 13)

21st    <u>UOCAVA 45-Day Deadline</u>:  Circuit Clerks' Offices send by email, mail or fax absentee ballots for the General Election to UOCAVA voters who previously requested an absentee ballot by state application, FPCA or FWAB since January 1, 2019. *(Miss. Code Ann. §§ 23-15-683, 23-15-691, 23-15-692, 23-15-699)*

    <u>Absentee Ballots Available</u>:  Absentee ballots must be available in the Circuit Clerks' Offices as of this date.  Absentee ballots must be mailed within 24 hours to voters who submitted an application before ballots became available, once ballots are available.  *(Miss. Code Ann. § 23-15-715)*

    <u>Permanently Disabled Voters List</u>:  Election Commissioners return revised list to Circuit Clerks for General Election. *(Miss. Code Ann. § 23-15-629(3))*

**23rd** <u>Temporary MS Voter ID Card</u>: Circuit Clerks' Offices must print in color on TVIC paper the Temporary MS Voter ID Card to those voters who submit an application for the MS Voter ID Card during the 45-days preceding the General Election.

**26th** <u>Absentee Ballot Deadline for Permanently Disabled Voters</u>: Circuit Clerks' Offices mail absentee ballots to voters on the county's revised permanently disabled voters list. *(Miss. Code Ann. § 23-15-629(4))*

**30th** <u>Voter Registration</u>: Circuit Clerks' Offices may remain open from 8:00 a.m. until 7:00 p.m., including the lunch/noon hour, for voter registration. *(Miss. Code Ann. § 23-15-37(2))*

# OCTOBER

**1st** <u>Voter Registration</u>: Circuit Clerks' Offices may remain open from 8:00 a.m. until 7:00 p.m., including the lunch/noon hour, for voter registration. *(Miss. Code Ann. § 23-15-37(2))*

**2nd** <u>Voter Registration</u>: Circuit Clerks' Offices may remain open from 8:00 a.m. until 7:00 p.m., including the lunch/noon hour, for voter registration. *(Miss. Code Ann. § 23-15-37(2))*

**3rd** <u>Voter Registration</u>: Circuit Clerks' Offices may remain open from 8:00 a.m. until 7:00 p.m., including the lunch/noon hour, for voter registration. *(Miss. Code Ann. § 23-15-37(2))*

**4th** <u>Voter Registration</u>: Circuit Clerks' Offices may remain open from 8:00 a.m. until 7:00 p.m., including the lunch/noon hour, for voter registration. *(Miss. Code Ann. § 23-15-37(2))*

**5th** <u>Voter Registration</u>: Circuit Clerks' Offices MUST remain open from 8:00 a.m. until 12:00 p.m. *(Miss. Code Ann. § 23-15-37(2))*

**7th** <u>Voter Registration Deadline, 5:00 p.m.</u>: Applicants who register in-person in the Circuit Clerks' Offices no later than 5:00 p.m. today and those who mail registration applications post-marked no later than today (10/7/2019) are eligible to vote in the November General Election. *(Miss. Code Ann. §§ 23-15-37(2), 23-15-47(2)(a))*

**10th** <u>Campaign Finance Reporting Deadline, 5:00 p.m.</u>: Periodic Reports due in the appropriate office for 2019 candidates and political committees supporting or opposing 2019 candidates. *(Miss. Code Ann. § 23-15-807(b)(ii)(e))*

**14th** **FEDERAL HOLIDAY**

25th   **Publication of Notice of Poll Worker Training**: County Election Commissioners post notice of the time and location of poll manager training at the Courthouse and publish the same in a newspaper at least five (5) days prior to the date of the training. *(Miss. Code Ann. § 23-15-239(1)(4))*

26th   **UOCAVA Voter Registration Deadline**: To be eligible to vote in the upcoming General Election, Circuit Clerks' Offices must be in actual receipt of a completed FPCA from a UOCAVA voter. *(Miss. Code Ann. § 23-15-677(2))*

      **Circuit Clerks' Offices OPEN for Absentee Voting** from 8:00 a.m. until 12:00 p.m. *(Miss. Code Ann. § 23-15-653)*

28th   **Publication of Notice of L&A Testing**: County Election Commissioners must provide public notice of the time and location of L&A testing at least five (5) days prior to the date of the testing. Candidates, candidate representatives, political parties, news media and the public are permitted to observe L&A testing. *(Miss. Code Ann. § 23-15-531.6(3)(b))*

