# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

JOSEPH THOMAS; VERNON AYERS; MELVIN LAWSON,

Plaintiffs – Appellees

v.

PHIL BRYANT, Governor of the State of Mississippi, all in the official capacities of their own offices and in their official capacities as members of the State Board of Election Commissioners; DELBERT HOSEMANN, Secretary of State of the State of Mississippi, all in the official capacities of their own offices and in their official capacities as members of the State Board of Election Commissioners,

Defendants – Appellants
_____

On Appeal from the United States District Court for the Southern District of Mississippi; USDC No. 3:18-cv-00441-CWR-FKB

# BRIEF OF APPELLEES

Robert B. McDuff, MSB 2532
767 North Congress Street
Jackson, MS 39202
(601) 969-0802
rbm@mcdufflaw.com

Beth L. Orlansky, MSB 3938
MISSISSIPPI CENTER FOR JUSTICE
P.O. Box 1023
Jackson, MS 39205-1023
(601) 352-2269
borlansky@mscenterforjustice.org

Ellis Turnage, MSB 8131
TURNAGE LAW OFFICE
108 N. Pearman Ave.
Cleveland, MS 38732
(662) 843-2811
eturnage@etlawms.com

Jon Greenbaum
Ezra D. Rosenberg
Arusha Gordon
Pooja Chaudhuri
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington, D.C. 20005
(202) 662-8600
erosenberg@lawyerscommittee.org

Peter Kraus
Charles Siegel
Caitlin Silhan
WATERS KRAUS
3141 Hood Street, Suite 700
Dallas, TX 75219
(214) 357-6244
pkraus@waterskraus.com

*Counsel for Appellees*

JOSEPH THOMAS, *et al.,*
　　　　　Plaintiffs-Appellees,

v.　　　　　　　　　　　　　　　　　　No. 19-60133

PHIL BRYANT, *et al.*,
　　　　　Defendants-Appellants.

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Honorable Court may evaluate possible disqualification or recusal.

1.　　Joseph Thomas, Appellee

2.　　Vernon Ayers, Appellee

3.　　Melvin Lawson, Appellee

4.　　Robert B. McDuff, Lead Counsel for Appellees

5.　　Beth L. Orlansky, Mississippi Center for Justice, Counsel for Appellees

6.　　Jon Greenbaum, Lawyers' Committee for Civil Rights Under Law, Counsel for Appellees

7.　　Ezra D. Rosenberg, Lawyers' Committee for Civil Rights Under Law, Counsel for Appellees

8.　　Arusha Gordon, Lawyers' Committee for Civil Rights Under Law, Counsel for Appellees

9.　　Pooja Chaudhuri, Lawyers' Committee for Civil Rights Under Law, Counsel

for Appellees

10.     Ellis Turnage, Turnage Law Office, Counsel for Appellees

11.     Peter Kraus, Waters Kraus, Counsel for Appellees

12.     Charles Siegel, Waters Kraus, Counsel for Appellees

13.     Caitlyn Silhan, Waters Kraus, Counsel for Appellees

14.     Phil Bryant, Governor of Mississippi, Appellant

15.     Delbert Hosemann, Secretary of State of Mississippi, Appellant

16.     Michael B. Wallace, Wise Carter Child & Caraway P.A., Counsel for Appellants

17.     Charles E. Cowan, Wise Carter Child & Caraway P.A., Counsel for Appellants

18.     T. Russell Nobile, Wise Carter Child & Caraway P.A., Counsel for Appellants

19.     Tommie S. Cardin, Butler Snow LLP, Counsel for Appellants

20.     B. Parker Berry, Butler Snow LLP, Counsel for Appellants

21.     Jim Hood, Attorney General of Mississippi

22.     Douglas T. Miracle, Counsel for the Office of the Mississippi Attorney General

Respectfully submitted,

**_s/Robert B. McDuff_**
May 6, 2019

## STATEMENT REGARDING ORAL ARGUMENT

This case already has been set for oral argument on June 11, 2019.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS ................................................................................. iv

TABLE OF AUTHORITIES .............................................................................. vi

STATEMENT OF JURISDICTION .................................................................... 1

STATEMENT OF THE ISSUES ......................................................................... 2

INTRODUCTION ............................................................................................. 4

STATEMENT OF THE CASE ............................................................................ 7

      A.     Statement of Facts ................................................................... 7

      B.     Litigation of the Case Through Trial ................................. 12

      C.     The District Court's Findings ............................................. 13

      D.     Post-Liability Proceedings in the District Court and This Court ........ 18

SUMMARY OF ARGUMENT ......................................................................... 21

ARGUMENT ................................................................................................. 22

I.  28 U.S.C. § 2284(a) Does Not Require Convening a Three-Judge Court in This Section 2 Case ..................................................................................... 22

    A. Even Assuming 28 U.S.C. § 2284(a) Applies, Defendants Waived Their Right to a Three-Judge Panel ................................................................. 24

    B. The Plain Language of 28 U.S.C. § 2284(e) Limits Three-Judge Courts to Constitutional Challenges ..................................................................... 25

    C. No Canon of Statutory Construction Supports Defendants' Construction ............................................................................................ 27

    D. The Legislative History Does Not Support Defendants' Contention that

Congress Intended Three-Judge Courts to Hear Statutory Challenges to the Apportionment of State Legislative Bodies but Single Judges to Hear Statutory Challenges to Congressional Apportionment ............................29

II.     The Trial Court Did Not Abuse Its Discretion or Commit Clear Error in Rejecting Defendants' Laches Defense .........................................................32

        A. Broad Rules as Urged by Defendants Have No Place in the Doctrine of Laches and District Courts that Decline to Dismiss on Laches Grounds Should Not Be Reversed Absent Extreme Facts that Do Not Exist Here .33

        B. The District Court's Finding that Defendants Were Not Unduly Prejudiced by Any Delay Was Not Clearly Erroneous .................................................36

III.    Contrary to Defendants' Contention, There Is No *Per Se* Rule Against Section 2 Claims in Bare Majority-Minority Districts, and the District Court Committed No Error in Its Finding Regarding Turnout Differentials .........44

        A. No *Per Se* Rule Prohibits Section 2 Claims in Bare Majority-Minority Districts .................................................................................................45

        B. The District Court's Finding Regarding Turnout Differentials Is Not Clearly Erroneous and, Even if It Were, Proof of Depressed Political Participation Is Not Essential to a Section 2 Claim .................................49

IV.     Any Claim of Error Regarding Remedy Is Moot Because the Mississippi Legislature Exercised Its Prerogative and Adopted the Plan that Is To Be Used for the Election ....................................................................................54

V.      In Response to the Amicus Argument, the District Court Explained that It Examined the African-American Representation Gap Solely to Demonstrate that No Affirmative Defense of Proportional Representation Existed ..........55

CONCLUSION .........................................................................................................55

CERTIFICATE OF SERVICE ...............................................................................58

CERTIFICATE OF COMPLIANCE .......................................................................59

# TABLE OF AUTHORITIES

## CASES

*Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n,* 366 F. Supp. 2d 887 (D. Ariz. 2005).... …34, 37, 39

*Armour v. Ohio,* 925 F.2d 987 (6th Cir. 1991) ...................................... 24, 26

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ................................................ 46, 47

*Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976 (D.S.D. 2004) ........................ 9

*Bouchikhi v. Holder*, 676 F.3d 173 (5th Cir. 2012) ...................................... 25

*Chestnut v. Merrill*, 356 F. Supp. 3d 1351 (N.D. Ala. 2019) ............... passim

*Chestnut v. Merrill*, 2019 WL 1376480 (N.D. Ala. Jan. 28, 2019) ............. 34

*City of El Paso, Tex. v. El Paso Entm't Inc.,* 382 Fed. App'x 361 (5th Cir. 2010).......................................... 32

*Clark v. Calhoun Cnty.*, 21 F.3d 92 (5th Cir. 1994) ............................... 21, 54

*Envt'l Def. Fund, Inc. v. Alexander*, 614 F.2d 474 (5th Cir. 1984) ............. 36

*Fouts v Harris,* 88 F. Supp. 2d 135 (S.D. Fla. 1999) ............................ 41, 42

*Hagans v. Lavine,* 415 U.S. 528 (1974)....................................................... 26

*Jeffers v. Beebe*, 895 F. Supp. 2d 920 (E.D. Ark. 2012) .............................. 47

*Jeffers v. Clinton*,  730 F. Supp. 196 (E.D. Ark. 1989) .......................... 42, 43

*Jeffers v. Clinton*,  498 U.S. 1019 (1991) .................................................... 43

*Kalson v. Patterson*,  542 F.3d 281 (2d Cir. 2008)...................................... 24

*Kingman Park Civic Ass'n v. Williams,* 348 F.3d 1033 (D.C. Cir. 2003).......................................................45, 46

*Lamie v. U.S. Trustee,* 540 U.S. 526 (2004). ................................................ 25

*Larios v. Cox*, 305 F. Supp. 2d 1335 (N.D. Ga. 2004). ................................ 40

*Lopez v. Hale Cty., Tex.*, 506 U.S. 1042 (1993). ......................................... 37

*Lopez v. Hale Cty., Tex.*, 797 F. Supp. 111 (D. Mass 1986). ...................... 37

*LULAC v. Perry,* 548 U.S. 399 (2006). ................................................. passim

*LULAC of Tex. v. Texas*, 318 F. App'x 261 (5th Cir. 2009). ........................ 24

*MacGovern v. Connolly*, 637 F. Supp. 111 (D. Mass. 1986) ............... passim

*Matter of Bohart*, 743 F.2d 313 (5th Cir. 1984) ......................................... 36

*Martin v. Allain*, 658 F. Supp. 1183 (S.D. Miss. 1987)................................. 9

*Maxwell v. Foster*, 1999 WL 33507675 (W.D. La. Nov. 24, 1999)............. 39

*Meek v. Metro Dade Cnty.*, 908 F.2d 1540 (11th Cir. 1990)....................... 46

*Md. Citizens for a Representative Gen. Assembly v. Governor of Md.,*
    429 F.2d 606 (1970) ................................................................................ 39

*Moore v. Leflore Cty. Bd. of Election Comm'rs,*
    502 F.2d 621 (5th Cir. 1974) .................................................................. 46

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.,*
    894 F.3d 924 (8th Cir. 2018) ............................................................ 45, 47

*Monroe v. City of Woodville*, 881 F.2d 1327 (5th Cir. 1989). ..................... 17

*NAACP v. Fordice*, 252 F.3d 361 (5th Cir. 2001) .................................. 52, 54

*Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.,*
    40 F.3d 698 (5th Cir. 1994) .............................................................. 32, 35

*Old Person v. Brown*, 182 F.Supp.2d 1002 (D. Mont. 2002)...................... 26

