# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

JOSEPH THOMAS; VERNON AYERS; MELVIN LAWSON,

Plaintiffs – Appellees

v.

PHIL BRYANT, Governor of the State of Mississippi, all in the official capacities of their own offices and in their official capacities as members of the State Board of Election Commissioners; DELBERT HOSEMANN, Secretary of State of the State of Mississippi, all in the official capacities of their own offices and in their official capacities as members of the State Board of Election Commissioners,

Defendants – Appellants

_____

On Appeal from the United States District Court for the Southern District of Mississippi; USDC No. 3:18-cv-00441-CWR-FKB

# EN BANC BRIEF OF APPELLEES

Robert B. McDuff, MSB 2532
767 North Congress Street
Jackson, MS 39202
(601) 969-0802
rbm@mcdufflaw.com

Beth L. Orlansky, MSB 3938
MISSISSIPPI CENTER FOR JUSTICE
P.O. Box 1023
Jackson, MS 39205-1023
(601) 352-2269
borlansky@mscenterforjustice.org

Ellis Turnage, MSB 8131
TURNAGE LAW OFFICE
108 N. Pearman Ave.
Cleveland, MS 38732
(662) 843-2811
eturnage@etlawms.com

Jon Greenbaum
Ezra D. Rosenberg
Arusha Gordon
Pooja Chaudhuri
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington, D.C. 20005
(202) 662-8600
erosenberg@lawyerscommittee.org

Peter Kraus
Charles Siegel
Caitlyn Silhan
WATERS KRAUS
3141 Hood Street, Suite 700
Dallas, TX 75219
(214) 357-6244
pkraus@waterskraus.com

*Counsel for Appellees*

JOSEPH THOMAS, *et al.,*
   Plaintiffs-Appellees,

v.                No. 19-60133

PHIL BRYANT, *et al.*,
   Defendants-Appellants.

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Honorable Court may evaluate possible disqualification or recusal.

1. Joseph Thomas, Appellee

2. Vernon Ayers, Appellee

3. Melvin Lawson, Appellee

4. Robert B. McDuff, Lead Counsel for Appellees

5. Beth L. Orlansky, Mississippi Center for Justice, Counsel for Appellees

6. Jon Greenbaum, Lawyers' Committee for Civil Rights Under Law, Counsel for Appellees

7. Ezra D. Rosenberg, Lawyers' Committee for Civil Rights Under Law, Counsel for Appellees

8. Arusha Gordon, Lawyers' Committee for Civil Rights Under Law,

Counsel for Appellees

9. Pooja Chaudhuri, Lawyers' Committee for Civil Rights Under Law, Counsel for Appellees

10. Ellis Turnage, Turnage Law Office, Counsel for Appellees

11. Peter Kraus, Waters Kraus, Counsel for Appellees

12. Charles Siegel, Waters Kraus, Counsel for Appellees

13. Caitlyn Silhan, Waters Kraus, Counsel for Appellees

14. Phil Bryant, Governor of Mississippi, Appellant

15. Delbert Hosemann, Secretary of State of Mississippi, Appellant

16. Michael B. Wallace, Wise Carter Child & Caraway P.A., Counsel for Appellants

17. Charles E. Cowan, Wise Carter Child & Caraway P.A., Counsel for Appellants

18. T. Russell Nobile, Wise Carter Child & Caraway P.A., Counsel for Appellants

19. Tommie S. Cardin, Butler Snow LLP, Counsel for Appellants

20. B. Parker Berry, Butler Snow LLP, Counsel for Appellants

21. Jim Hood, Attorney General of Mississippi

22. Douglas T. Miracle, Counsel for the Office of the Mississippi Attorney General

Respectfully submitted,

__*/s/* Jon M. Greenbaum__
November 22, 2019

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................i

TABLE OF CONTENTS ...................................................................iv

TABLE OF AUTHORITIES ............................................................ vii

STATEMENT REGARDING ORAL ARGUMENT .............................................1

STATEMENT OF JURISDICTION.........................................................2

STATEMENT OF THE ISSUES..........................................................3

INTRODUCTION ....................................................................4

STATEMENT OF THE CASE............................................................8

SUMMARY OF ARGUMENT ............................................................12

STANDARD OF REVIEW .............................................................14

ARGUMENT .......................................................................16

I.      This Case Is Moot .......................................................16

II.     28 U.S.C. § 2284(a) Does Not Require Convening A Three-Judge Court In
        This § 2 Case ...........................................................19

        A.      The Plain Language of 28 U.S.C. § 2284 Limits Three-Judge Courts
                To Constitutional Challenges.....................................20

        B.      No Canon of Statutory Construction Supports Defendants'
                Construction ....................................................22

        C.      The Legislative History Does Not Support Defendants'
                Construction ....................................................25

III.    The District Court Did Not Abuse Its Discretion Or Commit Clear Error In
        Rejecting Defendants' Laches Defense ....................................27

        A.      The District Court's Finding That There Was No Inexcusable Delay

Is Not Clearly Erroneous ................................................................27

B.  The District Court Did Not Clearly Err In Finding An Absence of Undue Prejudice ...............................................................29

1.  The Length Of Time Between The Filing Of the Complaint And The Election Did Not Unduly Prejudice Defendants 29

2.  The Ability Of Defendants To Complete The Appellate Process Does Not Constitute Prejudice For Purposes of Laches ...............................................................31

3.  The Trial Court Did Not Abuse Its Discretion In Ruling That Alleged Voter Confusion And The 2021 Redistricting Do Not Constitute Undue Prejudice .................................32

IV.  A Bare Majority-Minority District May Prevail On A § 2 Vote Dilution Claim Without Pleading Or Proving "Cracking" Or "Packing"..................37

A.  No Per Se Rule Prohibits § 2 Claims In Bare Majority-Minority Districts ...............................................................37

B.  Plaintiffs Need Not Prove "Packing" Or "Cracking" To Sustain A § 2 Vote Dilution "Results" Claim.......................................43

V.  The District Court Did Not Commit Legal Or Clear Factual Error In Its Rulings That Plaintiffs Had Satisfied The *Gingles* Preconditions And Had Proved Their § 2 Vote Dilution Claim Based On The Totality Of the Circumstances ...............................................................45

A.  Plaintiffs Proved The *Gingles* Factors ............................................46

B.  Plaintiffs Were Not Required To Prove A Causal Connection Between Discrimination And Depressed Political Participation .....47

C.  The District Court Did Not Err In Its Treatment of Proportionality ...............................................................51

VI.  The District Court's Remedial Order Of A New Plan Is Moot And The Legislative Plan Is Not Unconstitutional .......................................52

CONCLUSION ................................................................54

CERTIFICATE OF SERVICE ...............................................56

CERTIFICATE OF COMPLIANCE ........................................57

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ....................................................................... 55

*Allen v. State Bd. Of Elections,*
393 U.S. 544 (1969) ........................................................................... 27

*Anderson v. City of Bessemer City,*
470 U.S. 564 (1985) ..................................................................... 16, 17

*Ariz. Minority Coal. for Redistricting v. Ariz. Indep. Redistricting Comm'n,*
366 F. Supp. 2d 887 (D. Ariz. 2005) ........................................... 32, 35

*Bartlett v. Strickland,*
556 U.S. 1 (2009) ......................................................................... 41, 42

*BedRoc Ltd., LLC v. U.S.,*
541 U.S. 176 (2004) ........................................................................... 22

*Bone Shirt v. Hazeltine,*
336 F. Supp. 2d 976 (D.S.D. 2004) ................................................... 23

*Boneshirt v. Hazeltine,*
461 F.3d 1011 (8th Cir. 2006) ........................................................... 23

*Bouchikhi v. Holder,*
676 F.3d 173 (5th Cir. 2012) ............................................................. 22

*Bradas v. Rapides Parish Police Jury,*
508 F.2d 1109 (5th Cir. 1975) ........................................................... 42

*Brown v. Schedler,*
2018 WL 2092500 (E.D. La. May 3, 2018) ....................................... 20

*Cavanagh v. Brock,*
577 F. Supp. 176 (E.D.N.C. 1983) .................................................... 23

*Chestnut v. Merrill,*
356 F. Supp. 3d 1351 (N.D. Ala. 2019) ............................................ 29

*Chestnut v. Merrill,*
377 F. Supp. 3d 1308 (N.D. Ala. 2019) ............................................... 35

*Church of Scientology of Cal. v. U.S.,*
506 U.S. 9 (1992) ................................................................................. 18

*City of New Orleans v. BellSouth Telecomms., Inc.,*
690 F.3d 312 (5th Cir. 2012) .............................................................. 16

*Clark v. Calhoun Cty.,*
21 F.3d 92 (5th Cir. 1994) ........................................................... 46, 51

*Cooper v. Harris,*
137 S. Ct. 1455, 1482 (2017) .............................................................. 46

*Dickinson v. Ind. State Election Bd.,*
740 F. Supp. 1376 (S.D. Ind. 1990) ....................................... 23, 36, 38

*Dickinson v. Ind. State Election Bd.,*
933 F.2d 497 (7th Cir. 1991) ........................................................ 23, 36

*Fairley v. Hattiesburg,*
584 F.3d 660 (5th Cir. 2009) ....................................................... 16, 40

*Fouts v. Harris,*
88 F. Supp. 2d 1351 (S.D. Fla. 1999) ................................................. 35

*Garza v. Cty. of Los Angeles,*
756 F. Supp. 1298 (C.D. Cal. 1990) ................................................... 32

*Garza v. Cty. of Los Angeles,*
918 F.2d 763 (9th Cir. 1990) .............................................................. 32

*Growe v. Emison,*
507 U.S. 25 (1991) ............................................................................. 41

*Hancock Cty. Bd. of Supervisors v. Ruhr,*
568 F. App'x 295 (5th Cir. 2014) ....................................................... 20

*Harris v. Ariz. Indep. Redistricting Comm'n,*
136 S. Ct. 1301 (2016) ....................................................................... 23

*Harris v. City of Houston*,
   151 F.3d 186 (5th 1998) ....................................................................19

*HC Gun & Knife Shows, Inc. v. City of Houston*,
   201 F.3d 544 (5th Cir. 2000) ............................................................33

*Husted v. Ohio State Conf. of N.A.A.C.P.*,
   573 U.S. 988 (2014)..........................................................................38

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
   304 F.3d 829 (9th Cir. 2002) ............................................................30

*Jeffers v. Clinton*,
   498 U.S. 1019 (1991)........................................................................37

*Jeffers v. Clinton*,
   730 F. Supp. 196 (E.D. Ark. 1989).................................................37

*Jones v. City of Lubbock*,
   727 F.2d 364 (5th Cir. 1984) ............................................................56

*Kalson v. Patterson*,
   542 F.3d 281 (2d Cir. 2008) .............................................................24

*Ketchum v. Byrne*,
   740 F.2d 1398 (7th Cir. 1984) .............................................. 43, 44, 47

*Kingman Park Civic Ass'n v. Williams*,
   348 F.3d 1033 (D.C. Cir. 2003)........................................................40

*Kirksey v. Bd. of Supervisors of Hinds Cty.*,
   554 F.2d 139 (5th Cir. 1977) ............................................................43

*Libertarian Party v. Dardenne*,
   595 F.3d 215 (5th Cir. 2010) ............................................................21

*Lopez v. City of Houston*,
   617 F.3d 336 (5th Cir. 2010) .......................................... 18, 19, 20, 21

*Lopez v. Hale Cty.*,
   506 U.S. 1042 (1993)........................................................................32