      **General Runoff Election, Voter Registration Deadline, 5:00 p.m.**: Applicants who register in-person in the Circuit Clerks' Offices no later than 5:00 p.m. today and who mail registration applications post-marked no later than today (10/28/2019) are eligible to vote in the November General Runoff Election. *(Miss. Code Ann. §§ 23-15-37(2), 23-15-47(2)(a))*

29th   **Campaign Finance Pre-Election Reporting Deadline, 5:00 p.m.**: Pre-Election Reports are due from only General Election candidates and political committees supporting or opposing those candidate in the appropriate office. *(Miss. Code Ann. § 23-15-807(b)(1) and (e))*

31st   **Poll Manager Training Deadline**: No poll manager or resolution board member may serve in the General Election unless he/she has received training within the twelve (12) months immediately preceding the date of the election. *(Miss. Code Ann. § 23-15-239(1)(a))*

# NOVEMBER

2nd   **In-Person Absentee Voting Deadline, 12:00 p.m.**: Circuit Clerks' Offices OPEN from 8:00 a.m. until 12:00 p.m. *(Miss. Code Ann. § 23-15-653)*

3rd   **L&A Testing Deadline**. *(Miss. Code Ann. § 23-15-541.6(3)(a))*

      **Campaign Finance 48-Hour Reporting Deadline**: Forty-Eight Hour Reports due for candidates and committees supporting or opposing those candidates for contributions received on or after Sunday, October 27 at 12:01 a.m. through Sunday, November 3 at 12:01 a.m. *(Miss. Code Ann. § 23-15-807(b)(1))*

4th   Absentee Ballot by Mail Deadline, 5:00 p.m.: Circuit Clerks' Offices must be in actual receipt of absentee ballots returned by mail for ballots to be timely. This is not a postmark deadline but an actual receipt deadline. *(Miss. Code Ann. §§ 23-15-631(1)(c), 23-15-637)*

5th   **GENERAL ELECTION DAY** for Statewide, State District, Legislative, County, County District and School District Offices. Polling places are open from 7:00 a.m. until 7:00 p.m.

UOCAVA Absentee Ballot Deadline, 7:00 p.m.: Absentee ballots received by the Circuit Clerks' Offices by 7:00 p.m. only from UOCAVA voters by email, fax or mail are timely, and should be delivered to the voters' respective precincts for processing by the poll managers. *(Miss. Code Ann. § 23-15-699(6))*

6th   Late Received Absentee Ballots: The applications and unopened absentee ballot envelopes received by the Circuit Clerks' Office after the deadline must be stamped with the date and hour of receipt and retained for twenty-two (22) months. *(Miss. Code Ann. § 23-15-647)*

11th   **STATE HOLIDAY**

12th   Publication of Notice of Poll Worker Training for General Runoff Election (if necessary): County Election Commissioners post notice of the time and location of poll manager training at the Courthouse and publish the same in a newspaper at least five (5) days prior to the date of the training. *(Miss. Code Ann. § 23-15-239(1)(4))*

13th   Voter ID Affidavit Ballot Deadline, 5:00 p.m.: Last day affidavit voters who cast an affidavit ballot by reason of voter photo ID may present an acceptable form of photo ID or complete an affidavit of religious objection in the Circuit Clerks' Offices. *(Miss. Const. 1890 § 249-A)*

15th   Delivery of General Election Returns Deadline: County Election Commissioners forward to the Secretary of State's Office their county's certified recapitulation from the General Election, which must be signed by a quorum (majority) of the commissioners, and two (2) sets of electoral vote totals for each statewide office by State House district. *(Miss. Code Ann. § 23-15-601, 23-15-603, Miss. Const. §§ 140, 143)*

16th   Circuit Clerks' Offices OPEN for Runoff Election Absentee Voting from 8:00 a.m. until 12:00 p.m. *(Miss. Code Ann. § 23-15-653)*

Circuit Clerks' Office must mail an absentee ballot available through SEMS to all voters on the county's permanently disabled voters list and to those voters who completed an absentee ballot application before the Runoff Election ballot was available. *(Miss. Code Ann. §§ 23-15-629(4), 23-15-715)*

**18th**    Publication of Notice of L&A Testing for Runoff Election:  County Election Commissioners must provide public notice of the time and location of L&A testing at least five (5) days prior to the date of the testing.  Candidates, candidate representatives, political parties, news media and the public are permitted to observe L&A testing.