*Page v. Bartels*, 248 F.3d 175 (3d Cir. 2001)............................................. 26

*Pope v. Cty. of Albany*, 687 F.3d 565 (2d Cir. 2012) ............................ 45, 46

*Rangel v. Attorney Gen.,* 8 F.3d 242 (5th Cir. 1993) .................................. 52

*Retractable Techs, Inc. v. Becton Dickinson & Co.,*
   842 F.3d 883 (5th Cir. 2016) ...................................................... 32

*Reynolds v. Sims*, 377 U.S. 533 (1964) .................................................. 39, 40

*Rural W. Tenn. African-Am. Affairs Council v. Sundquist*,
   209 F.3d 835 (6th Cir. 2000) ...................................................... 26

*Save Our Wetlands, Inc. v. U.S. Army Corps. of Eng'rs*,
   549 F.2d 1021 (5th Cir. 2010) .................................................... 32

*Simkins v. Gerrette*, 631 F.2d 287 (4th Cir. 1980) .................................... 37

*Teague v. Attala Cty.*, 92 F.3d 283 (5th Cir. 1996) ............................... 11, 21

*Thomas v. Bryant*, 919 F.3d 298 (5th Cir. 2019) ................................. passim

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ............................................. 4, 49

*U.S. v. Atl. Research Corp.,* 551 U.S. 128 (2007) ...................................... 27

*U.S. ex rel. Vaughn v. United Biologics, L.L.C.*,
   907 F.3d 187 (5th Cir. 2018)  .................................................... 28

*U.S. v. Kaluza,* 780 F.3d 647 (5th Cir. 2013) ............................................ 27

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) ........................................ 40

*White v. Daniel,* 909 F.2d 99 (4th Cir. 1990) ........................................ 35, 41

*Whitman v. Am. Trucking Ass'n,* 531 U.S. 457 (2001) ................................ 28

**STATUTES**

28 U.S.C. § 1292(a) ...................................................................... 1

28 U.S.C. § 1331 ........................................................................ 1

28 U.S.C. § 1343(a) ....................................................... 1

28 U.S.C. § 2284(a) ..................................................... 21

28 U.S.C. § 2284(b)(1)................................................. 24

28 U.S.C. § 2284(e) ..................................................... 22

52 U.S.C. § 10303........................................................ 29

52 U.S.C. § 10304........................................................ 29

52 U.S.C. § 10306........................................................ 29

## SECONDARY SOURCES

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ............................................. 28

17A Charles Alan Wright et al., *Federal Practice & Procedure* § 4235 (3d ed. 2007) ................................................ 24

S. Rep. 94-204 (1975), 1975 WL 12516 ..................................... 30

## STATEMENT OF JURISDICTION

This Court has jurisdiction of this appeal from a final judgment of the district court under 28 U.S.C. 1292(a)(1).  The district court had jurisdiction under 28 U.S.C. 1331 and 1343(a).

# STATEMENT OF THE ISSUES

1. Does the word "constitutionality" in the three-judge court provision of 28 U.S.C. § 2284(a) apply to both "the apportionment of congressional districts" and "the apportionment of any statewide legislative body," or does it modify only "the apportionment of congressional districts" so that purely Section 2 Voting Rights Act challenges are heard by single-judges for congressional districts but three-judge courts for statewide legislative bodies?

2. In this Voting Rights Act challenge to a single state senate district where the Complaint was filed 13 months before the election and where the district court made a factual finding that the timing of the case caused no undue prejudice, is that finding clearly erroneous and did the district court abuse its discretion to such an extent that the case should be dismissed on laches grounds?

3. Under Section 2 of the Voting Rights Act, is there an absolute prohibition on any minority vote dilution challenge when the district contains a majority-minority voting age population irrespective of how slim the majority is and whether that population can elect candidates of choice?

4. Did the district court commit clear error in finding that African-American turnout was lower than white turnout in the last four state senate elections in District 22, and if so, would that be sufficient to reverse the district court's liability finding?

5. Is the district court's ruling on remedy moot now that the legislature adopted a remedial plan for the upcoming election?

# INTRODUCTION

Vote dilution cases under Section 2 of the Voting Rights Act are proven by meeting the three preconditions set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986), and demonstrating that the totality of the circumstances establish that minority voters have less opportunity than others to elect candidates of their choice. In this claim involving one Mississippi legislative district, Senate District 22, the candidates of choice of African-American voters lost in every state senate election from 2003 to the present and also lost within District 22 in every statewide election since 2003 involving African-American and white candidates. ROA.363–64. The district court correctly concluded that though District 22 is presently 50.77 percent in black voting age population (BVAP), "white bloc voting in District 22 defeats the African-American community's candidate of choice." ROA.382–83. The court also noted that "although African-American voters in District 22 are already sufficiently numerous and geographically compact as to constitute a majority, the District could be redrawn to increase the BVAP by at least 10 additional percentage points" with plans that "satisfy traditional redistricting criteria" and "show that the BVAP can be increased without impairing the District's compactness." ROA.364; ROA.367; ROA.380. This could be done, said the court, simply by redrawing District 22 and one adjacent district, leaving the other 50 state senate districts undisturbed. ROA.387.

This showing of the Section 2 preconditions under *Gingles* was bolstered by Plaintiffs' evidence on the Senate factors. ROA.383–86. This included the district court's agreement with Plaintiffs' expert's conclusion, based on ecological inference analysis, that "[o]n average, white turnout is 10.2 percentage points higher than black turnout" in the last four state senate elections in District 22. ROA.363. Moreover, the court found that African-Americans are underrepresented in the Mississippi legislature. ROA. 385–86. After a comprehensive review, the court found that "plaintiffs have established District 22's lines result in African-Americans having less opportunity than other members of the electorate to elect the State Senator of their choice." ROA.386.

After this Court's stay panel denied Defendants' stay motion on liability, ROA.557–58, but explicitly gave the legislature time to adopt its own plan (a point emphasized by the district court even after it adopted an interim remedial plan), the legislature easily did so on March 26 with a plan that shifted five precincts from District 22 to 13 and three precincts from 13 to 22 such that the BVAP was increased from 50.8 to 58.1 percent in District 22 and decreased from 69.3 to 61.8 percent in District 13. ROA.617; ROA.621. No party challenged the plan and it is in place for the upcoming election. Candidates from both parties have qualified for the August primaries in Districts 13 and 22.

Defendants do not dispute that African-American candidates of choice lost within District 22 in the last four state senate elections and in the last seven black-white statewide elections (2003–2015) due to white bloc voting.  Instead, this appeal is largely about bars they say should be imposed to preclude merits review.  Br. at 8.  They contend a three-judge court was required even though a common-sense reading of the statute is against them and no court has adopted their reasoning.  *Id.*  They claim laches should be invoked even though the case was filed thirteen months before the primary election and the district court, which is charged with weighing the equities around laches, found no undue prejudice.  *Id.* at 8–9.  They claim there is an absolute prohibition on vote dilution challenges to all majority-minority districts, even though the Supreme Court has recognized that "it may be possible for a citizen voting-age majority to lack real electoral opportunity," *LULAC v. Perry*, 548 U.S. 399, 428 (2006), and this Court has repeatedly rejected such a prohibition.

Defendants' only real merits-based contention on appeal is that the district court erred by not blindly accepting statewide, self-reporting census data on voter participation in even numbered years.  Br. at 29.  But there was no error, much less clear error, in the district court's agreement with Plaintiffs' expert that the better data was from his ecological inference measurements based on actual turnout at the

precincts in this particular senate district in the quadrennial state office elections in odd-numbered years.

## STATEMENT OF THE CASE

A.  Statement of Facts

African-Americans comprise 35 percent of Mississippi's voting age population (VAP).  ROA.1295.  The Mississippi Senate consists of 52 members who run concurrently from separate districts every four years, with an election this year.  ROA.371.  In the 2012 senate redistricting plan challenged in this action, 15 (28.9 percent) of the 52 senate districts are majority African-American in VAP. ROA.371, 385–86.  There are 13 African-American members of the Mississippi Senate (25 percent), all of whom are from districts that are at least 55.1 percent in BVAP.  ROA.1295.  The two majority-black districts in the 2012 plan that are under 55 percent BVAP, District 29 and District 22, have white representatives. ROA.371; ROA.386 n.77.

Only one of those districts, District 22, is challenged here.  It was "the second-largest senate district in Mississippi, encompassing 2,166 square miles and spanning more than 100 miles from tip to toe."  ROA.359.  The challenged district included six counties, "all of Sharkey County and parts of Bolivar, Washington, Humphreys, Yazoo, and Madison Counties."  ROA.371.

All of these counties are located in the Mississippi Delta except Madison County.  ROA.360–61.  The Mississippi Delta has some of the richest soil in the nation.  ROA.361.  Before the soil could be used, the Delta's hardwood forests of trees needed to be cleared, initially by slaves, and after the Civil War, by emancipated slaves.  *Thomas v. Bryant*, 919 F.3d 298, 301 (5th Cir. 2019).  As a result, the land in the Delta was worked by tens of thousands of African-American laborers for the benefit of a small number of white landowners.  ROA.361.  At the beginning of the twentieth century, almost 90 percent of the population of the Delta was African-American.  ROA.361.  They suffered appalling poverty.  ROA.361; *Thomas*, 919 F.3d at 301.  Though many African-Americans moved from the Delta, it has remained majority African American.  ROA.361; ROA.563–64.

Flowing from this history, African-Americans are depressed socioeconomically compared to whites in the Delta region.  ROA.361.  In District 22, these socioeconomic differences are dramatic, as demonstrated by the following Table:

### SOCIO-ECONOMIC PROFILE OF DISTRICT 22

|  | *AfricanAmericans* | *Whites* |
|---|---|---|
| *Poverty Rate* | 41.2% | 8.8% |
| *Median Household Income* | $23,741 | $66,736 |

| | | |
|---|---|---|
| *SNAP Participation* | 40.3% | 4.3% |
| *High School Dropout Rate* | 28.7% | 9.8% |
| *Bachelor's Degree Attainment* | 14.0% | 38.6% |
| *Median Full-time Wage* | $20,256 | $40,485 |
| *Adults Without Health Insurance* | 29.1% | 11.5% |

ROA.368.

African-Americans in Mississippi, including in the Delta, have also suffered from a long history of discrimination in relation to the right to vote, a fact Defendants acknowledged at trial. ROA.383 n.70. One of the legacies of this discrimination is a pattern of racially polarized voting that infects elections throughout Mississippi. *See Martin v. Allain*, 658 F. Supp. 1183, 1194 (S.D. Miss. 1987) ("racial polarization of voters exists throughout the State of Mississippi"). This pattern is apparent in the area encompassed by Senate District 22.