*Lopez v. Hale Cty.*,
797 F. Supp. 547 (N.D. Tex. 1992) ......................................................32

*LULAC v. Perry,*
548 U.S. 399 (2006)........................................................... 39, 47

*Mac Govern v. Connolly*,
637 F. Supp. 111 (D. Mass. 1986) ......................................................32

*Maxwell v. Foster*,
1999 WL 33507675 (W.D. La. Nov. 24. 1999 ....................................35

*Md. Casualty Co. v. Pacific Coal & Oil Co.*,
312 U.S. 270 (1941)......................................................................19

*Md. Citizens for a Representative Gen. Assembly v. Governor of Md.*,
429 F.2d 606 (4th Cir. 1970) ......................................................35

*Metts v. Almond*,
217 F. Supp. 2d 252 (D.R.I. 2002) ......................................................23

*Metts v. Murphy*,
363 F.3d 8 (1st Cir. 2004).................................................................23

*Milavetz v. U.S.*,
550 U.S. 229 (2010)......................................................................26

*Miller v. Johnson*,
515 U.S. 900 (1995).........................................................................45

*Mirrione v. Anderson*,
717 F.2d 743 (2d Cir. 1983) ......................................................24

*Mo. State Conf. of the N.A.A.C.P. v. Ferguson-Florissant Sch. Dist.*,
894 F.3d 924 (8th Cir. 2018) .................................................. 40, 41

*Monroe v. City of Woodville*,
881 F.2d 1327 (5th Cir. 1989) ..............................................40

*Moore v. Leflore Cty. Bd. of Election Comm'rs*,
502 F.2d 621 (5th Cir. 1974) .................................................. 41, 43

x

*N.A.A.C.P. v. Fordice*,
  252 F.3d 361 (5th Cir. 2001) ...............................................................52

*Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*,
  40 F.3d 698 (5th Cir. 1994) .................................................................29

*North Carolina v. League of Women Voters of N.C.*,
  135 S. Ct. 6 (2014)................................................................................38

*Obduskey v. McCarthy & Holthus LLP*,
  139 S.Ct. 1029 (2019)...........................................................................26

*Old Person v. Brown*,
  182 F. Supp. 2d 1002 (D. Mont. 2002)..................................................23

*Old Person v. Brown*,
  312 F.3d 1036 (9th Cir. 2002) ..............................................................23

*Page v. Bartels*,
  248 F.3d 175 (3d Cir. 2001) .................................................................23

*Perez v. Abbott*,
  253 F. Supp. 3d 864 (W.D. Tex. 2017) ........................................... 41, 46

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014)..............................................................................30

*Pope v. Cty. of Albany*,
  687 F.3d 565 (2d Cir. 2012) .................................................................40

*Preiser v. Newkirk*,
  422 U.S. 395 (1975)..............................................................................19

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006)............................................................................ 37, 38

*Rangel v. Morales*,
  8 F.3d 242 (5th Cir. 1993) ...................................................................30

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
  842 F.3d 883 (5th Cir. 2016) .................................................... 16, 29, 31

*Reynolds v. Sims*,
  377 U.S. 533 (1964) .......................................................................37

*Rural W. Tenn. African Am. Affairs Council v. Sundquist*,
  209 F.3d 835 (6th Cir. 2000) ........................................................23

*Rural W. Tenn. African Am. Affairs Council v. Sundquist*,
  29 F. Supp. 2d 448 (W.D. Tenn. 1998) ........................................23

*Salas v. Sw. Tex. Jr. Coll. Dist.*,
  964 F.2d 1542 (5th Cir. 1992) ......................................................40

*Sanchez v. Colo.*,
  861 F. Supp. 1516 (D. Colo. 1994) ...............................................23

*Sanchez v. Colo.*,
  97 F.3d 1303 (10th Cir. 1996) ......................................................23

*Sanders v. Dooly Cty.*,
  245 F.3d 1289 (11th Cir. 2001) ....................................................36

*Save Our Wetlands, Inc. v. U.S. Army Corps of Eng'rs*,
  549 F.2d 1021 (5th Cir. 1977) ......................................................29

*Seals v. Quarterly Cty. Court of Madison*,
  562 F.2d 390 (6th Cir. 1977) ........................................................34

*Shelby Cty. v. Holder*,
  570 U.S. 529 (2013) ................................................................ 55, 56

*Simkins v. Gressette*,
  631 F.2d 287 (4th Cir. 1980) ................................................... 32, 35

*Sullivan v. Crowell*,
  444 F. Supp. 606 (W.D. Tenn. 1978) ............................................23

*Teague v. Attala Cty.*,
  92 F.2d 283 (5th Cir. 1996) ..........................................................51

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
  908 F.3d 127 (5th Cir. 2018) ................................................... 22, 26

*Thomas v. Bryant*,
919 F.3d 298 (5th Cir. 2019) ................................................................ 26, 33, 40

*Thomas v. Bryant*,
938 F.3d 134 (5th Cir. 2019) ...................................................................... passim

*Thornburg v. Gingles*,
478 U.S. 30 (1986).............................................................................. 6, 16, 46, 50

*U.S. ex rel. Vaughn v. United Biologics, L.L.C.*,
907 F.3d 187 (5th Cir. 2018) ................................................................................26

*U.S. v. Atl. Research Corp.*,
551 U.S. 128 (2007)................................................................................................25

*U.S. v. Bass*,
404 U.S. 336 (1971)................................................................................................24

*U.S. v. Marek*,
238 F.3d 310 (5th Cir. 2001) ................................................................................16

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) ................................................................. 38, 50, 56

*Veasey v. Perry*,
769 F.3d 890 (5th Cir. 2014) ................................................................................38

*Watkins v. Mabus*,
502 U.S. 954 (1991)................................................................................................19

*Watkins v. Mabus*,
771 F. Supp. 789 (S.D. Miss. 1991) ....................................................................19

*Weinstein v. Bradford*,
423 U.S. 147 (1975)................................................................................................21

*White v. Daniel*,
909 F.2d 99 (4th Cir. 1990) ..................................................................................32

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)................................................................................................25

*Wilson v. Minor*,
220 F.3d 1297 (11th Cir. 2000) ...........................................................................34

**Statutes**

28 U.S.C. § 2284(a) ....................................................................................... passim

Act of June 18, 1910, Pub. L. No. 61-218, 36 Stat. 557 .........................................28

Act of June 29, 1982, Pub. L. No. 97-205, 96 Stat. 134 ........................................28

Act of Nov. 9, 1984, Pub. L. No. 98-620, 98 Stat. 3335 ........................................29

Miss. Code Ann. § 15-1-49 .......................................................................................30

Miss. Code Ann. § 23-15-851 ...................................................................................20

**Rules**

Fed. R. Civ. P. 52 .......................................................................................... passim

**Secondary Sources**

S. Rep. 94-204 (1975), No. 204, 94th Cong., 2d Sess. 1976, *as reprinted in* 1976
U.S.C.C.A.N. 1988 ...............................................................................................28

S. Rep. No. 417, 97th Cong., 2d Sess. 29, *as reprinted in* 1982 U.S.C.C.A.N. 177
.................................................................................................................................51

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012) 24, 25

**Treatises**

17 Charles Alan Wright et al., Federal Practice and Procedure § 4235 (3d ed. 2007)
.................................................................................................................................23

22 James WM Moore et al., Moore's Federal Practice § 404.02[1] (3d ed. 1997) .23

**Internet Sources**

*2019 Candidate Qualifying Deadline*, Miss. Sec'y of State,
https://www.sos.ms.gov/Elections-
Voting/Documents/QualifyingForms/2019%20Candidate%20Qualifying%20List
.pdf (last visited Nov. 20, 2019) ..........................................................................12

*Mississippi State Senate District 13 General Race*, Clarion Ledger (Nov. 5, 2019), https://data.clarionledger.com/election-results/race/ms-state-senate-district-13--2019-11-05-general/20191105MS25042/ (last visited Nov. 20, 2019) ...............13

*Official County Recapitulation Sheets 2019 Democratic Primary Runoff Election*, Miss. Sec'y of State, https://www.sos.ms.gov/Elections-Voting/Pages/2019-Democratic-Primary-Runoff.aspx (last visited Nov. 20, 2019) ...........................12

*Official County Recapitulation Sheets 2019 General Election*, Miss. Sec'y State, https://www.sos.ms.gov/Elections-Voting/Pages/2019-General-Election.aspx (last visited Nov. 20, 2019)...................................................................................13

*Official County Recapitulation Sheets 2019 Republican Primary Runoff Election*, Miss. Sec'y of State, https://www.sos.ms.gov/Elections-Voting/Pages/2019-Republican-Primary.aspx (last visited Nov. 20, 2019).........................................12

**STATEMENT REGARDING ORAL ARGUMENT**

This case has been set for oral argument during the week of January 20, 2020.

**STATEMENT OF JURISDICTION**

This Court lacks jurisdiction because this appeal has been rendered moot by the holding of the general election on November 5, 2019, in accordance with the legislature's remedial plan for Senate District 22, and the fact that the next election will not be held until 2023 after the next statewide redistricting. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

**STATEMENT OF THE ISSUES**

1.      Is this appeal moot because the November 5, 2019 election has been held under the legislature's remedial plan, and no election will take place in District 22 until after new redistricting in accordance with the 2020 Census results?

2.      Does the word "constitutionality" in the three-judge court provision of 28 U.S.C. § 2284(a) apply to both "the apportionment of congressional districts" and "the apportionment of any statewide legislative body," or does it modify only "the apportionment of congressional districts" so that purely § 2 Voting Rights Act ("VRA") challenges are heard by single-judges for congressional districts but three-judge courts for statewide legislative bodies?

3.      Did the district court abuse its discretion in ruling that this action was not barred by laches?

4.      Did the district court commit legal error and/or clear error in its findings of fact, in ruling that Defendants violated § 2 of the VRA?

**INTRODUCTION**

This appeal is now moot. The only general election for the new Mississippi Senate District 22 pursuant to the legislative remedial plan occurred on November 5, 2019. The next general election in the district is not until 2023, by which time new statewide redistricting will be completed in accordance with the results of the 2020 Census. Nothing this Court, Defendants, or the Mississippi legislature can do will affect that situation, so there is no longer a justiciable case or controversy.

That makes this case an unlikely vehicle for the extraordinary wish list of new law and the overturning of this Circuit's precedents that Defendants press on this appeal. Even were the matter still justiciable, the district court's decision is deeply rooted in this Circuit's voting rights jurisprudence. It is a simple case, focusing on a single legislative district, which—despite teetering on the brink of majority-minority status—was unable to elect the candidates of choice of African-American voters in any election since 2003.

The proofs adduced at trial were straight-forward and largely uncontested. Plaintiffs easily met the preconditions of *Thornburg v. Gingles*, 478 U.S. 30 (1986), proving without challenge that a geographically compact and sufficiently numerous majority-minority district could be created and that voting was racially polarized in that African-Americans voted cohesively and white voters voted as a bloc, usually defeating African-Americans' candidates of choice. This, coupled

with the undisputed evidence of historic racial discrimination, socio-economic disparity and depressed political participation, racial polarization, and lack of African-Americans elected within the state and district, easily demonstrated the totality of the circumstances to support the court's conclusion that "plaintiffs have established that District 22's lines result in African-Americans having less opportunity than other members of the electorate to elect the State Senator of their choice." ROA.386.