**20th**    Pre-Runoff Election, Campaign Finance Reporting Deadline, 5:00 p.m.:  Pre-Runoff Election Reports due in the appropriate office for ONLY General Runoff Election candidates and the political committees supporting or opposing any runoff election candidate.  *(Miss. Code Ann. § 23-15-807(b)(i))*

**21st**    Poll Manager Training Deadline for Runoff Election:  No poll manager or resolution board member may serve in the Primary Runoff Election(s) unless he/she has received training within the twelve (12) months immediately preceding the date of the election.  *(Miss. Code Ann. § 23-15-239(1)(a))*

**23rd**    In-Person Runoff Election Absentee Voting Deadline, 12:00 p.m.:  Circuit Clerks' Offices OPEN from 8:00 a.m. until 12:00 p.m.  *(Miss. Code Ann. § 23-15-653)*

**24th**    L&A Testing Deadline for Runoff Election.  *(Miss. Code Ann. § 23-15-531.6(3)(a))*

**25th**    Runoff Election Absentee Ballot by Mail Deadline, 5:00 p.m.:  Circuit Clerks' Offices must be in actual receipt of absentee ballots returned by mail for ballots to be timely.  This is not a postmark deadline but an actual receipt deadline.  *(Miss. Code Ann. §§ 23-15-631(1)(c), 23-15-637)*

Campaign Finance 48-Hour Reporting Deadline:  Forty-Eight Hour Reports due for Runoff Election candidates and committees supporting or opposing those candidates for contributions received on or after Sunday, November 17 at 12:01 a.m. through Sunday, November 25 at 12:01 a.m.  *(Miss. Code Ann. § 23-15-807(b)(1))*

**26th**    **GENERAL RUNOFF ELECTION DAY** for Municipal Separate and/or Consolidated/Consolidated Line School District Trustees.  Polling places are open from 7:00 a.m. until 7:00 p.m.

UOCAVA Absentee Ballot Deadline, 7:00 p.m.:  Absentee ballots received by the Circuit Clerks' Offices by 7:00 p.m. from only UOCAVA voters by email, fax or mail are timely, and should be delivered to the voters' respective precincts for processing by the poll managers.  *(Miss. Code Ann. § 23-15-699(6))*

**27th**    Late Received Absentee Ballots:  The applications and unopened absentee ballot envelopes received by the Circuit Clerks' Office after the deadline must be stamped with the date and hour of receipt and retained for twenty-two (22) months.  *(Miss. Code Ann. § 23-15-647)*

28th   **STATE HOLIDAY**

# DECEMBER

1st   Notice of Party's Intention to Hold Presidential Preference Primary:  The respective chair of each party's State Executive Committee must notify the Secretary of State if the party intends to hold a presidential preference primary.  *(Miss. Code Ann. § 23-15-1085)*

4th   Voter ID Affidavit Ballot Deadline, 5:00 p.m.:  Last day affidavit voters who cast an affidavit ballot by reason of photo ID may present an acceptable form of photo ID or complete an affidavit of religious objection in the Circuit Clerk's Office.  *(Miss. Const. 1890 § 249-A)*

5th   Ascertainment of Vote and Declaration of Results by the Secretary of State:  (*Miss. Code Ann. § 23-15-605*)

6th   Delivery of Runoff Election Returns Deadline:  County Election Commissioners forward to the Secretary of State's Office their county's certified recapitulation from the Runoff Elections, which must be signed by a quorum (majority) of the election commissioners.  *(Miss. Code Ann. § 23-15-603)*

11th   National Voter Registration Act, Systematic Purging Deadline:  This date is within ninety (90) days of a federal election.  No voters may be removed from the voter roll after this date *based upon the confirmation card process.*  However, voters MAY continue to be removed from the voter roll based upon proof of death, conviction of a disenfranchising crime, adjudication of incompetence and a written request for removal signed by the voter.  *(52 U. S. C. A. § 20507)*

25th   **STATE HOLIDAY**

# EXHIBIT 26

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**JOSEPH THOMAS, et al.**                                                    **PLAINTIFFS**

**V.**                                                    **CAUSE NO. 3:18-CV-441-CWR-FKB**

**PHIL BRYANT, et al.**                                                    **DEFENDANTS**

## <u>ORDER</u>

Two of the three defendants have filed a second motion to stay pending appeal. Several responses have been submitted and a hearing was held on March 4, 2019 to consider the issues. The Court has personal and subject matter jurisdiction to consider the present motion.