Using the standard technique of ecological inference, Plaintiffs' expert Dr. Maxwell Palmer analyzed the last four senate elections in District 22 (2003, 2007, 2011, and 2015) and the results from seven exogenous general statewide elections between black and white candidates from those same election cycles in District 22. ROA.362–63; ROA.1069. In each contest, Dr. Palmer found that voting was racially polarized; African-American voters were politically cohesive; and the

candidates preferred by African-American voters lost each time as a result of white bloc voting.  ROA.363; ROA.1069–70.

The following tables summarize Dr. Palmer's results:

**EI Estimates for General Elections in Senate District 22**

| District 22 Election Year | Estimated Black Vote Percentage for Black-Preferred Candidate(s) | Estimated Non-Black Vote Percentage for Black-Preferred Candidate(s) | Actual Vote Percentage for Black-Preferred Candidate(s) |
|---|---|---|---|
| 2003 | 87.7% | 14.4% | 44.3% |
| 2007 | 86.1% | 8.0% | 41.3% |
| 2011 | 82.5% | 16.2% | 46.1% |
| 2015 | 92.8% | 11.4% | 46.1% |

**EI Estimates in Senate District 22 for Statewide Exogenous Elections**

| District 22 Election Year | Position | Estimated Black Vote Percentage for Black-Preferred Candidate | Estimated Non-Black Vote Percentage for Black-Preferred Candidate | Actual Vote Percentage for Black-Preferred Candidate |
|---|---|---|---|---|
| 2003 | Lieutenant Governor | 87.7% | 10.4% | 43.9% |
| 2003 | Treasurer | 91.8% | 19.0% | 49.1% |
| 2007 | Commissioner of Insurance | 86.0% | 12.6% | 49.0% |
| 2011 | Governor | 85.6% | 9.3% | 47.8% |
| 2015 | Governor | 82.4% | 7.7% | 36.7% |
| 2015 | Commissioner of Agriculture | 88.3% | 9.1% | 41.8% |
| 2015 | Secretary of State | 90.5% | 8.7% | 42.1% |

ROA.1083.

As the courts have recognized, socioeconomic differences and the history of discrimination touching the right to vote are correlated with depressed minority voter participation. ROA.384; *Teague v. Attala Cty.,* 92 F.3d 283, 294 (5th Cir. 1996). In the last four elections in District 22, Dr. Palmer's analysis showed that white turnout was, on average, 10.2 percentage points higher than African American turnout, and the disparity was statistically significant in three of the four elections. ROA.363–64; ROA.1071.

**EI Estimates for Voter Participation in Elections for Senate District 22**

| Year | Estimated Black VAP Percentage Voting in Election | Estimated Non-Black VAP Percentage Voting in Election |
|---|---|---|
| 2003 | 34.7% | 45.0% |
| 2007 | 24.7% | 39.3% |
| 2011 | 31.3% | 39.3% |
| 2015 | 29.6% | 36.9% |

ROA.363; ROA.1083.

The candidates of choice of African-American voters lost the 2003, 2007, and 2011 elections due to white bloc voting. ROA.1083. The district used in those elections had a 49.82 percent BVAP as of the 2010 census. ROA.993. When the legislature adopted the 2012 plan, it increased that figure from 49.82 to 50.77 percent, barely making it into the list of majority-minority VAP districts. ROA.993–94. This one percentage point increase, however, did not change the

fact that African-American voters could not elect their candidate of choice in District 22, as confirmed by the 2015 election. ROA.362.

B. Litigation of the Case Through Trial

Plaintiffs Joseph Thomas, Melvin Lawson, and Vernon Ayers filed this action on July 9, 2018, alleging that Senate District 22, as drawn in the 2012 Mississippi Senate redistricting plan, diluted African American voting strength in violation of Section 2 of the Voting Rights Act. ROA.20–29; ROA.357.

Thomas is a registered voter in District 22. ROA.21. Thomas had run for election in District 22 in 2015, the one election held under the challenged plan. ROA.21. He lost in the general election. ROA.21. He knew that it would be an "uphill battle" to defeat the white candidate given the demographics of District 22, but he "ran hard" and spent a "quite a bit" of this own money attempting to win. ROA.358. Thomas had previously won election to the Senate from District 23 in 2003 but lost reelection in 2007. ROA.357–58. Lawson is a life-long resident of the Delta and a registered voter in District 22. ROA.359, ROA.823. He has worked on several political campaigns. ROA.827. He testified that holding the state senate elections in years where there are no presidential or congressional elections depressed African-American turnout because there are fewer transportation options on odd-year election days. ROA.359; ROA.825–26. Ayers is a registered voter in District 22. ROA.359.

Plaintiffs filed this action against Mississippi's Governor, Secretary of State, and Attorney General, the three members of the State Board of Election Commissioners.  ROA.21–22; ROA.359.

After filing an answer, ROA.76–83, Defendants moved for summary judgment on September 4, 2018, claiming they were not proper defendants and that the case was barred on statute of limitations and laches grounds.  ROA.134–56. Two weeks before trial began, Defendants suddenly filed a motion to convene a three-judge court or dismiss the case.  ROA.243–45.  The district court denied that motion two days before trial.  ROA.331–35.

The case was tried on February 6 and 7, 2019.  ROA.355–56.  On February 13, 2019, the district court issued an Order, advising that it had found liability with a more detailed opinion to follow.  ROA.355–56.  The district court stated it was entering this Order as soon as possible to give the legislature time to enact a remedial plan.  ROA.355-56.

C. The District Court's Findings.

On February 16, 2019, the district court issued its Memorandum Opinion and Order.  The court found that Defendants were properly named.  ROA.374–75. With respect to laches, the court held that Plaintiffs Lawson and Ayers had no prior basis to believe that they had a legal claim.  ROA.377.  More important, the court found that "[t]he evidence in our case weighs against a finding of undue

prejudice," noting that the case had been filed "16 months before the 2019 general election, 13 months before the primaries, and eight months before the qualification deadline." ROA.379. The court concluded that "[t]his timeframe is more than enough to litigate [Plaintiffs'] single-district, single-count claim." ROA.379.

Moving to the merits, the district court noted that Defendants did not contest the first *Gingles* precondition. ROA.379. The court found that District 22 already was majority-minority and Plaintiffs' illustrative districting plans demonstrated that the BVAP could be increased without impairing compactness. ROA.380.[1]

The district court also found that Plaintiffs satisfied the second and third *Gingles* preconditions. ROA.382–83. The court relied on Dr. Palmer's unrebutted analysis in the state senate elections from 2003–2015—which demonstrated that in the last four senate elections in District 22 and in the results in District 22 from seven exogenous general statewide elections between black and white candidates—white bloc voting routinely defeated the candidates of choice of African-American voters. ROA.362–63; ROA.382–83.

Defendants' expert Dr. Peter Morrison did not contest that Plaintiffs satisfied the second *Gingles* precondition or that voting is racially polarized. ROA.379–80.

---

[1] Defendants' expert Peter Morrison did not dispute that each of Plaintiffs' Illustrative Plans was acceptable in terms of population deviation, compactness and contiguity, and also testified he had no grave concerns that any of the plans subordinated traditional redistricting principles. ROA.961–62.

Dr. Morrison did not contest the soundness of Dr. Palmer's analysis, his use of ecological inference analysis, or his reported results. ROA.380. Instead, Dr. Morrison contended that the success of African-American candidates of choice in local elections in the various counties within District 22 somehow rebutted their lack of success in senate and statewide elections within District 22. ROA.381. Dr. Morrison attempted to rebut Plaintiffs' evidence on the third *Gingles* precondition by looking at the results of various county and sub-county elections within the counties contained wholly or partially in District 22. ROA.381. The district court found that Dr. Morrison's "methods were unreliable and led him to incorrect facts." ROA.380. Among the flaws the district court found were that the elections Dr. Morrison included were all from areas with higher African-American percentages than that of District 22; that he inaccurately coded a candidate's race or a winning candidate as a losing candidate on several occasions; that he lacked evidence that some candidates were preferred by African-American voters and instead he assumed that African-American voters preferred African-American candidates; and that he included uncontested elections, which he admitted on cross-examination only indirectly shed light on the third *Gingles* precondition. ROA.380–81; ROA.384–85; ROA.941–64.

Dr. Morrison also used Census survey data from even-year federal elections to assert that black turnout exceeded white turnout in Mississippi. ROA.381. On

cross-examination, he admitted that the data he reported from the Census was statewide, as opposed to limited to District 22; that he did not look at voter turnout in the odd-numbered state election years, and that the Census explicitly cautions that survey respondents overreport their voting behavior. ROA.381; ROA.960–62. After hearing both experts' testimony on this subject, the district court found that Morrison sought to "minimize the on-the-ground realities" by relying on the surveys, which "look at the wrong jurisdiction [statewide as opposed to District 22-specific], the wrong election years, and rely upon known issues with self-reported voting surveys—issues that EI [ecological inference], in contrast, seeks to overcome." ROA.384.

After concluding that Plaintiffs proved all three *Gingles* preconditions, the district court examined the Senate factors, part of the overall totality of circumstances test. ROA.383–85. The district court found that Plaintiffs satisfied Senate factor one regarding the history of discrimination; factor two regarding racially polarized voting; factor five regarding socioeconomic disparities and depressed political participation; and factor seven regarding the election of minority officials. ROA.383–85.

Regarding Senate factor seven, the district court noted that African-American candidates had consistently been defeated in District 22 elections and African-Americans comprise a disproportionally low number of senators, "[i]n

plain English, Mississippi's Senate is much whiter than Mississippi." ROA.385–86.[2] The district court rejected Defendants' attempt to "reframe the issue and look at local offices in District 22" because these local candidates had succeeded in districts with a higher BVAP than that of District 22, and their success said little about the ability of African-American candidates to win across District 22. ROA.385.

"Having satisfied the three *Gingles* preconditions," said the district court, "and given the persuasive evidence on Senate Factors one, two, five, and seven, the plaintiffs have established that District 22's lines result in African-Americans having less opportunity than other members of the electorate to elect the State Senator of their choice." ROA.386.

Finally, as pertaining to liability, the district court rejected Defendants' argument that, as a matter of law, Plaintiffs were precluded from challenging a district with a majority-black VAP. ROA.386–87. The district court cited this Court's decision in *Monroe v. City of Woodville, Miss*., 881 F.2d 1327, 1329 (5th Cir. 1989), which rejected the same argument based on "[u]nimpeachable authority from our circuit." ROA.386–87.

---

[2] The district court specifically noted that this representation gap in the Senate was not sufficient to establish Section 2 liability and specifically noted there is no right to proportional representation. ROA.385. The court simply engaged in the analysis to demonstrate there was no affirmative defense based on the existence of proportional representation. ROA.385–86.