After the district court repeatedly emphasized the legislature's option of adopting its own plan, and after this Court denied Defendants' stay motion, but gave the legislature a specific deadline to adopt its own plan, the legislature easily did so on March 26 shifting eight precincts between Districts 22 and 13, so as to increase the BVAP in District 22 from 50.8% to 58.1%. ROA.617; ROA.621; ROA.638. No party challenged the plan. The election went off as scheduled in November, with African-Americans winning in both Districts 13 and 22.

The district court's finding of § 2 vote dilution liability is subject to the "clear error" rule, and although Defendants' arguments are cloaked as legal error, several are attacks on the court's findings of fact. Each argument asks this Court to take steps that no other court has ever taken. Defendants argue that a three-judge panel should have been convened to hear this case, even though no court in the thirty-seven-year history of 28 U.S.C. §2284(a) has ever construed it as

*requiring* a three-judge panel other than in cases involving the constitutionality of federal or state apportionment. They argue that laches barred this action, even though no case has ever applied that doctrine in circumstances remotely similar to those here, where the complaint was filed more than a year before any relevant election, and Defendants cannot prove undue prejudice. They ask this Court to overturn its consistent precedent allowing plaintiffs to bring § 2 vote dilution claims, where the challenged jurisdiction is bare majority-minority. They ask this Court to overturn other solid precedent that relieves plaintiffs in § 2 vote dilution cases from having to prove a causal connection between historic discrimination and depressed political participation. And, finally, in a blunderbuss assault on § 2, they give this Court the Hobson's choice of either declaring the statute unconstitutional (on such ludicrous grounds as, because § 5 of the VRA was declared inoperative by the Supreme Court, so should § 2) or just avoid the problem by reversing the judgment below.

To be sure, Defendants sprinkle factual attacks on the district court's decision—such as the court's acceptance of Plaintiffs' expert's racial polarization analysis (despite Defendants' withdrawal of the very objection it asserts at trial and on appeal), ROA.735; ROA.1085–90, and the district court's not blindly accepting Defendants' statewide, self-reporting census data on voter participation, *see* ROA.384; ROA.965–68. Even these, they claim are "legal error," aware that

application of Rule 52 dooms their chances.

This Court should not hear this appeal, but, if it does, it should affirm the district court's judgment in its entirety.

## STATEMENT OF THE CASE

Plaintiffs refer the Court to the Statement of the Case in their brief filed before the merits panel, and add the following facts, focusing on more recent events.

When the district court announced on February 13, 2019, that it would rule District 22 violated § 2 of the VRA, it immediately invited the legislature to enact a remedial plan. ROA.355–56. It repeated this invitation when it issued its memorandum opinion on February 19, ROA.387, when the legislature had over seven weeks left in its regular session. For its own reasons, the legislature decided that it would not approach the redrawing of District 22 until Defendants had exhausted their avenues of achieving a stay of the district court's order. At no time did Defendants or the legislature advise the district court or this Court that it did not have sufficient time to enact a new plan. *See* ROA.470.

For example, on February 21, the district court conducted a teleconference joined by Secretary Hosemann, in which "[t]he parties convinced the Court that no further hearings were necessary." ROA.508. Defendants also "said they would confer to be sure, then made no request at all [for a hearing]. The lack of urgency was apparent." *Id*.

On February 25, the district court asked Defendants to report by noon the next day on the legislature's progress. ROA.457. On February 26, the Governor

and the Secretary informed the court that:

> [T]hey are authorized to report that, should the stay motions pending before this Court and the Fifth Circuit be denied, the Senate desires the opportunity to enact a new redistricting plan redrawing Senate District 22.  Defendants, as litigants in this Court, expect to be in a position to support that plan.

ROA.470.  Thus advised, the district court denied Defendants' motion to stay pending appeal, ROA.474–80, extended the qualifying deadline to March 15, ROA.473, ordered into effect Plaintiffs' Illustrative Plan 1, *see id.*, and entered final judgment, ROA.481.

On March 4, the district court convened a hearing on the motion for stay of final judgment pending appeal.  ROA.1045–48.  The court emphasized that the legislature "still [has] every right to seek to implement a remedy" and "this Court . . . has put itself in the second position to the legislature," ROA.1044, "I just don't think the legislature should be under the assumption that they cannot act," ROA.1056.

On March 15, this Court denied Defendants' motion to stay final judgment, and gave the legislature and Governor until April 3 "an opportunity to remedy the Section 2 violation."  ROA.558.

The legislature was able to draw up a new plan quickly, enacting the implementing legislation on March 26, well within the deadline given by this Court and days before the legislature's regular session ended.  ROA.612–36 (Miss Legis.,

J.R. 202 (2019)).  The new plan affected only two districts, and a total of only eight precincts within those districts. Three precincts were moved from District 13 to District 22 (all in Sunflower County) and five precincts were moved from District 22 to District 13 (all in Bolivar County).  ROA.609; ROA.617; ROA.621. No party challenged the legislature's plan.

The legislature's plan was used in the primary election on August 6, 2019. There were five Democratic candidates and two Republican candidates who qualified in District 22.[1]  Plaintiff Thomas won the Democratic primary in District 22 after a runoff[2] and Hayes Dent won the Republican primary.[3]

In the November general election, Plaintiff Thomas won by a vote of 10,464 (52.2%) to 9,570 (47.8%), winning in the five majority black counties in District 22 and losing in the only majority white county, Madison County, by a vote of 5,513 (67.2%) to 2,676 (32.8%).[4]  In District 13, the other affected district, the

---

[1] *See 2019 Candidate Qualifying Deadline*, Miss. Sec'y of State, https://www.sos.ms.gov/Elections-Voting/Documents/QualifyingForms/2019%20Candidate%20Qualifying%20List.pdf (last visited Nov. 20, 2019).

[2] *See Official County Recapitulation Sheets 2019 Democratic Primary Runoff Election*, Miss. Sec'y of State, https://www.sos.ms.gov/Elections-Voting/Pages/2019-Democratic-Primary-Runoff.aspx (last visited Nov. 20, 2019).

[3] *See Official County Recapitulation Sheets 2019 Republican Primary Runoff Election*,  Miss. Sec'y of State, https://www.sos.ms.gov/Elections-Voting/Pages/2019-Republican-Primary.aspx (last visited Nov. 20, 2019).

[4] *Mississippi State Senate District 22 General Race*, Clarion Ledger (Nov. 5, 2019),

African-American Democratic candidate won with 65% of the vote.[5]

https://data.clarionledger.com/election-results/race/ms-state-senate-district-13--2019-11-05-general/20191105MS25042/ (last visited Nov. 20, 2019); *Official County Recapitulation Sheets 2019 General Election*, Miss. Sec'y State, https://www.sos.ms.gov/Elections-Voting/Pages/2019-General-Election.aspx (last visited Nov. 20, 2019).

[5] *Mississippi State Senate District 13 General Race*, Clarion Ledger (Nov. 5, 2019), https://data.clarionledger.com/election-results/race/ms-state-senate-district-13--2019-11-05-general/20191105MS25042/ (last visited Nov. 20, 2019); *Official County Recapitulation Sheets 2019 General Election*, Miss. Sec'y State, https://www.sos.ms.gov/Elections-Voting/Pages/2019-General-Election.aspx (last visited Nov. 20, 2019).

## SUMMARY OF ARGUMENT

There is no longer a case or controversy sufficient to allow this Court to take jurisdiction of this appeal, because the election has already been held in District 22 as enacted by the legislature post-judgment. The next election will occur years after the next redistricting cycle.

Even were the appeal not moot, the district court's finding of liability as to the § 2 violation should be affirmed. Defendants' argument that the district court erred in not convening a three-judge court under 28 U.S.C. § 2284(a), is contrary to statutory language, has never been adopted by any court in the decades the statute has been in effect, and would lead to the nonsensical result of three-judge courts hearing purely § 2 state legislative claims but single judges hearing such congressional redistricting claims.

The district court did not abuse its discretion in not finding laches because Defendants fail to show how they were unduly prejudiced by the timing of the filing of the case, or that the district court committed clear error in finding no undue prejudice, particularly where the complaint was filed more than a year before the next election.

This action is not barred because African-Americans are a slight voting age majority in District 22. The Supreme Court noted that majority-minority populations can, in some circumstances, lack real electoral opportunity, and this

Court and other courts have held that minorities can bring vote dilution cases when they are a majority in eligible voter population. Contrary to Defendants' argument, allowing this case to proceed under § 2 does not "guarantee" the success of minority-preferred candidates, but rather provides African-Americans with a realistic opportunity to participate equally in the political process. Moreover, to the extent that these arguments are intertwined with an attack on the district court's remedy, Defendants concede that the injunction is not in effect, and, therefore, issues relating to the court's remedial order are moot. Defs' Br. at 1 n.2.[6]

The district court's conclusion of § 2 liability was not based on legal error in its treatment of the issue of proportionality and did not otherwise rest on findings that were "clear error." Further, the district court properly found that African-American participation is lower than white participation in District 22, and even if that were not so, it would not bar suit.

Finally, Defendants' request that this Court apply the doctrine of constitutional avoidance should be rejected, because neither § 2 nor the way the district court applied the statute is unconstitutional.

---

[6] Hereinafter, Defendants' opening brief will be referred to as Br. at [].

## STANDARD OF REVIEW

Grant of rehearing en banc has the "collateral effect of vacating" the panel's decision and the en banc court reviews the district court's rulings anew. *U.S. v. Marek*, 238 F.3d 310, 313 (5th Cir. 2001).

The district court's conclusions of law, including issues of statutory interpretation and whether § 2 of the VRA was violated, are reviewed *de novo*. *City of New Orleans v. BellSouth Telecomms., Inc.*, 690 F.3d 312, 322 (5th Cir. 2012); *Fairley v. Hattiesburg*, 584 F.3d 660, 667 (5th Cir. 2009).

The district court's application of legal principles such as its ruling on laches is reviewed for abuse of discretion, which will be overturned only if its findings as to delay, unreasonableness, and prejudice are in clear error. *Retractable Techs., Inc. v. Becton Dickinson & Co*., 842 F.3d 883, 898 (5th Cir. 2016).

 "[T]he ultimate finding of vote dilution [is] a question of fact subject to the clearly-erroneous standard of Rule 52(a)." *Gingles,* 478 U.S. at 78. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985). "[W]hen a trial judge's finding is based on his

decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.* at 575.

# ARGUMENT

## I. This Case Is Moot.

Under Article III of the United States Constitution, "to qualify as a case for federal court adjudication, a case or controversy must exist at all stages of the litigation, not just at the time the suit was filed." *Lopez v. City of Houston*, 617 F.3d 336, 340 (5th Cir. 2010) (declaring moot late-decade § 2 VRA challenge, because election passed and next election to be held in district was dictated by next census). "[I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief what[so]ever to a prevailing party," the case is moot and no longer justiciable. *Church of Scientology of Cal. v. U.S.*, 506 U.S. 9, 12 (1992) (citation omitted). Here, the November 5 election and the fact that the next election from the district will not be held until 2023—and then, only pursuant to the statewide redistricting that will follow the 2020 Census—render this case moot. There is no longer any effectual relief available to a prevailing party on this appeal.[7]

With limited exceptions not relevant here, courts have consistently ruled that intervening elections render appeals moot. *See, e.g., Watkins v. Mabus*, 502 U.S.

---

[7] Specifically, the provision in the enactment codifying the legislative remedial plan providing that the amendments for Districts 22 and 13 "shall be repealed and the districts as originally configured" shall be used if "appellants prevail" on this appeal, ROA.635–36, has no force and effect now that the only election has occurred.