The movants do not attempt to meet the usual four-part standard for stays pending appeal. Instead, they seek a stay because their preferred candidates for Senate District 22 live outside of the District's new boundaries.

The Court has substantive and procedural concerns. First, as movants' counsel acknowledged at the hearing, these candidates' addresses were not relevant to the determination of a lawful remedy in this case.[1] Even if relevant, though, it is problematic that the candidates' addresses were known to the movants before trial, during trial, and before entry of Final Judgment, but were not raised. *See Puckett v. United States*, 556 U.S. 129, 134 (2009). The movants also never responded to the Court's inquiries into a remedial plan of their own—a plan which could have resolved their current objection.

Given the circumstances, the motion for stay pending appeal must be denied.

**SO ORDERED**, this the 6th day of March, 2019.

                                        s/ Carlton W. Reeves
                                        UNITED STATES DISTRICT JUDGE

---

[1] All plans entered into the record, including the one adopted by the Court, kept incumbents in their Districts.

# EXHIBIT 27

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


JOSEPH THOMAS, ET AL                          PLAINTIFFS

VS.                          CIVIL NO. 3:18CV441-CWR-FKB

PHIL BRYANT, ET AL                            DEFENDANTS



**TRANSCRIPT OF TRIAL**
**VOLUME 1**


BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
FEBRUARY 6, 2019
JACKSON, MISSISSIPPI


APPEARANCES:


FOR THE PLAINTIFFS:  ROBERT B. MCDUFF
                     JON GREENBAUM
                     ARUSHA GORDON
                     POOJA CHAUDHURI
                     BETH L. ORLANSKI


FOR THE DEFENDANTS:  TOMMIE S. CARDIN
                     B. PARKER BERRY
                     MICHAEL B. WALLACE
                     DOUGLAS T. MIRACLE


REPORTED BY:  BRENDA D. WOLVERTON, RPR, FCRR, CRR
              Mississippi CSR #1139

_____


501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4188

1   change by a tremendous amount between the two plans, but the

2   2015 one, given it is under the new lines, is highly relevant.

3   Q   Highly relevant?  Is that what you said?

4   A   Yes.

5            MR. CARDIN:  Your Honor, if I may?

6            THE COURT:  Yes.

7   (SHORT PAUSE)

8            MR. CARDIN:  Your Honor, I have no further questions.

9            THE COURT:  Thank you.

10           MR. GREENBAUM:  Your Honor, quick redirect.

11           THE COURT:  All right.

12                    **REDIRECT EXAMINATION**

13  BY MR. GREENBAUM:

14  Q   Dr. Palmer, we're going to pop up on the screen Exhibit

15  P-15.  Page 15 of that looks at -- looks at the districts, the

16  components of the precincts that are in District 22.  And we

17  have had a lot of discussion in your cross-examination about

18  the Northwest Cleveland and the West Cleveland precincts as

19  being the ones that people in those precincts should have voted

20  for District 22 but they were instead given ballots for another

21  district.  Correct?

22  A   That's correct.

23  Q   And I just want to call your attention because it shows the

24  racial composition of those precincts.  And if you look in

25  Northwest Cleveland, you have a population of 1,672 and a black

1   population of 89.  And then in West Cleveland you have a total

2   population of 3,692 and a black population of 527.  Correct?

3   A   That's correct.

4   Q   Fair to say that these precincts were -- are predominantly

5   white precincts?

6   A   That's right.

7   Q   And would it be fair to say that if voters in those

8   precincts would have gotten the proper ballots and the pattern

9   of voting was the same as what you had been exhibited in other

10  elections, including the exogenous elections that you analyzed

11  in 2015, that the most likely result is that there would have

12  been more votes for the white candidate in Senate District 22

13  than the black candidate in Senate District 22 had those voters

14  been given the proper ballots?

15          MR. CARDIN:  Objection, Your Honor.  That calls for

16  pure speculation.