After finding liability, the district court said it would give the legislature the first opportunity to redraw District 22.  ROA.387.

D. Post-Liability Proceedings in the District Court and This Court

On February 19, three days after the district court issued its Memorandum Opinion and Order and before Judgment was entered, the Governor and Secretary of State, but not the Attorney General, filed a Notice of Appeal and filed a Motion to Stay Order Pending Appeal in the district court.  ROA.389–91.  On February 25, Defendants filed an Emergency Motion for Stay of Order in this Court.  *See* Doc. 00514849400 (19-60109).

Plaintiffs also moved that same day in the district court to have the candidate qualifying deadline extended by two weeks in District 22 and adjoining District 23, the only other affected district in their Illustrative Plans 1 and 2.  ROA.448–52.  The district court asked Defendants to report the next day on the legislature's progress.  ROA.437.

That next day, the Governor and Secretary of State opposed the motion to extend the qualifying deadline and stated that the Senate leadership had authorized them to state that it would like the opportunity to enact a remedial plan if the motions to stay were denied.  ROA.468–72.

Later that day, the district court denied the Motion to Stay.  ROA.474–80.  With the legislature having taken no action, the district court extended the

qualifying deadline to March 15 and ordered Plaintiffs' Illustrative Plan 1 into effect. ROA.473. The court separately entered its Final Judgment that day. ROA.481.

On February 27, Defendants filed a second Notice of Appeal, ROA.484, and on February 28, they filed a Motion for Stay of Final Judgment Pending Appeal in the district court. ROA.490–93. Also on February 28, a motions panel of this Court dismissed the original appeal because of the intervening judgment. ROA.501–03.

At a March 4 hearing on Defendants' Motion for Stay of Final Judgment Pending Appeal, the district court confirmed that the legislature still could adopt its own plan. ROA.1045–48. On March 6, the district court denied this second motion for stay. ROA.550.

On March 8, Defendants filed an Emergency Motion for Stay of Judgment in this Court. Doc. 00514864509 (19-60133). On March 15, a divided motions panel of this Court granted the motion in part and denied the motion in part. ROA.557–58. The majority stated that "there is not a strong likelihood that Defendants will succeed in overturning the liability finding on appeal." ROA.558. The majority granted the motion "only based on the need to give the legislature and Governor an opportunity to remedy the Section 2 violation." ROA.558. The majority gave the legislature until April 3 to enact a remedial plan and extended

the candidate filing deadline to April 12.  ROA.558.  The panel issued its opinions on March 22 and amended opinions on March 25.  ROA.562–606; *Thomas*, 919 F.3d at 301.

The legislature adopted a remedial plan on March 26.  Only Districts 13 and 22 are affected by the remedial plan.  ROA.609.  Three precincts were moved from District 13 to District 22 (all in Sunflower County) and five precincts were moved from District 22 to District 13 (all in Bolivar County).  ROA.609; ROA.617; ROA.621.

Under the new plan, District 13 has a BVAP of 61.48 percent and District 22 has a BVAP of 58.13 percent.  ROA.638–39.  The plan makes District 22 much more compact and reduces its geographic size.  While the plan splits the City of Indianola, it reunites the City of Cleveland so that there is no increase in municipal splits.  ROA.608–10. Neither side has expressed any issues with the remedial plan. According to the Secretary of State's website, six Democratic and two Republican candidates have qualified in District 22 and six Democratic and one Republican candidate have qualified in District 13.  *See* http://www.sos.ms.gov/Elections-Voting/Documents/QualifyingForms/2019%20Candidate%20Qualifying%20List.pdf.

## SUMMARY OF ARGUMENT

This Court has stated that rare is the case that Plaintiffs establish the three *Gingles* preconditions and do not ultimately prevail. *Teague*, 92 F.3d at 293; *Clark v. Calhoun Cty.*, 21 F.3d 92, 97 (5th Cir. 1994). Defendants do not contest Plaintiffs have satisfied the first and second *Gingles* preconditions, and their arguments on the third precondition are limited and unavailing. For the most part, Defendants leave unaddressed most of the district court's findings on the Senate factors. This case presents a clear-cut Section 2 violation.

As a result, Defendants are left with presenting unpersuasive collateral arguments for reversal. First, they contend that the district court erred in not convening a three-judge court under 28 U.S.C. § 2284(a), although their argument is contrary to statutory language and has never been adopted by any court in the decades the statute has been in effect, and would lead to the nonsensical result of three-judge courts hearing purely Section 2 state legislative claims but single judges hearing such congressional redistricting claims. Br. at 16–22. Second, they claim that the district court erred in not finding laches—an argument this court reviews for abuse of discretion—even though they cannot show how they were unduly prejudiced by the timing of the filing of the case or that the district court committed clear error in finding no undue prejudice. Br. at 22–32. Third, they claim that this action is barred because African-Americans are a slight voting age

majority in the challenged District 22, and because, according to them, African-Americans do not have depressed political participation compared to whites. Br. at 33–40. The United States Supreme Court said that majority-minority populations can, in some circumstances, lack real electoral opportunity, and this Court and other courts have held that minorities can bring vote dilution cases when they are a majority in eligible voter population. In fact, the district court properly found that the African-American participation is lower than white participation in District 22, and even if that was not the case, it would not bar suit. ROA.384. Fourth, they claim that the district court erred in imposing a remedy prematurely. Br. at 48–51. This claim is moot because the legislature adopted a plan that no party challenged. Fifth, amicus Judicial Watch's claim regarding the district court's comments about the representation gaps is based on a complete misreading of the district court's opinion. *See* Doc. 514931443 (19-60133).

## ARGUMENT

### I. 28 U.S.C. § 2284(a) Does Not Require Convening a Three-Judge Court in This Section 2 Case

This is a legal claim subject to de novo review. Two weeks before trial, Defendants first raised the issue that Plaintiffs' claims should be tried by a three-judge panel pursuant to 28 U.S.C. § 2284(a). ROA.246–54. The district court and the motions panel of this Court soundly rejected Defendants' tortured construction of the statute. ROA.331–35. A number of state legislative redistricting Section 2-

only cases have been tried to a single judge but never in front of three judges.

There is no basis in the statute's language, its legislative history, or any applicable

canons of statutory construction for this Court to rule otherwise. Moreover,

Defendants' construction would mean that state legislative redistricting cases

brought solely under Section 2 would be heard by three-judge courts while similar

congressional redistricting cases would be heard by single judges, a nonsensical

result. *See Thomas*, 919 F.3d at 307.

Indeed, Defendants have changed their position repeatedly. They believed

for several months that their case was properly before a single judge. Then, in

their district court motion, Defendants said that "[a]s matter of English grammar,

this sentence [§ 2248] has two *equally plausible* meanings, depending on the

nature of the word 'apportionment' the second time it is used." ROA.248

(emphasis added). Now on appeal, heading I-A of their brief states that "[t]he

*plain and unambiguous language* of 28 U.S.C. § 2248 mandates that a three-judge

court shall be convened to hear challenges to the apportionment of any statewide

legislative body." Br. at 12 (emphasis added). Thus, for Defendants, a single-

judge case became a three-judge case and allegedly ambiguous language became

allegedly unambiguous.[3]

---

[3] Amicus Judicial Watch claims that Plaintiffs may have raised only a Section 2 claim as a means of forum shopping. Amicus Br. at 7. That is untrue. A constitutional claim is much more

A. Even Assuming 28 U.S.C. § 2284(a) Applies, Defendants Waived Their Right to a Three-Judge Panel

Although as the motions panel acknowledged, the issue is not free from doubt, the requirement of a three-judge panel set forth in Section 2284(a) is not jurisdictional. Therefore, Defendants' failure to request a three-judge panel until two weeks before trial constituted a waiver.

There is no controlling precedent on the issue of whether the requirement is jurisdictional, although courts that have considered the issue (including this Court in a non-binding decision) have ruled that Section 2284 is jurisdictional. *See LULAC of Tex. v. Texas*, 318 F. App'x 261, 264 (5th Cir. 2009); *Kalson v. Patterson*, 542 F. 3d 281, 287 (2d Cir. 2008); *Armour v. Ohio*, 925 F. 2d 987, 989 (6th Cir. 1991) (en banc);[4] However, these decisions do not square with the statutory language that triggers the procedure for convening a three-judge court "[u]pon the filing of a request for three judges." 28 U.S.C. § 2284(b)(1). As the motions panel observed, "[t]hat does not sound jurisdictional." *Thomas*, 919 F.3d at 304. Accordingly, Defendants' delay waived any right they may have to a three-judge court.

---

difficult to prove and is unnecessary in this case. Moreover, judicial assignment is random and no forum considerations militated one way or the other.
[4] The leading federal court procedure treatise questions whether Section 2284 is jurisdictional. *See* 17A Charles Alan Wright et al., *Federal Practice & Procedure* § 4235, at 206–08 (3d ed. 2007).

However, in the event this Court finds the requirement jurisdictional and thus not waivable, Plaintiffs will brief the issue of whether the statute requires a three-judge court in this case.

B. The Plain Language of 28 U.S.C. § 2284(e) Limits Three-Judge Courts to Constitutional Challenges

The starting point of this Court's analysis, of course, is the statute's plain language. *Lamie v. U.S. Trustee*, 540 U.S. 526, 530 (2004).

Section 2284(a) states in pertinent part:

> A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.

The plain language of a statute is construed to express its ordinary meaning. *Bouchikhi v. Holder*, 676 F.3d 173, 177 (5th Cir. 2012). The statute's plain language provides that only constitutional challenges to apportionment, whether of congressional districts or of any statewide legislative body, are subject to three-judge review unless "otherwise required by Act of Congress." 28 U.S.C. § 2284(a).

This plain, common sense meaning of Section 2284 is confirmed by Defendants' delay in raising the issue. As the motions panel stated: "At the outset of this lawsuit, it was not obvious to Defendants (*or* Plaintiffs or the district judge for that matter) that its exclusively statutory claims required a

three-judge court." *Thomas*, 919 F.3d at 304. Even more telling, as the

motions panel also found, "no reported case has ever used a three-judge

panel for a case challenging district lines only under Section 2 of the Voting

Rights Act." *Id. See Rural W. Tenn. African-American Affairs Council v.*

*Sundquist*, 209 F.3d 835, 838 (6th Cir. 2000); *Armour*, 925 F.2d at 989

(stating the jurisdictional test for Section 2284 as whether "there exists a

non-frivolous *constitutional* challenge to the apportionment of a statewide

legislative body") (emphasis added); *Chestnut v. Merrill*, 356 F. Supp. 3d

1351, 1354 (N.D. Ala. 2019); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976,

980 (D. S.D. 2004); *Old Person v. Brown*, 182 F. Supp. 2d 1002, 1003 (D.