954, 954 (per curiam), *aff'g in part, vacating in part as moot* 771 F. Supp. 789

(S.D. Miss. 1991) ("The completion of the September 17 election has rendered this

claim moot with regard to the relief sought, i.e., an order enjoining the September

17 election for failure to comply with preclearance requirements."); *Lopez,* 617

F.3d at 340. A court "simply cannot enjoin that which has already taken place."

*Harris v. City of Houston*, 151 F.3d 186, 189 (5th 1998) (dismissing as moot a

voting law case in which the complained-of election had passed).[8]

That Plaintiffs asked for declaratory relief in addition to injunctive relief

does not change the equation. The question is whether "under all the

circumstances," the facts alleged "show that there is a substantial controversy,

between parties having adverse legal interests, of sufficient immediacy and reality

to warrant the issuance of a declaratory judgment." *Md. Casualty Co. v. Pacific

Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *Preiser v. Newkirk*, 422 U.S. 395, 401–

02 (1975) (dismissing appeal from prisoner seeking declaratory relief that a

transfer to maximum security was unconstitutional, where prisoner had been

transferred back to minimum security). There is neither immediacy nor reality to

Plaintiffs' claims at this point. No election will be held under the same districting

---

[8] As would be expected, these cases typically arise on appeals by plaintiffs who had challenged the holding of an election that occurred after trial court judgment, but before appeal. There is no basis to distinguish these cases from those arising on appeals by defendants who claim that elections should not have been held in districts resulting from favorable decisions in favor of plaintiffs.

lines again, without reference to completely different Census results.

Nor does the theoretical possibility of a special election establish justiciability.[9] The remedy of a special election is decidedly disfavored and has served to save a case from a finding of mootness under extraordinarily narrow circumstances, i.e., only where there is proof of evidence of racial discrimination amounting to an "egregious defiance of the Voting Rights Act." *Lopez,* 617 F.3d at 340; *Hancock Cty. Bd. of Supervisors v. Ruhr*, 568 F. App'x 295, 301 (5th Cir. 2014) (declaring moot one-person/one-vote challenge after intervening election, explaining, "[a]ppellants have not asserted factual allegations justifying a special elections remedy; there has been no evidence that the Mississippi county election officials deliberately defied the requirements of the Voting Rights Act or otherwise acted egregiously or in bad faith"); *Brown v. Schedler*, 2018 WL 2092500, at *4 (E.D. La. May 3, 2018) (concluding the plaintiffs had not made a claim of such "egregious or invidious discrimination" that would make judicial invalidation of the election appropriate).

Finally, this case does not qualify under the exception to mootness, that "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same

---

[9] The legislature has statutory power to call a special election only in cases of vacancy.  Miss. Code Ann. § 23-15-851.

complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). The party invoking this exception must show a "demonstrated probability" or "reasonable expectation," not merely a "theoretical possibility," that it will be subject to the same government action. *Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010) (internal quotations omitted).

Here, there is "no reasonable expectation" or "demonstrated probability" that another state senate election will take place under the legislature's March 26 plan. The 2020 Census will report the population of the district more than two years before the next state senate election in 2023, and the legislature will engage in redistricting prior to 2023. There is no probability that another election will be held under the current plan because, otherwise, it would violate the one-person/one-vote principle. *See, e.g., Lopez,* 617 F.3d at 341 (exception to mootness doctrine inapplicable where there was no evidence that city would violate its charter by failing to add additional single-member districts if the population hit a certain threshold after upcoming census).

## II.     28 U.S.C. § 2284(a) Does Not Require Convening a Three-Judge Court in This § 2 Case.

At the eleventh hour, Defendants raised the issue that Plaintiffs' claims should be tried by a three-judge panel, pursuant to 28 U.S.C. § 2284(a). ROA.243–45. A number of state legislative redistricting § 2-only cases have been tried to a single judge, but never in front of three judges. There is no basis in the statute's

language, legislative history, or any applicable canons of statutory construction for this Court to rule otherwise.  Moreover, Defendants' construction would lead to absurd results.

A.  The Plain Language of 28 U.S.C. § 2284 Limits Three-Judge Courts to Constitutional Challenges.

"The judicial inquiry thus 'begins with the statutory text, and ends there as well if the text is unambiguous.'"  *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 132 (5th Cir. 2018) (quoting *BedRoc Ltd., LLC v. U.S.*, 541 U.S. 176, 183 (2004)).  Here, § 2284(a) states in pertinent part:

> A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.

The plain language of a statute is construed to express its ordinary meaning. *Bouchikhi v. Holder*, 676 F.3d 173, 177 (5th Cir. 2012).  The language of § 2284(a) could not be plainer: only constitutional challenges to apportionment, whether of congressional districts or of any statewide legislative body, are subject to three-judge review unless "otherwise required by Act of Congress."  For decades, district courts have routinely handled challenges to statewide legislative maps under § 2 of the VRA as single-judge matters, and appellate courts— including the Supreme Court—have reviewed their decisions without a doubt as to jurisdiction.  *See, e.g., Harris v. Ariz. Indep. Redistricting Comm'n*, 136 S. Ct.

1301, 1306 (2016) (§ 2284(a) "provid[es] for the convention of [a three-judge district court] whenever an action is filed challenging the *constitutionality* of apportionment of legislative districts") (emphasis added).[10]  Leading scholars have adopted this position as well.  22 James WM Moore et al., Moore's Federal Practice § 404.02[1] (3d ed. 1997) (three-judge district court required "in cases challenging the constitutionality of state or federal legislative apportionment"); 17 Charles Alan Wright et al., Federal Practice and Procedure § 4235 (3d ed. 2007) ("[A] three-judge court for reapportionment cases . . . [is convened for] all federal constitutional challenges that could result in a reapportionment.").  There could scarcely be more powerful evidence of the unambiguous text of this statute.[11]

---

[10] *See also Cavanagh v. Brock*, 577 F. Supp. 176, 180 n.3 (E.D.N.C. 1983) (three-judge court) ("A three-judge court is mandated pursuant to § 2284 when an action challenges the apportionment of a statewide legislative body on substantial *federal* constitutional grounds.") (emphasis in original); *Sullivan v. Crowell*, 444 F. Supp. 606, 615 n.6 (W.D. Tenn. 1978) (three-judge court) ("Congress did not intend to require a three-judge court in the state legislative apportionment context except where a constitutional challenge is made to a statute involving the apportionment of (a) statewide legislative body") (internal quotations omitted).  Examples of single-judge courts adjudicating § 2 vote dilution cases challenging state apportionment are *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976 (D.S.D. 2004), *aff'd*, 461 F.3d 1011 (8th Cir. 2006) (South Dakota legislature); *Metts v. Almond*, 217 F. Supp. 2d 252 (D.R.I. 2002), *rev'd on other grounds sub nom. Metts v. Murphy*, 363 F.3d 8 (1st Cir. 2004) (en banc) (Rhode Island Senate); *Old Person v. Brown*, 182 F. Supp. 2d 1002 (D. Mont.), *aff'd*, 312 F.3d 1036 (9th Cir. 2002) (Montana legislature); *Rural W. Tenn. African Am. Affairs Council v. Sundquist*, 29 F. Supp. 2d 448 (W.D. Tenn. 1998), *aff'd*, 209 F.3d 835 (6th Cir. 2000) (Tennessee House); *Sanchez v. Colo.*, 861 F. Supp. 1516 (D. Colo. 1994), *rev'd on other grounds*, 97 F.3d 1303 (10th Cir. 1996) (Colorado House); *Dickinson v. Ind. State Election Bd.*, 740 F. Supp. 1376 (S.D. Ind. 1990), *rev'd in part, vacated in part*, 933 F.2d 497 (7th Cir. 1991) (Indiana House.).

[11] *Page v. Bartels*, 248 F.3d 175 (3d Cir. 2001), fully supports Plaintiffs' reading of the statute. Although the Third Circuit concluded that the single-judge district court, confronted with a complaint alleging *both* constitutional and § 2 challenges to a state legislative apportionment,

B.    No Canon of Statutory Construction Supports Defendants'
      Construction.

Nevertheless, Defendants proceed through a series of gyrations under the

pretext of statutory construction, each of which can be easily dispatched.  Br. at

11–14.  First, contrary to Defendants' argument, Br. at 14, the "series modifier"

canon of construction, which holds that a modifier ordinarily applies to an entire

series of parallel terms, Scalia & Garner, *Reading Law: The Interpretation of Legal*

*Texts* 147 (2012), supports a reading that "constitutionality" modifies both "the

apportionment of congressional districts" and "the apportionment of any statewide

legislative body."  When the modifier "undeniably applies to at least one

antecedent, and since it makes sense with all three, the more plausible construction

here is that it in fact applies to all three."  *U.S. v. Bass*, 404 U.S. 336, 339–40

(1971) (applying modifier "in commerce or affecting commerce" to all antecedents

in list).

---

should have left the issue of preliminary relief to the three-judge court, it analyzed the issue only
because it viewed the § 2 claim as *outside* the scope of § 2284(a).  *Id.* at 181 (describing § 2284
as "a special procedural mechanism for constitutional challenges to statewide legislative
apportionment schemes").  *Mirrione v. Anderson*, 717 F.2d 743 (2d Cir. 1983), relied upon by
amicus curiae Judicial Watch, JW Br. at 5, adds nothing to the debate.  There, the complaint
alleging § 2 and constitutional violations in connection with a state redistricting was heard by a
single judge, whose dismissal of the action was affirmed by the Second Circuit, without
comment on the issue of whether a three-judge panel should have heard the matter.  This was
twenty-five years before the Second Circuit ruled that a three-judge panel was a jurisdictional
requirement under § 2284(a) in *Kalson v. Patterson*, 542 F.3d 281, 287 (2d Cir. 2008).

Defendants' argument that a single-word determiner "the" appearing before the second part of § 2284(a)—"apportionment of any statewide legislative body"— was intended to cut off the application of "constitutionality" to that second part, Br. at 14, ignores the context to which the series modifier canon is "highly sensitive." Scalia & Garner, *supra* p. 28, at 150. As Justice Scalia put it: "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). It is "highly unlikely" that Congress would make such an important decision as delegating a specific set of cases to three-judge panels "through such a subtle device," *see id.*, as the word "the".

Second, Defendants' contention that the second use of "the apportionment of" before the phrase "any statewide legislative body" results in needless surplus words unless the statute is construed according to Defendants' liking, Br. at 14, distorts the surplusage canon. Some surplusage in a statute is only natural. Justice Thomas has explained, "[i]n any event, our hesitancy to construe statutes to render language superfluous does not require us to avoid surplusage at all costs. It is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that threatens to render the entire provision a nullity." *U.S. v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007). Unlike the authority relied upon by

Defendants, the allegedly superfluous phrase makes complete sense within the context of the statute as a whole and does not render any other part of the statute superfluous.[12]  Here, the phrase "the apportionment of" has no similar effect.  It is simply a few redundant words that do not change the meaning of the statute.

Finally, Defendants' construction would violate the canon of statutory construction that statutes should not be construed in a way that leads to an absurd result.  *Milavetz v. U.S.*, 550 U.S. 229, 245–246 (2010).  Here, Defendants' construction would mean that state legislative redistricting cases brought solely under § 2 would be heard by three-judge courts while similar congressional redistricting cases would be heard by single judges, a nonsensical result, as this Court's motions panel observed.  *See Thomas v. Bryant*, 919 F.3d 298, 307 (5th Cir. 2019).