17          THE COURT:  Objection overruled.

18  A   I think that's a reasonable conclusion.

19          MR. GREENBAUM:  No further questions, Your Honor.

20          THE COURT:  I have a couple of questions and the

21  parties may follow up based on the questions that I ask.  And

22  if this is not the appropriate witness, let me know that as

23  well.

24          One of the issues that Mr. McDuff mentioned in his

25  opening, if the district is reconfigured that the City of

1   witness?

2            MR. CARDIN:   Yes, sir.

3                          **CROSS-EXAMINATION**

4   BY MR. CARDIN:

5   Q    Mr. Cooper, my name is Tommie Cardin, and we have met

6   before.

7   A    Yes, we have.

8   Q    And it's good to see you again.

9   A    Good to see you.

10  Q    Now, Mr. McDuff first contacted you about working on this

11  case somewhere in late January or February of 2018, wasn't it?

12  A    That's correct.

13  Q    Which one of those was it?  Do you recall?

14  A    I think it was probably late January, but I also know that

15  I may not have really started until sometime in late February.

16  I may have done something minor in January, but I know that for

17  two or three weeks in February I was working almost nonstop on

18  a plan for the Governor of Pennsylvania and the Pennsylvania

19  Congressional case.  So I wouldn't have had any time to really

20  do anything on this in that late January to late February

21  time frame.

22  Q    But you would have started sometime around when?

23  A    Sometime in late January would have been when I was first

24  contacted.

25  Q    And when you were first contacted, I believe you testified

 1  Everybody agrees their own expert said so that the best data

 2  comes from endogenous elections which are an election in the

 3  same population with the same district.  That means the only

 4  endogenous election in this case is the election for state

 5  senate in 2015.  That's the only election in which these

 6  borders have been used.  All of the elections in 2003, 2007,

 7  2011 were in an area called District 22 but they could have

 8  called it District 309 for all it matters; it has different

 9  borders, it has different people in it, and those people have

10  different characteristics as voters which are not relevant to

11  the district we have now.  There is only one good election that

12  they have looked at.

13        So, you know, their problem is that even with the one

14  good election they have, they don't have good data because

15  there were bad votes cast in Bolivar County.  And he says,

16  Well, the way I fixed that is I just took Northwest Cleveland

17  and West Cleveland out of my -- out of my calculations and I

18  made a calculation for everything else in District 22 and I

19  don't think those two would have made any difference.

20        But think about it for just a minute.  The problem in

21  Cleveland is that particularly with white turnout is what you

22  have in Cleveland is Delta State University.  And if you just

23  throw those districts out altogether, then you are throwing out

24  two of the lowest performing white turnout districts in the

25  state, because everybody knows that college students don't turn

1    out to vote.  They show up in the census, all right, but they

2    don't turn out to vote.

3        So you have very low-performing white voters who were

4    thrown out of these calculations.  And from what's left, he

5    said the whites overperformed the blacks.  Maybe they do if you

6    don't count all the whites, because he threw out the worst

7    white voters at Delta State.  I'm sure they are lovely people,

8    but we just know what happens with college turnout.

9        So he wants you to throw out official federal

10   statewide statistics based on one election where he has not

11   analyzed the correct population and the population he has

12   missed has every reason to believe may have thrown his numbers

13   off completely.

14       Now, the lack of having even one good election to

15   analyze may be the reason that Dr. Palmer's report does not

16   opine that the current Senate District 22 does not provide

17   black voters with a realistic opportunity to elect candidates

18   of their choice.  It's very peculiar that his opinion says:  If

19   you give me 62 percent, then you will have a realistic

20   opportunity.  But he doesn't offer the opinion that they lack a

21   realistic opportunity now, and they have the burden of proof on

22   that subject.

23       Now, this is not a med/mal case.  You don't have to

24   have an expert opinion that somebody lacks a reasonable

25   opportunity.  Senator Joseph can offer such an opinion, and he

1    Q    But there is certainly nothing wrong with considering race

2    in drawing districts, is there?

3    A    My understanding -- and I am not the lawyer here, but my

4    understanding is that the Supreme Court has frowned on or more

5    importantly more than frowned on a predominant emphasis on race

6    subordinating other redistricting considerations.  And here, I

7    would say you can strip away all of the balancing things of

8    compactness, a little bit more compactness here, a little bit

9    less there, splitting one community, not splitting another

10   community, and just set all of that aside, there is a big red

11   flashing light here which this is a classic example of an

12   instance in which the plan -- each of these plans that

13   Mr. Cooper has constructed, in my opinion, could be regarded as

14   examples of packing and cracking in violation of the Voting

15   Rights Act.

16        And I personally, if somebody showed me these plans and

17   said this is one we came up with, could you -- would you

18   approve of it, I would say don't do that, this is going to be

19   viewed as violating the Voting Rights Act.  It is a clear

20   example.