Mont. 2002). There is no contrary authority.[5]

Finally, as the motions panel also observed, "[b]efore this year, it

apparently had never dawned on a judge or party in a Section 2-only state

redistricting case that a three-judge panel might be required. And that is

because the most straightforward reading of the three-judge statute is that it

---

[5] The one case Defendants cite is *Page v. Bartels*, 248 F.3d 175 (3d Cir. 2001). Br. at 19. *Page* simply held that "when a single district judge is presented with *both* types of claims, he or she may not resolve the Voting Rights Act issues in isolation while reserving the constitutional claims to a three-judge district court." *Id.* at 190. (Emphasis added.) Plaintiffs did not allege a constitutional claim here, so the case is inapposite. Moreover, there is reason to question the correctness of *Page. See Hagans v. Lavine*, 415 U.S. 528, 543–44 (1974) (affirming single-judge consideration of statutory claim and three-judge court consideration of constitutional claim under former 28 U.S.C. § 2281 as appropriate procedure to follow when both statutory and constitutional claims were pled).

applies only when the 'constitutionality' of apportionment is being

challenged." *Thomas*, 919 F.3d at 305.

C. No Canon of Statutory Construction Supports Defendants' Construction

Defendants' attempt to apply canons of statutory construction in the face of

the plain language of the statute is futile.[6]  Plaintiffs argue that the second use of

"the apportionment of" before the phrase "any statewide legislative body" results

in needless surplus words.  Br. at 14, 25.  However, as Justice Thomas has

explained and the motions panel repeated, "In any event, our hesitancy to construe

statutes to render language superfluous does not require us to avoid surplusage at

all costs. It is appropriate to tolerate a degree of surplusage rather than adopt a

textually dubious construction that threatens to render the entire provision a

nullity."  *U.S.  v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007); *see Thomas*, 919

F.3d at 305 n.5.

Although they did not mention it in their district court motion,

ROA.246–54, Defendants refer to the series-qualifier canon and argue that

the word "the" appearing before the second part of Section 2284(a),

---

[6] The law of this Circuit is unclear as to whether this Court must first find an ambiguity in the statute, before applying statutory construction canons or whether this Court must apply canons to find ambiguity.  *See U.S. v. Kaluza*, 780 F.3d 647, 658 n.34 (5th Cir. 2013).  The Court need not resolve that issue, because, as demonstrated above, the canons do not result in a requirement of a three-judge court in this case.

"apportionment of any statewide legislative body" was intended to cut off the application of "constitutionality" to the second phrase.  Br. at 13–14.  As this motions panel recognized, *Thomas*, 919 F.3d at 306, and Justice Scalia artfully put it: "Congress . . .  does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).  The series-qualifier canon is highly sensitive to context, Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 150 (2012), and that context "supports the natural reading that courts have long given it:  that 'constitutionality' modifies both 'the apportionment of congressional districts' and 'the apportionment of any statewide legislative body.'"  *Thomas*, 919 F.3d at 306.  It is "highly unlikely" that Congress would make such an important decision as delegating a specific set of cases to three-judge panels "through such a subtle device. . . ."  *Whitman*, 531 U.S. at 468.[7]

---

[7] Amicus Judicial Watch makes a similar argument, relying on *U.S. ex rel. Vaughn v. United Biologics, L.L.C.*, 907 F. 3d 187 (5th Cir. 2018), where this Court construed a phrase in the False Claims Act providing that an action "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."  *Id.* at 195. This Court held that the word "their" broke the connection between "written" as modifying "consent" and "reasons for consenting".  *Id.* at 195; *see* Amicus Br. at 5.  That construction made sense, because otherwise the phrase would read "give written . . . their reasons."  Here, "constitutionality of" makes sense modifying both "the apportionment of congressional districts or the apportionment of any statewide legislative body."

Congress knew how to assign cases to three-judge panels, and it did so in several other sections of the Voting Rights Act.  Congress explicitly included language in Section 5 of the Voting Rights Act authorizing a three-judge court to adjudicate such claims. 52 U.S.C. § 10304. Likewise, Congress explicitly clarified that claims brought under Section 4 of the Voting Rights Act must be heard by a three-judge court.   52 U.S.C. § 10303.  Congress also explicitly clarified that poll tax claims under Section 10 of the Voting Rights Act shall be heard before a three-judge district court. 52 U.S.C. § 10306.  In addition, Congress specified claims brought by the Attorney General under Sections 201, 202, and 203 of the Voting Rights Act also are heard in front of a three-judge court.  52 U.S.C. § 10306.  Congress did not include language in Section 2 requiring a three-judge court.

D. <u>The Legislative History Does Not Support Defendants' Contention that Congress Intended Three-Judge Courts to Hear Statutory Challenges to the Apportionment of State Legislative Bodies but Single Judges to Hear Statutory Challenges to Congressional Apportionment</u>

Finally, even if the statutory language has "two equally plausible meanings," as Defendants asserted in their district court motion, ROA.248, the legislative history does not support Defendants' interpretation.

The provision of the three-judge courts was enacted by Congress in 1910 for all cases challenging the constitutionality of state statutes in federal court.  Act of

June 18, 1910, Pub. L. No. 61-218, 36 Stat. 557. In 1975, Congress decided to eliminate the requirement of three-judge courts in all cases except certain enumerated ones, in part to reduce federal judges' workload. Br. at 17; S. Rep. 94-204, at 3-4 (1975), WL 12516 (hereinafter, "Rep.").

Defendants cherry-pick two sentences from a single fourteen-page Senate Committee report from 1975. Br. at 17; Rep. at 4. In these sentences, the Committee merely explained its rationale for preserving three-judge courts in certain cases "involving congressional reapportionment or the reapportionment of a statewide legislative body" because "these issues are of such importance." Rep. at 9.

Defendants appear to say that because the word "constitutional" was not in these sentences, Congress did not mean for the word "constitutionality" to have any meaning. Indeed, Defendants imply that Congress included the word "constitutionality" in Section 2284 only because they failed to anticipate that some future challenges to state legislative and congressional redistricting plans might be filed solely under Section 2 and not under the Constitution. Br. at 18. Even were that true, that is not a justification for reading "constitutionality" out of the statute. Indeed, the Senate Report explicitly stated that "[s]ubsection (a) would also continue the requirement for a three-judge court in cases challenging the

*constitutionality of* any statute apportioning congressional district or apportioning any statewide legislative body." Rep. at 12 (emphasis in original).

The legislative history confirms that Congress intended to treat congressional redistricting cases and state legislative redistricting cases alike, which completely undermines Defendants' claim that "constitutionality" modifies only "the apportionment of congressional districts" and not "the apportionment of any statewide legislative body."  Br. at 13.  Even if Congress failed to anticipate that future challenges would be filed solely under Section 2, it had an opportunity to amend the statute to remove the word "constitutionality" in 1982, when it amended Section 2, Act of June 29, 1982, Pub. L. No. 97-205, 96 Stat. 134, and again in 1984 when it amended Section 2284 a second time.  Act of Nov. 9, 1984, Pub. L. No. 98-620, 98 Stat. 3335.  It did not do so.  As the court noted in *Chestnut v. Merrill*:

> Nevertheless, Congress could have so amended Section 2 had it desired to send those cases invoking it to a three-judge court. But currently, § 2284 and Section 2— reading them together and separately—do not provide three-judge panels for purely statutory Section 2 challenges.

356 F. Supp. 3d at 1356.  Similarly, this Court should not remove the word "constitutionality" or interpret it in such a limited manner that congressional redistricting cases are treated differently from state legislative cases.

31

## II. The Trial Court Did Not Abuse Its Discretion or Commit Clear Error in Rejecting Defendants' Laches Defense

Defendants had the burden of proof as to their affirmative defense of laches. *City of El Paso, Tex. v. El Paso Entm't, Inc.*, 382 Fed. App'x 361, 366 (5th Cir. 2010). To prove laches, a defendant must show: "(1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Save Our Wetlands, Inc. v. U.S. Army Corps of Eng'rs*, 549 F.2d 1021, 1026 (5th Cir. 1977). The district court enjoys "considerable discretion in deciding whether to apply the doctrine of laches to claims pending before it." *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 707 (5th Cir. 1994). The district court's factual findings regarding laches are reviewed for clear error. *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 898 (5th Cir. 2016). Where, as here, a district court finds no prejudice, there is no abuse of discretion unless the underlying finding was clearly erroneous. The same analysis applies here as in this Court's decision in *Retractable Technologies*:

> We need not decide . . . whether BD proved an inexcusable delay . . . because in any event, the district court neither erred nor abused its discretion in concluding that BD suffered no undue prejudice. . . The district court's factual findings are not clearly erroneous; as a result, the district court did not abuse its discretion in rejecting the affirmative defense of laches.

*Id.* at 900.

The district court ruled that Defendants failed to meet their burden because, among other reasons, the suit was filed 13 months before the election and any delay in filing the Complaint after the 2015 election did not prejudice Defendants. ROA.379. "The evidence in our case weighs against a finding of undue prejudice." ROA.379. The district court's ruling and factual findings easily meet the appellate standards for affirmance.[8] As the court found, the case was filed 13 months before the primary election and the parties had ample time to litigate this single-issue, single-district challenge. ROA.379. Moreover, the legislature easily implemented the limited two-district remedy that neither party claims is problematic. ROA.617; ROA.621. In the two affected districts, candidates from both parties have qualified. Any alleged prejudice to Defendants is no different from and, because of the limited nature of the claim, substantially less than that which occurs in the typical redistricting challenge.

A. Broad Rules as Urged by Defendants Have No Place in the Doctrine of Laches and District Courts that Decline to Dismiss on Laches Grounds Should Not Be Reversed Absent Extreme Facts that Do Not Exist Here

Defendants seem to urge this Court to adopt two broad rules: first that any redistricting suit filed 13 months or less before an election should be barred by laches, and second that any suit of any kind should be barred unless filed in time for a full appeal on the merits to take place before an injunction is imposed. See

---

[8] Laches is not a defense against declaratory relief. *See Chestnut*, 356 F. Supp. 3d at 1351.

Br. at 22–30.  But broad rules of this sort have no place with respect to an equitable

doctrine like laches.  As noted in one of the cases cited by Defendants: "Whether

laches bars an action is a *discretionary determination* to be made by the court

*based on the particular facts presented*."  *Arizona Minority Coal. for Fair*

*Redistricting v. Ariz. Indep. Redistricting Comm'n*, 366 F. Supp. 2d 887, 908 (D.