---

[12] Compare with the cases relied upon by Defendants and amicus curiae Judicial Watch: *Obduskey v. McCarthy & Holthus LLP*, 139 S.Ct. 1029, 1037 (2019) (holding that the word "also" before "also includes" in the secondary definition of debt collector under Fair Debt Collection Act was intended to add requirements); *Tex. Educ. Agency*, 908 F.3d at 132 (5th Cir. 2018) (ruling that the requirement that a state must "not reduce the amount of State financial support" rendered superfluous another statutory clause that allowed a waiver from this requirement).  *See also U.S. ex rel. Vaughn v. United Biologics, L.L.C.*, 907 F.3d 187 (5th Cir. 2018), where this Court construed a phrase in the False Claims Act providing that an action "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."  *Id.* at 195.  This Court held that the word "their" broke the connection between "written" as modifying "consent" and "reasons for consenting."  *Id.*  That construction made sense, because otherwise the phrase would read "give written consent to . . .  reasons for consenting," a nonsensical result.  *Id.*

.

Although amicus curiae Judicial Watch argues that limiting three-judge panels to constitutional challenges of apportionment may create the "anomalous" situation where a claim for intentional discrimination in violation of § 2 and the Fourteenth Amendment are adjudicated in different courts, Judicial Watch Br. at 7,[13] that rare anomaly pales next to the larger anomaly of why Congress would—without a scintilla of explanation—limit three-judge review of congressional apportionment to constitutional challenges, yet open the flood-gates of three-judge review to any challenge to state legislative apportionment.  This is particularly absurd because statutes dealing with three-judge panels should be strictly construed because of the burden placed on the court system.  *Allen v. State Bd. Of Elections*, 393 U.S. 544, 561 (1969) ("[c]onvening a three-judge court places a burden on our federal court system, and may often result in a delay in a matter needing swift initial adjudication.").

C.     The Legislative History Does Not Support Defendants' Construction.

Finally, even were it appropriate for this Court to consider the statute's legislative history, it provides no support for Defendants' construction.  The provision of the three-judge courts was enacted by Congress in 1910 for all cases challenging the constitutionality of state statutes in federal court. Act of June 18,

---

[13] Hereinafter, Judicial Watch's amicus curiae brief will be referred to as JW Br. at [].

1910, Pub. L. No. 61-218, 36 Stat. 557. In 1975, Congress decided to eliminate the requirement of three-judge courts except in specifically enumerated cases, in part to reduce court workload. Br. at 17; *see* S. Rep. 94-204 (1975), No. 204, 94th Cong., 2d Sess. 1976, *as reprinted in* 1976 U.S.C.C.A.N. 1988, WL 12516 (hereinafter, "Rep.").

Defendants cherry-pick two sentences from a fourteen-page Senate Committee report from 1975, where the Committee did not use the word "constitutionality" in describing the new statute. Br. at 15–16; *See* Rep. at 1, 9. Leaving aside the illogical result of Defendants' argument—that the word "constitutionality" has no application in the statute whatsoever—it is clear that the Committee was merely explaining why it was important to preserve three-judge courts in cases "involving congressional reapportionment or the reapportionment of a statewide legislative body," Rep. at 9, not explaining the precise sort of such cases that should be subject to three-judge review. That explanation was set forth in a different page of the Report, which stated explicitly that "[s]ubsection (a) would also continue the requirement for a three-judge court in cases challenging the constitutionality of any statute apportioning congressional districts or apportioning any statewide legislative body." Rep. at 12.

Congress had several opportunities to remove the word "constitutionality" from the statute in 1982, when it amended § 2, Act of June 29, 1982, Pub. L. No.

97-205, 96 Stat. 134, and, again in 1984, when it amended § 2284 a second time, Act of Nov. 9, 1984, Pub. L. No. 98-620, 98 Stat. 3335, well aware that courts had consistently adjudicated pure § 2 claims before a single judge. It did not do so. *See Chestnut v. Merrill*, 356 F. Supp. 3d 1351, 1356 (N.D. Ala. 2019) (relying on Congress's failure to amend in construing statute as limited to constitutional challenges).

## III. The District Court Did Not Abuse Its Discretion or Commit Clear Error in Rejecting Defendants' Laches Defense.

Defendants failed to meet their burden of proof as to their affirmative defense of laches by showing "(1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Save Our Wetlands, Inc. v. U.S. Army Corps of Eng'rs*, 549 F.2d 1021, 1026 (5th Cir. 1977). The district court, in finding that Defendants failed to meet their burden on showing inexcusable delay *and* undue prejudice, correctly exercised "considerable discretion in deciding whether to apply the doctrine of laches to claims pending before it." *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 707 (5th Cir. 1994).

### A. The District Court's Finding that There Was No Inexcusable Delay Is Not Clearly Erroneous.

The period for laches is triggered when the plaintiff knew or should have known of the defendant's injurious conduct. *Retractable Techs.*, 842 F.3d at 900.

27

"It is usually applied 'with reference to the limitations period for the analogous action at law,'" *id.* (quoting *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002)), "which may be state law if no federal limitations law exists," *id.* *Cf. Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 680 (2014) (acknowledging laches is "essentially gap-filling, not legislation-overriding," and noting that the Supreme Court has never applied laches to bar completely claims for discrete wrongs occurring within a federally prescribed limitations period).

Here, the district court used the general three-year "catch-all" limitations period of Mississippi Code § 15-1-49 as a reference point, without objection from Defendants. Plaintiffs' suit was filed within three years of the only time that the redistricting plan was used in an election. Had suit been filed before the 2015 election, Defendants would undoubtedly have argued that Plaintiffs' claim that African-American voters' candidates of choice could not prevail was speculative.[14]

Defendants argue that using the limitations period as a shield against the laches defense "defeats the entire purpose of the doctrine as suits could be deemed excusable even if filed on the day of an election deadline so long as within the prescriptive period." Br. at 23. This straw man can be toppled. It is not that filing within the prescriptive period is an absolute defense to laches, but rather that, in

---

[14] Elsewhere Defendants argue "evidence of one or two elections may not give a complete picture as to voting patterns within the district generally," Br. at 42 (quoting *Rangel v. Morales*, 8 F.3d 242, 246 (5th Cir. 1993)).

this case, its application did not amount to an abuse of discretion, given that the suit was filed more than a year before the primary and sixteen months before the general election. The district court did not abuse its discretion in concluding that (1) November 2015 was the triggering date for laches and (2) filing the complaint within the analogous statute of limitations period instructed favorably on the issue of the reasonableness of any delay. ROA.379.

B. The District Court Did Not Clearly Err in Finding an Absence of Undue Prejudice.

This Court "need not decide" whether Defendants proved an inexcusable delay, "because in any event the district court neither erred nor abused its discretion in concluding that [the defendants] suffered no undue prejudice." *Retractable Techs*., 842 F.3d at 900. Here, Defendants' broad claims of prejudice are two-fold: alleged prejudice flowing from the proximity of election deadlines to the date of the filing of the suit, Br. at 25–26, and alleged prejudice flowing from the upcoming census and redistricting cycle, Br. at 27 n.16. The district court did not abuse its discretion in rejecting these claims of prejudice.

1. The Length of Time Between the Filing of the Complaint and the Election Did Not Unduly Prejudice Defendants.

This case was filed nearly thirteen months prior to the primary election and sixteen months before the general election. No case, which has applied laches because of prejudice flowing from the proximity of an election, has done so based

29

on facts even remotely approaching those here.[15]  Indeed, one circuit court rejected

a laches defense to § 2 relief where the general election was closer in time than

here.  *Garza v. Cty. of Los Angeles*, 756 F. Supp. 1298, 1303 (C.D. Cal. 1990),

*aff'd in relevant part*, 918 F.2d 763, 772 (9th Cir. 1990) (trial concluded after the

primary and less than seven months before general election and relief ordered four

months before election).

Further, although Defendants complain of prejudice flowing from "a

compressed litigation schedule," Br. at 25 n.13, and their "inability to effectively

try this case because of plaintiffs' delay," Br. at 27, Defendants cite no case where

undue prejudice was based on such a theory.  If that is Defendants' theory, their

real argument is not laches, but that the trial court somehow abused its discretion in

ordering an expedited trial when it ruled that, "[t]his timeframe is more than

enough to litigate [Plaintiffs'] single-district, single-count claim," ROA.379.

Defendants have not pressed that claim on appeal because there is no basis in the

record for it, particularly given that the trial court's "judgment range" in making

---

[15] *See Lopez v. Hale Cty.*, 797 F. Supp. 547, 550–51 (N.D. Tex. 1992), *aff'd sub nom.* 506 U.S. 1042 (1993) (complaint filed months *after* qualifying deadline and weeks *after* primary); *White v. Daniel*, 909 F.2d 99, 102–04 (4th Cir. 1990) (complaint filed seventeen years *after* redistricting and months *after* last election held under plan); *Simkins v. Gressette*, 631 F.2d 287, 289 (4th Cir. 1980) (complaint filed sixteen days before opening of candidate qualifying period and forty days before primary); *Ariz. Minority Coal. for Redistricting v. Ariz. Indep. Redistricting Comm'n*, 366 F. Supp. 2d 887, 909 (D. Ariz. 2005) (complaint filed "just weeks before critical election deadlines"); *Mac Govern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986) (complaint filed twenty-six days before qualifying deadline, three months before primary, eight months before general elections and *after* new state census had begun).

scheduling decisions is "exceedingly wide." *HC Gun & Knife Shows, Inc. v. City of Houston*, 201 F.3d 544, 549 (5th Cir. 2000). Defendants have never demonstrated with any sort of specificity why they did not have sufficient time to defend the case, that with more time they would have presented additional evidence, or that any other district court ruling prevented them from presenting a complete defense. *See Thomas*, 919 F.3d at 316.[16] Moreover, they expressly withdrew their objection to the single, specific item of alleged prejudice they now assert.[17]

> ### 2. The Ability of Defendants to Complete the Appellate Process Does Not Constitute Prejudice for Purposes of Laches

Nor does Defendants' ability to complete the appellate process support their claim of undue prejudice—an argument never made by Defendants before the trial court and therefore waived. In any event, no case has held that a complaint is

---

[16] The complaint was filed in July 2018, and Plaintiffs filed a motion to expedite proceedings in August 2018. ROA.114–20. Discovery lasted through January 2019. ROA.201. Defendants had about two months before trial to review the report of Plaintiffs' principal expert Dr. Maxwell Palmer.

[17] This is the hyperbolic claim that Defendants were prejudiced by a clarification several days before trial concerning data in Dr. Palmer's previously produced report. Br. 27 n.16. The additional information simply clarified the specific data used for certain precincts, including his logical exclusion from the analysis of two Bolivar County precincts where most voters were given the wrong senate ballots. This was no surprise to Defendant Hosemann who had issued a press statement about the ballot mix-up when it happened. ROA.1088 n.12. During trial, Defendants never complained about the timing of this information, never asked for additional time for their expert to review this information, never made a record of how they were prejudiced by this information, and expressly withdrew any objection to the admission of this information. ROA.735–36.

untimely filed if the timing is such that the defendants may not get the benefit of a completed appellate review process prior to holding an election under a new plan. To the contrary, it is not uncommon for elections to proceed under court-ordered plans as appeals proceed. *See, e.g.*, *Wilson v. Minor*, 220 F.3d 1297, 1301 n.8 (11th Cir. 2000); *Seals v. Quarterly Cty. Court of Madison*, 562 F.2d 390, 392 (6th Cir. 1977).

Indeed, this is what stay procedure is all about. Here, Appellants had the opportunity to prove to this Court that it had a strong likelihood of success on the merits, meriting a stay of the court-ordered plan. It could not meet that standard, and its inability to do so does not amount to undue prejudice for purposes of laches.