21   Q    In looking at the illustrative plans, have you looked at

22   the effect that Mr. Cooper's plans would have on Senate

23   District 23?

24   A    I have.

25   Q    And based on your review of his plans, what effect in your

1    adopted.  Do those Minutes reflect any of those criteria?

2    A    Yes, sir, the Minutes do reflect some of these criteria.

3    Q    You don't have to read them.  If you could, just give me a

4    summary of what those criteria were.

5    A    Yes, sir.  We spent a lot of time making sure we had

6    complied with all these criteria over the period of months that

7    it took to get these maps together.  But in general, we

8    complied with all state and federal laws.  At the time, we were

9    under Section 2 and 5 of the Voting Rights Act and we needed to

10   comply with all the requirements that came with those items.

11       The 5 percent deviation was below or below, so really

12   10 percent.  It could be 5 below, it could be 5 above.  And

13   then contiguous territory along with traditional redistricting

14   principles.  And we wanted to try to reduce the number of split

15   precincts and keep some counties whole.

16   Q    Now, I think you mentioned that compliance with state law

17   was one of the -- part of one of the criteria?

18   A    And federal law.

19   Q    Were there any state laws in particular that you recall

20   that the committee was trying to adhere to?

21   A    All of it.

22   Q    With regard to any criteria, any redistricting criteria.

23   A    The traditional principles of our criteria.

24   Q    What was the purpose in adopting those criteria, Senator

25   Flowers?

1  A   We wanted to be fair and, you know, looking at the state

2  and dividing it into 52 parts was not easy with 52 individual

3  Senators having their own opinion of how they think things

4  ought to be drawn.  Well, that took some -- a lot of hard work

5  to try to figure out where the pieces of the puzzle went to

6  make it all work and also while at the same time complying with

7  all the state laws and the federal laws and our Constitution

8  and things of that nature and the criteria that our committee

9  established.

10 Q   After the Standing Joint Committee adopted the criteria,

11 Senator Flowers, could you describe for us the process that you

12 followed generally as a committee after that?

13 A   Yes.  One of the things we did was made it transparent and

14 public.  So we had a public access policy for the Standing

15 Joint Committee over at the Woolfolk Building.  The public

16 could come and go as they wanted and take a look at things and

17 have it open, as could the members of the legislature.

18     So we began meeting with -- I began meeting with our

19 attorneys a good bit and to try to get the ball rolling and

20 figure out how things may look with this overlay but also to

21 get input from each individual Senator.  So we gave them access

22 and had them go over and meet at the Joint Committee room and

23 go through various scenarios of what precinct may go where and

24 how it fit into a new district and the population and all those

25 other criteria we had, what their idea might be.  And that

1   Q   What factors did the committee consider with regard to all

2   of the adjacent districts to Senate District 22?

3   A  Well, we had a unique situation in that there were parts of

4   the state that had a lot of growth and had large segments of

5   population.  Particularly where I live, we had a lot of

6   increase in population.  Not so in the Delta.  The Delta lost

7   population over time, so we had to figure out how to approach

8   that with those districts up and down the Delta and how to come

9   up with a way to solve that, the lost population, and achieve

10   what we wanted to achieve.

11   Q   Was there any consideration of the black voting age

12   percentage population in any of the adjacent districts?

13   A   Yes, sir.  We considered all kind of criteria as we looked

14   at the entire state for every district.

15   Q   What other factors did you consider with regard to the

16   adjacent districts?

17   A  Well, we were fearful of retrogression as we looked south

18   in 23.  22, you had to go get population somewhere.  We

19   couldn't go sneak over to Arkansas and go to the

20   Mississippi River and get some, so we had to get it from

21   somewhere.  And so we were able to achieve that.  Also, we

22   maintained -- we increased our majority-minority districts by

23   two, from 13 to 15, including District 22.

24   Q   Senator Flowers, what were your concerns about

25   retrogression in Senate District 23?