Ariz. 2005) (emphasis added).   For example, the district court here found no

prejudice stemming from a filing 13 months before the election because only one

district was challenged and a remedy could easily be configured by redrawing only

two of 52 districts.  ROA.379; ROA.387.  By contrast, a redistricting challenge

with a statewide impact or a ripple effect through several districts may be a

different matter.  In *Chestnut*, 2019 WL 1376480, at *3 (N.D. Ala. Jan. 28, 2019),

where the plaintiffs claimed that Alabama packed African-American voters in one

of Alabama's seven congressional districts and split them in three others; any

remedy likely would have required redrawing a majority of the districts, and the

prejudice would far exceed any that exists in this case.

Because laches is an equitable doctrine dependent upon the particular facts,

district courts are invested with "considerable discretion."  *Nat'l Ass'n of Gov't*

*Emps.,* 40 F.3d at 707.  Only one of the cases cited by Defendants involved an

appellate reversal of a district court's decision declining to dismiss on laches

grounds.  That was *White v. Daniel*, 909 F.2d 99 (4th Cir. 1990), where the

plaintiffs did not file their challenge until "months *after* the last election under the 1981 plan took place" when any relief would have required a special election. *Id.* at 102–03 (emphasis added). The court specifically noted that the disruption of a remedial redistricting "is not justified when there will be no election prior to November 1991, at which time the court-ordered plan may no longer be appropriate because of new census information." *Id.* at 104. *White* involved a challenge to the entire county board of supervisors redistricting plan. Id. at 100–01. By contrast, the present case was filed 13 months before the 2019 election, only one prior election had been held under the plan, no special election relief was required, and only two of 52 districts needed to be redrawn. These are not the sort of extreme facts justifying reversal of a district court's discretionary decision to decline to dismiss a case because of laches.

Although Defendants argue that the district court failed to consider "the need for this Court to have the time to exercise its powers of review in an orderly manner," this was not a factor they raised in their laches motion in the district court. ROA.134–50. More important, Defendants have cited no decision holding that cases must be dismissed on laches grounds if not filed in time for full appellate review on the merits before an injunction takes effect. Part of the orderly processes for appellate courts to exercise their authority is the power to review injunctions pursuant to motions for stay. Defendants availed themselves of that

procedure in this Court. This is not a basis for ruling that the district court committed clear error in finding there was no undue prejudice.

B. <u>The District Court's Finding That Defendants Were Not Unduly Prejudiced by Any Delay Was Not Clearly Erroneous</u>

The district court did not commit clear error in finding that any delay was not unduly prejudicial to Defendants. Prejudice "requires more than simply negligence or delay in bringing an action." *Matter of Bohart*, 743 F.2d 313, 326 (5th Cir. 1984). "Measuring prejudice entails balancing equities." *Envtl. Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 479 (5th Cir. 1984). Under this Court's precedent, one asserting the defense of laches must show either "a delay which causes a disadvantage in asserting and establishing a claimed right or defense," *Matter of Bohart*, 743 F.2d at 327, or "other damage caused by a detrimental reliance on his adversary's conduct." *Id.* Defendants' proof as to prejudice is woefully lacking in either regard.[9]

Unlike the cases relied upon by Defendants, the Complaint in this case was filed not just days or weeks before critical election dates, but nearly eight months

---

[9] The district court correctly noted that Plaintiff Joseph Thomas "did not perceive a legal violation in 2012 and then sit on his laurels," but "decided to take a risk and enter the 2015 election in an attempt to prove that an African-American could win District 22 despite its boundaries." ROA.378. The district court also concluded that laches was not appropriate for Plaintiffs Ayers and Lawson because "[t]here is no evidence that either had any indication of a problem with District 22's boundaries and slept on his rights." ROA.377. For the reasons expressed by the motions panel majority, the district court can be affirmed on this ground alone. But this Court need not reach the issue of excusable delay given that the district court's factual finding of no undue prejudice is not clearly erroneous.

before the qualifying candidate deadline, nearly 13 months before the primary, and nearly 16 months before the general election.[10]  Defendants have not claimed, let alone demonstrated, they did not have sufficient time to defend the case or that with more time, they would have presented additional evidence.  The district court's finding that, "This timeframe is more than enough to litigate [Plaintiffs'] single-district, single-count claim," ROA.379, was not clear error.

Defendants do contend on appeal that they "suffered prejudice in their ability to try the case" because they were provided "only several days before trial" Plaintiffs' expert's analysis which they say was "done almost a year before" and "showed that 2,000 voters in 2015 mistakenly voted outside the district."  Br. at 29. Their claim is false and misleading.  The expert analysis to which Defendants refer was Dr. Palmer's report, produced as required by the district court's scheduling order on December 10, 2018, almost two months before trial.  ROA.201; ROA.1065–83.  There is no basis for the claim that this report was "done almost a year before" trial.  Br. at 29.  Dr. Palmer was not even contacted by Plaintiffs until

---

10 Compare with *MacGovern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986) (complaint filed 26 days before qualifying candidate deadline, three months before primary, eight months before general elections and <u>after</u> new state Census had begun); *Lopez v. Hale Cty., Tex.*, 797 F. Supp. 547, 550–51 (N.D. Tex. 1992), *aff'd sub nom.* 506 U.S. 1042 (1993) (complaint filed months <u>after</u> qualifying deadline and weeks <u>after</u> primary); *Ariz. Minority Coal.*, 366 F. Supp. 2d at 887 (complaint filed "just weeks before critical election deadlines"); *Simkins v. Gerrette*, 631 F.2d 287 (4th Cir. 1980) (complaint filed 16  days before opening of candidate qualifying period and five-and-a-half weeks before primary election).

July or August 2018, approximately six months before trial.  ROA.769.  The information produced a few days before trial simply clarified the specific data used for certain precincts, including his logical exclusion from the analysis of the two Bolivar County precincts where most voters were given the wrong senate ballots.  ROA.1085–89.  But this was no surprise to Defendant Hosemann, Secretary of State, who issued a press statement about the Bolivar County ballot mix-up in 2015 when it happened.  ROA.1088 n.12.

During trial, Defendants never made any complaint about the timing of this information.  They never asked for additional time so their expert could review the impact of this information, they never made a record as to what analysis they purportedly would have done had they learned about it previously, and they never made a record as to how they allegedly were prejudiced this timing.  Indeed, Defendants expressly withdrew any objection to the admission of the supplement.  ROA.735–36.  Defendants suffered no prejudice.

As the district court noted, this case focuses on a single district which further supports the finding of no undue prejudice.  ROA.379.  Most of the cases relied upon by Defendants challenged statewide apportionment or called for a remedy that would affect many, if not all, of the legislative districts in the state.[11]

---

[11] *See, e.g.*, *Md. Citizens for a Representative Gen. Assembly v. Governor of Md.*, 429 F. 2d 606, 608 (1970) (challenge to statewide apportionment); *Simkins*, 631 F.2d at 287 (4th Cir. 1980) (same); *Ariz. Minority Coal.*, 366 F. Supp. 2d at 887 (same); *Maxwell v. Foster*, 1999 WL

The district court did not abuse its discretion in ruling that there was no undue prejudice to Defendants in proceeding to try this single-issue, limited facts, case within a seven-month period.

Curiously, Defendants rely on snippets from *Reynolds v. Sims*, 377 U.S. 533 (1964), as apparent protection from what they call "the unseemly spectacle before us now." Br. at 25, 32. But the Court in *Reynolds* gave its imprimatur to a district court order issued on July 25, 1962, that changed statewide district lines for the November 1962 election. 377 U.S. at 620. The Court in *Reynolds* described the district court's order there, a far more drastic remedy issued with considerably less notice than the district court's order here, as "an appropriate and well considered exercise of judicial power," *id.* at 586–587, a far cry from an abuse of discretion. The motions panel recognized, "[I]t would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Thomas*, 919 F.3d at 304 (quoting *Reynolds*, 377 U.S. at 585). Or as this Court put it in another voting rights case: "It would be untenable to permit a law with a discriminatory effect to remain in operation for that election." *Veasey v. Abbott*, 830 F.2d 216, 270 (5th Cir. 2016) (en banc).

---

33507675, at *4 (W.D. La, Nov. 24. 1999) (remedy implicated statewide redistricting); *MacGovern*, 637 F. Supp. at 111 (challenge to statewide redistricting).

Defendants also complain that the filing of this case 13 months before the election led to a compressed appellate procedure. Br. at 30. Plaintiffs are aware of no principle of law that mandates that a complaint is untimely filed if the timing is such that the defendants may not get the benefit of a completed appellate review process before it is forced to hold an election under a court-ordered new plan. To the contrary, it is not uncommon for elections to proceed under court-ordered plans as appeals proceed. *Larios v. Cox*, 305 F. Supp. 2d 1335, 1336–37 (N.D. Ga. 2004) (collecting cases).

Indeed, this is what stay procedure is all about. Here, Defendants had the opportunity to prove to this Court that it had a strong likelihood of success on the merits, meriting a stay of the court-ordered plan. It could not meet that standard, and many redistricting cases have proceeded under like circumstances through the appellate process without being dismissed for laches.

While Defendants claim that the district court's denial of their laches defense failed to account for "the need for the Mississippi legislature to have the time to take up redistricting in an orderly manner," Br. at 24, the legislature clearly had sufficient time to redraw two districts. Indeed, the legislature did. After the motions panel issued its Order on March 15 specifying that the legislature should formulate a remedial plan by April 3, the legislature adopted a plan on March 26.

*See Thomas*, 919 F.3d at 316; ROA.608–10; ROA.617; ROA.621. Neither party has objected to that plan.

As to Defendants' claim that the prejudice flows from the injection of "needless uncertainty into the November 2019 election," because voters and candidates "suddenly" find themselves in new districts, Br. at 28 n.6 (quoting *Thomas*, 919 F.3d at 321 (Clement, J. dissenting)), that is not undue prejudice. Changes in the drawing of a district's lines within months before an upcoming election occur in many successful redistricting cases.

Defendants' argument that the delay also prejudiced the Mississippi legislature because it will have to redraw the district twice within a period of a few years is without merit. *See* Br. at 29. Unlike many of the cases relied upon by Defendants, there has been only one election under the 2012 plan and elections are held every four years rather than every two years.[12] Thus voter reliance is not as significant as in other cases. *See, e.g., Fouts*, 88 F. Supp. 2d at 1354 ("over the six years and three election cycles voters have come to know their districts and candidates").

---

[12] *See White*, 909 F.2d at 99 (complaint filed 17 years after redistricting and 17 elections under the challenged plan); *Chestnut*, 356 F. Supp. 3d at 1353 (complaint filed seven years after redistricting and four elections under challenged plan); *MacGovern,* 637 F. Supp. at 111 (complaint filed nine years after redistricting); *Fouts v Harris*, 88 F. Supp. 2d 135 (S.D. Fla. 1999) (complaint filed six years after redistricting and four elections under the challenged plan).