3. The Trial Court Did Not Abuse Its Discretion in Ruling that Alleged Voter Confusion and the 2021 Redistricting Do Not Constitute Undue Prejudice

This suit challenged only one of fifty-two state senate districts, District 22, and only one election had ever been held there under the challenged plan. There were a grand total of eight precincts in two counties that were redistricted. The same nine-year old data underlying the challenged plan and the legislature's remedial plan. Under these circumstances, there is no credence to Defendants' claim of undue prejudice flowing from the injection of needless uncertainty into the November 2019 election, because voters and candidates found themselves in

new districts, Br. at 25, or that the legislature was forced to draw its plan based on nine-year old Census data only one year before the 2020 Census. Br. at 24, 27.

That voters find themselves in new districts happens in virtually every successful redistricting case, so that cannot constitute prejudice. The very limited changes (eight precincts and two districts),[18] and only having a single election under the prior plan serve to distinguish this case from the primary authority relied upon by Defendants. In *Chestnut v. Merrill*, 377 F. Supp. 3d 1308, 1315 (N.D. Ala. 2019), four elections had already taken place before plaintiffs asked the court to redraw a majority of the congressional districts in Alabama. In *Maxwell v. Foster*, 1999 WL 33507675, at *4, three elections had been held under the old plan, and four elections were held in *Fouts v. Harris*, 88 F. Supp. 2d 1351 (S.D. Fla. 1999), which was the basis for that court's conclusion that "voters have come to know their districts and candidates," *id.* at 1354.

Nowhere in the record is there any evidence of voter confusion. The district court and this Court extended the deadline for qualifying candidates a combined

---

[18] Most of the cases relied upon by Defendants or Judge Willett in his dissent challenged statewide apportionment or called for a remedy that would affect many, if not all, of the legislative districts in the state. *See, e.g., Md. Citizens for a Representative Gen. Assembly v. Governor of Md.*, 429 F.2d 606, 608 (4th Cir. 1970) (challenge to statewide apportionment); *Simkins*, 631 F.2d at 287 (4th Cir. 1980) (same); *Ariz. Minority Coal.*, 366 F. Supp. 2d at 887 (same); *Mac Govern*, 637 F. Supp. at 111 (same); *Maxwell v. Foster*, 1999 WL 33507675, at *4 (W.D. La. Nov. 24. 1999) (remedy implicated statewide redistricting).

total of six weeks, and candidates from both parties easily qualified in both District 13 and District 22.[19]

Indeed, the arguments of voter confusion and duplicate redistricting underscore why this appeal is moot. At this stage, with an election already having been held under the new plan, there is no relief that this Court could grant that could reduce any alleged voter confusion. Nor is there any relief that would reduce the number of redistrictings. Whether the case had been filed in 2012 or 2016 or 2018, the legislature would have been required to redraw the district twice—first to remedy the dilution and second after the 2020 Census (prior to the 2023 elections). There is no prejudice stemming from the fact that the remedial plan was adopted in early 2019 as opposed to 2018 or 2017 or 2012.

That the remedial plan is drawn using Census data toward the end of the Census cycle does not demonstrate prejudice. The same data would have served as the basis for District 22 for the 2019 election whether or not Plaintiffs prevailed. "The true comparison is between out-of-date districts that . . . dilute the black vote,

---

[19] The cases relied upon by amici curiae Texas and Louisiana for the same proposition as in *Fouts*, are no more helpful to Defendants' position. In *Dickinson*, 933 F.2d at 500 and *Sanders v. Dooly Cty.*, 245 F.3d 1289, 1291 (11th Cir. 2001), the courts simply found no abuse of discretion in the district court's having dismissed claims for injunctive relief under § 2 of the VRA as barred by laches. It is one thing to hold that it is *not* an abuse of discretion to apply laches on this basis, and quite another to hold that *is* an abuse of discretion *not* to apply laches on this basis. Further, in *Dickinson*, the complaint was filed only eight months before the last general election under the plan, while the 1990 census was underway. 933 F.2d at 498. The *Sanders* opinion provides no information as to whether any elections were scheduled after the filing of the complaint in November 1998. 245 F.3d at 1290.

and out-of-date districts that do not." *Jeffers v. Clinton*, 730 F. Supp. 196, 203

(E.D. Ark. 1989), *aff'd sub nom.* 498 U.S. 1019 (1991). In rejecting a laches

defense to a § 2 challenge to Arkansas's 1981 redistricting plan, the *Jeffers* court

noted that "the expense, trouble, and disruption of compliance" in increasing the

number of black-majority districts "would have occurred whenever the suit was

filed." *Id.* at 202–03.

Nor did prejudice flow from the legislature's decision to construct a

remedial plan on relatively short order, as argued by Defendants—again, for the

first time on appeal—and posited by Judge Willett, relying on *Reynolds v. Sims*,

377 U.S. 533 (1964), and *Purcell v. Gonzalez*, 549 U.S. 1 (2006). *See* Br. at 23

n.11; *Thomas v. Bryant*, 938 F.3d 134, 176 n.67 (5th Cir. 2019) (Willett, J.,

dissenting). Neither *Reynolds* nor *Purcell* is a laches case, and neither advances

Defendants' cause.

In *Reynolds*, the Court gave its imprimatur to a district court order issued on

July 25, 1962, that changed statewide district lines for the November 1962

election, a far more drastic remedy issued with considerably less notice than the

district court's order here, and which the *Reynolds* Court described as "an

appropriate and well-considered exercise of judicial power." 377 U.S. at 586–87.

In *Purcell*, the Court ruled that October relief regarding the November

implementation of a voter identification law's application to every precinct in the

state would cause disruption, a far cry from the over six-month gap between the ordered relief and the election in this case.  549 U.S. at 2.[20]

Here, the legislature had over seven weeks left in its regular session when the district court first said it would give the legislature the first opportunity to redraw District 22. ROA.355.  As Defendants began a series of unsuccessful appellate moves, the district court granted Plaintiffs' motion—over Defendants' objection—to extend the qualifying deadline for two weeks, ROA.473, a deadline ultimately extended by this Court for another month. ROA.558.[21]  Obviously, the legislature believed it had adequate time to enact a remedial plan because it

---

[20] Other cases cited by Judge Willett had similarly shorter periods between the date of the order of relief and the election date.  *Husted v. Ohio State Conf. of N.A.A.C.P.*, 573 U.S. 988, 988 (2014) (mem.) (preliminary injunction issued September 4 for November election); *North Carolina v. League of Women Voters of N.C.*, 135 S. Ct. 6, 6 (2014) (mem.) (preliminary injunction issued October 3 for November election).  Judge Willett cited *Veasey v. Perry*, 769 F.3d 890 (5th Cir. 2014), where this Court stayed an order that would have blocked implementation of Texas's voter identification law in every precinct in the state just twenty-four days before the election, a far cry from the facts in this case where the order was issued six months before the election and affected only two districts.  *Id.* at 892.  A more apt decision from the *Veasey* litigation is this Court's later en banc opinion issued less than four months before the election, which upheld the § 2 "results" ruling and directed the district court to formulate an interim remedial order to cure the adjudicated discriminatory effect for the upcoming November election, because "[i]t would be untenable to permit a law with a discriminatory effect to remain in operation for that election."  *Veasey v. Abbott*, 830 F.3d 216, 270 (5th Cir. 2016) (en banc).

[21] In light of (1) Defendants' objection to extending the qualifying deadline and (2) the denial of that objection resulting in a six-week extension, Defendants' argument that the qualifying period is relevant to their alleged prejudice, Br. at 28, should be disregarded.  Further, *N.A.A.C.P. v. Hampton Cty. Election Comm'n*, 470 U.S. 166, 177 (1985), which Defendants cite for the proposition that qualifying deadlines "cannot be considered in isolation from the election of which [they] form[] a part," Br. at 28, involved the issue of whether a qualifying deadline was a change in election practices subject to preclearance under § 5 of the VRA.  It has nothing to do with laches.

repeatedly refused to even start on the process until Defendants' several stay opportunities were exhausted. And then it was able to do so without the need to call a special session, with days to spare in its regular session. Neither party has objected to that plan. Nor has the legislature, which had ample opportunity to advise the district court and this Court of any difficulties in enacting its simple remedial plan. There was no prejudice.

## IV. A Bare Majority-Minority District May Prevail on a § 2 Vote Dilution Claim Without Pleading or Proving "Cracking or Packing."

Defendants claim variously that a plaintiff is prohibited from asserting a § 2 vote dilution claim in a majority-minority district, and buoyed by Judge Willett's dissent to the merits panel's decision, cannot bring such a claim without asserting a claim of "cracking" or "packing." Defendants are wrong on both counts.

### A. No Per Se Rule Prohibits § 2 Claims in Bare Majority-Minority Districts.

The Supreme Court has recognized that "it may be possible for a citizen voting-age majority to lack real electoral opportunity." *LULAC v. Perry,* 548 U.S. 399, 428 (2006).[22] This Court stated that "[u]nimpeachable authority from our circuit has rejected any per se rule that a racial minority that is a majority in a

---

[22] Defendants attempt to portray *LULAC v. Perry* as standing for the proposition that bare majority-minorities cannot bring § 2 vote dilution suits unless their lack of real electoral opportunity is caused by lack of citizenship. Br. at 32. Neither *LULAC v. Perry* nor any other court has imposed such a requirement.

37

political subdivision cannot experience vote dilution." *Monroe v. City of Woodville*, 881 F.2d 1327, 1333 (5th Cir. 1989); *accord Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1547 (5th Cir. 1992).[23]  The dissenters from the motions panel and the merits panel in this case acknowledged this law.[24]  Decisions from other circuits have reached the same conclusion. *Mo. State Conf. of the N.A.A.C.P. v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 934 (8th Cir. 2018); *Pope v. Cty. of Albany*, 687 F.3d 565, 575 n.8 (2d Cir. 2012); *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041 (D.C. Cir. 2003); *Meek v. Metro Dade Cty.*, 908 F.2d 1540, 1546 (11th Cir. 1990).

Contrary to Defendants' bald assertion, Br. at 29–30, courts have found § 2 violations brought by bare majority-minorities.  In *Ferguson-Florissant,* the Eighth Circuit affirmed the lower court's holding that, even if the population of the challenged district was majority-minority, the district's election system still violated § 2, noting that "minority voters do not lose VRA protection simply because they represent a bare numerical majority within the district."  894 F.3d at

---

[23] Defendants attempt to distinguish *Monroe* on the basis that "no lack of equal opportunity was actually proven" in that case.  Br. at 31.  But that merely means that the plaintiffs in *Monroe* were unable to prove their case—independent of any majority-minority issue. It has nothing to do with the issue at hand in this case.

[24] "It may be possible for a state to violate § 2 even when a protected group forms a majority of the voting population."  *Thomas*, 919 F.3d at 319 (Clement, J., dissenting).  "Our precedent . . . suggests that members of a registered voter majority class are not barred, as a matter of law, from bringing a vote-dilution claim." *Thomas*, 938 F.3d at 180 (Willett, J., dissenting) (internal quotations omitted).

934; *see also Perez v. Abbott*, 253 F. Supp. 3d 864, 879–80 (W.D. Tex. 2017) (finding that the 2011 version of Texas Congressional District 23 violated § 2 in both intent and effect despite having a Hispanic citizen voting-age majority of 58.5%).