Whenever the case was filed, whether in 2012 or 2016 or 2018, the legislature would have been required to redraw the district twice—first to remedy the dilution for the upcoming election and second after the 2020 Census (likely in 2021 or 2022, prior to the 2023 elections). There is no prejudice stemming from the fact that the remedial plan was adopted in early 2019 as opposed to 2018 or 2017 or 2012.

That the remedial plan is drawn using Census data toward the end of the Census cycle does not demonstrate prejudice. This is the same data that was employed to draw the challenged district, which would have been used in the 2019 election. "The true comparison is between out-of-date districts that . . . dilute the black vote, and out-of-date districts that do not." *Jeffers v. Clinton*, 730 F. Supp. 196, 202–203 (E.D. Ark. 1989), *aff'd sub nom.* 498 U.S. 1019 (1991).

Other factors distinguish Defendants' authority from this case. In *White v. Daniel*, the key finding was that judicial relief would make "no sense" because there was no election before the next census. 909 F.2d at 104. In *MacGovern*, 637 F. Supp. at 111, the complaint was filed <u>after</u> the 1985 state Census had occurred, but its challenge was based on the 1975 state Census.

In *Jeffers*, the court's December 4, 1989, opinion rejected the defendants' laches argument and held that the Arkansas legislative redistricting plan of 1981 violated Section 2 and required an extensive redrawing of legislative districts prior

to the 1990 election. 730 F. Supp. at 198, 202. The opinion describes a court's task of deciding the laches issue: "The Court must weigh the facts and interests on both sides, summon up the discretion of a chancellor, remember that it is a court of conscience and not of legal stricture, and come as close as it can to a fair result." *Id.* at 202. While the *Jeffers* court recognized "the expense, trouble, and disruption of compliance" in increasing the number of black-majority districts, it noted that these problems "would have occurred whenever the suit was filed." *Id.* at 198, 202. It also noted that there would be public confusion caused by the changing of districts so close to an election but stated that all of these issues did not outweigh the harm that would be caused by not remedying the violation:

> The question is essentially one of judgment and degree. Logic cannot absolutely exclude either answer. In our judgment, the defense of laches must fail. In part, the expense and disruption that will undeniably occur are nothing but a consequence of the wrong that has been done. . . . To the extent that electoral confusion and disruption exceed what they would have been if the case had been filed earlier, we think that fairness and equal opportunity in voting are worth it. We will not say to these plaintiffs, "Wait for another census. The time is not yet ripe." They have heard these words too many times in the past.

*Id.* at 202–203.

This case presents no special circumstances that constitute clear error in the district court's finding of no undue prejudice. The Complaint was filed more than a year before the election and the district court tried this single-claim, single-

district case in time. *See* ROA.20–29. Defendants did not claim any prejudice in the district court resulting from the trial schedule and made no showing that the schedule or any other development prevented them from presenting a complete defense. *See* ROA.201. Defendants have availed themselves of the opportunity, albeit unsuccessfully, to prove to this Court that they deserved a stay pending appeal. *Thomas*, 919 F.3d at 316. Unlike the cases relied upon by Defendants, only one election has been held under the challenged plan, so that there was little likelihood of deep-seeded reliance on the old plan. The legislature had sufficient time to redraw two districts and was able to do so by moving only eight precincts. Whatever minor disruption results from that move is vastly outweighed by the need to remedy the Section 2 violation. Under the specific facts of this case, the district court acted well within its scope of discretion in rejecting Defendants' affirmative defense of laches and its finding of the absence of undue prejudice is not clearly erroneous. ROA.379.

### III. Contrary to Defendants' Contention, There Is No *Per Se* Rule Against Section 2 Claims in Bare Majority-Minority Districts, and the District Court Committed No Error in Its Finding Regarding Turnout Differentials

Although Defendants label Section III of their brief with a broad heading— "[t]he district court erred as a matter of law by finding that the boundaries of SD 22 violates § 2 of the Voting Rights Act"—they make only two basic arguments. Br. at 33. First, they claim that Section 2 claims are not legally cognizable in

districts with a majority-minority population. This is a legal claim subject to de novo review. Second, they claim that "[t]he results test of § 2 is not violated unless participation in the political process is depressed among black citizens." Br. at 40. Although that is a legal claim, the district court's factual finding of depressed African-American political participation is subject to the clear error standard.

A. No *Per Se* Rule Prohibits Section 2 Claims in Bare Majority-Minority Districts

The Supreme Court has recognized that "it may be possible for a citizen voting-age majority to lack real electoral opportunity." *LULAC v. Perry,* 548 U.S. at 428. This Court stated that "[u]nimpeachable authority from our circuit has rejected any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution." *Monroe,* 881 F.2d at 1327. Decisions from other circuits have reached the same conclusion. *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 934 (8th Cir. 2018); *Pope v. Cty. of Albany*, 687 F.3d 565, 575 n.8 (2d Cir. 2012); *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003); *Meek v. Metro Dade Cty.*, 908 F.2d 1540, 1546 (11th Cir. 1990).

This principle extends to at-large systems and single-member districts alike. *LULAC*, *Kingman*, and *Pope* all involved challenges to districts. With respect to a proposed county supervisors districting plan in which all five districts were

majority African-American in total population—but where "blacks would have exceedingly slim [voter-registration] majorities in some of these districts and minorities in others"—this Court held that "[t]he mere existence of a black population majority does not preclude a finding of dilution." *Moore v. Leflore Cty. Bd. of Election Comm'rs*, 502 F.2d 621, 624 (5th Cir. 1974).

The primary case Defendants cite, *Bartlett v. Strickland*, 556 U.S. 1 (2009), involves a fundamentally different issue.  Br. at 33–34.  There, the plaintiffs attempted to meet the first *Gingles* precondition by creating an illustrative district where African-American voters made up less than 50 percent but could, along with white crossover voters, elect representatives of their choice.  *Id*. at 6.  The Supreme Court rejected this argument.  *Id.* at 12–13.  The Supreme Court's holding in *Bartlett* precluding a Section 2 violation when the minority population is too small does not suggest a *per se* rule barring a claim on the ground that the minority population is too large.  Such a rule would nullify the Court's statement four years earlier in *LULAC*, which, like the *Bartlett* plurality opinion, was authored by Justice Kennedy.

Defendants rely on Judge Clement's claim in her motions panel dissent that "[n]o court has ever found that a majority-minority single-member district violates Section 2 by itself."  Br. at 37 (quoting Thomas, 919 F.3d at 319 (Clement, J., dissenting)).  However, the *Ferguson-Florissant* decision from the Eighth Circuit

specifically affirmed the lower court's holding that even if the population of the challenged district was majority-minority, the district's election system still violated Section 2. 894 F.3d at 933–34, 941. As the Eighth Circuit noted, "minority voters do not lose VRA protection simply because they represent a bare numerical majority within the district." *Id.* at 941.[13]

*Ferguson-Florissant* involved an at-large election but as mentioned earlier, the case law demonstrates there is no such per se ban for either at-large systems or districts. The Supreme Court's statement in *LULAC* that "it may be possible for a citizen voting-age majority to lack real electoral opportunity" related to a districting plan. Judge Clement acknowledged in her dissent there is no *per se* prohibition with respect to this case. "I agree with the majority that, at least as a matter of theory, it may be possible for a state to violate Section 2 of the Act even when a protected group forms a majority of the voting population. That option is left open by our precedent." *Thomas*, 919 F.3d at 319.

The Supreme Court's statement in *LULAC* and the similar precedent from this Court and other courts makes perfect sense. In the present case, District 22 under the prior plan used in the 2003, 2007, and 2011 elections was 49.82 percent African-American according to the 2010 census. ROA.993. Each time the

---

[13] Defendants cite *Jeffers v. Beebe,* 895 F. Supp. 2d 920 (E.D. Ark. 2012), Br. at 35, but that decision has been effectively overruled by the Eighth Circuit's contrary holding in the *Ferguson-Florissant* case.

African-American preferred candidates were defeated by white bloc voting. ROA.362–63; ROA.382–83. With the 2012 plan, the legislature increased the BVAP by one percentage point from 49.8 to 50.8 percent and called the district a majority-minority district. ROA.993–94. But as the 2015 election demonstrated, the addition of that percentage point did not interrupt the pattern and again the African-American candidate of choice was defeated by white bloc voting. ROA.362–63; ROA.1069. Racial vote dilution continues to infect District 22. The district should not suddenly be immune to Section 2 enforcement because the legislature pushed the BVAP barely across the 50 percent line.[14]

Given the Supreme Court's recognition that "it may be possible for a citizen voting-age majority to lack real electoral opportunity," the task for a district court in a case like this is to examine the *Gingles* factors and the totality of the circumstances to determine if the very slim majority-minority population in the relevant district "lack[s] real electoral opportunity." *LULAC v. Perry*, 548 U.S. at 428. That is exactly what the district court did here, finding that "plaintiffs have established District 22's lines result in African-Americans having less opportunity

---

[14] Defendants lament that "each of the 15 majority-minority Senate districts could be subject to suit, and, of course, the same would be true of every majority-minority House district, supervisor district, or city council district." Br. at 39. But this is the only suit involving a Section 2 challenge to any current Mississippi legislative district and the undersigned are aware of no similar suits involving local districts in Mississippi. Obviously, there is no incentive to bring a suit unless the evidence demonstrates legally significant racial bloc voting and other indicia of a Section 2 violation. For most majority-minority districts, that will not be the case.

than others members of the electorate to elect the State Senator of their choice."

ROA.386.  That decision may not be overturned absent clear error.  "[T]he ultimate finding of vote dilution as a question of fact subject to the clearly-erroneous standard of Rule 52(a)."  *Gingles,* 478 U.S. at 78.

### B. The District Court's Finding Regarding Turnout Differentials Is Not Clearly Erroneous and, Even If It Were, Proof of Depressed Political Participation Is Not Essential to a Section 2 Claim

Neither Section III-B of Defendants' brief nor any other section of the brief claims that the district court's finding of vote dilution—or the district court's finding that "white bloc voting in District 22 defeats the African-American community's candidate of choice," ROA.382–83—was clearly erroneous.  The only discussion of the *Gingles* factors in the argument portion of their brief is contained in two paragraphs of Section III-B.  First, Defendants state that "because SD 22 already contains a majority-minority voting-age population, plaintiffs cannot meet the first *Gingles* precondition and their claim must be dismissed."  Br. at 41.  But that is just another way of arguing that no claim can be brought against bare majority-minority districts, an argument addressed in the prior section.