This principle extends to at-large systems and single-member districts alike. *LULAC*, *Kingman*, and *Pope* all involved challenges to single-member districts.[25] With respect to a proposed county supervisors districting plan in which all five districts were majority African-American in total population—but where "blacks would have exceedingly slim [voter-registration] majorities in some of these districts and minorities in others"—this Court held that "[t]he mere existence of a black population majority does not preclude a finding of dilution." *Moore v. Leflore Cty. Bd. of Election Comm'rs*, 502 F.2d 621, 624 (5th Cir. 1974).

*Bartlett v. Strickland*, 556 U.S. 1 (2009), which Defendants cite, Br. at 31,involves a fundamentally different issue. There, the plaintiffs attempted to meet the first *Gingles* precondition by creating an illustrative district where African-American voters made up less than 50%, but could, along with white crossover voters, elect representatives of their choice. *Id.* at 13. The Supreme Court rejected the claim, explaining that minority voters must possess the "potential" to elect

---

[25] The Supreme Court has held that the *Gingles* framework is applicable to vote dilution challenges to single-member districts. *Growe v. Emison*, 507 U.S. 25, 40–41 (1991).

representatives of their choice, by themselves, not because of crossover white votes and that "[n]othing in § 2 grants special protection to a minority group's right to form political coalitions." *Id.* at 15. Nowhere did the Court hold, as Defendants incorrectly argue, that if the district being challenged was already majority-minority, then a § 2 violation is precluded.

Indeed, *Bartlett* serves to answer another criticism leveled by Defendants and the dissent to the merits panel, that permitting this action promotes a remedy akin to "something close to recurring success," or a "guaranteed victory." *Thomas*, 938 F.3d at 183–84 (Willett, J., dissenting); *see also* Br. at 36. Respectfully, the dissent is wrong and ignores ample and unbroken precedent that holds the appropriate remedy for an unlawful vote dilution is one that gives the minority population a "realistic" or "reasonable" opportunity to elect candidates of their choice, a remedy not wed to a simple majority of the VAP.

In *Bartlett*, the Court defined a majority-minority district for purposes of vote dilution as one where the minority group composes both a "numerical" and a "working" majority of the VAP. 556 U.S. at 13. This Court has steadfastly implemented that definition: "We have consistently recognized that access to the political process and not population is the barometer of dilution of minority voting strength." *Bradas v. Rapides Parish Police Jury*, 508 F.2d 1109, 1112 (5th Cir. 1975) (internal quotations omitted).

Were suits like the instant case not allowed, jurisdictions with a history of discrimination and lower minority voter turnout could evade § 2 by drawing districts that are barely majority-minority, with near certainty that the continuing effects of past discrimination will allow white voters, voting as a bloc, to continue to block the minority population's opportunity from electing candidates of their choice. Thus, in *Moore*, 502 F.2d at 622–23 (5th Cir. 1974), this Court scrutinized proposed plans submitted to cure a malapportioned plan. It rejected a plan because, "by retaining the barest of black population majorities, it enhanced the possibility of continued black political impotence." *Id.* at 624. It approved a plan that contained 55% or higher BVAP in four of the five districts, explaining that "Black voters are therefore far more likely to be able to exercise their franchise in a full and meaningful way." *Id.* at 625.

In *Kirksey v. Bd. of Supervisors of Hinds Cty.*, 554 F.2d 139 (5th Cir. 1977) (en banc), this Court reversed a district court's remedial plan because the district court had relied only on VAP and had not adequately assessed whether black voters "have a realistic opportunity to elect representatives of their choice." *Id.* at 150. This Court held that the same criteria applied when the district court was formulating a plan on non-constitutional grounds. *Id.* at 151.

And in *Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir. 1984), relying on this Court's precedent, the court reversed the district court's acceptance of a

redistricting plan as a remedy for a § 2 violation, because the district court had found that a simple VAP majority was "the only criterion to be used in determining whether a particular minority has a reasonable opportunity to elect a candidate of its choice." *Id.* at 1402. The court explained:

> [M]inorities must have something more than a mere majority even of voting age population in order to have a reasonable opportunity to elect a representative of their choice. There is simply no point in providing minorities with a 'remedy' for the illegal deprivation of their representational rights in a form which will not in fact provide them with a realistic opportunity to elect a representative of their choice.

*Id.* at 1413.

In the present case, District 22, under the prior plan used in the 2003, 2007, and 2011 elections, was 49.82% African-American according to the 2010 Census. ROA.993. Each time the African-American preferred candidates were defeated by white bloc voting. ROA.362–63. With the 2012 plan, the legislature increased the BVAP by one percentage point from 49.82% to 50.77% and called the district a majority-minority district. ROA.993–94. But as the 2015 election and Dr. Palmer's turnout analysis demonstrated, this was not a "working" majority, because the addition of that percentage point did not interrupt the pattern and again African-American voters' candidate of choice was defeated by white bloc voting. ROA.363; ROA.1069. Racial vote dilution continued to infect District 22. And the district court's providing a remedy that allowed for more than just 50% was not

42

a "guarantee" of success, but rather a cure for past discrimination. Indeed, were more evidence needed, the Court need only look to the November 2019 election results, where the African-American candidate in District 22 managed to squeak by to victory with a hair over 52% of the vote in the redrawn district, hardly reflecting a "guarantee" of success.[26]

B.    Plaintiffs Need Not Prove "Packing" or "Cracking" to Sustain a § 2 Vote Dilution "Results" Claim.

Apparently aware that the law is overwhelmingly against their per se prohibition against majority-minority § 2 claims, Defendants resort to an argument made for the first time on appeal, that for a majority-minority § 2 claim to succeed, it must be based on allegations and proof of "cracking" or "packing." Br. at 35 n.23; *see also Thomas*, 938 F.3d at 176 (Willett, J., dissenting). No court has ever suggested that there is any such requirement, and precedent argues strongly against this Court's adopting it.

First, Defendants' argument is contrary to controlling VRA jurisprudence, which holds that to prove a § 2 vote dilution claim, plaintiffs must only (1) satisfy the *Gingles* preconditions, and (2) then show that based on the "totality of circumstances," typically informed by the Senate factors, the challenged district

---

[26] Defendants' reliance on *Miller v. Johnson*, 515 U.S. 900, 902 (1995), for the proposition that the district court "implied a right to succeed wherever mathematically and geographically possible," Br. at 51, is inapposite for the same reasons. In *Miller*, the Court found that the jurisdiction did not need to create the challenged districts to avoid violating the VRA, whereas, here, the lines drawn are to remedy a VRA violation.

lines result in plaintiffs' having "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Clark v. Calhoun Cty.*, 21 F.3d 92, 94 (5th Cir. 1994). "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Id.* at 97 (internal quotations omitted). This authority is incompatible with a requirement that Plaintiffs must prove "packing" or "cracking" to succeed on their vote dilution "results" claim.

Second, allegations of "cracking" and "packing" are typically made expressly, in intentional vote dilution claims or in racial gerrymandering cases, where evidence of intent, i.e., that "racial considerations predominated," is required. *See Cooper v. Harris*, 137 S. Ct. 1455, 1482 (2017); *Perez*, 253 F. Supp. 3d at 939. This is not to say that "cracking" and "packing" and other forms of "boundary manipulation" are not often part of § 2 "results" claims. There is just no requirement to plead or prove them as such, because intent is not an element of a § 2 "results" claim. *Gingles*, 478 U.S. at 35.

Viewed in this light, Defendants' argument is a not-so-veiled attempt to reinstate an intent requirement into § 2, contrary to the express purpose of the 1982 amendments to the VRA. *Id.* For example, in *LULAC v. Perry*, the Court found a § 2 "results" violation without express proof of "cracking" or "packing." *See*

*generally* 548 U.S. at 399–447. In *Ketchum, supra* pp. 47–48, the Seventh Circuit

upheld a finding of a § 2 vote dilution "results' violation, even though the district

court had rejected claims of "dilution of minority voting strength through packing

and fracturing of minority communities." 740 F.2d at 1406. The court explained

that, in amending the VRA, Congress eliminated the "elusive and perhaps

meaningless issue" of governmental 'purpose' from the calculus of vote dilution

claims . . . . There appears to be no difference in the practical result or in the

available remedy regardless of how the resulting discrimination is characterized."

*Id.* at 1409–10. [27]

## V.   The District Court Did Not Commit Legal or Clear Factual Error in Its Rulings that Plaintiffs Had Satisfied the *Gingles* Preconditions and Had Proved Their § 2 Vote Dilution Claim Based on the Totality of the Circumstances.

While couched as legal error, the bulk of Defendants' challenges to the

district court's findings as to the *Gingles* preconditions and totality of the

circumstances are factual, and must be rejected under Rule 52.

---

[27] Even were there a requirement of pleading and proving "cracking" or "packing" here, the amended complaint described the action as one challenging "the boundary lines" of District 22 "which dilute African American voting strength." ROA.65. The claim was the functional equivalent of a boundary manipulation or cracking claim, and no more was needed. In this regard, we note Defendants have mischaracterized Plaintiffs' closing argument, implying that counsel admitted that this was not a "cracking" case. Br. at 34–35. The excerpt quoted by Defendants was of Plaintiffs' counsel explaining that *Defendants'* expert had wrongly accused Plaintiffs of "packing and cracking" the African-American population in their illustrative plans. ROA.997–98.

A.    Plaintiffs Proved the *Gingles* Factors.

First, Defendants state that "because SD 22 already contains a majority-minority VAP, plaintiffs cannot meet the first *Gingles* precondition and their claim must be dismissed."  Br. at 38. That is another way of arguing that no claim can be brought against bare majority-minority districts, an argument addressed in the prior section.  Further, as the district court noted, Defendants did not contest the evidence on the first *Gingles* precondition at trial, ROA.379, and cannot do so now.

Second, Defendants contend that "plaintiffs attempted to satisfy the second and third *Gingles* preconditions without a single election for senator that has ever been properly conducted in District 22" and that Plaintiffs were therefore unable "to prove that whites have ever actually defeated 'the minority's preferred candidate' for senator in District 22."  Br. at 38.  The district court found that Plaintiffs satisfied the second and third *Gingles* preconditions, relying on Dr. Palmer's unrebutted analysis which showed that African-American voters in the 2003, 2007, and 2015 endogenous and exogenous elections were politically cohesive and their preferred candidates of choice were defeated every time. ROA.363.[28]

---

[28] Defendants do not even attempt to rely on their own proofs in support of this argument, including the testimony of their expert Peter Morrison, who did not contest that Plaintiffs

Defendants' reference to Dr. Palmer's having not considered any "properly conducted" state senate elections, Br. at 40, refers to the election error in Bolivar County in 2015 when most voters in two District 22 precincts were given ballots that did not include the District 22 election. *See* ROA.1088. Dr. Palmer explained to the trial court's satisfaction the effect of his excluding the two precincts from his analysis. ROA.780–81. He based his conclusion on his analysis of the other approximately 50 precincts in District 22 where voters received the proper ballots. *See* ROA.1085–89.[29] The district court specifically noted that Defendants "presented no evidence indicating that Dr. Palmer's approach was in error or would cast any shadow on his conclusions." ROA.382. The district court's weighing of the evidence, and in particular, its ability to judge the credibility of the live testimony of the experts, is decisive under Rule 52, and cannot be disturbed on appeal.

B.   <u>Plaintiffs Were Not Required to Prove a Causal Connection Between Discrimination and Depressed Political Participation.</u>

Defendants allege that the district court improperly failed to connect past

---

satisfied the second *Gingles* precondition or that voting is racially polarized, the soundness of Dr. Palmer's analysis, his use of ecological inference analysis, or his reported results. The district court found that Dr. Morrison's "methods were unreliable and led him to incorrect facts." ROA.380.