Second, they contend that "plaintiffs attempted to satisfy the second and third *Gingles* preconditions without a single election for senator that has ever been properly conducted in SD 22" and that plaintiffs were therefore unable "to prove that whites have ever actually defeated 'the minority's preferred candidate' for

Senator for SD 22." *Id*. This is a reference to the election error in Bolivar County in 2015 when most voters in two District 22 precincts were given ballots that did not include the District 22 election. *See* ROA. 1088. While those voters received the wrong ballot, the rest of the voters across District 22 received the proper ballot. *See* ROA.1088 n.12. Had those two heavily white precincts received the proper ballots, they likely would have added to the winning totals of the white candidate. ROA.785–86. This mistake in Bolivar County in no way detracts from the fact that white bloc voting defeated the African-American candidate of choice in the 2015 senate race just as it did within District 22 in the 2015 statewide elections and also in senate and statewide elections in the three earlier election cycles under the prior version of the district. Thus, Defendants have not demonstrated clear error regarding the district court's finding of legally significant racially polarized voting and its overall finding of vote dilution.

Instead, Defendants' argument hinges on a claim that proof of depressed political participation among African-American voters is essential to a Section 2 claim and that the district court was wrong to conclude that it was depressed. Defendants are wrong as a matter of law, and their attack on the district court's fact-finding does not approach clear error.

The district court's opinion described the conclusion of Plaintiffs' expert Dr. Palmer based on an ecological inference analysis of the last four District 22 senate

elections: "[T]here is a sizable turnout gap between African-American and white voters in District 22. On average, white turnout is 10.2 percentage points higher than black turnout." ROA.363. Defendants claim the court should have disregarded this analysis and relied on self-reporting statewide census surveys showing that African-American voter registration and turnout equals or exceeds that of whites in even-numbered years during presidential and congressional elections. Br. at 44. But after hearing the expert testimony the district court found that the surveys "look at the wrong jurisdiction [statewide rather than District 22], the wrong election years, and rely upon known issues with self-reported voting surveys—issues that EI [ecological inference], in contrast, seeks to overcome." ROA.384; *see* ROA.640–80; ROA.960–62. This is a sensible and supportable finding based on actual turnout at the polls in the Senate District 22 race during odd-year elections for state offices.[15] There is no clear error.[16]

---

[15] Contrary to Defendants' suggestion there was no evidence of problems with the Census Bureau's self-reported figures, Br. at 44 n.12, Dr. Palmer testified about all of these problems, including the unreliability of self-reporting estimates. ROA.764–65. Even were the Census Bureau's self-reported figures accurate, they reflected statewide measures in federal elections in even-numbered years rather than turnout in District 22 elections during the state office elections in odd-numbered years.

[16] Defendants cite the statement in *NAACP v. Fordice* that the plaintiffs' expert there "acknowledged that in recent years Mississippi's African-American and white citizens have maintained virtual parity in voter turnout." 252 F.3d 361, 368 (5th Cir. 2001). But the accompanying footnote states that white turnout was slightly higher in 1994 and 1996 while African-American turnout was slightly higher in 1995. *Id.* at 368 n.1. These statewide numbers from 1994–96 do not undermine Dr. Palmer's expert analysis regarding turnout in District 22 from 2003 to 2015.

Defendants renew their claim that the court erred by considering the 2015 District 22 election given that Dr. Palmer properly excluded from his analysis two majority white precincts in Cleveland within District 22 where most voters were mistakenly given ballots for another senate district. Dr. Palmer based his conclusion on his analysis of the other approximately 50 precincts in District 22 where voters received the proper ballots. *See* ROA.384. Moreover, the analysis of prior District 22 elections corroborates these turnout differentials.[17]

As the district court found, Defendants did not present any evidence on this issue: "The defendants presented no evidence indicating that Dr. Palmer's approach was in error or would cast any shadow on his conclusions." ROA.382. Their contention rests solely on their attorneys' statement asserting that the court could take "judicial notice that Cleveland is the location Delta State University, a predominantly white institution," and had Dr. Palmer included the wrong-ballot precincts, "the level of white participation *throughout SD 22* would necessarily have fallen." Br. at 46 (emphasis added). But these attorneys' arguments cannot

---

[17] The current plan, adopted in 2012, was used for the 2015 election. The 2011, 2007, and 2003 elections were conducted under the prior plan adopted in 2002. Having claimed in their laches arguments in district court that this case should have been filed once the plan was precleared in 2012, Defendants now imply that the one election held in 2015 under the existing plan was an insufficient basis for the decision in this case. According to Defendants, "the Court reversed the district court's decision finding legally significant white bloc voting based on a single contest." Br. at 47; *see also Rangel v. Attorney Gen.,* 8 F.3d 242, 246 (5th Cir. 1993). In *Rangel,* this Court based its ruling on five statewide judicial elections where minority candidates won in the territory covered by the judicial district under challenge. *Id.* at 247. By contrast, the candidates supported by African-American voters lost due to white bloc voting in both senate and statewide elections in District 22 from 2003 to the present. ROA.363.

substitute for expert witness testimony. Defendants produced no statistical analysis and did not even identify which precinct Delta State is in. Their expert never testified to the publicly available figures on actual turnout in the precincts with the wrong ballots and made no effort to demonstrate that their inclusion would have changed the turnout figures throughout the district. *See* ROA.960–62. Moreover, that a pocket of mostly white college students in one precinct might not vote because they are registered elsewhere—and ineligible to vote in District 22— does not demonstrate that African-American turnout somehow equals white turnout among eligible voters through the entirety of District 22. *See* ROA.1087– 89; ROA 382–83.

Even had the district court committed clear error in its finding regarding turnout, that subsidiary finding is not essential to the court's ultimate finding of a violation. Defendants claim that in order to win, Plaintiffs "bore the burden to demonstrate that the African-American citizens of Mississippi 'do not in fact participate to the same extent as other citizens.'" Br. at 44 (quoting *Fordice,* 252 F.3d at 368). But they omit part of the quote. The Fifth Circuit in *Fordice* was referring to the impact of the Senate factors on the history of discrimination and socioeconomic disparities on present-day participation. The Fifth Circuit simply said that "*to support a favorable finding on these factors*, [the plaintiff] bore the burden to demonstrate that the African-American citizens of Mississippi 'do not in

fact participate to the same extent as other citizens.'" 252 F.3d at 368 (emphasis added) (internal citation omitted). The absence of proof on certain Senate factors does not usually override proof of the *Gingles* factors. "[I]t will be only the very unusual case in which Plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances." *Clark,* 88 F.3d at 1396. Thus in *Clark,* this Court held that a Section 2 violation had been demonstrated even though there was no proof of depressed African-American political participation. *Id.* at 1396, 1399.

## IV. Any Claim of Error Regarding Remedy Is Moot Because the Mississippi Legislature Exercised Its Prerogative and Adopted the Plan that Is to Be Used for the Election

Defendants spend three and a half pages of their brief complaining about the district court's remedial plan without acknowledging, except in an indirect way at the very end, that the district court's plan *is not being used* in the upcoming election. Br.at 48–51. Instead, the plan adopted by the legislature on March 26 is being used. ROA.608–36.

Even after the district court made a finding of a Section 2 violation and adopted its own plan after being informed that the legislature would not take action unless and until the stay motions were denied, the district court continued to emphasize that the legislature "still [has] every right to seek to implement a remedy" and "this Court . . . has put itself in the second position to the legislature."

ROA.1044.  "I just don't think the legislature should be under the assumption that they cannot act."  ROA.1056.  The legislature exercised that authority and easily redrew District 22 and also District 13 on March 26.  ROA.608–36.  No party has challenged that plan.

This claim of error is moot.

## V.  In Response to the Amicus Argument, the District Court Explained that It Examined the African-American Representation Gap Solely to Demonstrate that No Affirmative Defense of Proportional Representation Existed

As if it did not read the district court's opinion, amicus Judicial Watch claims the district court gave "great probative weight," Amicus Br. at 10, to what the district court called "the representation gap" in African-American representation in the Mississippi Senate.  ROA.386.  But the district court expressly noted that "the representation gap is not itself a sufficient reason to . . . create additional majority-minority districts" given that Section 2 explicitly denies a right to proportional representation.  ROA.386.  Instead, the court said that the gap demonstrates that "defendants do not qualify for the kind of § 2 immunity" that exists when there is proportional representation.  ROA.386.  There is no error.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's finding of liability and leave the legislative remedy in place.

May 6, 2019                                    Respectfully submitted

*/s/ Robert B. McDuff*
ROBERT B. MCDUFF, MSB 2532
767 North Congress Street
Jackson, MS 39202
(601) 969-0802
rbm@mcdufflaw.com

JON GREENBAUM
EZRA D. ROSENBERG
ARUSHA GORDON
POOJA CHAUDHURI
LAWYERS'COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington, D.C. 20005
(202) 662-8600
erosenberg@lawyerscommittee.org
agordon@lawyerscommittee.org

BETH L. ORLANSKY, MSB 3938
MISSISSIPPI CENTER FOR JUSTICE
P.O. Box 1023
Jackson, MS 39205-1023
(601) 352-2269
borlansky@mscenterforjustice.org

ELLIS TURNAGE, MSB 8131
TURNAGE LAW OFFICE
108 N. Pearman Ave.
Cleveland, MS 38732
 (662) 843-2811
 eturnage@etlawms.com

PETER KRAUS
CHARLES SIEGEL
CAITLYN SILHAN
WATERS KRAUS
3141 Hood Street, Suite 700
Dallas, TX 75219

(214) 357-6244
 pkraus@waterskraus.com
 csiegel@waterskraus.com
 csilhan@waterskraus.com

*Attorneys for Plaintiffs-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed with the Clerk of Court the foregoing

brief with a corrected cover on May 7, 2019 (and filed and served the original

brief on May 6, 2019) by using the CM/ECF system, which serves all counsel of

record, and that I have served the District Court by email as follows:

> District Judge Carlton Reeves
> United States District Court
> Southern District of Mississippi, Northern Division
> 501 East Court Street, Ste. 5.500
> Jackson, MS 39201
> Reeves_chambers@mssd.uscourts.gov

I have also served all counsel of record by email:
Benjamin McRae Watson ben.watson@butlersnow.com
Brian Parker Berry parker.berry@butlersnow.com
Charles E. Cowan cec@wisecarter.com
Charles E. Griffin charles.griffin@butlersnow.com
Douglas T. Miracle dmira@ago.state.ms.us
Michael B. Wallace mkp@wisecarter.com
Tommie S. Cardin tommie.cardin@butlersnow.com
Russell T. Nobile trn@wisecarter.com

        *_s/ Robert B. McDuff_*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2, this document contains 12,989 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word, Version 2013, in 14-point Times New Roman font and 12-point Times New Roman font for footnotes.

This, the 6th day of May, 2019.


_s/ Robert B. McDuff_