[29] No court has held that an expert must undertake a "reconstituted election analysis" as Defendants would have this Court believe. *See* Br. at 40.

discrimination to present depressed voter participation.[30]  Defendants allege that

failure to connect past discrimination to present effects renders § 2

unconstitutional. Br. at 50.  However, this same argument has been soundly

rejected by this Court en banc:

> Unlike discrimination claims brought pursuant to the Fourteenth
> Amendment, Congress has clarified that violations of Section 2(a) can
> 'be proved by showing discriminatory effect alone,' *Thornburg v.*
> *Gingles*, 478 U.S. 30, 35 [] (1986); *see also* 52 U.S.C., § 10301(b). In
> proscribing laws that have a discriminatory effect, Congress exercised
> its authority pursuant to the Fifteenth Amendment, which states that
> '[t]he right of citizens of the United States to vote shall not be denied
> or abridged by the United Sates or by any state on account of race,
> color, or previous condition of servitude,' and gives Congress the
> 'power to enforce this article by appropriate legislation.' U.S. Const.
> amend. XV.

*Veasey v. Abbott*, 830 F.3d at 256 (footnotes omitted).

Next, Defendants argue that excusing Plaintiffs from proving a causal nexus

between disparate socio-economic status and depressed political participation fails

to meet the "on account of race" standard.  Br. at 49–50.  However, that is not the

law.  Vote dilution "results" claims brought under § 2 are based on the interaction

of past and current discrimination against the minority within districting schemes,

not proof of a causal connection.  *Gingles*, 478 U.S. at 64–65.  The Senate

Committee Report issued in connection with the 1982 amendments to § 2 of the

---

[30] This issue is raised both as a constitutional challenge to § 2, Br. at 49–52, and as a legal and
factual challenge to the district court's conclusion, Br. at 37–42.  Plaintiffs address them
together.

VRA made this abundantly clear:

> The courts have recognized that disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown, and where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.

S. Rep. No. 417, 97th Cong., 2d Sess. 29 n.114, *as reprinted in* 1982 U.S.C.C.A.N. 177, 207 n.114. Thus, this Court has expressly held: "Plaintiffs are not required to prove a causal connection between [socio-economic discrimination] factors and a depressed level of political participation." *Teague v. Attala Cty.*, 92 F.2d 283, 294 (5th Cir. 1996).

Nor is it essential in every § 2 "results" case for plaintiffs to prove depressed voter turnout. The absence of proof on certain Senate factors does not usually override proof of the *Gingles* factors. *Clark,* 88 F.3d at 1396. In *Clark,* this Court held that a § 2 violation had been demonstrated even though there was no proof of depressed African-American political participation. *Id.* at 1396, 1399.

Here, the evidence of historic socio-economic discrimination against African-Americans in Mississippi is undisputed. And the evidence that African-American political participation was depressed in District 22 is substantial. The district court's opinion summarized Dr. Palmer's conclusions: "[T]here is a sizable turnout gap between African-American and white voters in District 22. On

average, white turnout is 10.2 percentage points higher than black turnout."
ROA.363. Moreover, Plaintiffs went beyond the requirements of the law and were
able to show a causal nexus between the disparate socioeconomic circumstances of
African-Americans in District 22 and their depressed level of political
participation. Specifically, Plaintiff Lawson testified that in the Delta, many
African-American voters are uneducated, reside in the rural areas, and have no
transportation to travel to the polls. ROA.359; ROA.825–26.

Defendants claim the court should have disregarded this evidence and relied
on self-reporting *statewide* census surveys showing that African-American voter
registration and turnout equals or exceeds that of whites. Br. at 39, 44. But after
hearing the expert testimony the district court found that Defendants' expert's data
"look[ed] at the wrong jurisdiction [statewide rather than District 22], the wrong
election years, and rel[ied] upon known issues with self-reported voting surveys—
issues that [ecological inference], in contrast, seeks to overcome." ROA.384;
ROA.960–62. This conclusion is entitled to deference under Rule 52.[31]

Once again, Defendants try to make hay out of the 2015 election where
voters in two precincts where voters had received the wrong ballots. However, as

---

[31] Contrary to Defendants' suggestion that there was no evidence of problems with the Census
Bureau's self-reported figures, Br. at 39–40, Dr. Palmer testified about all of these problems,
including the unreliability of self-reporting estimates. ROA.764–65. Similarly, the statewide
numbers cited by Defendants in *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 368 (5th Cir. 2001), not
only fail to undermine Dr. Palmer's analysis, but are inadmissible hearsay.

found by the district court, Defendants' expert never testified the inclusion of publicly available figures would have changed the turnout figures throughout the district. Defendants' contention on appeal rests solely on their attorneys' statement that the court could take "judicial notice that Cleveland is the location of Delta State University, a predominantly white institution," Br. at 41, and had Dr. Palmer included the wrong-ballot precincts, "the level of estimated white participation throughout SD 22 would necessarily have fallen," *id.* (emphasis added). Attorneys' arguments cannot substitute for expert witness testimony. *See also* ROA.960–62; ROA.382. Moreover, that a pocket of mostly white college students in one precinct might not vote because they are registered elsewhere—and ineligible to vote in District 22—does not demonstrate that African-American turnout equals white turnout among eligible voters through the entire district. The district court's findings cannot be disturbed under Rule 52.

### C.     The District Court Did Not Err in Its Treatment of Proportionality.

Finally, amicus curiae Judicial Watch argues that the district court erred as a matter of law in giving too much weight to whether the number of African-Americans in the Mississippi legislature was proportional to their voting population. JW Br. at 8; *see also Thomas*, 938 F.3d at 180, 183–85 (Willett, J., dissenting). This issue has been waived by Defendants because they never raised it. In any event, § 2(b) expressly provides that "one circumstance" which may be

considered in determining whether § 2(a) has been violated is the "extent to which members of a protected class have been elected to office in the State or subdivision."

Here, the district court followed the statute precisely. It noted that nothing in § 2 establishes a "right to have members of a protected class elected in numbers equal to their proportion in the population," but simply noted, as one factor in its analysis of the totality of the circumstances (specifically Senate factor seven) that the gap between population and elected officials, when viewed in the context of Senate factor seven, "suggests that the Mississippi Senate does not provide political effectiveness in proportion to minority voting-age numbers." ROA.386.

## VI. The District Court's Remedial Order of a New Plan Is Moot and the Legislative Plan Is Not Unconstitutional.

Defendants argue that, because voters were assigned to the new district on the basis of race, the district court's remedy was unconstitutional. Br. at 43–44. They take this argument a giant step further, and argue that § 2 is itself unconstitutional and that the Court should apply the doctrine of constitutional avoidance by reversing the finding of § 2 liability. *Id.*

But Defendants concede that the district court's remedy is not subject to this appeal, because it was not and will not be used in any election. Br. at 2 n. 1. Thus, Defendants' entire "constitutional avoidance" argument should be ignored.

Even were this Court to consider Defendants' "constitutional avoidance" argument, it can be given short shrift. Justice Alito, writing for the Court, recently explained why consideration of race in § 2 remedies is constitutional:

> At the same time that the Equal Protection Clause restricts the consideration of race in the districting process, compliance with the Voting Rights Act . . . pulls in the opposite direction: It often insists that districts be created precisely because of race . . . . In an effort to harmonize these conflicting demands, we have assumed that compliance with the VRA may justify the consideration of race in a way that would not otherwise be allowed.

*Abbott v. Perez*, 138 S. Ct. 2305, 2314–15 (2018) (internal quotations omitted).

Next, Defendants argue that because the Supreme Court found the coverage formula in § 4 of the VRA unconstitutional in *Shelby Cty. v. Holder*, 570 U.S. 529, 538–39 (2013), thus rendering § 5 inoperable, based in part on information concerning African-American voter registration rates, "it is hard to imagine how the continued imposition of the extraordinary remedy of § 2 can be constitutionally justified." Br. at 48. It is not that hard. Section 5 of the VRA imposed requirements on certain covered jurisdictions to obtain federal approval before implementing changes in voting practices and procedures. The Supreme Court's decision in *Shelby County* was based on the unique elements of that law, including that it treated states differently, but that federalism issue is not applicable to § 2. Indeed, the Supreme Court expressly stated in *Shelby County*: "Our decision in no way affects the permanent, nationwide ban on racial discrimination in voting found

in § 2." 570 U.S. at 575.

This Court has, repeatedly and recently, upheld the constitutionality of § 2 more than once. *See Veasey*, 830 F.3d at 252 (en banc); *Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir. 1984).[32] There is no basis in the record for this Court to jettison the protections of § 2 based solely on Defendants' say-so.

## CONCLUSION

For the reasons set forth above, and in Plaintiffs' brief filed before the merits panel, this Court should declare this case moot, and decline to assert jurisdiction over it, or in the alternative should affirm the district court's judgment.

November 22, 2019                                    Respectfully submitted

*/s/ Jon Greenbaum*
JON GREENBAUM
EZRA D. ROSENBERG
ARUSHA GORDON
POOJA CHAUDHURI
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Ste. 900
Washington, D.C. 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org

---

[32] Defendants try vainly to distinguish *Veasey* because it was not a redistricting case, and then try, with equal failure, to distinguish *Jones* (which was a redistricting case) because it dealt with at-large districts and not single-member districts, as if the difference between the two has anything to do with whether "the full exercise of the franchise by American minorities still suffered from the effects of electoral systems that hinder minority input into the nation's decision-making." *Jones*, 727 F.2d at 374.

ROBERT B. MCDUFF, MSB 2532
767 North Congress Street
Jackson, MS 39202
(601) 969-0802
rbm@mcdufflaw.com

BETH L. ORLANSKY, MSB 3938
MISSISSIPPI CENTER FOR JUSTICE
P.O. Box 1023
Jackson, MS 39205-1023
(601) 352-2269
borlansky@mscenterforjustice.org

ELLIS TURNAGE, MSB 8131
TURNAGE LAW OFFICE
108 N. Pearman Ave.
Cleveland, MS 38732
(662) 843-2811
eturnage@etlawms.com

PETER KRAUS
CHARLES SIEGEL
CAITLYN SILHAN
WATERS KRAUS
3141 Hood Street, Suite 700
Dallas, TX 75219
(214) 357-6244
pkraus@waterskraus.com
csiegel@waterskraus.com
csilhan@waterskraus.com

*Attorneys for Respondents-Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Jon Greenbaum, hereby certify that I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system and that I have served the

District Court by email as follows:

> District Judge Carlton Reeves
> United Stated District Court
> Southern District of Mississippi, Northern Division
> 501 East Court Street, Ste. 5.500
> Jackson, MS 39201
> Reeves_chambers@mssd.uscourts.gov

I have also served all counsel of record by email:
Benjamin McRae Watson ben.watson@butlersnow.com
Brian Parker Berry parker.berry@butlersnow.com
Charles E. Cowan cec@wisecarter.com
Charles E. Griffin charles.griffin@butlersnow.com
Douglas T. Miracle dmira@ago.state.ms.us
Michael B. Wallace mkp@wisecarter.com
Tommie S. Cardin tommie.cardin@butlersnow.com
Russell T. Nobile trn@wisecarter.com

> */s/Jon Greenbaum*
> **JON GREENBAUM**
> November 22, 2019

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2, this document contains 12,983 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word, Version 2013, in 14-point Times New Roman font and 12-point Times New Roman font for footnotes.

This, the 22nd day of November, 2019.


_s/Jon Greenbaum_
JON GREENBAUM